**MAY 1, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

 

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

**RECEIVED**

| | |
|---|---|
| United States of America ex rel. | MAR 1 0 2008 |
| MICHAEL THRELKELD K-66117 | Mar 10, 2008 MB |
| PETITIONER | MICHAEL W. DOBBINS |
| | CLERK, U.S. DISTRICT COURT |
| vs. | CASE NO :_____ |
| STATEVILLE CORRECTIONAL CENTER Warden Terry McCann | Case Number of State Court Conviction : No. 00CR 4537 |
| ATTORNEY GENERAL OF THE STATE OF ILLINOIS LISA MADIGAN | Honorable James B. Linn Presiding Judge. |

PETITION FOR WRIT OF HABEAS CORPUS

1.)
The petitioner was convicted in the County of Cook, Circuit Court, 2650 S. California, Chicago Illinois, 60608.

2.)
The petitioner was convicted on March 14, 2001.

3.)
The petitioner was convicted of two counts of first degree murder. One count of murder/intent to kill/injure, and count two of murder/strong prob kill/injure.

4.)
The petitioner was sentence to a term of 35 years on May 15, 2001.

5.) The petitioner pleaed to a plea of not guilty.

08CV1479
JUDGE HIBBLER
MAGISTRATE JUDGE NOLAN

PART 1#-TRIAL AND DIRECT REVIEW

1.)
   Kind of trial : The petitioner herein had a bench trial.

2.)
   Did you testify at trial? : "Yes", the petitioner testified.

3.)
   Did you appeal from the conviction or the sentence imposed? :
   "Yes", the petitioner appealed from the conviction.

(A) If you appealed, give the

1.)
   Name of Court : THE APPELLATE COURT OF ILLINOIS, FIRST DISTRICT.

2.)
   Result : The Appellate Court Judges Garcia J, with Cahill and
            Burke JJ all concurred in affirming the petitioner's
            appeal.

3.)
   Date of ruling : On September 7, 2004, the First District enter-
                    ed it's Order affirming the trial Court's con-
                    viction of the petitioner.

4.)
   Issues raised : Issue 1# : The trial Court abused it's discret-
                   ion in admitting the evidence of the defendent's
                   prior bad acts and the error substantially pre-
                   judiced the defendants right to a fair trial.
   (A) The defendant's prior bad acts are not probative of his in-
   tent or motive to commit the charged offense. (B) The prejud-
   icial effect of the other crimes evidense substantially out-
   weighed any probative value. (C) The introduction of the prior
   bad acts substantially prejudiced the defendants right to a fair
   trial. Issue 2# : The evidence in the record does not support

a conviction of first degree murder. Issue 3# : The failure of the defen-
dants trial attorney to call Nikki Wittingham as a witness constituted
ineffective assistance of counsel.

4.)

Did you appeal, or seek leave to appeal, to the highest State Court?

: "Yes", the petitioner appealed to the Illinois Supreme Court.

(A)

If yes, give the

1.)

Result :  The petitioner's P.L.A. was denied.

2.)

Date of ruling :  Jan 26 of 2005.

3.)

Issues raised :  The defendant's right to a fair trial under Illinois
                    law and Due Process Clause of the Fourteenth Amend-
ment to the United States Constitution was prejudiced by the improp-
er introduction of evidence of his prior bad acts. Issue 2# : The
State failed to prove beyond a reasonable doubt that the defendant
intended to kill or cause great bodily injury to the victim as re-
quired under Illinois law and the Fourteenth Amendment to the United
States Constitution. Issue 3# : The defendant's trial attorney was
ineffective in failing to call Nikki Wittingham to testify as a
witness at trial.

5.)

Did you petition the United States Supreme Court for a Writ of
Certiorari? : No the petitioner did not.

PART 2#-COLLATERAL PROCEEDINGS

1.)
With respect to this conviction or sentence, have you filed a post conviction petition in State Court? : "Yes" the petitioner has.

(A)
Name of Court : The Circuit Court of Cook County, Illinois.

(B)
Date of filing : The petitioner filed his post on 7/22/05.

(C)
Issues raised : That the petitioner was denied his Constitutional rights to due process, effective assistance of counsel, fair trial and equal protection of the law, due to trial counsel's failure to adquately represent petitioner in accordance with Constitutional guarantees of the 6th Amendment.

(D)
Did you receive an evidentiary hearing? : No the petitioner did not.

(E)
What was the Court's ruling? : The Circuit Court Judge Honorable James B. Linn denied the petitioner's post .

(F)
Date of ruling : August 1, 2005.

(G)
Did you appeal from the ruling on you'r petition? : "Yes", the petitioner did appeal the petition.

(H)
1.)
What was the result? : The Appellate Court denied the petitioner's petition.

2.)

Date of decision : The petitioner's appeal was denied on August 20th
of 2007.

(I)

Did you appeal, or seek leave to appeal this decision to the highest
State Court? : "Yes", the petitioner appealed to the Illinois Supreme
Court.

Also orderly appealed through this same pro se petition to the high-
est State Court ... the petitioner herein also amended and raised that
: The Circuit Court Judge, Honorable James B. Linn violated the Defen-
dant's 14th Amendment of the U.S Constitution as well as the Illin-
ois Criminal law and Procedures regarding section 5/122 2.1 No.(2).
And that the Appellate Court failed in seeking the evidence of intox-
ication within the State's reply brief as well as within the transcr-
ipts regarding the evidence that trial counsel failed to present an
intoxication defence because he misunderstood the law.

1.)

What was the result? : The petitioner's pro se P.L.A. to the Supreme
Court of Illinois was denied.

(2)

Date of decision : The petitioner's petition was denied Nov 29th, of
2007.

With respect to this conviction or sentence, have you filed a petit-
ion in a State Court using any other form of post conviction proced-
ure, such as Coram Nobis or habeas Corpus? : "Yes".

1.)

Nature of proceeding : Coram Nobis

2.)

Date petition filed : *The petition was sent off on: 2/28/08*

3.)

Ruling on the petition : The petition is currently pending.

3.)

With respect to this conviction or sentence, have you filed a previous

petition for habeas corpus in Federal Court? : "No" the Petitioner has

not.

(4).

WITH RESPECT TO THE CONVICTION OR SENTENCE, ARE THERE ANY LEGAL PRO-

CEEDINGS PENDING IN ANY COURT, OTHER THAN THIS PETITION? : With res-

pect and admiration for the Federal Court herein, the petitioner has

no other pending petition except for his Coram Nobis petition.


NEXT PAGE

PART 3#- PETITIONER'S CLAIMS

(A). GROUND ONE

THE TRIAL JUDGE ABUSED IT'S DISCRECTION, IN ADMITTING THE EVIDENCE
OF DEFENDANT'S PRIOR BAD ACTS, IN WHICH THE ERROR SUBSTANTIALLY
PREJUDICED THE DEFENDANT'S DUE PROCESS RIGHTS TO A FAIR TRIAL UNDER
ILLINOIS LAW, AND DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO
THE UNITED STATES CONSTITUTION.

The petitioner argues that right before trial through a pretrial
motion, that the State was allowed to summit in the prior bad acts
of the petitioner against Edwina Asha Quansah. Edwina Asha Quansah
was a State's witness within the bench trial herein, and was also
notified as being an ex-girlfriend of the petitioner for approximately
six and a half year's. The victim herein in which the petitioner
is allegedly charged in the murder of is name Linton Boyd. Linton
Boyd was apparently and coincidently a close friend and also a co-
worker to the State's witness Ms. Edwina Asha Quansah. Linton Boyd
was apparently struck by the petitioner's vehicle accidently while
being heavily intoxicated on Jan 12th of the year 2000.

The petitioner asserts that while being repersented by a private
attorney Mr. Martin Abrams, that the defence were currently in a
position in which to notify the Court that the defence was in fact
ready for trial. But yet consequently, the State filed a motion
before trial on August the 9th regarding the allowment of the petit-
ioner's prior bad acts against Edwina Asha Quansah... the State's
primary witness.

Case 1:08-cv-01479   Document 1   Filed 03/10/2008   Page 8 of 118

During the pretrial hearing held on August 24th, of the year 2000 :
the State focused on five seperate issue's involving Asha. First, a
June of "99" damage to property incident, five month's later another
damage to property incident, and then in December of "99", the defen-
dant confronted Asha outside of her home attempting to get her to re-
turn an engagement ring and coat he had given her. When Asha refused
to return the item's, the defendant allegedly exhibited a (BB gun)
and Asha returned the item's. None of these prior bad acts had any
bearing on defendants motive for committing murder, or his intent to
kill or seriously injury the victim Linton Boyd . IN FACT, none of the
defendants prior bad acts were directed at all towards the victim. And
more importantly, the defendant never knew, saw or even met the deceas-
ed prior to or even before the incident. Nothing in the prior bad acts
alleged by the State was probative of the defendants capacity to commit
first degree murder. The most egregious act involved the use of a BB
gun to force Asha to return a ring and a coat . The defendant never
physically harmed Asha or expressed an intent to kill her.

Property damage to a vehicle or even preceived threats of physical
violence simply do not equate with the intent to commit murder. Futher-
more, within most cases, the prior bad acts that were allowed in trial
were against the victim...and not the witnesses who happen to be test-
ifing against the defence. There lies a magnatude of State and Federal
cases that refutes the admission of evidence as well as testimony being
brought in against defendants that were not revelvant to or towards
their current pending cases.

Case 1:08-cv-01479   Document 1   Filed 03/10/2008   Page 9 of 118

It is quite nieve and clearly evident for one to think that only pre-judicial and incompetent evidence can only convict a defendant upon a jury trial...and not a bench trial? And as an initial matter, the law recognizes that even Judges are human and may be improperly influenced, especially by the admission of prior bad acts. "Nonetheless", Judges are human and as such may error. And that Court's have no more right than a jury to convict the accused on incompetent evidence...while we recognize that it is, of course presumed that a Court in a bench trial considers only proper evidence, it is obvious that the record herein discloses that the Judge did in fact consider improper evidence in arriving at his verdict, even though the guilt or innocence of the defendant could have been ascertained if the improper evidence had been excluded, notwithstanding this, but a defendant is entitled to a fair trial upon evidence properly admitted. And when such a matter refutes this, the defendant's Due Process rights to a fair trial under Illinois law, and Due Process Clause of the 14th Amendment to the United States Constitution are violated.

(B).  GROUND TWO

THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT THE
DEFENDANT INTENDED TO KILL OR CAUSE GREAT BODILY INJURY TO THE
VICTIM AS REQUIRED BY AND UNDER ILLINOIS LAW AND THE FOURTEENTH
AMENDMENT TO THE UNITED STATES CONSTITUTION.

---

The petitioner argues that the testimony of the by-standers, as
well as Asha, tends to support, rather than contradict, the def-
endant's account of the incident. The defendant explained that
after Asha motioned for him to follow her, "I drove up a few feet,
I tried to dip a little bit to the right, and then I made a left.
I swooped around and made a left, a u-turn". The defendant's test-
imony that he pulled slightly forward and then made a quick u-turn
which resulted in his vehicle accidently striking the victim is
consistent with the accounts of Asha and Ms. Slater. As Asha des-
cribed the incident during the State's direct examination :

(A).  Well, I looked in the rearview, I mean I automaticly saw the
      u-turn and the hit, and that was it.

(Q) . It happen pretty fast?

(A).  Yes.

The testimony of meterial witness for the State Ms. Slater also
bolsters the conclusion that this was an accident resulting from
the defendant's attempt to make a hasty u-turn and follow Asha,
not a deliberate and intentional killing. Ms. Slater testified
that Michael's vehicle pulled forward maybe five feet and that :

(Q).  About how far down the block was that car when you saw it
      come back towards where the man was standing by his car?

(A). It was'nt that far. It was just like -- all you had to do was turn
the corner, and he was right there getting ready to get inside of
his car. So it took like a second to make the u-turn, hit the guy,
and keep going.

The defendant's own testimony is even more reasonable in the light of
his poor driving record. The defendant's driving record contains number-
ous accidents resulting from his inattention and poor driving, including
hitting a lamp post, a fire hydrant, a parked car, as well as a C.T.A.
bus. The defendant's driving record when conbined with the testimony
of the by-standers and Asha strongely undercuts the State's allegation
that he intentionally killed Linton Boyd.

And yet during trial, a dectective by the name of SGT. Charles
Williams testified that while enterviewing the defendant : that the def-
endant admitted he was intoxicated and had an accident on 63rd and Stony
Island.

(O). And did the defendant tell you he was drunk yesterday, January 14th,
of the year 2000, and had an accident?

(A). That's correct.

(A). Yes he did.

(Q). Did he tell you he consumed a pint of Seagram's gin and stated he
just so happen to be driving in the area of 63rd and Stony Island
when he saw Asha in her vehicle?

(A). That's correct.

The report of Threlkeld's arrest afterwards, while driving on Interstate
55 also states that he admitted drinking a pint of Seagram's gin and that
after doing so, he threw out the bottle in Chicago.

Futhermore, the State's evidence of the defendant's intent was entire-
ly circumstantial. None of the State's witnesses testified that the
defendant's actions were a deliberate attempt to kill or cause great
bodily harm to the victim. When questioned on direct by the State,
Asha stated that she could not tell whether it was deliberate. And
while the State called several witnesses to the stand to establish the
forensic evidence in the case, none of the witnesses could conclude
that the defendant acted intentionally. Investigator Michael Trummel
of the Illinois State Police testified that he could not conclude from
the physical evidence that he collected from the defendant's truck
while it was impounded in Bloomington that the defendant's actions
were intentional.

Investigator Leonard Stocker of the Mobile Crime Lab Unit of the
Chicago Police Department examined the crime scene and collected evid-
ence, he also did not testify that the defendant's actions were intent-
ional. Dr. Rexene Worrell from the notable Cook County Medical Examiner's
Office performed the autopsy on Linton Boyd, but could not testify that
the defendant's actions were intentional. It was stipulated that, if
called, Ellen Connolly of the Illinois State Police Divison of Forensic
Services would testify that fragments of plastic from the scene matched
those samples taken from the defendant's vehicle. Her stipulated test-
imony did not state that the defendant's actions were intentional. Here,
the State repeatedly referred to the defendant's prior bad acts con-
tinuously, essentially shifting the focus of the trial from the events
of and on the night of January 12th, 2000, to the prior bad acts comm-
itted against Asha.

Case 1:08-cv-01479    Document 1    Filed 03/10/2008    Page 13 of 118

The State referred only to the prior misconduct in it's opening state-
ment, on direct examination of it's witnesses, on cross-examination of
defence witnesses and in it's closing arguments. In conclusion to ground
two, the defendant's trial was never attentive to the crime charged, but
rather focused upon his prior mishaps with the State's witness Asha
Quansah : where the State knowingly failed to prove beyond a reasonable
doubt that the defendant intended to kill or cause great bodily injury
to the victim as required by and under Illinois law, and the 14th Amend-
ment to the United States Constitution.

(C). GROUND THREE

THE DEFENDANT'S TRIAL ATTORNEY WAS INEFFECTIVE IN FAILING TO CALL
NIKKI WHITTINGHAM TO TESTIFY AS A WITNESS AT TRIAL VIOLATING THE
DEFENDANT'S SIX AMENDMENT RIGHTS TO THE UNITED STATES CONSTITUTION
AS WELL AS THE ILLINOIS CONSTITUTION

As the defendant argued in his pro se supplemental brief, his
right to effective assistance of counsel under the Illinois Constit-
ution and the sixth Amendment to the United States Constitution was
violated by his counsel's actions at trial, including the failure
to call Nikki Whittingham, Asha's mother, as a character witness.
This witness was not a family member in retrospect to the defendant,
but knew the defendant personally and well enough to have given test-
imony contrary to the picture that the State painted to the Court
of the defendant that could of changed the out come of the case. In
this case, counsel had plenty of time and opportunities to list Ms.
Nikki Whittingham (Asha's mother), as a person to be called to test-
ify to corroborate her own affidavit and an opportunity to be cross-
examined so that her testimony and affidavit could have been consid-
ered and entered as substantive evidence.

Trial counsel stated in the record that Ms. Nikki Whittingham
had originally contacted him by letter expressing her willingness to
testify on behalf of the defendant. But would later on recant her
testimony, in exchange for an affidavit she would later on present.
Trial counsel failed to pursue this person to testify if for nothing
else but for mitigation purposes...even if he had to file such a
motion to order her to testify as a hostil witness. Ms. Nikki Whitt-
inghams testimony would have been relevant in showing the defendant's

Case 1:08-cv-01479   Document 1   Filed 03/10/2008   Page 15 of 118

character in a different light as she knew him to be, instead of the
inaccurate picture the State presented to the Court of the defendant's
mind-set. Ms. Nikki Whittinghams testimony could have been highly crucial,
very important, and also meritable to a point of circumstantial evidence.
If this Honorable Court would read the second paragraph, first page of
her affidavit she states : I first met Michael in 1993. He and Asha attend-
ed the same clinical group therapy sessions at the University of Chicago's
Blue Gargoyle, a center for youth services. They quickly became very close
and as a single mother, I was concern with my 14 year old daughter's relat-
ionship. I tried to break them up, and not because he was a bad person,
but because they were too close at such a young age. My efforts only push-
ed them closer together. So I decided to embrace Michael, as I tried to
keep an eye on their envolvement.

Ms. Nikki Whittingham could of testified to the above statement and
not only in regards to just that, but of also Asha's character as well as
myself in it's entity. Ms. Nikki Whittingham knows with-out a doubt very
well and precisely for the past seven year's the ins-and-outs of our relat-
ionship. And if the Court's would pay close attention to Ms. Whittinghama's
affidavit in regards to the significance of it and examine it sincerly,
especially in paragraphs 2,3 and also 5 where she states : that she work-
ed as a court reporter and has witness the cold blooded stares of murders ;
worked also as an assistant to the Public Defenders ; maintains a certif-
icate in marriage and family therapy and most importantly, personally
knows the defendant. Ms. Whittingham would have been a perfect witness,
because if anybody is conscious of the relationship between Asha and the
defendant, it's her.

Even within the Judges own ruling, the Judge states that : this is an unusual case insofar as I must look at this case in a context that extends well beyound the fateful days of Jan 12th, year 2000. This case could arguable have been born and begun some seven year's before when at age 13, the defendant. WHAT MORE GREATER WITNESS COULD OF TESTIFIED TO WHAT WAS STATED HEREIN THAN MS. WITTINGHAM ? Also within the Judges ruling, it's kind of ironic that the Judge makes a statement that coincides with Ms. Whittingham stating that : I don't belive that he woke up that morning to kill somebody. While within Ms. Whittinghams affidavit, she states that : I personally know Michael and he's no ruthless murderer. He did not leave out of his house on Jan 12th with the intent to kill.

Futhermore, the defendant's trial attorney Martin Abrams understood and also acknowledged very clearly that Ms. Whittingham's testimony was highly crucial and very important to the defendant, where it could of changed the out-come of the case. And that the Judge, Judge James B. Linn never just excepted the affidavit for just mitigation, but gave the defendant's attorney a choice and a ultimatum regarding the cross - examination of Nikki's affidavit, or if he just wanted to use it for mitigation purposes. Stating that, "I cannot -- if it's going to be considered as substantive evidence, it would have to be subject to being cross examined. With-out that, I could not consider it substantive evidence. I can't consider it post trial until she is cross examined ... if you want me to consider this as some kind of post trial matter or newly discovered evidence or something, which I don't understand how to do that, it can't be considered as part of the trial record unless it's cross - examined.

If you'r asking me for considering it for mitigation, without her test-
ifing, the letter from her to me an affidavit from her to me, I can con-
sider it mitigation. If you want it to be some kind of substantive record,
I don't allow it until it's cross examined. Futhermore, after continuously
explaining to the defence attorney that he had an option of obtaining the
witness to testify to her affidavit, or to use such an affidavit for miti-
gation purposes. The trial Judge actually thought that the defence attorney
had a notion to bringing her in to testify. Stating that he belived that
the affidavit presented was probably more than mitigation. And that he pre-
sumed that the defence was bringing in a live witness. Attorney Abrams had
plenty enough time stipulated by the Court to subpoena the witness therein
to testify but never made any attempt to ... violating the defendant's six
Amendment rights to and also under the United States Constitution. Asha's
mother should have been subpoenaed to testify if not only as a hostil
witness to testify for the petitioner during the trial herein.

(D). GROUND FOUR

THE CIRCUIT COURT ERRED IN SUMMARILY DISMISSING THE DEFENDANT'S POST
CONVICTION PETITION, AS TO WHERE HIS TRIAL COUNSEL WAS INEFFECTIVE
FOR REFUSING OVER THRELKELD'S INSISTENCE, TO INTRODUCE EVIDENCE OF
INTOXICATION BECAUSE HE MISUNDERSTOOD APPLICABLE LAW, VIOLATING THE
DEFENDANT'S DUE PROCESS, EFFECTIVE ASSISTANCE OF COUNSEL, FAIR TRIAL
AND EQUAL PROTECTION OF THE LAW, DUE TO TRIAL COUNSEL'S FAILURE TO
ADEQUATELY REPRESENT PETITIONER IN ACCORDANCE WITH THE CONSITUTIONAL
GUARANTEES OF THE U.S CONSTITUTION OF THE SIX AMENDMENT.

The Defendant's post conviction petition stated the gist of a claim
of ineffective assistance of counsel. Specifically, it alleged that
trial counsel was ineffective for persuading Threlkeld that it was
against his interest to introduce evidence of intoxication, even tho-
ugh this evidence negated the mental state required for first-degree
murder. Supporting documents included in Threlkeld's petition show
that Threlkeld urged his attorney to pursue a lesser included offence,
but his attorney opposed it because he mistakenly believed this evi-
dence would aggravate the offence and subject Threlkeld to a sentence
of life imprisonment.

These facts taken as true, show that counsel both prevented
Threlkeld from knowingly and intelligently asserting his rights to
requesting a lesser included offence and failed, due to his own legal
error, to introduce evidence in supporting the lesser included find-
ing. Thus, the Defendant Threlkeld stated the gist of the ineffecti-
veness claim, and it was error for the Circuit Court to summarily
dismiss his petition.

The Defendant's trial counsel could have presented ample evidence that the Defendant was in fact intoxicated at the time of the accident, but chose not to. The Defendant's trial counsel did not elicit testimony regarding Threlkeld's intoxication from any defence witnesses or submit the related lesser included offence of reckless homicide to the Court. Trial counsel also had access to evidence that would have shown that Threlkeld's intoxication on January 12th, 2000, was part of an ongoing habit of drunk-driving.

This history was detailed in affidavits of defence witnesses and police reports attached to Threlkeld's petition. Police records show incidents of driving under the influence of alcohol in January 1998, March 1999, and June 1999. Defence witness Terrance Coleman's affidavit stated that Threlkeld had a drinking problem and "every time I seen him in a car or anywhere he is always drunk".

Carter's affidavit corroborated this also, stating that she knew about Michael's drinking problem and that he's always drunk when he drives. Ahmad Kendell also could have testified that Threlkeld had a drinking problem and drinks when he drives.

Counsel presented none of this available evidence to the trial Court. Had counsel given defence witnesses the chance, Threlkeld's petition shows that he, Terrance Coleman and Jasmine Carter as well as Ahmad Kendell would have testified that Threlkeld was drinking and intoxicated before the accident on January 12th, 2000, "but was told not to". And because of trial counsel's insistence, the Court only received a notion in believing that Threlkeld was intoxicated afterwards, and not during.

Trial counsel's failure to present evidence of intoxication here pre-
cluded the trial Court from fully considering the applicability of reck-
less homicide. Evidence available to trial counsel could have negated
the mental state required for murder. Threlkeld's mental state was the
key issue at trial. This was acknowledged by the trial Court : "the
question I must decide is what the mental state of Michael Threlkeld
when this happen". But because trial counsel misunderstood the law, and
because he subsequently failed to introduce evidence of intoxication
regarding Threlkeld's history of drunk-driving offences, the trial Court
was left only to consider whether Threlkeld's poor driving skills was
the cause of the accident.

And not surprisingly, this defence did not win over the Court.
Had evidence of Threlkeld's intoxication been brought to the light, the
trial Court would have had a reason to find Threlkeld guilty only of the
lesser offence.

The record herein does not rebut these allegations. Coincidently,
a detective by the name of SGT.Charles Williams testified for the State,
that the Defendant Michael Threlkeld admitted while interviewing him
that he consumed a pint of Seagrams Gin and had an accident. The record
herein shows that trial counsel did not present this evidence or argue
for the lesser offence. Rather, counsel argued at trial that the accident
was the result of poor driving.

In fact, defence counsel tried to prevent and impeach evidence of
intoxication, and only in a motion for a new trial did counsel urge the
Court to consider the offence of second-degree murder. This lesser includ-
ed offence was inapplicable because it requires either provoked intense
passion or mistaken belief that force was justified.

Neither of these were present within this case. Were Boyd's death an accident, as trial counsel argued, it would not be second-degree murder. However, at no time did counsel argue the Court to consider the applicable lesser-included offence of reckless homicide or present the supporting defence of intoxication. It is counsel's failure in this regard that Threlkeld alleges deprived him of his right to a fair trial and establishes the "gist" of a meritorious claim.

Futhermore, Threlkeld's testimony that he was not intoxicated does not rebut his claim of ineffective assistance of counsel. Rather, Threlkeld's testimony sprang from trial counsel's misapprehension of the law and forceful warnings that Threlkeld could be subject to an aggravated offence and a life sentence should this information be presented at trial. Cross examination was the only time Threlkeld was directly asked whether he was intoxicated during the accident.

In his petition, Threlkeld explains that the reason for him denying the truth of his intoxication in which resulted in the death of Linton Boyd Jr. ... is because his trial counsel warned him that an affirmative answer would result in life imprisonment. Specifically, Threlkeld stated in his affidavit that trial counsel advised him that : "If you tell the Court that you were intoxicated, it would only aggravate the charge ... and you could get a life sentence." Also within the petition, Threlkeld alleges that his trial counsel coerced him to present false testimony of the events of January 12th, 2000.

Instead of refuting Threlkeld's claim of ineffective assistance, petitioner's testimony shows ths that trial counsel was mistaken as to the effects of the evidence and impressed upon Threlkeld a great urgency to avoid admissions of his intoxication at trial. Taken as true, the allegations in Threlkeld's post-conviction petition stated the "gist" of a

Case 1:08-cv-01479   Document 1   Filed 03/10/2008   Page 22 of 118

meritorious claim of ineffective assistance of counsel. These allegations are not rebutted by the record. And consequently, the Circuit Court was highly in error for summarily dismissing Threlkeld's petition, and this cause should have been remanded for futher proceedings.

(E). GROUND FIVE

TRIAL JUDGE HONORABLE JAMES B. LINN, FAILED AT NOT DISMISSING THE
DEFENDANT'S POST CONVICTION PETITION UNDER SECTION 5/122-2.1, IN
WHICH A WRITTEN ORDER AS WELL AS THE FINDING OF FACTS WERE NEVER
SUBMITTED TO THE DEFENDANT, AND WHERE THE JUDGE FAILED AT NOT DIS-
MISSING THE DEFENDANT'S PETITION AS FRIVOLOUS OR PATENTLY WITH-OUT
MERIT, VIOLATING ILLINOIS LAW SECTION (2), AS WELL AS HIS 14th
AMENDMENT RIGHTS UNDER THE U.S CONSTITUTION REGARDING LIFE, LIBERTY,
DUE PROCESS AS WELL AS EQUAL PROTECTION OF THE LAW.

---

The Defendant asserts that during the month of August 1st of the year
2005. The Circuit Court Judge, Honorable James B. Linn denied the
Petitioner's post conviction petition in which he denied egregiously,
violating number 1 : Illinois Criminal Law and Procedures in regards
to the dissmissal order of section 5/122-2.1 number 2, where it clear-
ly and directly states that :

　　　　　　　　If the Petitioner is sentenced to impri-
sonment and the Court determines the petition is frivolous or is
patently with-out merit, it shall dismiss the petition in a written
order, specifing the findings of fact and conclusion of the law it
made in reaching it's decision. And that such an order of dismissal
is a final judgment and shall be served upon the Petitioner by cirti-
fied mail within 10 days of it's entry.

　　　　　　　　But within the cirtified report of dis-
postion concerning the Petitioner's denial which was filed and sent
to the Petitioner in a timely fashion according to the 10 day entry
. . . the judge never does this. In fact, the judge never specifies
at all his reason or findings of fact, but clearly states the petition

as only denied.

The judge also denies and violates the Petitioner's constitut-
ional rights under Illinois law section (2), as well as his 14th Amend-
ment rights under the U.S Constitution regarding life, liberty, due pro-
cess as well as equal protection of the law, where the Defendant herein
never receives. Futhermore, it also states within the Illinois Criminal
law and Procedures in regards to the dismissal order of 5/122-2.1 letter
(B) that :

If the Petitioner's petition is not dismissed pursuant to this
section, that the Court so much shall order the petition to be docketed
for futher consideration to accordance with section 5/122-4-122-6 of the
Criminal Law and Procedures.

Quoting from the Columbia Human Rights Law review booklet call-
ed J.L.M. regarding Due Process. Due Process clause of the 14th Amendment
forbids the State from depriving any person of life, liberty, or property
with-out Due Process of the law. The clause has been interpreted as contain-
ing 2 separate types of protection, one called "substantive" due process
and the other is called "procedural" due process.

Procedural Due Process refers to the methods or procedures by
which you'r rights are protected, as distinguished from what you'r rights
actually are. It's purpose is to make sure that you are not deprived of
life, liberty, or property with-out due process of the law. These claims
usually arise from admenistrative procedures or Court hearings in which
in which are conducted in some manners that are unfair, including when
you have not been given fair notice of occurance of the procedure, or
have been denied you'r rights to defend you'r self.

In the Petitioner's hearing of his post, the Honorable Judge James B. Linn denied and dismissed the petition (sua-sponte). The Court did not specify his conclusion of the law, and nor did the Court express his decision to dismiss the petition on or what grounds or findings as mention in 725 5/122-2.1 (2).

It shall also be noted that the Court did not state the petition and claims stated herein were "frivolous" or patently with-out merit. The word "frivolous", according to Barron's Legal Guide Law Dictionary, is defined as : clearly lacking in substance ; clearly insufficient as a matter of law ; presenting no detail or debatable question . . . while the word patent or patently is defined as : evident ; obvious . . .

Thus, the term frivolous or patently with-out merit was intended by and through legislation to be construed as a claim or petition in it's entirety to be obviously lacking sufficient merit or lacking debatable question of which a Petitioner seeks relief. And with this fact of legislation being understood, one must now turn to the issue or question to determine if in fact there is a debatable question to violations of Constitutional rights affirmatively afforded to persons by the U.S Constitution regarding the said issue presented. And as to where egregiously, the Defendant was denied both his State and Federal Constitutional rights under the 14th Amendment to the U.S Constitution.

2.)

Have all grounds raised in this petition been presented to the high-
est Court having jurisdiction? : "Yes", all grounds within this petit-
ion were presented amongst the Illinois Supreme Court.

3.)

If you answered no to question (2), state briefly what grounds were
not so presented and why not :

PART IV-REPRESENTATION

Give the name and address, if known, of each attorney who represented
you in the following stages of the judgment attacked herein :

(A).

At preliminary hearing : Martin Abrams, 900 West Jackson Boulevard,
Chicago Illinois, 60607, suite 4 East.

(B).

At arraingment and plea : Martin Abrams, 900 West Jackson Boulevard,
Chicago Illinois, 60607, suite 4 East.

(C).

At trial : Martin Abrams, 900 West Jackson Boulevard, Chicago Illinois,
60607, suite 4 East.

(D).

At sentencing : Martin Abrams, 900 West Jackson Boulevard, Chicago
Illinois, 60607, suite 4 East.

(E).

On Appeal : Jones Day, 77 West Wacker Drive, Chicago Illinois, 60601,
(Attorney Jeffery R. Weiland).

(F).

In any post conviction proceedings : The Defendant was given reper-
sentation upon the appeal of his post conviction petition within the
Appellate Court by and through the Assistant Appellate Defenders
Office of the State Appellate Defender, 203 N. Lasalle Street,
Chicago Illinois, 60601, 24th Floor : Attorney Holly J.K. Schroetlin
and Deputy Defender Michael J. Pelletier.

(G).

Other State :

PART V-FUTURE SENTENCE

Do you have any future sentence to serve following the sentence impo-
sed by this conviction? : No the Defendant does not.

Name the location of the Court which imposed the sentence _____.

Date and length of sentence to be served in the future _____.

WHEREFORE, Petitioner prays that the Court grant Petitioner all relief
to which he may be entitled in this proceedings.

Signed on : _____
                (DATE)

I declare under penalty of perjury that the forgoing is true and
correct.

P.O.BOX 112
STATEVILLE C.C
JOLIET ILLINOIS
60434
K-66117

Case 1:08-cv-01479   Document 1   Filed 03/10/2008   Page 28 of 118

## CONTENTS OF THE EXZIBITS

1.) Exzibit One : The August 24th motion hearing regarding the prior bad acts.

2.) Exzibit Two : The testimony of State witnesses Kyra Ester, Michelle Slater, Dr.Rexene, Asha Quansah and SGT.Charles Williams.

3.) Exzibit Three : The affidavit of Asha's mother Ms.Nikki Whittingham as well as pages 16-21 of the transcripts.

4.) Exzibit Four : The Petitioner's pro se post conviction petition as well SGT.Charles Williams testimony and the Chicago Police Case Supplementiary Report.

5.) Exzibit Five : The dismissal Order of the Petitioner's post conviction.

EXZIBIT 1-A

STATE OF ILLINOIS    )
                     )
COUNTY OF COOK       )

        IN THE CIRCUIT COURT OF COOK COUNTY
        COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE    )
STATE OF ILLINOIS    )
                     )
     vs.           )       No. 00 CR 4537
                     )
                     )
MICHAEL THRELKELD    )

      REPORT OF PROCEEDINGS had of the hearing in the
above-entitled cause, before the Honorable JAMES LINN,
Judge of the said Court, on Thursday, the 24th day of
August, A.D., 2000.

           APPEARANCES:

                HONORABLE RICHARD DEVINE,
                State's Attorney of Cook County, by:
                MS. LAURA FORESTER,
                Assistant State's Attorney,
                on behalf of the People;

                MR. MARTIN ABRAMS,
                on behalf of the defendant.

Ann Hieber, CSR
Official Court Reporters
2650 S. California Avenue
Chicago, Illinois   60608

2

1          THE CLERK:  Michael Threlkeld.

2          MS. FORESTER:  Judge, I have a copy of my motion

3     I filed on August 9th.

4          THE COURT:  All right.  This is Mr. Threlkeld.

5     He's accused of murder.  Matter is on call for trial.

6          Defense ready?

7          MR. ABRAMS:  We'll be ready today, Judge.

8          Good morning.  Martin Abrams, A-b-r-a-m-s, on

9     behalf of Mr. Threlkeld.

10         THE COURT:  What kind of trial?

11         MR. ABRAMS:  Judge, we're anticipating a bench

12    trial and this is why I'm objecting to the motion.  If

13    ever a case cried out for bench trial, it's this one.

14    And it wasn't until after we had told the court on an

15    earlier date that we intended to do a bench trial that

16    they then introduced the motion for other crimes

17    evidence.  It was never done before we announced our

18    intentions and --

19         THE COURT:  Well, there's been no waiver.

20         MR. ABRAMS:  No, I understand.  But like I said,

21    this is a case that cries out for a bench trial.

22         THE COURT:  Well --

23         MR. ABRAMS:  And at this time it's still

24    indicated a bench trial.

1          THE COURT:  Okay.  Now they have a motion for

2    proof of other crimes so we need to have a hearing on

3    that.  Right.  We're ready for hearing today?

4          MR. ABRAMS:  I'll be ready.

5          THE COURT:  Okay.  State, you're also saying that

6    if this matter is a bench trial that you're ready to

7    start but not complete the trial today?

8          MS. FORESTER:  That is correct.  I have one

9    civilian witness.

10          THE COURT:  We'll talk about that shortly.  But

11    at least let's pass it.  We'll have a hearing on motion

12    of other crimes evidence.

13          MR. ABRAMS:  Can I come back in about a half

14    hour?

15          THE COURT:  Sure.  Pass it.

16                    (Whereupon, the case was passed and

17                     recalled.)

18          THE COURT:  This is Michael Threlkeld.  This

19    matter was up for trial.  The government has filed a

20    motion for proof of other crimes evidence, that

21    obviously has to be resolved before the case goes to

22    trial.

23          Are both sides ready to proceed on the motion?

24          MS. FORESTER:  Yes, Judge.

4      3

1       THE COURT:  Why don't you have a seat over at the

2   table.

3       What is your proffer as to what proof of other

4   crimes evidence you have and why it would be more

5   probative than prejudicial?

6       MS. FORESTER:  As set forth in the memoranda in

7   support of our motion, there were numerous incidents

8   involving the witness in this case by the name of Edwina

9   Kuansah, K-u-a-n-s-a-h.  The other evidence that we are

10  seeking to introduce involves --

11      THE COURT:  Is there a memorandum that you filed?

12      MS. FORESTER:  Yes.

13      THE COURT:  I have a two page motion.

14      MS. FORESTER:  No.  That is the memorandum right

15  there.  And the act which I'm referring to is in

16  paragraph 3.  There is a one page motion and a

17  memorandum in support.

18      THE COURT:  I see.

19      MS. FORESTER:  Your Honor, there are numerous

20  acts that were taken against --

21      THE COURT:  I beg your pardon.  I don't mean to

22  be rude.  Start at the beginning.  Tell me what happened

23  on this case and then what you think happened before

24  this case that would be relevant.

1        MS. FORESTER:  Your Honor, the case that is

2    before your Honor is a first degree murder where the

3    victim is Linton Boyd.  Linton Boyd was a gentleman that

4    was employed along with a woman by the name of Edwina

5    Kuansah.  Edwina Kuansah is the former girlfriend of the

6    defendant in this case, Michael Threlkeld.

7        On the night that this occurred which was January

8    12th of this year, the year 2000, the victim, Mr. Boyd,

9    was leaving work along with Miss Kuansah at the area

10   of -- exact address of the YMCA that is located there is

11   5 -- I'm sorry, 6335 South Stony Island, is where this

12   occurred.

13       After Miss Kuansah and Mr. Boyd had gotten off

14   work, Miss Kuansah drove Mr. Boyd to his car.  It was at

15   that time that the defendant rode up in his Jeep

16   Cherokee, had some interaction with Miss Kuansah, where

17   she had said numerous things to him including get away

18   from me. ← SHE NEVER said that !!!

19       At the time the defendant had previously had a

20   warrant issued out of domestic violence court from 13th

21   and Michigan.  Miss Kuansah had sought and obtained an

22   order of protection against the defendant based on

23   various acts prior to this time that I'll enumerate

24   shortly.

1          On the night of the incident, January 12th of

2     this year, Miss Kuansah was driving Mr. Boyd to his car

3     that was parked on Stony Island.  It was at that time

4     that the defendant passed, observed Miss Kuansah in the

5     driver's seat, and observed her male friend in the car

6     at which time words were exchanged.  The defendant in

7     his Jeep Cherokee sped off, made a U-turn and then sped

8     back towards where Mr. Boyd had exited Miss Kuansah's

9     car as he was attempting to get into his parked car at

10    that address.

11         As Mr. Boyd was opening his door, the defendant

12    sped up and it's the State's position deliberately

13    struck him and then sped away passing Miss Kuansah who

14    had already proceeded on after dropping off Mr. Boyd

15    who's up at an intersection, who observed this entire

16    incident in her rear view mirror.  He sped past her,

17    went through the intersection and fled the jurisdiction

18    and was subsequently arrested downstate after a number

19    of things occurred, one of which was a truck driver told

20    the Illinois State Police in that area that he had

21    observed a truck driving in an erratic manner, at which

22    time Mr. -- the defendant was located and there was

23    damage to his car consistent with the injuries that had

24    occurred.

Case 1:08-cv-01479  Document 1  Filed 03/10/2008  Page 36 of 118

1        Prior to this incident the defendant had dated

2   Miss Kuansah.  However she had terminated the

3   relationship and obtained an order of protection as set

4   forth in the motion.

5        THE COURT:  When?

6        MS. FORESTER:  In December of 1999.

7        THE COURT:  And this happened when?

8        MS. FORESTER:  January 12th.  Including a

9   criminal damage to property, there was a report filed on

10  that, actually three separate incidents of criminal

11  damage to property starting in June of 1998, November of

12  '99.  December of '99 was the most recent.  And there

13  was an armed robbery which actually ended up being

14  charged as an aggravated assault based on the victim's

15  reluctance to proceed.

16       There were a series of issues at the time but

17  there are certain actions by the defendant.

18       THE COURT:  Damage to property allegedly

19  committed by him with the car, with his car?

20       MS. FORESTER:  By the defendant.  Well, at one

21  point depending on which accident or which incident in

22  June or, excuse me, in -- yes, in June, there was a

23  slashing of the tires by the defendant of the victim's

24  vehicle.  And this goes, as the motion sets forth, bears

8

1    directly on the defendant's motive and intent and his

2    state of mind at the time that he murdered Mr. Boyd.

3         There was a series of events escalating in nature

4    all because of his relationship or lack thereof with

5    Miss Kuansah, including but not limited to the defendant

6    assaulted the victim.  He was in his car at the time,

7    came up behind her, exited his car and ordered her to

8    get out of her car.  At that time he struck her car with

9    a baseball bat and he said get out of the car and she

10   said no and he caused damage.  He broke out one of the

11   lights.  That was the incident in December.

12        In addition in December, he -- the defendant

13   produced a weapon on the 6th of December, ordered her to

14   return a ring that he had given her and a jacket that he

15   had given her and she contacted the police.  There was

16   an outstanding warrant for an order of protection.  The

17   defendant had not appeared in court.

18        THE COURT:  Were there police reports made on all

19   these events?

20        MS. FORESTER:  Yes.  With regard to an additional

21   incident, December 16th, the defendant phoned the victim

22   in violation of the order of protection as well, the

23   order of protection which I did not include in the

24   motion was under 99 452908.  The actual charge of the

9

1    violation of the order of protection, that is the

2    defendant calling her, did not proceed to court because

3    there was an issue as to whether or not the defendant

4    had been served since he had failed to appear.  But we

5    would still be seeking to introduce the defendant's

6    efforts to contact Miss Kuansah within weeks before this

7    incident.

8        It is the State's position as set forth in the

9    motion that other crimes evidence is in fact relevant to

10    establish any facts relevant in the case other than the

11    propensity to commit crime.  The case law is clear on

12    that.  I specifically cite you a case, People v Herdia,

13    H-e-r-d-i-a, which is cited at 550 Northeast Second

14    1023.  It's a 1989 case which is similar to the case,

15    though not identical.

16        In that case the Illinois Appellate Court held

17    that prior incidents that bear directly on the

18    defendant's state of mind at the time of the murder,

19    including motive and intent, are certainly relevant for

20    the trier of fact if specifically there is a defense of

21    accident or recklessness with regard to the state of

22    mind.

23        And in that case the judge admitted a prior

24    assault.  The defendant killed his wife.  There is a

1   prior assault and also a conviction for the defendant

2   taking indecent liberties with his daughter.  They were

3   admissible at that time to show a lack of accident when

4   he subsequently murdered her and lack of a reckless

5   state of mind.

6         In  this case, your Honor, the previous dating

7   relationship and the order of protection and all the

8   incidents prior to this that Miss Kuansah would be able

9   to present to the court by way of evidence have direct

10  bearing on the defendant's intent and motive at the time

11  that he murdered Mr. Boyd on January 12th of this year.

12  It is based on a series of events that frankly escalated

13  and led to this.   It's the State's position that the

14  defendant murdered Mr. Boyd on the street.

15        And based on that we're asking that you permit

16  the State to admit the facts of those prior incidents at

17  trial.

18        MR. ABRAMS:  Your Honor, the defense is going to

19  be that this was an accident.  And where the State says

20  that they want to show evidence of other crimes or other

21  incidents to clear up the mistake of accident, I believe

22  that the State should introduce to this court the

23  numerous, numerous times that Michael Threlkeld has

24  driven his cars into other cars, into buildings, into a

1   hospital wall.  He may be the worst driver that ever

2   took the wheel of a car.

3        We're alleging that this is an accident.  There

4   is no intent.  This is a relationship that he had with

5   this woman, Miss Kuansah, over a 7 year period where

6   they dated and broke up numerous times, probably dozens.

7   They broke up, got back together, broke up, got back

8   together.

9        Actually on the date of this exact incident they

10  had a date for that evening, even though there was an

    NO IT WASN'T !!!

11  order of protection.  And by the way, that order of

12  protection never was served and they remained in

13  constant contact.  They dated during the course of this,

14  quote, order of protection, and that is because Mr.

15  Threlkeld never exhibited violence on her person but did

16  exhibit violence on her property.  He did damage cars

17  and we're not disputing that.

18       And we will say that he had given her a ring and

19  jacket and he confronted her and demanded those back

20  which was returned to him.  She brought an accusation of

21  armed robbery which she later recanted and didn't go to

22  court and press the issue on that.

23       At the time of this incident he's never committed

24  an act of violence against anyone else.  If the State is

                          12

1   alleging this is an act of violence against her, this is

2   not an act of violence against her.  This is -- he's

3   being charged with murder of a third party who's --

4   there is no involvement between the two of them.  There

5   is no motive for him to kill this person.  There is no

6   need.  He doesn't even know this person who's killed.

7   It was strictly an accident based on a bad driver.

8        But at the time of this incident Mr. Threlkeld

9   was driving on Cottage Grove and Kuansah was in the car

10  with Linton and they were sitting and talking as he

11  approached and he came up and he had a conversation with

12  them.  He had a conversation.

13       THE COURT:  What kind of conversation?

14       MR. ABRAMS:  Said I'll follow you so they could

15  go on their date for the evening.

16       And now she testified at the Grand Jury, she says

17  I don't remember any conversation.  She said I had a

18  conversation, I don't remember what it's about.  And the

19  State is now telling me that she's saying that she told

20  him to get out of there.  It wasn't one of those.  And

21  then he said I'll follow you and made a U turn and he

22  hit this guy.  And when he hit this guy, he panicked

23  and took off.

24       And there is no question that that is what

*13*

1    happened.  He panicked.  He went home.  He took money

2    and he took off.  He was heading for California and he

3    found out sometime later when the police were calling

4    him on his cell phone that this person he hit was dead

5    and apologized to the police on the telephone but said

6    I'm going to California.  And it was some point that he

7    was stopped in Bloomington, Illinois, McClain County, by

8    the Illinois State Police and returned to Chicago based

9    on that.

10    But the whole defense in this case is this is an

11    accident.  This was not an intentional act.  He's not a

12    good driver.  He's a terrible driver.  He shouldn't be

13    behind the wheel of a car.  But he didn't know this

14    person, had no motive to kill him, and he's never

15    exhibited violence against anybody.

16    And, you know, like I indicated earlier, we

17    intended to be a bench trial.  There is nothing to hide.

18    And these are incidents that happened.  But as far as

19    this woman who, Miss Kuansah, this complaining witness,

20    since his arrest on January 13th he's been in constant

21    contact with her from the jail.  So I don't know what

22    the State wants introduced against this woman to prove

23    he killed a third party.

24    THE COURT:  I think their theory might be from

14

1    what I'm gathering from this is why they're bringing

2    this motion, is there was a history of inappropriate

3    criminal acts, violent acts between Mr. Threlkeld toward

4    this woman.  That he drove up, he saw her in the company

5    of another man and continued his rage and took it out on

6    the man that he saw her with and he did so intentionally

7    because it was a continuation of his history of conduct

8    towards her as opposed to just being a fortuitous

9    accident, he just happened to be there at that location,

10   this woman that he's got this history of conduct with

11   and happens to see her with another man and just happens

12   to drive accidentally into him and kill him.

13          MR. ABRAMS:  They just happen to have a date for

14   that night too.

15          THE COURT:  That may be.

16          Anything else?

17          MR. ABRAMS:  No, Judge.  I just want to

18   reiterate, there is no history of violence against

19   anyone else and there is no indication that the

20   girlfriend had ever had a relationship with any other

21   person.  And if she did, he never exhibited any

22   animosity towards her regarding that stuff.  So I don't

23   think it's indicative of what the defense is going to be

24   and --

15

1    THE COURT:  Well, the defense is stating that

2    their defense is going to be that this is an accident.

3    It was just an accidental killing, some kind of reckless

4    act without any criminal mind, without any criminal

5    intention.  The government claims that they had police

6    reports that have been generated and there was a history

7    of conduct towards this woman.  The woman was present at

8    the time of the offense, was in the immediate company of

9    the deceased moments before he was killed, from what

10   both sides are telling me.  It was the car being driven

11   by Mr. Threlkeld.

12       Anything else you want to say before I rule?

13       MR. ABRAMS:  Other than the fact that also at the

14   same Grand Jury she said she had pulled away and all she

15   observed in her rear view mirror is that he made a

16   U-turn and struck him.  Nothing about high speed

17   acceleration, anything else.  Just a U-turn and

18   striking, that is what her testimony at the Grand Jury

19   is, testimony previously, so --

20       THE COURT:  Court finds that what the government

21   is seeking is other crimes evidence, is in the nature of

22   trying to put into context an ongoing relationship

23   between Mr. Threlkeld and a woman that was present in

24   the company of the deceased who was the male right

16

Case 1:08-cv-01479   Document 1   Filed 03/10/2008   Page 45 of 118

1    before he was killed.

2         I find that from what I'm being told by the

3    parties that everything about the relationship between

4    this woman and Mr. Threlkeld is of extreme relevance and

5    extreme importance.  I find that its probative value, if

6    true, would by far outweigh the prejudicial value.  It's

7    the only way to put in context, at least through the

8    government's theory what Mr. Threlkeld was doing that

9    night.

10        Without making any judgments about the veracity

11   of the other crimes evidence, I find that what has been

12   told to me would fall clearly in the exception.  This is

13   exactly what the exception is for use of, these other

14   crimes evidence.  And you talk about absence from the

15   State and that is exactly what is being alleged here.  I

16   find the prejudicial value is far outweighed by the

17   probative value of what is being proffered.  I'm going

18   to allow it.  The trier of fact, whoever that may be, is

19   going to hear it.

20        MR. ABRAMS:  You said the prejudicial value

21   wears --

22        THE COURT:  No, is far outweighed by the

23   probative value.

24        MR. ABRAMS:  I misunderstood you.

17

1    THE COURT:  Now, if that causes you to rethink

2    the trier of fact to be, that is fine.

3    MR. ABRAMS:  I would like to have a minute to

4    discuss it with Mr. Threlkeld.

5    THE COURT:  State's not ready today any way.

6    MS. FORESTER:  Judge, I have one witness but

7    we're going to ask that the matter be heard at the same

8    time such as other interested parties are present.

9    THE COURT:  Why don't you talk to your client?

10   Let me know if I'm scheduling a bench or jury.

11   There will be a couple minute recess.

12                      (Whereupon, the case was passed and

13                       recalled.)

14   THE CLERK:  Michael Threlkeld.

15   THE COURT:  All right.  Marty?

16   MR. ABRAMS:  Sorry, Judge.

17   Judge, Mr. Threlkeld has indicated to me he still

18   wants to continue the bench trial.

19   THE COURT:  Okay.

20   MS. FORESTER:  I know our schedule very well in

21   September.  One of my witnesses is having surgery in

22   October.

23   THE COURT:  October what?

24   MS. FORESTER:  Beginning October.  The assistant

*18*

1    state's attorney is going in for surgery and possibly be

2    incapacitated for two months.

3         MR. ABRAMS:  Who's the assistant state's

4    attorney?

5         MS. FORESTER:  Allen Murphy.

6         THE COURT:  Do you know what date the surgery is

7    scheduled for?

8         MS. FORESTER:  1st of October.

9         THE COURT:  October 1st?

10        MS. FORESTER:  Yes.

11        MR. ABRAMS:  Why do we need the assistant state's

12   attorney?

13        MS. FORESTER:  If we can set it, I think that is

14   when he's going into the hospital.  That is what he

15   indicated to me.  If we can set --

16        MR. ABRAMS:  Judge, I don't know if there is even

17   a need for a state's attorney.  I can stipulate.

18        MS. FORESTER:  That would be my call.  My

19   position is that we do.

20        MR. ABRAMS:  I don't see any statements.  I've

21   never been tendered any statements.

22        THE COURT:  What would he be testifying to?

23        MS. FORESTER:  The defendant did make a

24   statement, an oral statement to this assistant.  There

*19*

1    are several other witnesses interviewed by Allen Murphy

2    that were locked in.

3         THE COURT:  Whatever the defendant allegedly

4    said, was that given to Mr. Abrams?

5         MS. FORESTER:  Yes.

6         MR. ABRAMS:  I never saw any incriminating

7    statements.

8         THE COURT:  Sometimes it's a question as to what

9    is incriminating.

10        MR. ABRAMS:  Judge, we're not denying that Mr.

11   Threlkeld caused the accident.

12        THE COURT:  I understand.  And that he did it.

13   They call it a non-accident.  That is what this trial is

14   going to be about.  They're saying it's not really a

15   accident.

16        MR. ABRAMS:  Right.  Now I think it's a

17   terminology.  Mr. Threlkeld never denied hitting this

18   gentleman.  Never denied it.  And we're not going to do

19   that at trial anyhow.  So if that is the issue, then we

20   need a state's attorney.  I would be willing to work out

21   a stipulation on that.

22        THE COURT:  September 22nd.

23        MR. ABRAMS:  I'm picking a jury in front of Judge

24   Dernbach on that date and it's supposed to run the

1    entire week.

2         Judge, my book is terrible.  It's just shot, shot

3    literally.

4         THE COURT:   The 15th?

5         MR. ABRAMS:   I have a jury trial in front of

6    Judge Crane.  It probably won't go but it's set for that

7    week also.

8         THE COURT:  Why don't we set it on the 15th since

9    it probably won't go.

10        MR. ABRAMS:  I do have a trial also set on this

11   date in front of Judge Sumner.

12        THE COURT:  Well, you'll be in the building.

13   We'll start this on the 15th.  It's a bench.  I don't

14   have any problem commencing and continuing it to work

15   out at the convenience of the parties.

16        We'll start on the 15th.

17        MR. ABRAMS:  I have explained to Mr. Threlkeld

18   what that means with commencing and continuing, you

19   know, versus starting with a jury and he is in agreement

20   with commence and continue.

21        THE COURT:  It's all right with you, we start on

22   the 15th?

23        MR. ABRAMS:  Yes.  I do have one other request

24   though, Judge.

1       Regarding, back to the motion to introduce other

2   crimes.  I said that they have to introduce to show lack

3   of mistake or accident.  I believe the State now has the

4   responsibility to produce -- to produce evidence of

5   accidents.  They have access to all of his driving

6   records and all of his accidents, to show that this was

7   an accident and that would be exculpatory type of

8   material and I ask that --

9       THE COURT:  Do you have his drivers license

10  number?

11      MS. FORESTER:  Yes.  I have subpoenaed his

12  driving abstract.  If that is what counsel -- I believe

13  he indicated he had already --

14      THE COURT:  Do you have the abstract?

15      MR. ABRAMS:  The abstract is not the problem.

16  It's all the accident reports.

17      THE COURT:  Well, they would be in the abstract,

18  right?

19      MR. ABRAMS:  No, that is exculpatory material.

20  That I believe is the obligation of the State to tender.

21      THE COURT:  No, no, no.  Are there accident

22  reports?

23      MR. ABRAMS:  Yeah.  I mean he drove into a

24  hospital.

22

1        THE COURT:  How many accident reports are there?

2        MR. ABRAMS:  How many would there be?

3        MR. THRELKELD:  One.

4        MR. ABRAMS:  And that is it?

5        MR. THRELKELD:  One.

6        THE COURT:  One.

7        MR. ABRAMS:  What about the other accidents.

8    They're unreported?

9        MR. THRELKELD:  Yes, but they're on the sheet.

10        THE COURT:  Okay.

11        MS. FORESTER:  I'm not sure what the attorney is

12    saying.

13        THE COURT:  I know what he's saying exactly.

14    He's saying that this man is such a bad driver, he

15    drives into things, the building, the cars.  In this

16    case he drove into a person and he's got a pattern and

17    history of accidentally bumping into things.

18        MS. FORESTER:  That I get.  That I understand.

19        THE COURT:  He wants to show in court as part of

20    his defense that this is just another one of those

21    events and he wants to prove that he really did do all

22    these other things and he thinks you have information to

23    show that.

24        Now, it's not exactly exculpatory in the common

                        23

1    sense of our understanding but it may be circumstantial

2    exculpatory evidence.  It's very circumstantial.

3          MS. FORESTER:  Okay.  Counsel had indicated to me

4    that he was already in receipt of his drivers abstract.

5          THE COURT:  Do you have them?

6          MR. ABRAMS:  Just the abstract.

7          THE COURT:  You got to tell us -- I don't know

8    that they have this information under their control,

9    that they can just say give us this and give -- I don't

10   know how accident reports are even kept.  It's not like

11   a criminal offense police report.

12         MR. ABRAMS:  I understand.  But I thought those

13   types of accidents are assigned a R.D. number and the

14   computer gets them by the defendant's name.  That is the

15   way they were tendered to me on these incidents.

16         THE COURT:  You have the accident reports?

17         MS. FORESTER:  No.  Crimes committed against Miss

18   Kuansah.

19         THE COURT:  That you have but accident reports?

20         MS. FORESTER:  It's not the same system.  My

21   understanding, and it seems with all due respect that

22   counsel is in the best position because of the

23   defendant's knowledge of his own accidents, to obtain

24   those.  I will certainly make every effort.

24

1          THE COURT:  You have to talk to each other and

2     look at the abstract and find out which incidents on the

3     abstract involve matters, if you think they're Chicago

4     police or some police department, generated paper and

5     with that information when you disect those matters from

6     the abstract, she'll see if you can find them.

7          And, okay.  And I'll order you to do it because

8     it would be easier for you to do it.

9          MS. FORESTER:  I can't tell by looking at the

10    abstract.

11         THE COURT:  He'll talk with his client and he'll

12    come back and show you how ever many entries there are

13    in the abstract.  Not all of them are accidents but

14    those that he thinks might fall within his defense and

15    give you those, several of them and those are the ones

16    you'll look for.  Fair enough?

17         MS. FORESTER:  That is fine.

18                         (Whereupon, the above-entitled matter

19                          was continued to September 15,

20                          2000.)

21

22

23

24

                          25

1    STATE OF ILLINOIS )

2                     )

3    COUNTY OF COOK    )

4

5

6              I, ANN HIEBER, Official Court Reporter of

7    the Circuit Court of Cook County, County

8    Department-Criminal Division, do hereby certify that I

9    reported in shorthand the proceedings had in the

10   above-entitled cause, that I thereafter caused to be

11   transcribed into typewriting the above Report of

12   Proceedings, which I hereby certify is a true and

13   correct transcript of the proceedings had before the

14   Honorable JAMES LINN, Judge of the said Court.

15

16

17

18

19   _____

20             Official Court Reporter of the

21             Circuit Court of Cook County

22             CSR #  084-001393

23

24

EXZIBIT 2-B

1    as follows:

2                        DIRECT EXAMINATION.

3                    BY MS  CALLAHAN:

4         Q    In a loud,  clear voice, state your name, spell

5    your first and last name for the court reporter.

6         A    K-y-r-a. E-s-t-e-r.

7         Q    Miss Ester, how old are you?

8         A    21.

9         Q    And you live in Chicago?

10        A    Yes.

11        Q    I'm going to turn your attention back to

12   January 12th, year 2000. Back in January were you working in

13   the area of 63rd and Stony Island in Chicago, Cook County?

14        A    Yes.

15        Q    Approximately 9 o'clock p.m. on January 12th

16   of 2000, you recall where you were?

17        A    Yes, 63rd and Stony.  I was waiting--

18        THE COURT:  I want you to move up a little closer.

19        THE WITNESS:  A   I was at the bus stop on 63rd and

20   Stony Island.

21        MS. CALLAHAN:  Q   When you first arrived, were you

22   the only one or was there anyone else there?

23        A    There was a young lady already there.

24        Q    Did you later learn that this young lady's

                        B10

1    name was Michelle Slater?

2          A    Yes.

3          Q    Now when you first arrived at the bus stop,

4    did you notice a vehicle in the area of the bus stop?

5          A    Yes, I did.

6          Q    What vehicle did you notice?

7          A    I seen a red truck double parked in the middle

8    of the street.

9          Q    And this red truck, you recall which direction

10   it was facing northbound or southbound?

11         A    Northbound.

12         Q    With respect to the bus stop, were you on the

13   same side of the street as this red vehicle or across the

14   street?

15         A    Across the street.

16         Q    You were closer to the southbound lanes of

17   Stony Island?

18         A    Yes.

19         Q    On your side of the street where the bus stop

20   was, were there any cars parked on your side of the street?

21         A    Yes.

22         Q    When you first arrived at that bus stop at

23   approximately 9 o'clock was that red vehicle already doubled

24   parked in front of the bus stop or did it arrive after you

1    got there ?

2           A    Red truck was already there.

3           Q    And could you tell how many people were in

4    that vehicle when you first saw it?

5           A    2.

6           Q    And did you know was if it male or female

7    persons in that vehicle?

8           A    Yes, a male and female.

9           Q    Now after you arrived at the bus stop and saw

10   that red vehicle double parked on in the northbound lanes,

11   you see any other vehicle approaching the area?

12          A    Yes, I did.

13          Q    How soon after you arrived at the bus stop did

14   you see this other vehicle approach the area?

15          'A   At the same time I did.

16          Q    And can you describe if you could what this

17   other vehicle looked like?

18          A    A silver jeep.

19          Q    Where did you see this vehicle?  First of all,

20   which direction was this vehicle traveling on Stony Island?

21          A    Southbound .

22          Q    That would be in the lane closest to you, is

23   that right ?

24          A    Yes.

1          Q      And what did you see happen with respect to

2     the silver jeep?

3          A      It stopped right there on the side of the red

4     truck and in which I seen her raise down her window and say

5     something.

6          Q      When you say her, who do you mean?

7          A      The young lady that was in the red truck.

8          Q      And you indicated that she said something to

9     the driver of the silver car, is that correct?

10         A      Yes.

11         Q      Kyra, could you tell how many occupants were

12    in that silver truck?

13         A      No, I couldn't.

14         Q      Could you hear any of the conversation or any

15    words that were spoken between those 2 vehicles?

16         A      No, I didn't.

17         Q      Approximately how far were you from these 2

18    vehicles that were double parked on Stony Island?

19         A      I'm not precise, maybe ten feet.

20         Q      What happened after you saw what appeared to

21    be the female of that red car exchange words with the person

22    in the silver jeep?

23         A      After that I seen him pull out the silver

24    jeep, pull off.

1       Q   Which direction did that silver jeep pull off?

2       A   Southbound.

3       Q   Did you see where that silver jeep went?

4       A   To the stop sign.

5       Q   Where is that stop sign located?

6       A   Maybe 64th and Stony Island.

7       Q   Approximately how far would you say if you

8  could tell me in feet how far that stop sign was from where

9  you were standing?

10      A   In feet?

11      Q   Or half block, a block if you can estimate.

12      A   Maybe half a block.

13      Q   And what did you see when it got to that stop

14 sign?  What did you see happen with respect to that silver

15 jeep?

16      A   I seen the guy in the red truck get out.

17      Q   Did you see where the silver jeep was when the

18 guy in the red truck got out ?

19      A   He was at the stop sign.

20      Q   What happened after the guy in the red jeep

21 got out of that car?

22      A   He proceed to get in the red car.

23      Q   You said he proceed to get into the red car,

24 is that correct?

1       A    Yes.

2       Q    And where was that red car parked in relation

3  to where he got out of that red jeep?

4       A    Right across the street from where I was

5  standing.

6       Q    And after the man got out of that red jeep and

7  went towards the red car, what did you see happen next?

8       A    I seen the silver jeep make a U turn.

9       Q    Now when you saw the silver jeep making a U

10  turn, did you know or did you see where that red jeep had

11  gone?

12       MR. ABRAMS:  I'm going to object to the leading.

13       THE COURT: Sustained.

14       MS. CALLAHAN:   Q  After you saw the silver

15  jeep --

16       MR. ABRAMS:   Objection.

17       THE COURT:  Let her finish the question.

18       MS. CALLAHAN:  Q  After you saw the silver jeep

19  make a U turn, what did you see next?

20       THE WITNESS:   A   I seen the red truck pull off.

21       Q    What direction was that red trucking going?

22       A    Northbound.

23       Q    What street was it headed towards?

24       A    Back towards 63rd--62nd.

1       Q     What happened after you saw that red car pull

2   off towards 63rd or 62nd Street?

3       A     I then seen the silver jeep speed by.

4       Q     What happened when you saw the silver jeep

5   speed by?

6       A     At the same time I saw an object fly in the

7   air then scatter across the ground.

8       Q     I want to back up for a second.  You said that

9   you saw the silver jeep make a U turn, is that correct?

10      A     Yes.

11      Q     Where in relation to 64th Street did you see

12  this car make the U turn ?

13      A     I didn't understand the question.

14      Q     Where in relation to 64th Street did you see

15  this silver jeep make a U turn ?

16      A     At the stop sign.

17      Q     Would that be the stop sign at 64th and Stony

18  Island?

19      A     Yes.

20      Q     After you saw the silver jeep make the U turn,

21  could you estimate for the Court how many feet it traveled

22  before it reached that red car that was parked across the

23  street from you?

24      A     Maybe half block.

1      Q      After you saw that jeep make the U turn, what

2      direction was that silver jeep traveling in?

3             A      Northbound.

4             Q      And could you please describe for the Court

5      after you saw that jeep make the U turn the manner in which

6      that silver jeep was being operated by whoever was driving

7      it?

8             A      Can you rephrase the question?

9             Q      After that jeep made the U turn, describe

10     exactly how you saw that jeep being driven?

11            A      Very fast.

12            Q      You indicated that you saw an object flying

13     through the air, is that correct?

14            A      Yes.

15            Q      Could you tell me at anytime after you saw

16     that object flying through the air, did you see what

17     happened with respect to the silver jeep?

18            A      It kept going .

19            Q      And from the point that that silver jeep made

20     the U turn from the point that you saw that object flying in

21     the air, did you ever see that silver jeep stop or make any

22     hesitation ?

23            A      No, I didn't.

24            Q      You ever see the silver jeep swerve?

217

1          A     No.

2          Q     Now after you saw that object besides going

3     through the air, did you ever see the silver jeep?

4          MR. ABRAMS: Objection, Judge, leading.

5          THE COURT:  Try not to lead please.

6          MS. CALLAHAN:   Q   After you saw that object go

7     through the air, what did you see happen with respect to the

8     silver jeep?

9          THE WITNESS:  A   It kept going, kept driving.

10         Q     And at anytime after it made contact with that

11    object did it ever stop?

12         A     No.

13         Q     Could you see what direction, what happened to

14    that jeep after it continued on?

15         A     Kept going, kept driving.

16         Q     What direction was that silver jeep traveling

17    in?

18         A     Northbound.

19         Q     After you saw that silver jeep continue

20    northbound, could you tell me whether or not from the time

21    that you first saw it make the U turn until the time it

22    continued driving northbound, did that jeep ever appear to

23    change speeds to you?

24         A     Can you rephrase the question?

1          Q     From the time that you saw the silver jeep

2     make and complete the U turn from the time you said it

3     continued going northbound, did the speed of that vehicle

4     change or slow down?

5          A     It sped up.

6          Q     At what point did you observe that vehicle or

7     did you realize that vehicle was speeding up before or after

8     you saw that object flying through the air?

9          MR. ABRAMS:   Objection. It's leading.

10         THE COURT:  Overruled.

11         THE WITNESS:  A   Can you rephrase the question?

12         MS. CALLAHAN:   Q  At what point did you realize or

13    did you know that that car was speeding up ?

14         THE WITNESS:  A  You can hear it, I heard.

15         Q     Describe how you hear accelerating?

16         A     I heard it coming after he made the U turn.

17         Q     That would be before you saw that object

18    flying through the air?

19         A     Yes.

20         Q     And what happened after that silver jeep

21    continued on Stony Island?

22         A     I seen the red truck stop down the street and

23    the girl got out and walked back down there to where we was

24    standing.

1          MS. CALLAHAN:   Judge, may I approach the witness?

2    I'm going to show you what I have previously marked as

3    People's Exhibit Number 11 for identification. I'd ask you

4    if you can take a look at that photograph and tell me what

5    is depicted in that photograph ?

6          A     Say that again.

7          Q     What do you see in this photograph?

8          A     The red car that the guy he got into the red

9    car.   This is the car that the guy got into.

10         Q     When you say the guy which guy are you

11   referring to?

12         A     The guy that got hit.

13         Q     Did he actually get into the vehicle before he

14   got hit?

15         A     He wasn't all the way in.  He had the door

16   open.  He was trying to get into the car.

17         Q     Can you see in this photograph, Kyra, where

18   you were standing or sitting when you observed the things

19   that you just described for the Court?

20         A     Yes.

21         Q     Place your initials on the photograph where

22   you were when you saw the things that you have described?

23         MS. CALLAHAN:   Judge, for the record, she's placed

24   her initials at approximately the center of the photograph .

1        Q   Now you indicated in this photograph there is

2  a red vehicle, is that correct?

3        A   Yes.

4        Q   Was that vehicle parked across from that

5  location when you got to the bus stop that day?

6        A   Yes.

7        Q   I'm going to show you what I have previously

8  marked as People's Exhibit number 4 for identification and

9  ask you if you can take a look at that photograph?

10       A   Yes.

11       Q   And can you tell me what this photograph

12  shows?

13       A   It shows the bus stop in which I was standing

14  and the car in which the guy was getting into.

15       Q   Can you please if you can place your initials

16  near where you were standing in this photograph? What street

17  is depicted in this photograph?

18       A   Stony Island.

19       Q   Could you write the word Stony Island on the

20  photograph please? And you indicated that there was both

21  northbound on southbound lanes, is that correct?

22       A   Yes.

23       Q   Could you write an S and B on what was the

24  southbound lane and N and B which were the northbound lanes?

1    MS. CALLAHAN:  Judge, for the record, she's placed

2    the word Stony Island on the photograph and letter S and B

3    and the letters N and B?

4    THE COURT: The record will so note.

5    Q    Can you see in this photograph, is it depicted

6    where you saw the defendant making the U turn ?

7    A    Right up here like where this sign is at.

8    Q    If you could place an X on the photograph

9    approximately where you saw the defendant making the U

10    turn.  And if you could place a circle around that so we can

11    see it?

12    MS. CALLAHAN:  Judge, for the record, she's placed

13    an X with a circle on the photograph.

14    Q    Now in this photograph, there is a street sign

15    that's depicted. You see that in the photograph a small

16    green street sign?

17    A    Yes.

18    Q    And do you know what street that is?

19    A    No.

20    Q    Is that street sign near where the stop sign

21    you say you saw the defendant stopped at before he made the

22    U turn?

23    A    Yes.

24    Q    Could you circle that small green street

A22

1    sign. Now you indicated that the defendant before he made

2    the U turn, he stopped at that stop sign, is that correct?

3            A    Yes.

4            Q    You know how long or how much time went by

5    while he was sitting at that stop sign?

6            A    No, maybe 2 minutes .

7            Q    Prior to January 12th of 2000, did you know

8    the woman that was in that red jeep?

9            A    No, I didn't.

10           Q    Did you know the man that got out of the red

11   jeep?

12           A    No, I didn't.

13           Q    Kyra, you said you saw the defendant stop at

14   the stop sign, is that correct ?

15           A    Yes.

16           Q    Was that before or after he made the U turn?

17           A    Before he made the U turn.

18           Q    After the defendant made the U turn, from the

19   time that he made the U turn until the time he traveled

20   northbound on Stony Island, did you ever see him stop?

21           A    No.

22           MS. CALLAHAN:  Nothing further.

23           THE COURT: Cross.

24                          CROSS EXAMINATION

BY MR. ABRAMS:

1

2      Q    Miss Ester, you said you arrived at the bus

3 stop around about 9 o'clock at night?

4      A    No, I didn't say that.

5      Q    What time did you arrive at the bus stop ?

6      A    After 9.

7      Q    And how long were you there waiting for the

8 bus before the second person joined you ?

9      A    I didn't understand your question.

10      Q    How long were you there standing alone and

11 then joined by someone else?

12      A    I was never alone.  Someone was there before

13 me.

14      Q    So there was no buses coming?

15      A    No.

16      Q    No traffic?

17      A    No .

18      Q    So the first time that you notice anything --

19 May I approach, Judge?  I'll show you what has been marked

20 as People's Exhibit Number 3 and 4 for identification.

21 Number 4 you have already seen and you have made some marks

22 on it.  Can you identify what's in number 3, what's been

23 marked as People's Exhibit Number 3 ?

24      A    Yes.  Again the car in which the victim was

1    getting into and the bus stop.

2         Q    This is basically the same scene looking in

3    the opposite direction, correct?

4         A    Yes.

5         Q    You were on the other side of the street from

6    the red car that was parked ?

7         A    Yes.

8         Q    The first time that you saw --Well let me ask

9    you this.  Counting parking lanes, how wide is the street at

10   that point?  Counting the parking as a lane, how many lanes

11   of traffic and parking are there on each side?

12        A    2.

13        Q    So this is just one lane here and one parking

14   lane or can you get 2 cars and a parking lane?

15        A    2.

16        Q    Just 2 or 2 cars plus parking?

17        A    You say counting parking as a lane so that's

18   one lane, two lanes.

19        Q    Total?

20        A    Right.

21        Q    On each side?

22        A    Right.

23        Q    So now when the red truck comes over and stops

24   it's facing northbound?

25

1       A    Yes.

2       Q    And it's blocking the entire street at this

3   point, isn't it?

4       A    Exactly.

5       Q    No cars can can get by?

6       A    Right.

7       Q    How long was the red car parked there before

8   the silver jeep pulled up ?

9       A    Now that I don't know.

10      Q    Did you notice the red truck pull up?

11      A    No.  The red truck was already there.

12      Q    When you got there?

13      A    Yes.

14      Q    And how long did you watch the --How long had

15  you been waiting before the silver jeep pulled up?

16      A    Not that long.

17      Q    Time wise?

18      A    Maybe four or five minutes.

19      Q    So in that four or five minutes that red truck

20  was blocking traffic?

21      A    Right.

22      Q    No cars were coming ?

23      A    No.

24      Q    And then the silver truck it pulled up along

1    side but in the opposite direction of the red truck?

2         A    Yes.

3         Q    It was blocking traffic?

4         A    Exactly .

5         Q    No cars came in that timeframe?

6         A    No.

7         Q    You say that you watched the windows roll down

8    in the jeep and--

9         A    No, I didn't say that.  I said the window

10   rolled down in the red truck.

11        Q    You saw the window roll down?

12        A    Yes.

13        Q    And did you see the window up or down in the

14   silver car?

15        A    I couldn't tell .

16        Q    Was there a conversation out there?

17        A    She was saying something.

18        Q    Could you hear it?

19        A    No, I couldn't.

20        Q    Could you hear the person from the jeep say

21   anything?

22        A    No.

23        Q    Did it get loud ?

24        A    That I don't recall.

1          Q     How long was the conversation?

2          A     I can't be precise.  Just a few minutes

3     though.

4          Q     And during the time that the conversation was

5     going on, no traffic was going on, right?

6          A     Right.

7          Q     Now you say somebody exited the red truck?

8          A     Yes.

9          Q     And the red truck was near the red parked car?

10         A     Yes.

11         Q     And now you are watching all this and you see

12    someone get out of the red truck and the red truck pull off

13    going north?

14         A     Yes.

15         Q     And at the same time that person got out of

16    the red car, how far did they have to walk to the car that

17    person?

18         A     She was parked on the side of the car.

19         Q     It was wasn't a far walk?

20         A     No.

21         Q     It was just like out the door stepping over?

22         A     Yes.

23         Q     And then after that person stepped out of the

24    truck, had the red truck pulled off?

1       A    Yes.

2       Q    And when the red truck pulled off then the

3  silver jeep pulled off?

4       A    No, the jeep pulled off before the red truck.

5       Q    Did the jeep pull off before the guy got out

6  of the truck ?

7       A    No.

8       Q    I want to get the sequence on this. The guy,

9  the jeep pulls off, the guy get out of the truck and the red

10  truck pulls off?  Is that the sequence?

11       A    Yes.

12       Q    So now how long did it take the guy to get

13  from the red truck to his car one step, two steps?

14       A    Yes, maybe 2 or 3 steps.

15       Q    Did you notice when the red truck pulled off

16  that the guy went to his car?

17       A    He got in his car.

18       Q    And when you say in his car was he sitting

19  down in it?

20       A    No.

21       Q    What do you mean he got in his car?

22       A    He opened the door and was proceeding to get

23  in.

24       Q    At that point he was struck by the jeep?

1          A     Yes.

2          Q     Did you see the jeep actually strike that car?

3          A     Yes.

4          Q     And where was the first point on that red car

5    that the jeep struck?

6          A     Can you rephrase the question?

7          Q     Well where did the jeep hit the car the first

8    place it hit?

9          A     The door.

10         Q     I'll show you what has been marked as People's

11   Exhibit 12 for identification. What is in that picture

12   there?

13         A     The car, the back of the car.

14         Q     Is that the red car?  I'm going to show you

15   what has been marked as People's Exhibit number 17 for

16   identification. Is that the same red car?

17         A     Yes.

18         Q     You notice on People's Number 12 the marks

19   with the broken tail light by the back there?  Did you see

20   the jeep hit the back of this car?

21         A     I didn't see it hit the back of the car.

22         Q     How long was it from the time the gentleman

23   got by the red car until he opened the door and started to

24   make his entry?

1        A    Can you rephrase the question?

2        Q    You testified that the gentleman got out of

3  the red truck?

4        A    Yes.

5        Q    The jeep pulls away, the red truck pulls away

6  and the gentleman goes to his car, to the red car?

7        A    No, that's not what I said .

8        Q    Let's do it again so I get it right. The

9  gentleman steps out of the red truck.  Is that the first

10  thing ?

11       A    No.

12       Q    The silver jeep pulls away?

13       A    Yes.

14       Q    Then the gentleman steps out of the red truck?

15       A    Yes.

16       Q    Then the red truck pulls away?

17       A    Yes.

18       Q    After the gentleman stepped out of the red

19  truck, how long was it before he opened the door?

20       A    A few seconds.

21       Q    Right away?

22       A    Right.

23       Q    And did he just stay there with his door open

24  before he got in or did he just go right in?

Case 1:08-cv-01479   Document 1   Filed 03/10/2008   Page 78 of 118

1    A    He never made it in.

2    Q    So within a few seconds of opening the door,

3    that's when he was struck by the jeep?

4    A    Yes.

5    Q    And all you saw was the jeep strike the open

6    door?

7    A    And I seen an object fly in the air.

8    Q    But that's the only --You didn't see the

9    object he struck, did you?

10    A    I seen him fly in the area.

11    Q    Did you see the jeep actually make contact

12    with that object ?

13    A    Can you rephrase the question?

14    Q    Did you actually see the jeep hit that object,

15    that object you learned was a person?

16    A    Yes.

17    Q    Did you actually see the jeep strike that

18    person?

19    A    Yes.

20    Q    And did you actually see the jeep strike the

21    door?

22    A    It happened all at once so we wasn't you

23    know --he hit him then the door.  It happened all at once.

24    Q    You did not see that jeep strike the back of

1     A    Yes.

2     MS. FORESTER:  Nothing further.

3     THE COURT:  Any other questions?

4     MR. ABRAMS:  Nothing.

5     THE COURT:  Thank you.  You're excused.

6                      (Witness excused.)

7     THE COURT:  Government may call your next witness.

8                      (Witness sworn.)

9     THE COURT:  Please be seated, try and keep your

10    voice loud.  You may inquire.

11    MS. CALLAHAN:  Thank you, Judge.

12                      MICHELLE SLATER,

13    the witness herein, called as a witness on behalf of

14    the People of the State of Illinois, having been first

15    duly sworn, was examined and testified as follows:

16                      DIRECT EXAMINATION

17                          BY

18                      MS. FORESTER:

19    Q    Can you please tell the judge your name,

20    spell your name for the court reporter?

21    A    Michelle Slater, S-l-a-t-e-r.

22    Q    And are you employed, Michelle?

23    A    Yes, I am.

24    Q    What kind of work do you do?

1      A    I'm a dental assistant at Soell Dental

2  Associates.

3      Q    And that's downtown?

4      A    Uh-huh.

5      Q    How long have you been a dental assistant?

6      A    Three and-a-half years.

7      Q    I'm going to direct your attention back to

8  January 12th of the year 2000, what kind of job were

9  you working then?

10     A    I was working at Walgreen's as a cashier.

11     Q    Which Walgreen's was that?

12     A    55th and Lake Park.

13     Q    How far is that from 63rd and Stony Island?

14     A    Like around the corner and right up the

15  block.  It's not that far.

16     Q    And in the evening hours on January 12th of

17  the year 2000, were you working?

18     A    Yes.

19     Q    About what time did you get off?

20     A    I got off at I think 8:30.

21     Q    Where did you go after you got off?

22     A    I went to the store.

23     Q    And at some point were you in the area of

24  63rd and Stony Island?

1          A       Yeah, after I got on -- after I left the

2    store, I took the Stony Island bus to 63rd and Stony

3    Island and waited on the 63rd Street bus.

4          Q       So at approximately 9:30, were you at the bus

5    stop there at 63rd and Stony Island?

6          A       Yeah, about 9:30, 9:40.

7          Q       As you were waiting for the bus, did you

8    notice anything out in front of you?

9          A       There was a red truck with a young lady and a

10   young man sitting in front like double parked right

11   like on the other side in front of the park.

12         Q       And was the man in the passenger or the

13   driver's seat?

14         A       He was in the passenger seat.

15         Q       And the lady was in the driver --

16         A       She was the driver, uh-huh.

17         Q       As they were seated there, did anything

18   happen?

19         A       Like about 15 minutes later a white truck

20   pulled up on the side of them, on her side.  And they

21   had a couple of words, but I didn't hear what they

22   were saying not until he got kind of loud.

23         Q       He are you talking about the person driving

24   the car that came up?

1      A    Uh-huh, in the white truck, he got kind of
2  loud and said, "Okay, well, I'll be back."
3      Q    And after he said, "I'll be back" --
4      A    Uh-huh.
5      Q    -- did you continue to watch what was going
6  on?
7      A    Yes.
8      Q    What happened, what did you see next?
9      A    He pulled like maybe five feet -- there's a
10 stop sign right at the corner, and he just pulled up
11 to there and sat there.
12     Q    And did you see where -- did anyone get out
13 of the red truck that was sitting there?
14     A    Yeah, the guy on the passenger side he got
15 out and got in the car that was next to the truck.
16     Q    And did the lady stay there that was driving
17 the car?
18     A    Naw, as soon as he got out, she pulled off,
19 and she got stopped at a red light.
20     Q    And that would be at 63rd?
21     A    Uh-huh, at 63rd.
22     Q    Did you see where that second truck that had
23 pulled going south --
24     A    Uh-huh.

1      Q   -- did you see where that truck went?

2      A   Yeah, he was still at the stop sign, and

3  after the guy -- after she pulled off, the guy walked

4  around his car to get in the passenger side; and the

5  guy in the white truck, you know, kind of made a

6  U-turn and hit him and kept going.

7      Q   Now, when you say he made a U-turn?

8      A   Uh-huh.

9      Q   About how far down the block was that car

10  when you saw it come back towards where the man was

11  standing by his car?

12     A   It wasn't that far.  It was just like -- all

13  you had to do was turn the corner, and he was right

14  there getting ready to get inside his car.  So it took

15  like a second for him to make the U-turn, hit the guy,

16  and keep going.

17     Q   Can you describe the speed that this car was

18  going when it struck --

19     A   Oh, he was going really fast.  You know, it

20  was like he kind of like -- he was at a complete stop

21  at the stop sign.  It was like, you know, he was just

22  waiting, and then he turned, and hit him, and it was

23  going really fast.  I remember it was going really

24  fast.  And he just hit him, and he kept going right

1    through the red light because she was still at the red

2    light.

3         Q    Now, when this car struck the person that was

4    standing in the street --

5         A    Uh-huh.

6         Q    -- did it slow down at all?

7         A    No.

8         Q    Did it stop and come back?

9         A    No.

10        Q    Was anyone else out there with you at the bus

11   stop?

12        A    Yeah, it was another young lady out there.

13        Q    I'm going go to show you what I've previously

14   marked People's Exhibit No. 4?

15        A    Uh-huh.

16        Q    Do you recognize what's shown in this

17   photograph?

18        A    Yes.

19        Q    What's shown here?

20        A    This was the bus stop where me and the other

21   young lady were.  This is the bus stop.  This is the

22   car, and this is the way that the car was going

23   because it stopped at this stop sign and -- at the

24   corner, it made a U-turn, hit him, and kept going.  I

1    was at this bus stop with another young lady.

2        Q    So if you could just put your initials by the

3    bus stop where you've pointed that you were standing

4    when you saw the car strike the person?

5        A    (Witness marks exhibit.).

6        Q    For the record the witness has placed her

7    initials on People's Exhibit No. 4.

8            Now, you indicated that it was down at this

9    area (indicating) --

10       A    Uh-huh.

11       Q    -- that you saw the car come back, and the

12   man was standing here when he got struck (indicating)?

13       A    Uh-huh.

14       Q    Okay.  Thank you.

15   THE COURT:  Let me see that picture please.  Do

16   you mind if I look at it now?  Mr. Abrams, do you mind

17   if I look at it now?

18       MR. ABRAMS:  No, go ahead.

19                        (Brief pause.)

20   BY MS. FORESTER:

21       Q    Michelle, you indicated that the car was back

22   by the stop sign after it turned around -- he had

23   stopped and appeared to be waiting, is that right?

24       A    Yeah, he was just -- the car was just

1    standing there.  Because, you know, after he got loud

2    with whatever he was saying, you know, me and the

3    other girl were like what's going on, you know, trying

4    to, you know, really be nosy, you know, because he got

5    loud.  So after he said he'll be back or whatever, he

6    pulled up to the stop sign, and he just sat there,

7    just sat there.

8         Q    And then after the woman pulled away --

9         A    Uh-huh.

10        Q    -- is that when that car started towards

11   where the man was standing?

12        A    Yes, it's like they pulled off at the same

13   time.  When she pulled off, he pulled off, made a

14   U-turn, hit him, and kept going through the light;

15   because she was still at the red light when he went

16   through.

17        Q    Now, when this car hit the man that had just

18   gotten out of the lady's car --

19        A    Uh-huh.

20        Q    -- did it appear that it was out of control?

21        A    No.

22        Q    Why not?

23        A    It was a straight.  It was just a straight

24   shot.  It didn't swerve or anything like that.  It hit

1   the guy and kept going straight.

2      Q    Did it appear to you that this car had slowed

3   down either before or after striking the man standing

4   there by his car?

5      A    No, it didn't slow down at all.  It just went

6   straight on through.  Hit the guy full speed and kept

7   on going.

8      MS. FORESTER:  May I have a moment?

9                          (Brief pause.)

10     MS. FORESTER:  I have nothing further.

11     THE COURT:  Cross.

12                     CROSS-EXAMINATION

13                          BY

14                     MR. ABRAMS:

15     Q    Now, Ms. Slater, you said that about 9:30 you

16   arrived at that bus stop?

17     A    Uh-huh.

18     Q    And when you arrived there, were you the

19   first one there or was that the other woman already --

20     A    I was the first one there.

21     Q    And you said that approximately 15 minutes

22   later, the red truck with people inside pulled up?

23     A    No.  The red truck was already there once I

24   was at the bus stop.  I said the white truck pulled up

1    15 minutes later.

2        Q    I'm sorry.  I'm sorry.  I'm going to show you

3    what's been marked as People's No. 4?

4        A    Uh-huh.

5        Q    Do you see the X on that?

6        A    Yes.

7        Q    Now, you see the red car there?

8        A    Uh-huh.

9        Q    Was that car struck during this incident?

10       A    Yes.

11       Q    Okay.  Now, the car that was -- that pulled

12   up alongside of it, was it alongside of this red car?

13       A    No, the truck that she was in was on the side

14   of this car (indicating).  He was -- the white truck

15   was on the side of her truck.

16       Q    I'm trying to understand?

17       A    Uh-huh.

18       Q    In relation to this red car --

19       A    Okay.

20       Q    -- where was the red truck?

21       A    Right next to it.  It was double parked.

22       Q    That's what I was -- yeah.

23       A    Uh-huh.

24       Q    Okay, so and then that -- when that red truck

1    pulled up and doubled parked alongside the red car --

2        A    Uh-huh.

3        Q    -- it stayed at that spot, didn't it?

4        A    Uh-huh.  Yes, it did.

5        Q    It stayed at that particular spot?

6        A    Uh-huh.

7        Q    And then -- it stayed there for about 15

8    minutes; is that what your testimony is?

9        A    It was sitting there already when I got to

10   the bus top.

11       Q    Okay.

12       A    I don't know how long it had been sitting

13   there.  It was already sitting there.

14       Q    Well, after you arrived how long was it

15   before --

16       A    Before what?

17       Q    -- the silver Jeep pulled up?

18       A    About 15 minutes.

19       Q    Okay, so the red car -- the red truck --

20       A    The red truck.

21       Q    -- was double parked for at least 15 minutes

22   before the jeep showed up?

23       A    Uh-huh.

24       Q    And was there any traffic on that street?

1     A    No, it was late.  There wasn't no one coming

2    back and forth, maybe a car once every 20 minutes.

3     Q    So no traffic was --

4     A    No.

5     Q    Okay, so now the silver -- the silver jeep

6    pulls up?

7     A    Uh-huh.

8     Q    And the jeep pulls up, and you said it pulled

9    up alongside the red truck?

10     A    Uh-huh.

11     Q    And it got loud?

12     A    No, I said he got loud.

13     Q    And when you say he got loud, could you

14    actually hear the driver of that jeep have a

15    conversation or say things?

16     A    They were saying something back and forth.

17    At the beginning I didn't hear them, but when he got

18    loud and said, "Okay, I'll be back," that's when I

19    heard him.

20     Q    Okay, so you heard the driver of the jeep say

21    things?

22     A    I heard him say, "Okay, I'll be back."

23     Q    Well, what did he -- he said things before

24    then, and you just couldn't make out the words?

1       A    Right, they were talking back and forth.

2   They were having a conversation.

3       Q    How long were they having this conversation?

4       A    Not long, not long after he pulled up.  You

5   know, he kind of, you know, they were going back and

6   forth talking, but I didn't hear anything until he

7   said, "Okay, I'll be back," and then he pulled off.

8       Q    But you can actually hear a man's voice and a

9   woman's voice?

10      A    Yeah.

11      Q    Having a conversation?

12      A    Uh-huh.

13      Q    You just didn't make out the words?

14      A    Right, I didn't make out the words.

15      Q    Until "I'll be back"?

16      A    Right, until he got louder.

17      Q    Okay, and how long did that conversation

18  last?

19      A    Not long, like five minutes.

20      Q    So then at that point you were watching this

21  whole thing because of the loud conversation?

22      A    Right, with him getting loud we kind of drew

23  our -- you know --

24      Q    You said you were getting nosy?

1       A       Right, yeah, I was getting nosy.

2       Q       So now somebody got out of the red truck?

3       A       Uh-huh.

4       Q       And did you see where that person went?

5       A       Yeah, he just -- after she pulled off, he

6   walked around to get to the driver's side.

7       Q       What do you mean he walked around to get

8   around to the driver's side?

9       A       He walked around to his side of the car to

10  get in the driver's side.

11      Q       Was the red truck facing the same direction

12  as the red car?

13      A       Yeah.

14      Q       And this gentleman was in the passenger seat?

15      A       Uh-huh.

16      Q       And you saw him get out of the passenger

17  seat?

18      A       Uh-huh.

19      Q       Didn't he just have to step right over to his

20  car?

21      A       Yeah, he probably did.

22      Q       But he got out and walked around?

23      A       Okay, well, he got right out and stepped out

24  and got in -- getting ready to get into his car.

A-71

1      Q    Okay, so he didn't get out and walk around

2   the red truck?

3      A    No, he didn't.

4      Q    He got out and walked to his car?

5      A    Yeah.

6      Q    And did you see him open the door to his car?

7      A    Yeah, I saw him open it, but he didn't get a

8   chance to get in.

9      Q    Okay, but in the meantime when he stepped out

10  of the red truck --

11     A    Uh-huh.

12     Q    -- the red truck pulled off?

13     A    Yes.

14     Q    And you watched the red truck drive up to the

15  corner and stop at the red light?

16     A    Uh-huh.

17     Q    And then when the red truck was at the corner

18  at the red light, this gentleman was still trying to

19  get into his car, he hadn't gotten into his car yet?

20     A    Right.

21     Q    Did you watch why he was delaying get into

22  his car?

23     A    No.

24     Q    So you were just watching the red car at that

1    point?

2         A    No, I was watching the white car actually.

3         Q    Okay, so the white car was -- was still --

4         A    Still at the corner.

5         Q    Okay, where it was originally?

6         A    Uh-huh.

7         Q    And then that white car made a U-turn?

8         A    Uh-huh.

9         Q    And it hit the guy?

10        A    And kept going through the red light.

11        Q    Did you know the guy that was struck by the

12   car?

13        A    No.

14        Q    Did you know the woman in the red truck?

15        A    No.

16        Q    Did you know the driver of the Jeep?

17        A    No.

18        Q    Before then -- before the white Jeep arrived,

19   had you ever seen this gentleman here drive a car

20   anywhere?

21        A    No, I don't even know him (indicating).

22        THE COURT:   Indicating the defendant.

23   BY MR. ABRAMS:

24        Q    And what was the only words that you said

1    that you understood him say?

2         A    "I'll be back."

3    MR. ABRAMS:  Okay, thank you.

4    THE WITNESS:  Uh-huh.

5    THE COURT:  Any other questions, Ms. Forester?

6                   REDIRECT EXAMINATION

7                          BY

8                   MS. FORESTER:

9         Q    What was the tone of the defendant's voice,

10   that voice, "I'll be back" --

11        A    Uh-huh.

12        Q    -- or "Okay, I'll be back," what was the tone

13   of his voice; how would you describe that?

14        A    Well, I guess he was kind of upset or

15   agitated or whatever.  Because when he was having the

16   conversation at first, I couldn't make it out; he was

17   at a low tone.  But when he said, "Okay, I'll be

18   back," he, you know, got kind of upset.  You know, it

19   was loud like a boom, you know, "Okay, well, I'll be

20   back," you know, kind of agitated.

21        Q    Okay.

22        A    If it was quiet, I would have heard what he

23   was saying at the beginning when they were having the

24   conversation, but I didn't hear that because he was at

1  a low tone.

2      MS. FORESTER:  Okay, nothing further.

3      THE COURT:  Any other questions?

4               RECROSS EXAMINATION

5               BY

6               MR. ABRAMS:

7     Q   You've never heard this gentleman speak?

8     A   I don't know him.

9     Q   So you don't know if that was agitated, do

10  you?

11     A   Well, I know that if he wasn't agitated or if

12  he, you know, if the conversation was on the same

13  level, then he wouldn't have gotten loud.

14     Q   But you don't know what the previous words

15  were?

16     A   I know people.  I know people.

17     Q   You don't know what the previous words were;

18  so you don't know if the previous words agitated him,

19  do you?

20     A   No, I don't know if they agitated him.  I

21  know what he said he was upset.

22     Q   Could you tell if the window in the Jeep and

23  the window in the truck were up or down?

24     A   I believe they were down.

1     MR. ABRAMS:  Nothing further.

2     THE COURT:  Any other questions of this witness?

3     MS. FORESTER:  No, Judge.

4     THE COURT:  Thanks.

5                      (Witness excused.)

6     THE COURT:  Ms. Forester, get your witness.

7         Step up please.  Please raise your right

8  hand.

9                      (Witness sworn.)

10    THE COURT:  You may inquire.

11    MS. FORESTER:  Thank you, Judge.

12              DR. REXENE WORRELL,

13  the witness herein, called as a witness on behalf of

14  the People of the State of Illinois, having been first

15  duly sworn, was examined and testified as follows:

16              DIRECT EXAMINATION

17                    BY

18              MS. FORESTER:

19    Q    Can you please tell the judge your name and

20  spell your name for the court reporter?

21    A    Rexene Worrell, R-e-x-e-n-e; last name is

22  W-o-r-r-e-l-l.

23    Q    Doctor, by whom are you employed?

24    A    The Cook County Medical Examiner's Office.

1     Q     In what capacity?

2     A     As an assistant medical examiner.

3     Q     How long have you been so employed?

4     A     A little over a year and-a-half.

5     Q     Are you licensed to practice medicine in the

6   State of Illinois?

7     A     Yes, ma'am.

8     Q     Can you tell the judge a little bit about

9   your educational background?

10     A     I attended Metropolitan State College for an

11   undergraduate Bachelor of Science Degree, then

12   attended Ross University School of Medicine and

13   received my medical degree.  And then I did an

14   anatomical pathology residency at Cook County Hospital

15   in Chicago.  After that I started or I did my last

16   year at the Medical Examiner's Office, and I'm

17   currently in a fellowship program at the Medical

18   Examiner's Office.

19     Q     Approximately how many autopsies have you

20   performed?

21     A     Almost 400.

22     Q     Have you been qualified previously as an

23   expert in the field of forensic pathology?

24     A     Yes, ma'am.

1       Q    And how many times?

2       A    Once.

3       Q    And that's here in Cook County?

4       A    Correct.

5       MS. FORESTER:  Judge, at this time I'm asking that

6    this witness be declared an expert in the field of

7    forensic pathology and permitted to testify as such.

8       THE COURT:  Any objection?

9       MR. ABRAMS:  No objection.

10      THE COURT:  All right, without objection she may

11   testify as an expert witness.  You may ask her

12   questions regarding her opinions in her field of

13   expertise.  Go ahead.

14      MS. FORESTER:  Thank you, Judge.

15   BY MS. FORESTER:

16      Q    Doctor, directing your attention to January

17   13th of the year 2000, did you perform a post-mortem

18   examination on an individual by the name of Linton

19   Boyd?

20      A    Yes, I did.

21      Q    Would it help you to refer to your notes for

22   purposes of your testimony?

23      A    Yes.

24      THE COURT:  You may.

1    BY MS. FORESTER:

2       Q   Doctor, when you first received the body of

3    Linton Boyd, did you make any observations with regard

4    to external injury?

5       A   Yes, I did an external examination of the

6    body.

7       Q   And what evidence of injury did you observe

8    to the outside of the victim's body?

9       A   I made note of several abrasions on his body

10   that were apparent on his forehead, upper back, mid

11   back, right back, and his buttock, as well there were

12   three separate abrasions on his penis.  There were

13   some small lacerations on the right arm.  There was an

14   abrasion on the right elbow.  There was also a

15   laceration on the left elbow.  There was a bruise on

16   his groin.  There was a small puncture wound on his

17   groin.  There were bruises and abrasions on his lower

18   extremities as well.  I mentioned five of those that I

19   found.  Oh, and then on the knee there was also an

20   abrasion; so multiple abrasions on the body.

21      Q   Did you also examine the body of Linton Boyd

22   internally?

23      A   Yes, I did.

24      Q   And what evidence of injury did you discover

1     from your internal examination?

2         A     The most significant injury that I saw at the

3     autopsy, the one that actually caused his death, was

4     that his cervical spine which is the neck was

5     fractured.  He also had blood in the peritoneal

6     cavity.  He had some hemorrhages in the mesentery

7     which is the fat that surrounds the intestines, and he

8     also had hemorrhage around the pelvis.

9         Q     Doctor, did you reach an opinion within a

10    reasonable degree of medical certainty as to what the

11    cause of death was for Linton Boyd?

12        A     Yes.

13        Q     And what was that?

14        A     That he died of multiple injuries, the result

15    of a pedestrian being struck by an automobile.

16        Q     Doctor, I'm going to show you what's been

17    previously marked as People's Exhibit 2 and No. 6

18    which have both been shown to defense counsel.

19              First, with regard to People's Exhibit No. 2,

20    do you recognize what's shown in that photograph?

21        A     Yes, I do.

22        Q     What's that?

23        A     This is an identification picture that we

24    take of every case that we have; that is a picture of

1    the victim with his specific number that's designated

2    to show me that this matches this case.

3        Q    And what number was designated for Linton

4    Boyd?

5        A    263 June of 2000.

6        Q    June or --

7        A    Or January -- 263 January.

8        Q    I'm going to show you now what I've marked as

9    People's Exhibit No. 6 for identification, do you

10   recognize what this shows?

11       A    Yes, this is an x-ray that was taken the

12   morning that I did the autopsy.

13       Q    And does this show the injury that you

14   previously described for the judge, that is the injury

15   to the cervical spine?

16       A    Correct.  This shows that he has a fracture

17   of C-1; that's actually fractured several places and a

18   dislocation of the head on the cervical spine.

19       Q    Does this, People's Exhibit No. 2, truly and

20   accurately show how Linton Boyd looked the morning

21   that you examined his body?

22       A    Yes, it does.

23       Q    And does People's Exhibit No. 6 truly and

24   accurately show the x-ray that you viewed in

1   conjunction with forming your opinion with regard to

2   the cause of death?

3        A    Yes.

4        MS. FORESTER:  May I have a moment, your Honor?

5        THE COURT:  Yes.

6   BY MS. FORESTER:

7        Q    Doctor, you described the internal injuries.

8   The major injury that you believed was the cause of

9   the death as the injury to the cervical spine, why is

10  that; why would that have caused Linton Boyd to die?

11       A    The neck fracture and the displacement of the

12  head dislocation would be an instantaneous cause of

13  death in anybody.

14       Q    Why?

15       A    Because you effect the cervical spine;

16  there's damage to the cord.

17       Q    Would it interfere with any neurological

18  functions or organs; how exactly would that manifest

19  itself as far as the sensation of life?

20       A    Well, basically the brain through the spinal

21  cord controls virtually every function of the body;

22  and if you damage the cord or sever the cord which

23  often happens when the spine is fractured and

24  definitely occurs when you dislocate the spine from

1    listed in all these -- this post-mortem examination

2    that you can say to a reasonable degree of medical

3    certainty were not the result of an auto accident?

4        MS. FORESTER:  Objection.

5        THE COURT:  She may answer.

6        THE WITNESS:  I don't understand your question.

7    BY MR. ABRAMS:

8        Q    Well, all the injuries that you listed here,

9    could you say that those were caused intentionally?

10       A    Referring to this case or --

11       Q    Referring to 263 of January 2000, can you say

12   that any injuries that you have listed in this

13   post-mortem examination were intentionally caused

14   based on your expertise?

15       A    For this particular case and the report that

16   I received, I would say that all of them were caused

17   intentionally.

18       Q    But based on your expertise can you say --

19   not what the police told you to write down, what you

20   came to your own conclusion, can you say that the

21   injuries caused here are different than the other 70

22   cases that you've done post-mortems on?

23       A    My report standing alone?

24       Q    Yeah?

1      A    No, I could not say that.

2      Q    Are there any injuries in this that are

3    different than these 70 other auto accident deaths

4    that you did autopsies on?

5      A    Every case the injuries are different if --

6    so I guess I don't understand your question.

7      Q    Well, what I'm asking is can you say to a

8    reasonable degree of medical certainty that these were

9    not accidentally caused injuries?

10      A    No.

11    MR. ABRAMS:   I have no further questions.

12    THE COURT:   Any other questions?

13                    REDIRECT EXAMINATION

14                    BY

15                    MS. FORESTER:

16      Q    Doctor, you can say, however, that based on

17    your examination that this is consistent with someone

18    deliberating running someone over?

19      A    (No audible response.).

20      Q    Consistent?

21      A    Using all the information available to me,

22    yes.

23    MS. FORESTER :   Nothing further.

24

1                    RECROSS-EXAMINATION

2                    BY

3                    MR. ABRAMS:

4        Q    Doctor, you've never done an autopsy on

5    anyone else that's been deliberately run over, have

6    you?

7        A    No, sir.

8        Q    So this is a brand new revelation to you, but

9    the injuries are the same as the other 70 auto

10   accidents?

11       A    Correct.

12       MR. ABRAMS:   I have nothing further.

13       THE COURT:   Any other questions?

14       MS. FORESTER:   No, Judge.

15       THE COURT:   Thank you, Doctor.

16                              (Witness excused.)

17       THE COURT:   How many more witnesses do you have

18   today?

19       MS. CALLAHAN:   Judge, there are two that we would

20   like to put on because they're from downstate, but the

21   others could wait.

22       THE COURT:   Well, no.

23                              (Witness sworn.)

24       THE COURT:   Ms. Callahan, you may inquire.

1    MS. CALLAHAN:  I was just going to ask if she may

2   have permission to remain in the courtroom.

3    MR. ABRAMS:  What was the question?

4    MS. CALLAHAN:  If she may remain in the courtroom

5   during the testimony, Judge.

6    THE COURT:  No objection?

7    MR. ABRAMS:  No.

8    THE COURT:  All right.  Government call your next

9   witness.  Who is the next witness?

10    MS. FORESTER:  Asha.

11                    (Witness sworn.)

12    THE COURT:  Try to keep your voice loud.

13        You may inquire, Ms. Forester.

14              EDWINA ASHA QUANSAH,

15   the witness herein, called as a witness on behalf of

16   the People of the State of Illinois, having been first

17   duly sworn, was examined and testified as follows:

18                  DIRECT EXAMINATION

19                  BY

20                  MS. FORESTER:

21    Q    Could you please tell the judge your name and

22   spell your full name for the court reporter?

23    A    Edwina Asha Quansah, E-d-w-i-n-a  A-s-h-a

24   Q-u-a-n-s-a-h.

1      Q      Do you go by Edwina?

2      A      No, I go by Asha.

3      Q      Asha, how old are you?

4      A      21.

5      Q      Do you go to school?

6      A      Yes.

7      Q      What kind of school do you go to now?

8      A      It's a training center on the west side for a

9   medical assistant.

10     Q      Do you live with your parents right now?

11     A      Yes, I do.

12     Q      And that's in the City of Chicago?

13     A      Yes.

14     Q      Asha, I'm going to direct you back to January

15   of the year 2000, were you working back then?

16     A      Yes.

17     Q      Where were you working?

18     A      At the south side YMCA.

19     Q      And what's the address?

20     A      6330 South Stony Island.

21     Q      That's in Chicago, Cook County, Illinois?

22     A      Yes.

23     Q      I'm going to ask you to look around the

24   courtroom and tell me if you see an individual by the

1    name of Michael Threlkeld?

2        A    Yes.

3        MR. ABRAMS:   Judge, we'll stipulate she can

4    identify Michael Threlkeld.

5        THE COURT:   Okay, indicating the defendant.   Go

6    ahead.

7    BY MS. FORESTER:

8        Q    How do you know Michael Threlkeld?

9        A    He's an ex-boyfriend.

10       Q    How long did you have a dating relationship

11   with the defendant?

12       A    Six and-a-half years.

13       Q    At some point during the year of 1999, did

14   your relationship end?

15       A    Yes.

16       Q    Do you remember when that was?

17       A    Like in September.

18       Q    Prior to that in June of 1999, was there ever

19   an incident with the defendant and your car?

20       A    Yes.

21       Q    What was that?

22       A    That was when he busted my front windshield

23   and my side, my side window.

24       Q    What kind of car did you have back then?

1     A   A '91 Blazer.

2     Q   Do you still have that kind of car now?

3     A   Yes.

4     Q   What color is it?

5     A   It's red.

6     Q   About five months later around November of

7 1999, was there another incident involving you, the

8 defendant, and that car?

9     A   Yes.

10    Q   What happened?

11    A   That was when my windshield wiper was bent

12 and my side mirror was bent.

13    Q   Now, as to each of those incidents, did you

14 talk to the defendant about them?

15    A   Yes.

16    Q   And what did he tell you?

17    A   Well, he just said that he did it cause he

18 was angry cause I wouldn't talk to him.

19    Q   In both of those different times?

20    A   Yes.

21    Q   In December of 1999 was there an incident

22 involving your car and the tires while you were at

23 work?

24    A   Yes.

1     Q    Can you tell the judge what happened?

2     A    When I got off work, I noticed that my car

3 was on three flats.

4     Q    Three flat tires?

5     A    Three flat tires, yes.

6     Q    Did you talk to the defendant about that?

7     A    Yes.

8     Q    What did he tell you?

9     A    The same thing, that he was angry cause I

10 didn't talk to him.

11     Q    So he admitted slashing your tires because he

12 was angry?

13     A    Yes.

14     Q    Still in December about three days after your

15 tires were slashed, did you see the defendant again?

16     A    In a restraining order court.

17     Q    Now, before you got the restraining order,

18 was there an incident where the defendant had a bat?

19     A    Yes.

20     Q    What happened at that time?

21     A    I was in the back of the YMCA about to take

22 an older lady home, and I was sitting in my car, and

23 he came to the car with a bat.

24     Q    And did the defendant say or do anything

1   while he held that bat?

2       A    I mean, I don't know what he was saying, but

3   yes he was saying something.

4       Q    And did you get out of your car when he came

5   up with the bat?

6       A    No.

7       Q    Why not?

8       A    Well, I mean I wasn't -- he had a bat, and I

9   wasn't going to get out of the car, no.

10      Q    At some point did he do anything with the

11  bat?

12      A    He tapped my -- the back light with the bat.

13      Q    Was there any damage to the back light?

14      A    It cracked.

15      Q    After that incident -- this is in December of

16  1999, is that correct?

17      A    Yes.

18      Q    Was there an incident near your home when you

19  were coming home one morning?

20      A    Yes.

21      Q    Can you tell the judge about that?

22      A    I was coming home about 4:00 o'clock in the

23  morning, and I was reversing down the alley.  And it

24  was a van coming towards me and the alley, and it

1  was -- and I crashed the car or whatever.  I ran into

2  the gate a little, and then I hopped out of the car,

3  and Michael hopped out of the car and kind of met me

4  around or whatever.

5      Q    When you say you were -- you crashed into the

6  gate, what were you trying to do when you were driving

7  your car in reverse at that point?

8      A    Well, I was trying to get away.  I was trying

9  to reverse and get away.

10     Q    From the defendant?

11     A    Yes.

12     Q    What happened after you got out of your car?

13     A    That's when he -- he kind of met me around

14  halfway, and he came up to me, and he had a gun or

15  whatever.

16     Q    He had a what?

17     A    A gun.

18     Q    And when you say he, you're talking about the

19  defendant?

20     A    Yes.

21     Q    And what did he say when he had the gun in

22  his hand?

23     A    Basically to give him my coat and my ring.

24     Q    What ring was he talking about?

1     A     A diamond ring.

2     Q     Is that a ring that he had given to you

3     previously?

4     A     Yes.

5     Q     And what kind of coat was it that he wanted

6     to get from you?

7     A     A leather coat.

8     Q     Did you give him the ring and the coat right

9     then and there?

10    A     No.

11    Q     What happened?

12    A     We were kind of --  we were tussling --

13    tussling with the gun, and tussling and talking, and

14    the gun fell.  He ran for the gun, and I think I ran,

15    and then he caught back up with me, and then I gave it

16    to him, and then he left.

17    Q     And did you contact the police after this

18    occurred?

19    A     Yes.

20    Q     And did you go to 13th and Michigan and

21    obtain an order of protection?

22    A     Yes.

23    Q     And part of that order required that the

24    defendant stay away from you at your home and at your

1   place of work?

2       A    Yes.

3       Q    Now, I'm going to direct you to January 12th

4   of the year 2000.  Were you working at the YMCA that

5   day?

6       A    Yes.

7       Q    About what time did you get off?

8       A    I got off at 9:00.

9       Q    At night?

10      A    Yes.

11      Q    Were you working with anybody else that day?

12      A    Was I working with anybody, yeah, several

13   people.

14      Q    When you went to leave the building, did you

15   go by yourself or was someone else with you?

16      A    No, someone was with me.

17      Q    Who was with you?

18      A    Linton Boyd.

19      Q    And how did you know Linton Boyd?

20      A    He was a co-worker, and he was my friend.

21      Q    How long had you known Linton back then?

22      A    About a year.

23      Q    He was working at the YMCA with you?

24      A    Uh-huh, yeah, he was working at the YMCA.

1      Q    What kind of work did he do?

2      A    He was the director of aquatics, the aquatic

3    department.

4      Q    And what kind of work were you doing back

5    then?

6      A    I was a switchboard operator and a membership

7    representative.

8      Q    So you walked out together that evening?

9      A    Yes.

10     Q    About what time did you leave the building?

11     A    It was between 9:20 and 9:25.

12     Q    Where was your car parked that night?

13     A    In the back of the YMCA.

14     Q    Did Linton have a car there too that night?

15     A    Yes.

16     Q    Where?

17     A    His was parked in front of the YMCA.

18     Q    On what street?

19     A    On 63red -- on Stony Island.

20     Q    On Stony Island.  Yes, it was on Stony

21   Island.

22     Q    So when you went out to your car, did Linton

23   go with you?

24     A    Yes.

1  Q Where did you go then?

2  A We both got in the car, and I drove him

3 around to the front of his car.

4  Q You gave him a ride to his car?

5  A Yes, I gave him a ride to his car.

6  Q When you pulled out on to Stony Island, where

7 was your car in relation to where Linton's car was

8 parked?

9  A Right next -- next -- parallel, right next to

10 the car.

11  Q So you didn't park; you just were double

12 parked next to his car?

13  A I was double parked next to Linton's car.

14  Q As you were next to Linton's car, what

15 happened?

16  A As I was next to his car, Michael -- we were

17 talking for a while, a minute, and then Michael rode

18 past in his car.

19  Q What kind of car was Michael driving back

20 then?

21  A It was a jeep Cherokee.

22  Q Do you remember what color it was?

23  A Like a silver grayish color I think.

24  Q Did you have plans to meet up with the

1    defendant that night?

2        A    No, we didn't have plans.  He wanted to, but

3    I told him I'd call him back.

4        Q    What -- had you talked to him earlier that

5    day?

6        A    He was calling me at work and basically

7    asking me to go out with him, and I told him no at

8    first.  And then I told him that I'd -- that I'd

9    think about it, and I'd call him back.

10       Q    Did you call him back?

11       A    No, I didn't get a chance to.

12       Q    Were you going to call him back?

13       A    I mean, I really can't -- I don't -- I really

14   can't say.  I don't know at the time if I was or if I

15   wasn't.

16       Q    When you saw him outside the YMCA on Stony

17   Island, he was in his car?

18       A    Yes.

19       Q    Was there anyone else in the car with him?

20       A    No.

21       Q    Which way was his car going?

22       A    South.

23       Q    And which way was your car facing?

24       A    North.

Case 1:08-cv-01479    Document 1-2    Filed 03/10/2008    Page 1 of 99

File Date: _March 10, 2008_

Case No: _08cv1479_

ATTACHMENT # _1_

EXHIBIT _1A cont'd (A-3) - Exhibit 5E_

TAB (DESCRIPTION) _____

1      Q    When you first saw the defendant, did you

2    talk to him?

3      A    I remember him pulling up on the side of me,

4    and he said something, and I put up my finger like one

5    minute.  And I mean I don't -- I can't -- I don't

6    think I heard what he said.  I don't --

7      Q    So you're still in your car, and he's still

8    in his car, and the driver's side are closest to each

9    other, is that right?

10     A    Yes.

11     Q    At some point did he pull away from you?

12     A    Yes.

13     Q    And where was Linton at that time?

14     A    He was in the car in the passenger side of my

15   car.

16     Q    After the defendant pulled away, which

17   direction was he going?

18     A    South.

19     Q    And you're still facing north?

20     A    Yes.

21     Q    After Linton got out of your car, where did

22   Linton go?

23     A    He went to his car to open his door.

24     Q    And that was directly next to where you were

1    parked?

2         A    Yes.

3         Q    The passenger side being closest to his car?

4         A    Yes.

5         Q    What did you do after Linton got out of your

6    car?

7         A    Pulled off.

8         Q    Were you able to see what was going on behind

9    you?

10        A    (Nodding head.)

11        Q    Is that a yes?

12        A    Yes, I'm sorry.

13        Q    That's okay.  How could you see that?

14        A    Through my rearview mirror.

15        Q    And what did you see?

16        A    I basically saw Michael make an U-turn and

17   hit Linton with the car.

18        Q    When you say he made a U-turn, how far down

19   did the defendant drive his jeep before you saw him

20   turn back around?

21        A    Well, I mean, the street is right -- from

22   Linton's car and the street, they're not too far.  I

23   mean they're --

24        Q    A block, a half a block?

1      A    No, no.  It's maybe about three car spaces

2   from the corner you could say, Linton's car was.

3      Q    So did --

4      A    So we were close to the corner kind of.

5      Q    Did the defendant drive all the way down to

6   the corner before he made a U-turn?

7      A    To the corner, uh-huh.

8      Q    Which was about --

9      A    64th -- I mean that was 64th Street so...

10     Q    Okay, and after the defendant turned around,

11  where was Linton?

12     A    Linton was opening his car door.

13     Q    He hadn't gotten in his car yet?

14     A    No.

15     Q    And what did the defendant do?

16     A    I mean he made a U-turn, and he hit him with

17  the car.

18     Q    Did you hear the screech of brakes?

19     A    (Shaking head.)

20     Q    Is that a no?

21     A    No, I mean, I was too -- I was far.  I was at

22  the light.  I was at the light at that time on 63rd.

23  I was at 63rd at the light.

24     Q   So this happened in the middle of the block

1    between 63rd and 64th, is that fair to say?

2        A    Yeah.

3        Q    When you first looked behind you and saw the

4    defendant driving after he made the U-turn, were you

5    able to see how far he was from Linton at that point?

6        A    Well, when I looked in the rearview, I mean I

7    automatically saw the U-turn and the hit, and that was

8    it.

9        Q    It happened pretty fast?

10       A    Yes.

11       Q    So the defendant was driving his car fast or

12   slow when he struck Linton?

13       MR. ABRAMS:  Objection.

14       THE COURT:  She may answer.  You may answer the

15   question.

16       THE WITNESS:  Okay, what was -- could you repeat

17   the question?

18   BY MS. FORESTER:

19       Q    Was the defendant driving his car fast or

20   slow when he struck Linton?

21       A    I don't know.  I couldn't tell the speed of

22   the car.

23       Q    After the defendant hit Linton, could you

24   tell where Linton went?

1      A      Excuse me.

2      Q      After the defendant's car hit Linton, could

3      you tell where Linton went?

4      A      On the ground.  He kind of rolled or whatever

5      on the ground.

6      Q      And where did the defendant go?

7      A      He kept -- he had pulled off.  I mean he was

8      still in motion.

9      Q      Did he slow down at all when he struck

10     Linton?

11     A      By the time -- when I was at the light, he

12     made it to the light.  I don't know if it was green or

13     red, but we were at that point at the same time, and

14     then he left.

15     Q      So he came right up to the light where you

16     were?

17     A      Right.  I was at the light, and he made a

18     stop at the light, and then kept going.

19     Q      Were you able to see the defendant's face

20     when he stopped at the light?

21     A      I mean, yeah, I could see his face.

22     Q      And what was the expression on his face?

23     A      I don't know, it was just a -- it was a

24     stare.  I don't know.  I can't really recall what his

Case 1:08-cv-01479   Document 1-2   Filed 03/10/2008   Page 7 of 99

1    facial expression was, but it was a stare.  He looked

2    at me.

3         Q    He looked at you?

4         A    Yeah, I mean, he looked at me.

5         Q    Okay, after the defendant looked at you, did

6    he stay there?

7         A    No.

8         Q    What did he do?

9         A    He pulled off.  He kept going.

10        Q    Where did you go?

11        A    I reversed my car back to where it happened

12   at.

13        Q    And where did you go next?

14        A    I went to Linton.

15        Q    And what condition was he in?

16        A    He was -- I thought he was unconscious.

17        Q    Was he able to talk to you at all?

18        A    (Shaking head.)

19        Q    Is that a no?

20        A    No.  I'm sorry.  No.

21        Q    What did you do?

22        A    Well, I went around him.  I was trying to see

23   if he was okay, and I just rubbed him a little and

24   waited.  I used the phone.  I was attempting to call,

1   you know, 911, or whatever but some other lady -- some

2   other people had come outside by that time, and they

3   had already made the 911 call, and I called his

4   mother.

5        Q    You called Linton's mother?

6        A    (Nodding head.)

7        Q    And what did you tell Linton's mother?

8        A    I basically told her that she had been hit

9   and that I'd call her back when I knew what hospital

10  he was going to be at.

11       Q    I'm going to show you what I've previously

12  marked as People's Exhibits 3 and 4.

13       MR. ABRAMS:  Judge, I'm just seeing these for the

14  first time.

15  BY MS. FORESTER:

16       Q    Asha, I'm going to show you what's marked as

17  People's Exhibit No. 3 for identification.   What

18  street is shown in this photograph?

19       A    Stony Island.

20       Q    And does this photograph show where Linton

21  was when he was struck by the car that the defendant

22  was driving?

23       A    Yes.

24       Q    Can you please take this pen and place an X

1   where Linton was standing when he was struck?

2       A    (Witness marks exhibit.)

3       MR. ABRAMS:  Judge, may I --

4                        (Brief pause.)

5   BY  MS. FORESTER:

6       Q    Does this photograph show where your car was

7   parked when the defendant drove up in his car?

8       A    Does it show where my car was parked?

9       Q    Yes.

10      A    Well, I don't know if it was still there at

11  this time.  It was up there.

12      Q    Okay, I'm going to show you what's marked as

13  People's Exhibit No. 4 for identification, do

14  recognize what's shown in that photograph?

15      A    Yes.

16      Q    What's shown there?

17      A    Stony Island and other vehicles.

18      Q    I'm going to ask you to mark on this

19  photograph where your car was parked when you first

20  pulled up to drop off Linton?

21      A    (Witness marks exhibit.)

22      Q    For the record she's marked People's Exhibit

23  No. 4.  And does this photograph show where the

24  defendant's car was when he first pulled up before

1   Linton got out of the car?

2       A    I don't know if it was still on this side of

3   the street or here (indicating).  I could draw a

4    line.

5       Q    Okay, that's fine.  I'm going to show you

6   what I've marked as People's Exhibit No. 5 for

7   identification; do you recognize what's shown there,

8   what's that?

9       A    That's the jeep Cherokee.

10      Q    The one that the defendant was driving?

11      A    Yes.

12      Q    And do each of these photographs truly and

13  accurately depict the area as it appeared on January

14  12th?

15      A    Yes.

16      Q    And does this photograph truly and accurately

17  show how the defendant's car looked the night that you

18  saw it on January 12th, 2000?

19      A    Yes.

20      MS. FORESTER:  Judge, I have nothing further.

21      THE COURT:  You may cross examine.

22

23

24

1              CROSS-EXAMINATION

2                    BY

3                 MR. ABRAMS:

4       Q    Is it okay if I called you Asha?

5       A    Yes.

6       Q    Thank you.  You've known Michael six

7   and-a-half, seven years?

8       A    (Nodding head.)

9       Q    Well, you've known him seven years?

10      A    Uh-huh, yes.

11      Q    And you had what I would call an off-again,

12  on-again relationship?

13      A    Yes.

14      Q    Broke up many times, got back together many

15  times?

16      A    Um, no.

17      Q    Sometimes?

18      A    Like maybe -- I only could think of one big

19  break up, one break up, and that was --

20      Q    Well, how many different times did you call

21  the police on him?

22      A    Um, about three or four.

23      Q    And he was arrested all -- every one of those

24  times you called the police?

1       A    No.

2       Q    No?

3       A    No.

4       Q    You dropped the charges every time, didn't

5    you?

6       A    Um, no.

7       MS. FORESTER:  Objection.

8       THE COURT:  Overruled.  She may answer.

9       THE WITNESS:  The times I called the police, he

10    was never picked up for the different -- the different

11    things that I had police reports on.

12    BY MR. ABRAMS:

13       Q    Well, the cases you got restraining orders --

14       A    Uh-huh.

15       Q    -- all those charges were dropped, weren't

16    they?

17       A    No, they weren't dropped; what do you mean

18    dropped?

19       Q    Well, he wasn't convicted of anything --

20       THE COURT:  Sustained, sustained.  You know that

21    could be for a variety of reasons that has nothing to

22    do with her.  Now, you can talk about what she did

23    about those, but --

24    BY MR. ABRAMS:

1      Q    You didn't testify in court about that, did

2  you?

3      A    I stopped going to restraining order court

4  because he was incarcerated; so, no, I didn't continue

5  to go to court for that.

6      Q    Well, on the date of this incident, there was

7  no restraining order in effect, was there?

8      A    Yes, there was.

9      Q    Hadn't the restraining order been terminated

10  previously?

11      A    No, it had not been terminated.  There was a

12  restraining order.

13      Q    Now, you said that you had a incident where

14  he took your ring and coat?

15      A    Yes.

16      Q    Now, this was a diamond ring and a leather

17  coat that he had given to you?

18      A    Ah, well, but yes, the ring he gave to me.

19  The coat, yeah, he gave me money on the coat.

20      Q    Well, he bought both of those?

21      A    I mean, if that's what you want to call it,

22  but he gave me money on the coat.  He bought the ring,

23  and gave me money on the coat.  I put some money on

24  the coat too.

1     Q    And he gave both of those back to you, didn't

2    he; you have them now, don't you?

3     A    The police returned to those to me; yes, the

4    police did.

5     Q    And he returned them to the police to give to

6    you, didn't he?

7     A    Yes.  They had arrested him, and I guess he

8    gave them to them.

9     Q    Now, during the time that you were with

10    Michael and not with Michael, you used to have regular

11    phone conversations with him, didn't you?

12     A    Yes, I --

13    MS. FORESTER:  Objection.

14    THE COURT:  Overruled.

15    MS. FORESTER:  Foundation.

16    THE COURT:  Go ahead.  You may answer.

17    THE WITNESS:  I talked -- could you --  repeat the

18    question one more time for me.

19    BY MR. ABRAMS:

20     Q    Well, I said during the times that you had

21    restraining orders against him, you called him on the

22    telephone, didn't you?

23     A    I talked to him; yes, I did.

24     Q    You have a cell phone?

1     A    Yes.

2     Q    Primco cell phone?

3     A    Yes.

4     Q    And during the time that the restraining

5  orders were in place against Michael, you called him

6  on your Primco cell phone?

7     A    I might have.

8     Q    Numerous times?

9     A    I might have.

10    Q    Let me call your attention to about 2:00

11 o'clock in the morning on January 2nd of this year, do

12 you know where you were, do you remember?

13    A    Where was I?

14    Q    Yes.

15    A    No.

16    Q    Do you remember being at the Stony Subs?

17    A    Yes.

18    Q    Do you remember seeing Michael with Terrance

19 Coleman and Armanis Kendall that night?

20    A    Yes.

21    Q    Do you remember Michael saying, let's get --

22    THE COURT:  This year, 2001?

23    MR. ABRAMS:  Yes, January 2nd, 2001?

24    THE WITNESS:  Um, no, it wasn't 2001.  It couldn't

1    have been.

2    BY MR. ABRAMS:

3         Q    I beg your pardon, 2000.  My fault, 2000,

4    january 2nd 2000, you saw Michael?

5         A    To be honest I had totally forgotten until

6    you just mentioned it; but yes, I did see him.

7         Q    And you had a conversation with Michael

8    there, didn't you?

9         A    I think we did talk, yes.

10        Q    You talked about you getting back together

11   and going out, didn't you?

12        A    I don't remember what the conversation was

13   about, but I do remember seeing him and talking to

14   him.

15        Q    Actually didn't you make a date to go to the

16   movie that night?

17        A    No, no.

18        Q    During the entirety of your relationship with

19   Michael, you maintained a friendship with a woman

20   named Jasmin Carter, didn't you?

21        A    Yes, that's his cousin.

22        Q    And you talked to Jasmin Carter all through

23   your relationship with Michael?

24        A    Yes.

1      Q    And you've talked to Jasmin Carter since this

2 incident occurred?

3      A    Yes, she's called.

4      Q    Now, in the time frame that you knew Linton,

5 he wasn't a boyfriend, was he?

6      A    No.

7      Q    You never went out with him?

8      A    No, we hung together all the time. He was my

9 friend. So, yes, we did go out.

10      Q    Michael know about him?

11      A    No.

12      Q    Jasmin know about him?

13      A    They're not my friends; so why would I tell

14 them, no, ugh-ugh.

15      Q    Now, you described some -- some incidents

16 that Michael did against you, but most of those were

17 property damage, correct?

18      A    Yes.

19      Q    And in all the incidents that he had against

20 you, you never caused any harm or attempted to harm

21 any other person, did he?

22      A    In those incidents, no, except for the one

23 where I was in the alley, but no.

24      Q    No, I mean anyone --

1      A    Besides that one?

2      Q    Everything was directed towards you, wasn't

3   it?

4      A    Yes.

5      Q    There was never any incident where it was

6   directed against --

7      A    (Shaking head.)

8      Q    Now, when you saw Michael on the night of the

9   incident, you said that Linton had just exited your

10  car?

11     A    Yes.

12     Q    Did Michael pull up before or after Linton

13  exited the car?

14     A    He pulled up before.

15     Q    And you had some conversation?

16     A    No.  See, I don't -- we didn't -- all I

17  remember saying to him is wait like one minute when he

18  pulled up and looked in the car.

19     Q    He didn't say anything to you either, did he?

20     A    Not that I recall, no.

21     Q    And at that point Linton got out of your car?

22     A    Yes.

23     Q    And did you pull off or did you stay there

24  when Linton got out?

1      A    I pulled off.

2      Q    And you didn't hear Michael say, "I'll meet

3    you later"?

4      A    No, he didn't say -- I mean, he was in his

5    car.  I was in mine.  I never had a conversation with

6    him.

7      Q    Now, when you pulled off, did you just

8    continues to go or --

9      A    Yes.  I made it to the light.

10     Q    And as you were going, you were looking in

11   your rearview mirror?

12     A    Yes, I was.

13     Q    And you saw Michael's car make a J-turn?

14     A    Yes, I did.

15     Q    You were headed what?

16     A    I was heading north.

17     Q    North on Stony?

18     A    Stony Island.

19     Q    And when Michael first saw you, he was

20   heading south?

21     A    Yes.

22     Q    Were either one of you blocking traffic when

23   this happened?

24     A    No.

1      Q    So there wasn't a long period of time where

2   his car was alongside of your car, right?

3      A    No.

4      Q    So he pulled up, and you basically -- he

5   tried to say something, you basically gave him the

6   wait-a-minute sign; Linton got out of the car, and you

7   drove off, and Michael turned around?

8      A    Yes.

9      Q    And it all happened in a rather short amount

10  of time, didn't it?

11     A    Yes, it did.

12     Q    And when Michael turned around, you couldn't

13  tell -- did you have your windows up or down?

14     A    I couldn't tell you.  I don't know.  I doubt

15  if they were down because it was cold outside that day

16  so...

17     Q    Did you hear tires squealing?

18     A    No, I was in my car.  I didn't hear anything.

19     Q    Did you hear any impact of any cars?

20     A    No, I was down -- I was down the street.

21     Q    So you didn't see what had happened?

22     A    No, I saw what happened.  I didn't hear.

23     Q    Okay, so when you looked back in your

24  rearview mirror, you saw Michael make a U-turn and had

1    hit Linton who was near the car at that time?

2         A    Yes.

3         Q    And Linton's body was pushed forward?

4         A    Yes.

5         Q    At that point you stopped?

6         A    Yes, I was already at -- I was at a stop

7    area, at a stoplight.

8         Q    You couldn't tell if Michael did this

9    deliberately, could you?

10        A    Um, at that point, no, I couldn't tell if it

11   was -- if it was --

12        Q    Okay, then you called Linton's mother?

13        A    Yes.

14        Q    Did you tell her that Linton had been struck

15   by a car?

16        A    Yes.

17        Q    Did you tell her that it was driven by

18   Michael?

19        A    No, not at first.  When I first called her, I

20   just told her that he had been hit by a car and that I

21   was going to tell her what hospital he was at, and by

22   that -- like -- maybe about 10 or 15 minutes after

23   that, she was already up there.

24        Q    So when you made the phone call, basically

1    you thought that Linton had been hit by a car, and

2    that's as much as you knew?

3         A    I didn't know he was dead when I called her,

4    no.  I just knew that he was hit.

5         Q    And at that point after -- after that Michael

6    took off?

7         A    Yes.

8         Q    And did he make any attempt to talk to you

9    later after he left the scene?

10        A    He was calling, but I mean I didn't have my

11   cell phone at that moment so...

12        Q    Who had your cell phone?

13        A    One of the officers.

14        Q    And were you present while the officer had

15   your cell phone?

16        A    I was within the area, yes.

17        Q    Were you with your cell phone and the

18   officer?

19        A    I didn't have my cell phone.  The officer had

20   my cell phone, but he was around me.

21        Q    Did you answer the phone when it rang or did

22   the officer?

23        A    No, she did.

24        Q    Did you hear any of the conversation?

1      A    No.

2      Q    So after -- after this incident you never

3   spoke to Michael again?

4      A    No, I didn't say that.  I've spoken to him

5   since the incident.

6      Q    But I mean that evening?

7      A    No.

8      Q    You didn't speak to him that evening at all?

9      A    No, no.

10     Q    Did you go to visit him in the jail?

11     A    No.

12     Q    Has he called you from the jail?

13     A    Yes.

14     Q    And you've accepted the calls?

15     A    Yeah, a couple of times.

16     MR. ABRAMS:  May I have one second, Judge?

17     THE COURT:  Yes.

18   BY MR. ABRAMS:

19     Q    Before you left work that day, did you call

20   Michael from the Y?

21     A    Before I left work?

22     Q    Yes.

23     A    Not to my knowledge.

24     Q    You don't recall calling Michael and making

Case 1:08-cv-01479   Document 1-2   Filed 03/10/2008   Page 24 of 99

1  arrangements to meet him for the show that evening?

2     A    No, we didn't make plans.  I told him I'd

3  call him back.

4     MR. ABRAMS:  Nothing further, Judge.

5     THE COURT:  Any redirect examination?

6     MS. FORESTER:  Yes, Judge.

7                    REDIRECT EXAMINATION

8                    BY

9                    MS. FORESTER:

10    Q    Did you expect to see Michael outside your

11  work when you were leaving that evening?

12    A    No.

13    Q    You didn't tell him to come meet you or pick

14  you up or anything like that?

15    A    No.

16    Q    Now, the defendant has a tattoo on his chest,

17  is that right?

18    A    (Nodding head.)

19    MR. ABRAMS:  Objection.

20    THE COURT:  Overruled.

21    THE WITNESS:  Yes.

22  BY MS. FORESTER:

23    Q    And what does it say?

24    A    Asha.

1  Q And that's what he called you, right?

2  A Uh-huh, yes.

3  Q Now, the defense attorney asked you about the

4 other incident that you described for the judge where

5 the defendant came around and damaged your car, and he

6 never directed any hostility towards anybody but you,

7 is that right?

8  A Yes.

9  Q This was the only time that you were in the

10 presence of another man, is that correct?

11  A Yes.

12  Q After this happened you had your cell phone

13 with you, right?

14  A (Nodding head.)

15  Q Is that a yes?

16  A Yes.

17  Q You received a voice mail from the defendant

18 even though you didn't speak to him directly?

19  A Yes.

20  Q How many voice mails had he left you after

21 this incident occurred?

22  A Two.

23  Q The defense attorney asked you if at that

24 time you thought that his striking Linton was

1    deliberate and you said at that time you didn't know?

2        A    I mean no, basically he was asking me like

3    did I know what he was doing when he hit him or

4    whatever, and I said no.

5        Q    Well, at some point did you -- did you have

6    an opinion one way or another as to whether or not the

7    defendant's actions were deliberate?

8        MR. ABRAMS:  Objection.

9        THE COURT:  Sustained.

10   BY MS. FORESTER:

11       Q    Do you remember what the first voice mail was

12   that the defendant left you?

13       A    Basically something about hitting him with

14   the car.  I don't remember the exact words.

15       MS. FORESTER:  Okay, I have nothing further.

16       THE COURT:  Any other questions.

17                    RECROSS EXAMINATION

18                    BY

19                    MR. ABRAMS:

20       Q    Basically he said -- he admitted to hitting

21   Linton with the car, but he didn't mean to do it;

22   wasn't that on your voice mail?

23       A    The voice mail, well, no.  He said something

24   about hitting him with the car, but he wasn't saying

A-55

1    it was an accident, the first voice mail, no.

2         Q    Didn't your voice mail say, "I hit him with

3    the car, I didn't mean to do it"?

4         A    No, not the first one; maybe the second one

5    did, but not the first one.   The first one did not say

6    that.

7         Q    But there was voice mails that said --

8         A    There were two voice messages.   One of them

9    said something different from what you're saying.   The

10   next one might have said that; I'm not positive.

11        Q    But you didn't speak live to him on either of

12   them?

13        A    No.

14        Q    But the officer did, right?

15        A    Yes.

16        Q    And do you know if he told the officer he

17   didn't mean to hit him?

18        THE COURT:   Sustained.

19        MS. FORESTER:   Objection.

20        MR. ABRAMS:   Nothing further.

21        THE COURT:   Any other questions?

22        MS. FORESTER:   Yes.

23

24

1                    RE-REDIRECT EXAMINATION

2                    BY

3                    MS. FORESTER:

4       Q    Asha, you talked about the first voice mail

5    you received where the defendant said he smashed or he

6    hit the guy, right?

7       A    Yes.

8       MR. ABRAMS:   Objection; objection.   Beyond the

9    scope.

10      THE COURT:   No, overruled.   Go ahead.

11      THE WITNESS:   Yes.

12   BY MS. FORESTER:

13      Q    Do you remember how the defendant

14   characterized the fact that he hit Linton in that

15   first voice mail?

16      A    Basically just said something about smacking

17   him with the car.   I mean, I don't remember the exact

18   words.

19      Q    And that was before the defendant knew that

20   Linton was dead, right?

21      A    Yes.

22      Q    And then the second voice mail after the

23   defendant learned that Linton was dead, he came up

24   with something about an accident, is that right?

1    MR. ABRAMS:  I will object to that as for

2  purposes even for credibility.  This is not a

3  drug-related case, has nothing to do with it.

4    THE COURT:  No, but it was a felony conviction

5  that does impact on the issue of credibility.

6        It will be received as to that issue and

7  that issue alone.

8                              (SHORT PAUSE.)

9    MR. ABRAMS:  Real far back to that jury room,

10  maybe 6th floor.

11    THE COURT:  I don't know.

12    MR. ABRAMS:  Takes a long time to call a witness,

13  doesn't it?

14    THE COURT:  Raise your right hand, please.

15                              (WITNESS SWORN.)

16    THE COURT:  Please be seated.

17        You may inquire.

18            SGT. CHARLES WILLIAMS,

19  called as a witness herein in rebuttal, having been

20  first duly sworn, was examined and testified as

21  follows:

22        D I R E C T   E X A M I N A T I O N

23  BY MS. FORESTER:

24    Q.    Sergeant, you previously testified in this

1    matter, is that correct?

2           A.    That's correct.

3           Q.    Can you state your name for the record.

4           A.    My name is Charles Williams, common

5    spelling, W-I-L-L-I-A-M-S.

6                 My star number is 2548.  I'm assigned to

7    the Fifth District.

8           Q.    I'm going to direct again your attention

9    back to January 14th of the year 2000.  Were you

10   involved in the homicide investigation of Linton Boyd

11   which had occurred on January 12th of the year 2000?

12          A.    That's correct.

13          Q.    And at approximately 12:31 in the morning

14   on January 14th of the year 2000, did you interview

15   anybody that you see here in court today?

16          A.    Yes, I did.

17          Q.    Can you point to that person and tell us

18   what he's wearing.

19          A.    He's sitting at the table with the DOC tan

20   uniform on.

21          THE COURT:  Indicating the Defendant, Michael

22   Threlkeld.

23          MS. FORESTER:  Thank you, Judge.

24

1    BY MS. FORESTER:

2        Q.    And did the Defendant tell you he was drunk

3    yesterday, January 13th of the year 2000, and had an

4    accident?

5        A.    That's correct.

6        MR. ABRAMS:  Objection.

7        THE COURT:  Basis?

8        MR. ABRAMS:  Compound question and not rebuttal.

9        THE COURT:  Overruled.

10            Go ahead.

11       MS. FORESTER:  You can answer, Sergeant.

12       THE WITNESS:  A.    Yes, he did.

13   BY MS. FORESTER:

14       Q.    Did he tell you that he had consumed a pint

15   of Seagram's gin and stated he just happened to be

16   driving in the area of 67th and Stony Island when he

17   saw Asha in her vehicle?

18       A.    That's correct.

19       MS. FORESTER:  I have nothing further.

20       THE COURT:  Cross.

21            C R O S S - E X A M I N A T I O N

22   BY MR. ABRAMS:

23       Q.    Did he say he had an accident?

24       A.    Yes, he did.

EXZIBIT 3-C

STATE OF ILLINOIS    )
                    ) SS
COUNTY OF C O O K   )

Debbie Cieslik
**FILED**

MAY – 2 2001

**DOROTHY BROWN**
**CLERK OF CIRCUIT COURT**

## A F F I D A V I T

NIK-KI WHITTINGHAM, being first duly sworn on oath, deposes and states as follows:

1.    I am the mother of Edwina Asha Quansah, Michael Threlkeld's former girl friend and the State's primary witness at his bench trial. I am writing to ask you to consider this letter when imposing Michael's sentence. By doing so, I do not mean to diminish the life and death of Linton Boyd. Linton had been to my house twice and I had a chance to meet him. I thank him posthumously for being Asha's friend and acting fearlessly in assisting her on many occasions while working at the YMCA. Linton, his family and his friends remain in my prayers. Michael and his family are also in my prayers. Each and every one of us is a child of God.

2.    I first met Michael in 1993. He and Asha attended the same clinical group therapy sessions at the University of Chicago's Blue Gargoyle, a center for youth services. They quickly became very close and, as a single mother, I was concerned with my 14-year-old daughter's relationship. I tried to break them up, not because he was a bad person, but because they were too close at such a young age. My efforts only pushed them closer together. So, I decided to embrace Michael, as I tried to keep an eye on their involvement.

3.    As time went on, Asha continued through high school while Michael dropped out of high school. I became alarmed because there was no separating the two. I reached out to Michael, trying to find out what role his family members had in his life. Michael began to confide in me, oftentimes phoning to speak to me about his feelings. He has come over to my house crying because his father not only abandoned him, but has continually claimed he is not Michael's father. During this period of time Michael felt his mother was not emotionally available for him.

4.    Michael has been a victim of his upbringing and environment. Being abandoned by his family of origin, whether real or perceived, Michael lived in a lonely, desperate state.

From the age of 13, Asha became Michael's friend and family – someone who loved him unconditionally and someone he could love. Asha was always there for Michael. He cried on her shoulder and he shared his hopes and dreams with her. When Asha terminated their relationship, Michael panicked. He not only lost her love, he lost what he perceived as his only family, his only friend, the only person who loved him unconditionally.

5.  I was an Official Court Reporter between 1973 and 1985 and for many years worked in the Criminal Division at 26th and California. I have seen the cold-blooded stares of first degree murderers and have heard many gruesome stories of love turned deadly. From 1988 to the present time, I have worked in the Cook County Public Defender's Office, initially as assistant to the Public Defender Randolph Stone and currently as the Public Information Officer. I am a PhD candidate (Walden University, 2002) in Family Studies and Intervention Strategies and am completing a Certificate in Marriage and Family Therapy (University of Chicago, 2001). I tell you this not to qualify myself as an expert, but to show you that I personally know Michael Threlkeld and I know he is not a ruthless murderer. He did not leave out of his house on January 12, 2000 with the intention of killing Linton Boyd.

6.  I visited Michael at the CCDOC shortly after the close of trial. I told him I love him and have compassion for him. Michael must take responsibility and be held accountable for his actions. I hope you will read this letter and consider it in deciding the length of Michael Threlkeld's incarceration.

NIK-KI WHITTINGHAM

SUBSCRIBED and SWORN to
before me this 27th day of
April, A.D., 2001.

NOTARY PUBLIC

OFFICIAL SEAL
T. ROWSTON

1    before, your Honor, that he didn't even see the other

2    person out there.. So any theory of second degree was

3    a matter of strategy deposited by Mr. Abrams and

4    being well aware of any other crimes evidence that

5    was properly --

6        THE COURT:  Okay.  Motion for new trial is

7    respectfully denied.  Are you ready to proceed for

8    sentencing today?

9        MR. ABRAMS:  Michael's mother for some reason

10   was not able to make it today.

11       THE COURT:  I have been advised that there is

12   some aggravation witnesses that are here today, I

13   will hear the witnesses in aggravation.  I will

14   withhold sentencing totally in your presentation of

15   mitigation unless his mother can be here.  I'll do

16   that for you, but I would like to commence the

17   hearing at this point.

18       MR. ABRAMS:  I have no problem with that.  I

19   have one question.  That affidavit that I submitted

20   to you this morning, will you accept this as an

21   affidavit or do you need live testimony on this

22   because --

23       THE COURT:  Well, what is the purpose of this

24   affidavit?  It appears to be mitigation.

1        MR. ABRAMS:  It appears to be mitigation, but I

2   also believe that it would be to show that it was not

3   an intentional act based on personal knowledge of the

4   defendant that --

5        THE COURT:  I don't know how I could come to

6   that conclusion from this affidavit?  All it says

7   this is from Osha's mother.  And she said that

8   Michael loved her daughter very much and confided

9   personal problems and any solicitations from his own

10  upbringing.  Some limitation in what his parents had

11  offered.  He loved Osha, and because he loved her so

12  much he would never do anything to hurt her.  That's

13  -- what am I supposed to do with this?

14       MR. ABRAMS:  Well, paragraph 5 there is --

15  towards the end of paragraph 5, there is some key

16  language in there.

17       THE COURT:  She knows him personally and she

18  states it's her opinion he didn't leave his house on

19  January 12th, 2000, with the intention of killing

20  Linton Boyd.  I believe that.  I think that's true.

21  I think I may have even said that when I made my

22  finding of facts.

23       MR. ABRAMS:  As a matter of fact, I thought that

24  was very interesting that --

1    THE COURT:  I don't believe he left his house

2  that day when he saw Osha in the company of another

3  man, that's when things got out of hand.  "I don't

4  think he left his house that day with the intention

5  to kill -- "  What am I supposed to do with this

6  affidavit?

7    MR. ABRAMS:  If you will not accept it as

8  evidence for mitigation purposes --

9    THE COURT:  I'll accept it for mitigation

10  purposes, yes.  I'll accept it for that.

11    MR. ABRAMS:  I was also asking the Court to

12  consider it, but you've already --

13    THE COURT:  Substantive, I can't consider it

14  substantively.  It's got to be subject to cross

15  examination.  I don't know what the relevance would

16  be in any event.

17    MR. ABRAMS:  Relevance would be is if Michael

18  Threlkeld could form the ability to -- would have the

19  ability to formulate the intent to commit murder.

20    THE COURT:  I cannot -- if it's going to be

21  considered as substantive evidence, it would have to

22  be subject to being cross examined.  Without that I

23  could not consider a substantive evidence.  If you

24  want me to consider it as mitigation, I would gladly

1    do it.

2         MR. ABRAMS:  Just so we can have this clarified.

3    This women contacted me after the --

4         THE COURT:  Just so we can be clear, if you want

5    me to consider this as some kind of post-trial matter

6    or newly discovered evidence or something, which I

7    don't understand how to do that, it can't be

8    considered as part of the trial record unless it's

9    cross examined.  I can't consider it post-trial until

10   he is cross examined.  You can't just give me an

11   affidavit --

12        MR. ABRAMS:  I understand.  I would like to make

13   an explaination to the Court, though, shortly after

14   your finding in this matter --

15        THE COURT:  Osia's mother contacted you.

16        MR. ABRAMS:  And she sent me a letter and then

17   said she would like to come and testify.  Her

18   original letter to me said she would be glad to come

19   and testify.  She then contacted me and said that

20   it's causing problems in her family, and she doesn't

21   want to come to testify.

22        THE COURT:  If she doesn't want to testify and

23   be cross examined, I still can consider it as

24   mitigation.

19

1      MR. ABRAMS:  She then called me back and asked

2   how she could get this in without testifying.  I said

3   you do this in a form of an affidavit.

4      THE COURT:  If you are asking me for considering

5   for mitigation, without her testifying, the letter

6   from her to me an affidavit from her to me, I can

7   consider it as mitigation.  If you want it to be some

8   kind of substantive record, I don't allow it until

9   it's cross examined.

10      MR. ABRAMS:  I'm not going to object to starting

11   this, but I would like to reserve the opportunity for

12   a motion to reconsider, if I could have her come in

13   and testify.

14      MS. FORESTER:  Your Honor, just for the record,

15   the legally amount definition of newly discovered

16   evidence, this doesn't come close.

17      THE COURT:  I agree.  But I think it's probably

18   more than mitigation, but he wants to bring in a live

19   witness.

20      MR. ABRAMS:  If I could explain how this would

21   be newly discovered evidence to the defense.  I had

22   no idea who this person was.  Had I known that, I

23   would have attmepted to subpoena her to court to

24   testify.

20

1          THE COURT:  I don't know.  If this was a jury

2     trial, I would let you tell the jury this because I

3     don't think it's really relevant.  Be that as it may,

4     if she wants to come and testify, we'll cross examine

5     her and then we'll cross that bridge of relevance.

6     You want it to be considered for mitigation only, I

7     will do so.

8          MR. ABRAMS:  So, I'm making an oral motion that

9     I'm going to ask you to reconsider on the next court

10    date --

11         THE COURT:  We're not going to finish

12    proceeding.  We are going to start the sentencing.

13         MR. ABRAMS:  All right.

14         THE COURT:  Government, you may call your

15    witnesses in aggravation, if you have any.

16         (Witness sworn.)

17         THE COURT:  You may inquiry.

18                   LT. CHESTER PLEXICO,

19    called as a witness on behalf of the State of

20    Illinois, having been first duly sworn was examined

21    and testified as follows:

22              D I R E C T   E X A M I N A T I O N

23                   By MS. FORESTER;

24         Q     Could you please introduce yourself to the

EXZIBIT 4-D

IN THE CIRCUIT COURT OF THE FIRST
JUDICIAL CIRCUIT, COOK COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS,

    Plaintiff,

-v-                                  CASE NO. 00 CR 4537

MICHAEL THRELKELD,

    Defendant.

## PETITION FOR POST CONVICTION RELIEF

    NOW COMES, Michael Threlkeld, pro se, and pursuant to 725 ILCS 5/122,
et seq, moves this Honorale Court for relief from his conviction and
sentence, and states the following in support hereof:

1. The Petitioner  was convicted in 00 CR 4537, of the offense of First
Degree Murder. After a bench trial before the Honorable Judge James Linn,
the Petitioner was sentenced to 36 years.

2. A direct appeal was taken from the judgment and sentence to the First
District Appellate Court. First District entered its Order affirming the
trial court's conviction of the defendant. Petitioner then filed his petition
for leave to appeal. Petitioner now files this timely petition for post
conviction relief.

3. Petitioner asserts that his constitutional rights were violated. Petitioner
request relief from his conviction and sentence based upon the following
violations of his rights under the Illinois and United States Constitutions.

4. Petitioner was denied his constitutional right to due process, effective
assistance of counsel, fair trial and equal protection of the laws, due to

trial counsel's failure to adequately represent petitioner in accordance
with constitutional guarantees.

5. It is well established that, a defendant's right to trial by a fair and
impartial trier of fact is a constitutional cornerstone of the judicial
system. This right should be guarded zealously; neither a trial judge's
inadvertant omissions, nor a trial attorney's laxness can be allowed to
impair this fundamental right.

The 'bench mark' in determining whether there has been ineffective
assistance of counsel is "whether counsel's conduct so undermined the proper
functioning of the adversarial process that the trial can not be relied on
as having produced a just result." Strickland v. Washington, 466 U.S. 668, at
686 (1984).

The U.S. Supreme Court developed a fact sensitive analysis in Strickland
which seeks to measure "the quality and impact of counsel's representation
under the circumstances of the individual case", see People v. Garza, 535
N.E.2d 968 (1989). A defendant must prove (1) that counsel's fell below an
objective standard of reasonableness and the shortcomings of counsel were so
severe as to deprive defendant of a fair trial; and (2) that there is a
reasonable probability that, but for counsel's unprofessional errors, the
result of the proceedings would have been different, Strickland 466 U.S. at
687. A reasonable probability is " a probability sufficient to undermine
confidence in the outcome," see People v. Davis, 560 N.E.2d 1072; also
People v. Garza, 535 N.E.2d 968.

A reviewing court must evaluate the attorney's performance from counsel's
perspective considering the circumstances at the time of trial, without the
distorting effects of hindsight, and the defendant must overcome the strong
presumption that the challenged action might be considered sound trial
strategy. Strickland, 466 U.S. at 689.

Traditionally, courts have not reviewed an attorney's choices when made
on the basis of strategic considerations. However, these strategic decision
may be made  only after there has been a **thorough investigation of all
matters relevant to plausible options.**" Strickland, 466 U.S. at 690; see
People v. Whittaker, 577 N.E.2d 468 (1990).

Petitioner contends that trial counsel's representation fell far below the
objective reasonableness standard so as to have denied the Petitioner his
right to a fair trial, due process and equal protection of the laws. Petitioner
further contends that if not for counsel's  incoherent representation the

outcome of the proceedings would have been different.

Petitioner will illustrate trial counsel's ineffectiveness, which includes, but is not limited to the following: a) failure to seek a reduce charge to reckless homicide, when there was ample amounts of evidence available to counsel to pursue such a course of action; b) encouraging defense witnesses to testify falsely by withholding key testimony that could have exonerated the Petitioner of First Degree Murder charges; c) failing to expose the perjury committed by the State through out the entire proceeding, which eventually led to Petitioner's conviction. Petitioner herein incorporates these allegations within this petitition for post conviction relief, see paragraphs 7-9.


6. Post conviction petition is a vehicle by which an individual that has been convicted of a crime, and as a result, imprisoned, may complain of substantial deprivations of his constitutional rights under the Illinois and United States Constitutions, see 725 ILCS 5/122 et. seq.. Petitioner herein complains of constitutional deprivations that are a direct result of the **ineffective assistance of trial counsel.**

Thus, to claim that matters of which the Petitioner complains have not been raised on direct appeal would be fruitless, as such an argument does not State a ground for dismissal of this petition. " An ineffective assistance claim will not be barred if 'what ought to have been done...[depends] on proof of matters which could not have been included in the record **precisely** because of the allegedly deficient representation'". People v. Keener, 655 N.E.2d 294 (2nd Dist. 1995)(emphasis added), quoting, People v. Erickson, 641 N.E.2d 455 (1994).

For example, "[W]here charges of incompetence are based on trial counsel's failure to call certain witnesses or **introduce certain evidence**, the substance of which does not appear in the record, it therefore cannot be claimed that such charges should have been raised in the direct appeal." People v. Edmonds, 558 N.E.2d 230, at 233 (1st Dist. 1979).

Furthermore, even if the matters were sufficiently set out in the record to be capable of being raised on appeal, this does not bar proceeding by way of a post conviction petition in this case. Even though claims that could have been presented to the reviewing court on direct appeal, if not presented, are barred under the doctrine of waiver, if the post conviction petition alleges the ineffective assistance of appellate counsel for a failure to raise such issues, then the issues are not waived. see e.g., People v. Winsett, 583 N.E.2d 589, 592-93 (2nd Dist. 1991).

Therefore, the Petitioner is within the guidelines of 725 ILCS 5/122,
and any applicable State laws and all Illinois and United States Constitutional
guarantees Petitioner is afforded to bring this action.

7. Petitioner contends that he should have been charged with Reckless
Homicide, 720 ILCS 5/9-3, and not First Degree Murder, 720 ILCS 5/9-1. And
that trial counsel was wholly ineffective for not seeking a reduced charge
when ample amount of evidence was available to pursue a reduction in charge.

Petitioner contends that trial counsel was wholly ineffective for failing
to seek a reduced charge from First Degree Murder to Reckless Homicide. There
was ample amount of evidence adduced during the investigation of this case
that clearly establishes the Petitioner lacked the requisite mental state
of intent to be charged or convicted of First Degree Murder. However, the
evidence clearly shows that the Petitioner is guilty of Reckless Homicide.

Petitioner asserts in support of this contention, evidence that establishes
on the night of January 12, 2000 the Petitioner actions were unintentional
and reckless. First, the elements of the offense of Reckless Homicide are,
"Person commits Reckless Homicide if, while driving a motor vehicle, he or she
**unintentionally kills individual,** and the **acts that caused the death are
performed recklessly** or as to create **likelihood of death or great bodily
harm to some person.**" People v. Edmundson, 617 N.E.2d 446; People v. Testin,
632 N.E.2d 645; People v. Wilson, 572 N.E.2d 937; specifically see, People v.
Camberis, 130 N.E.2d 712 (1921). The instant matter, Petitioner contends
that he unintentionally  killed Linton Boyd, after driving his vehicle under
the influence of alcohol and in a reckless manner which caused the death of
Mr. Boyd. And though the consumption of alcohol is not central to the element
of reckless homicide, being under the influence of alcohol to the degree
that it rendered the Petitioner incapable of safely driving his vehicle
can be considered under  the statue, 720 ILCS 5/9-3(a)(c)(2).

According to defense witnesses, police reports, State expert witnesses &
testimony of the State's chief witness and even this Honorable Court doubted
rather this was an intentional act committed by the Petitioner. And it because
of trial counsel's shear listless representation and incompetence that this
available evidence was not utilized to Petitioner's benefit. Petitioner will
take this evidence in order so as to illustrate trial counsel's ineffective
representation.

A) Petitioner has been arrested on several occasions for driving under the
influence (DUI), January 31, 1998, March 17, 1999 and the most recent
arrest coming 6 months prior to this unfortunate accident June 16, 1999. see
arrest record attached as (Ex. 1).

B) Petitioner has a history of driving recklessly, as demonstrated in
Ahmad Kendell's statement to Cook County State's Attorney's investigator
Dennis Cullom that, "...it did not surprise him that Michael was involved in
an accident because he knew Michael was a reckless driver." see statement
attached as (Ex. 2).

C) Petitioner was witnessed driving recklessly by a truck driver on I-55.
The truck driver described the Petitioner's driving as "The vehicle was all
over the roadway, slowing down in traffic and sometimes almost coming to a
stop." The truck driver when on to alert Illinois State Police Trooper
Brian Gray (Star No#4994) of the Petitioner's vehicle description and the
erratic driving displayed by Petitioner. see report of Trp. Gray attached
as (Ex. 3).

D) Petitioner was stopped by Trp. Gray at 2:45am, and smelled of alcohol.
see (Ex. 3).

E) Petitioner was asked to submit to a preliminary breath test with the
ALCO-SENSOR IV, Petitioner agreed to take the preliminary breath test, and
results were .006. Petitioner was arrested for illegal consumption by a
minor. see (Ex. 3).

F) Petitioner still had alcohol in his system at 10:00am when Petitioner
submitted to a second breath test INTOX EC/IR with the result being .002.
see (Ex. 3).

G) Affidavits of Terrance Coleman, Jasmine Carter and Ahmad Kendell all
support the fact Petitioner was intoxicated before the accident (it has
been established the Petitioner was intoxicated after the accident, see
(Ex. 3)) . Further, these affidavits taken separately paint a vivid picture
of the history of Petitioner's drinking and driving recklessy:

G1) Affidavit of Terrance Coleman, attached as (Ex. 4), states in part that, "...every time I seen him in a car or anywhere he is always drunk." And "...he was over intoxicated and driving during that of Jan. 12, 2000."

G2) Affidavit of Jasmine Carter, attached as (Ex. 5), states in part that, "...I actually knew about Michael's drinking problem and that he's always drunk when he drives..."

G3) Affidavit of Ahmad Kendell, attached as (Ex. 6), states in part that, "...his drinking problem and about how he drinks and drives."

H) Honorable Judge James Linn agreed with the defense, That the Petitioner did not set out to "intentionally kill" the deceased Linton Boyd. see (Tr. F36).

I) Sgt. Brendan Heffner (Star No#4225), while swearing out a complaint for a search warrant before the Honorable Judge Prall, Eleventh Judicial Circuit, Mc Lean County, relied on the information contain in Trp. Brian Gray's arrest report of the Petitioner. Further, lending credibility to the fact Petitioner was drunk and driving recklessly. see complaint for search warrant attached as (Ex. 7).

Petitioner contends that all of the evidence, paragraphs A-I, was available to trial counsel. And in comparison to the State's evidence at trial, the Petitioner would have prevailed on the lesser charge of Reckless Homicide, if not for trial counsel's incompetence.

Further, the State has no evidence, circumstantial, direct or otherwise that could legally support a conviction of First Degree Murder. The evidence adduced at trial by the State does not support, nor cannot sustain a charge of First Degree Murder or a conviction for the same. When looking at the crux of the State's case, it is incomprehensible that trial counsel would fail the Petitioner's right to effective assistance of counsel and right to fair trial.

None of the State's witnesses testified that the Petitioner's actions were a deliberate attempt to kill or cause great bodily harm to the victim. When

questioned on direct by the State, Asha stated that she could not tell
whether it was deliberate, (Tr. A50). And while the State called several
witnesses to the stand to establish the forensic evidence in this case, none
of the witnesses could conclude that the defendant acted intentionally.
Investigator Michael Trummel of the Illinois State Police testified that he
could not conclude from the physical evidence that he collected from the
defendant's vehicle while it was impounded in Bloomington that the defendant's
actions were intentional (Tr. A125). Investigator Leonard Stocker of the mobile
crime lab unitof the Chicago Police Department examined the crime scene and
collected evidence, he also did not testify that the defendant's actions were
intentional, (Tr. B54). Dr. Rexene Worrell from the Cook County Medical
Examiner's Office performed the autopsy on Linton Boyd, but could not testify
that the defendant's actions were intentional, (Tr. A78, A85). Simply put
there is no evidence that this was an "intentional act" under First Degree
Murder.

Finally, when looking at this case in the light most favorable to State.
There is no "intentional act" present, no iota of evidence supporting this
court's finding of guilt on the charge of First Degree Murder. And if not
for trial counsel's incompetent shortcomings the outcome of the trial would
have been different.

8.      Petitoiner contends that trial counsel was egregiously ineffective
for instructing defense witnesses to withhold 'exculpatory evidence' that
would have proved Petitioner innocent of First Degree Murder.

Trial counsel was informed by defense witnesses terrance Coleman,
Jasmine Carter and Ahmad Kendell, that Petitioner has a history of chronic
alcohol abuse, driving recklessly and driving under the influence, see
(Ex. 4, 5, & 6). Trial counsel was further informed by Terrance Coleman that
on the night of this unfortunate accident, Petitioner was in fact "over
intoxicated", see (Ex. 4)

The compulsory process clause provides that "[I]n all criminal prosecutions
the accused shall enjoy the right...to have compulsory process for obtaining
witnesses in his FAVOR" (emphasis added); U.S. Const. Amed. 14; this right is
held applicable to the States through the Fourteenth Amendmnet, see Washington
v. Texas, 388 U.S. 14, 19 (1967)

Trial counsel denied the petitioner the right to a fair trial when he
intentionally lied to defense witnesses in order to get them to withhold
the truth. That in fact if they had revealed the truth of Petitioner's

chronic drinking problem, reckless driving and driving under the influence,
particularly on the night of the offense, the information would only
'aggravate' the Fisrt Degree Murder charge and expose the Petitioner to
grave penalties, see (Ex. 4-6).

Further trial counsel induced Petitioner to testify under these same
circumstances. Misleading Petitioner to believe that he would be given the
maximum penalty or he may receive more time than Petitioner was actually
facing under statue. see Petitioner's affidavit attached as (Ex. 8); see also,
affidavit of Michael Flournoy attached as (Ex. 9). (Mr. Flournoy was present
when trial counsel Martin Abrams coerced the Petitioner into testifying
falsely about the 'true events' on the night of January 12, 2000).

It is reasonable to presume, based upon the evidence available to trial
counsel, a reduce charge to reckless homicide should have been pursued. As
Petitioner's 'acts' were performed recklessly, and under the influence of
alcohol. When counsel fails to pursue a defense which is availabl, counsel
fails to be effective, especially when the evidence supports such a pursuit.
see, Hart v. Gomez, 174 F.3d 1067,1073 (9th Cir. 1999) the court held,
"counsel's failure to introduce exculpatory records into evidence was
ineffective assistance because objectively reasonable performance by counsel
would have created reasonable probability of different verdict", and
U.S. v. Span, 75 F.3d 1383,1390 (9th Cir. 1996)(counsel's failure to request
jury instruction on self-defense  was ineffective assistance because
self-defense was the only defense available). Here, Petitioner contends
that counsel had available evidence to pursue a reduced charge of reckless
homicide, but his incompetence failed the Petitioner in this regard.

Finally, it is not sound strategy to have defense witnesses who possesss
exculpatory evidence, to withhold that evidence and expose the defendant to
an unfair verdict, and then promulgate a shiftless attempt at effective
representation. This notion violates every principle of STRICLAND, as well
as Petitioner's rights to fair trial, due process and equal protection of
the law. And, if there ever was a prototype for incompetence and incoherent
representation, this is it.

## CONCLUSION

Trial counsel was ineffective for withholding exculpatory evidence that would have exonerated Petitioner of First Degree Murder; trial counsel was ineffective for encouraging defense witnesses to withhold exculpatory evidence; trial counsel was ineffective for not a reduced charger to Reckless Homicide.

The cumulative effect of trial counsel's ineffective representation denied the Petitioner his right to fair trial, effective assistance of counsel, due process and equal protection guarantees unde the Illinois and United States Constitutions.

It is not mandatory that the Petitioner show a cumulative effect of errors, only that a constitutional violation took place, "[T]he right to effective assistance of counsel...may in a particular case be violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial". Murray v. Carrier, 477 U.S. 478,496 (1986). Petitioner has done so, vehemently.

**WHEREFORE,** Petitioner prays this Honorable Court vacates his conviction and sentence, and remand this cause back to the Circuit Court for a new trial.

Respectfully Submitted,

_____

MICHAEL THRELKELD, PRO SE

EXHIBIT 1

JAN-13-00 03:35       27475981         P.03      R-513   Job-351

Jan-13-00 02:38   From-IDENT 435 WINDOW       +3127475981      T-846 - P.03/04 - F-584

DEPARTMENT OF POLICE

THRELKELD, Michael C.    M/B     **Youth Division(Y.D.)283342 Is Identical by Fingerprint comparison to IR#1167457**

26 July 96

07 May 79

| 1167457 | 41369 CB4 | 36811920 |
|---|---|---|

| | |
|---|---|
| Michael C THRELKELD<br>5307 S Hyde Park<br>07 May 79 | 11023070 -07 Apr 98 Off. Turner Dist. 021 Traffic Warrant<br>on. |
| Michael C. THRELKELD<br>5307 S. Hyde Park<br>07 May 79 | 11043119 - 30 Apr 98, Off. Camp, Dist. 021, CPD WRT Cannabis<br>jmm |
| Michael C. THRELKELD<br>5307 S Hyde Pk<br>07 May 79 | 11053204 -12 May 98, Off. Jones, 021st. Dist., Disorderly Conduct<br>PW |
| Michael C. THRELKELD<br>5307 S. Hyde Park Bv<br>#1004<br>07 May 79 | 14143743 -17 Mar 99, Off. Williams Dist. 021 Driving Under Influ Of<br>Alcohol)<br>sb |
| Michael C. THRELKELD<br>5307 S. Hyde Park Bv<br>07 May 79 | 14146355 -20 Mar 99 Off. Artz, Dist. 02 Crim Trespass To Residence<br>AJ |
| Michael C. THRELKELD<br>5307 S. Hyde Park Bv<br>07 May 79 | 14189984 -12 May 99, Off. Chan, Dist. 021, Poss Cannabis<br>gd |
| | SEE CR# 26 Jun 98, VOP SUST. (97CR-21406), Resent To 3 YRS IDOC,<br>10537020 Impact Incar. Program, CCW/93CR-6123, Judge Flannery |
| | SEE CR# 15 Jun 98, Mfg/DCS. (98CR-6123), PC 3 YRS IDOC, Impact<br>10887627 Incar Program, Judge Sacks<br>09 Dec 98, Paroled From Vienna CC#K66117, (97CR-21406,<br>98CR-6123) |
| Michael C. THRELKELD<br>5307 S. Hyde Park Bv<br>07 May 79 | 14205562 -30 May 99, Off. Walker, Dist. 021, First Degree Murder<br>Release Without Charging<br>lw |
| Michael THRELKELD<br>07 MAY 79 | Juvenile -14 NOV 95,CPD,Poss contl Sub<br>Court 24 JAN 96,PCS(95JD18099)Findg Delinquency,Judge Haberkorn<br>IUU/JJH 20 FEB 96,PCS(95JD18099)Minor Adjud ward of Court,Placed on<br>Probation Judge Haberkorn |
| Michael THRELKELD<br>07 MAY 79 | Juvenile -09 JAN 96,CPD,Poss Contl Sub<br>Court 24 JAN 96,PCS(96JD00467)Finding of Delinquency,Judge Haberko<br>IUU/JJH 20 FEB 96,PCS(96JD00467)Minor adjud Ward of Court,Placed on<br>Probation Judge Haberkorn |

NOTE! Juvenile Court Records and Juvenile Law
Enforcement Records are restricted for use
in accordance with 705 ILCS 405/1-7and405/1-8

THRELKELD. Michael C.      M/B **Youth Division (Y.D.)number**
                               **283342  is Identical by fingerprint**
16 July 96                     **comparison to IR#1167457**

07 May 79

1167457                      41369CB4                        36811920

| | | |
|---|---|---|
| Michael C. THRELKELD<br>5307 S. Hyde Park<br>07 May 79 | 10289061<br><br>bw | -25 Jul 96, Off. Fowler Dist. 21 Assault<br>29 Aug 96, Aslt (720-5/12-1a1) BF SOL, Judge Sheridan,<br>Doc#96339730 |
| Michael C. THRELKELD<br>5307 S. Hydepark<br>07 May 79 | 10324573<br><br>ibp | -05 Sep 96 Off. Crear Dist. 21 Battery<br>08 Oct 96, Batt (720-5/12-3a1) CDTV (720-5/21-1) BF SOL,<br>Judge Morrissey, Doc#96383728 |
| Michael C. THRELKELD<br>5307 S. Hyde Pk<br>07 May 79 | 10330918<br><br>jmm | - 12 Sep 96, Off. King, Dist. 002. Battery<br>28 Oct 96, Batt (720-5/12-3a1). CDTV (720-5/21-1) BF SOL,<br>Judge Cepero, Doc#96383672 |
| Michael T. THRELKELD<br>5307 S. Hyde Park<br>07 May 79 | 10537020<br><br>IUU/jw | -06 Jun 97, Off. Thompson, Dist. 021, PCS, Unlawful Use of<br>Firearm, No FOID.<br>-12 Aug 97, INFO#97CR-21406, Carry/Possess Firearm, Carry/<br>Possess Firearm In Public |
| Michael THRELKELD<br>5307 S. Hyde<br>07 May 79 | 10636498<br><br>vw | -10 Aug 97 Off. Williams Dist. 02 Disorderly Conduct<br>-16 Sep 97, Disorderly Conduct, 720-5/26-1a1. BF SOL, Judge<br>Toole, DOC# 97387792 |
| Michael C. THRELKED<br>5307 S. Hyde Park Blvd<br>07 May 79 | 10686037<br><br>vv | -03 Sep 97, Off. Cousens, Dist. 21, Disorderly Conduct<br>24 Sep 97, D/C 720-5/26-1, BF-SOL, Judge Divsne, DOc#<br>(97379073) |
| Michael C. THRELKELD<br>5307 S. Hyde Pk<br>07 May 79 | 10692149<br><br>cb/remp | -06 Sep 97 Off. Mcdonald Dist. 21 Aslt<br>20 OCt 97,    Assault    5/12-1) BF SOL,    Jdge    Toole,    DO |
| Michael C. THRELKELD<br>5307 S. Hyde Park<br>07 May 79 | 10725613<br><br>vw | -08 Oct 97 Off. Singleton Dist. 21 Crim Trespass To Land<br>-01 Dec 97, C.T.T.L. 720-5/21-3, BF SOL, Poss of Cann,<br>720-550/4c, BF SOL, Judge Toole, DOC# 97426534 |
| | SEE CB<br>1053/020 | 09 Dec 97, Carry/Possess Firearm, Carry/Possess Firearm In<br>Public, (97CR-21406)PG 15Mos Prob, $25.00 Monthly Prob Fee.<br>Judge Flannery |
| Michael C THRELKELD<br>5307 S Hyde Park<br>07 May 79 | 10884921<br><br>cc | - 31 Jan 98, off. Randle, Dist.02. (DUI Other Drugs) |
| Michael THRELKELD<br>5307 S. Hyde Park<br>07 May 79 | 10887627<br><br>pb | -03 FEb. 98 Off. Smith Crim. Enterprise Inv. Gr. (021) Poss<br>Amt./Conr. Sub. Except (A)/(D)<br>.3 Mar 98, GJ IND#98CR-o.23, Mfg/Del Conc Sub |
| Michael C. THRELKELD<br>5307 So. Hyde Park<br>07 May 79 | 11000802<br><br>sp | -11 Mar 98, Off. Metcalf, Dist. C21., Poss Cann Less Than 2.<br>Grams<br>20 Apr 98, POC 720-550/4, BFW, Judge Divna, eDsC398225652 |

- JAN-13-00  03:35                27475981                    P. 02        R-513    Job-351

Jan-19-00  02:36   From-IDENT 435 WINDOW                  +3127475981      T-846   P. 02/04   F-584

CITY OF CHICAGO / DEPARTMENT OF POLICE / 1121 South State Street
IDENTIFICATION SECTION   Chicago, Illinois 60607

CRIMINAL HISTORY OF   **THRELKELD   Michael C. M/B**

1167457

DATE              26   JUL   96

DATE OF BIRTH     07   MAY   79

CB N.   1167457          I.R.N.   41369 CB4                 36811920

| NAME & ADDRESS | | ARREST DATE |
| Michael C. THRELKELD | 14219446 | -16 Jun 99, Off. Willis, Dist. 002, Driving Under Infu Of |
| 5307 S. Hyde Park Bv | cal | Alcohol |
| 7 May 79 | | |
| Michael C THRELKELD | 14268200 | -18 Aug 99 Off. Skokal Dist. 021 Aid/Abet/Poss/Sell Stolen |
| 5307 S Hyde Park Bv | om | Veh |
| 07 May 79 | | |

CHICAGO POLICE DEPARTMENT
IDENTIFICATION SECTION
THIS CRIMINAL HISTORY CONTAINS
CPD ARREST INFORMATION
AS OF THE INDICATED DATE

DATE: **JAN 1 9 2000** PROCESSED BY:

Jan-15-00  06:38   From-IDENT   LINE 2

T-383  P.01/03  F-669

**CLASS X FELONY**

CITY of CHICAGO / DEPARTMENT OF POLICE / 1121 South State Street
IDENTIFICATION SECTION   Chicago, Illinois 60605

THRELKELD   Michael C. M/B

DATE   JUL   96

15 JAN 00   10 ETA

DATE OF BIRTH   07   MAY   79

| IR NO | FBI NO | SID NO |
|---|---|---|
| 1167457 | 41369 CB4 | 36811920 |

| NAME & ADDRESS | C # NO | DATE OF ARREST   ARRESTING OFFICER & DISTRICT | CHARGE | DISPOSITION |
|---|---|---|---|---|
| Michael C. THRELKELD 5307 S. Hyde Park Bv 7 May 79 | 14219446 cal | -16 Jun 99, Off. Willis, Dist. 002  Driving Under Infu Of Alcohol | | |
| Michael C THRELKELD 5307 S Hyde Park Bv 07 May 79 | 14268200 on | -18 Aug 99 Off. Skokal Dist. 021 Aid/Abet/Poss/Sell Stolen Veh   SOL | | |
| Mihael C THRELKELD 5451 South Cornell 07 May 79 | 14383704 sb | -14 Jan 00. Off. Williams Dist. 005 First Degree Murder | | |

RETURN TRANSMITTED

AS OF   09 DEC 98

ON **PAROLE**

INSTITUTION   VIENNA
REL'S DATE   09 DEC 00

REVIEWED BY
INSTANT UPDATE UNIT

JAN 15 2000

TEL # 312 747-

CLERK'S COMPUTER DOWN

CONFIDENTIAL   Further dissemination of information contained in this record is forbidd
when this record has served the purpose for which it was issued. It must be destroyed (

Jan-15-00  06:34   From-IDENT     3              +3127477906      T-597  P.03/03  F-529

**CITY OF CHICAGO / DEPARTMENT OF POLICE / 1121 South State Street**
IDENTIFICATION SECTION  Chicago, Illinois 60605

CRIMINAL HISTORY OF THRELKELD, Michael C.   M/B **Youth Division (Y.D.)number**
**283342   is Identical by Fingerp**
**comparison to IR#1167457**

DATE          26 July 96

DATE OF BIRTH     07 May 79

| IR NO | FBI NO | SID NO |
|---|---|---|
| 1167457 | 41369CB4 | 36811920 |

| NAME & ADDRESS | I B NO | DATE OF ARREST / ARRESTING OFFICER & DISTRICT | CHARGE | DISPOSITION |
|---|---|---|---|---|
| Michael C. THRELKELD 5307 S. Hyde Park 07 May 79 | 10289061 bw | -25 Jul 96 Off. Fowler Dist. 21 Assault 29 Aug 96, Aslt (720-5/12-1a1) BF SOL Doc#96339730 | | Judge Sheridan, |
| Michael L. THRELKELD 5307 S. Hydepark 07 May 79 | 10324573 lbs | -05 Sep 96 Off. Greer Dist. 21 Battery 08 Oct 96, Batt (720-5/12-3a1) CDTV (720-5/21-1) BF SOL Judge Morrissey, Doc#96383728 | | |
| Michael C. THRELKELD 5307 S. Hyde Pk 07 May 79 | 10330918 jmm | - 12 Sep 96, Off. King, Dist. 002, Battery 28 Oct 96, Batt (720-5/12-3a1), CDTV (720-5/21-1) BF SOL Judge Cepero, Doc#96383672 | | |
| Michael T. THRELKLELD 5307 S. Hyde Park 07 May 79 | 10537020 IUU/jw | -06 Jun 97, Off. Thompson, Dist. 021, PCS, Unlawful Use of Firearm. No FOID. -12 Aug 97, INFO#97CR-21406, Carry/Possess Firearm, Carry/ Possess Firearm In Public | | |
| Michael THRELKELE 5307 S. Hyde 07 May 79 | 10636498 vw | -10 Aug 97 Off. Williams Dist. 02 Disorderly Conduct -16 Sep 97, Disorderly Conduct, 720-5/26-1a1, BF SOL, Judge Toole, DOC# 97387792 | | |
| Michael C. THRELKELD 5307 S. Hyde Park Blvd 07 May 79 | 10686037 vv | -03 Sep 97, Off. Cousens, Dist. 21, Disorderly Conduct 24 Sep 97, D/C 720-5/26-1, BF-SOL, Judge Divane, DOC# (97379073) | | |
| Michael C. THRELKELD 5307 S. Hyde PK 07 May 79 | 10692149 cb/temp | -08 Sep 97 Off. Mcdonald Dist. 21 Aslt 20 Oct 97, Assault 5/12-1) BF SOL Jdge Toole, D | | |
| Michael C. THRELKELD 5307 S. Hyde Park 07 May 79 | 10725613 vw | -08 Oct 97 Off. Singleton Dist. 21 Crim Trespass to Land -01 Dec 97, C.T.T.L. 720-5/21-3, BF SOL, Poss of Cann, 720-550/4c, BF SOL Judge Toole, DOC# 97426534 | | |
| | SEE CB 1053/020 | 09 Dec 97, Carry/Possess Firearm, Carry/Possess Firearm In Public, (9/CR-21406)PG 15Mos Prob, $25.00 Monthly Prob Fee, Judge Flannery | | |
| Michael C THRELKELD 5307 S Hyde Park 07 May 79 | 10884921 cc | - 31 Jan 98, off.Randle, Dist.02.,  DUI Other Drugs | | |
| Michael THRELKELD 5307 S. Hyde Park 07 May 79 | 10887627 ph | -03 Feb. 98 Off. Smith Crim. Enterprise Inv. Gr. (021) Poss Amt. Cont. Sub. Except (A)/(D) / Mar 98, GJ IND#98CR-6123, Mfg/Del Cont Sub | See previous page | |
| Michael C. THRELKELD 5307 So. Hyde Park 07 May 79 | 11000852 sp | -11 Mar 98, Off. Metcalf, Dist. 021., Poss Cann Less Than 2 Grams 20 Apr 98, POC 720-550/4, BFW, Jduge Divna, eDoC398226853 | | |

M   F

See previous page

CONFIDENTIAL   Further dissemination of information contained in this record is forbidden

Jan-15-00, 06:33   From-IDENT   3        +3127477906        T-597  P.02/03  F-529

PAGE TWO (2)

CITY OF CHICAGO / DEPARTMENT OF POLICE / 1121 South State Street
IDENTIFICATION SECTION  Chicago, Illinois 60605

| CRIMINAL HISTORY OF | THRELKELD, Michael C.   M/B | Youth Division(Y.D.)283342 Is Identical by Fingerprint comparison to IR#1167457 |
|---|---|---|
| DATE | 26 July 96 | |
| DATE OF BIRTH | 07 May 79 | |

| IR NO. 1167457 | FBI NO. 41369 CB4 | SID NO. 36811920 |
|---|---|---|

| NAME & ADDRESS | CB NO | DATE OF ARREST   ARRESTING OFFICER & DISTRICT   CHARGE   DISPOSITION |
|---|---|---|
| Michael C THRELKELD 5307 S Hyde Park 07 May 79 | 11023070 om | -07 Apr 98 Off. Turner Dist. 021 Traffic Warrant |
| Michael C. THRELKELD 5307 S. Hyde Park 07 May 79 | 11043119 jmm | - 30 Apr 98, Off. Camp, Dist. 021, CPD WRT Cannabis |
| Michael THRELKELD 5307 S Hyde Pk 07 May 79 | 11053204 PW | -12 May 98, Off. Jones, 021st. Dist., Disorderly Conduct   BFSOL |
| Michael C. THRELKELD 5307 S. Hyde Park Bv #1004 07 May 79 | 14143743 sb | -17 Mar 99, Off. Williams Dist. 021 Driving Under Influ Of Alcohol |
| Michael C. THRELKELD 5307 S. Hyde Park Bv 07 May 79 | 14146355 AJ | -20. Mar 99 Off. Artz, Dist. 02 Crim Trespass   To Residence   Nolle |
| Michael C. THRELKELD 5307 S. Hyde Park Bv 07 May 79 | 14189984 gd | -12 May 99; Off. Chan, Dist. 021, Poss Cannabis   BFSOL |
| | SEE CB# 10537020 (F) | 26 Jun 98, VOP SUST, (97CR-21406), Resent To 3 YRS IDOC, Impact Incar. Program, CCW/93CR-6123, Judge Flannery |
| | SEE CB# 10887627 (F) | 15 Jun 98, Mfg/DCS, (98CR-6123), PG 3 YRS IDOC, Impact Incar Program, Judge Sacks 09 Dec 98, Paroled From Vienna CC#K66117, (97CR-21406, 98CR-6123)  ←see next page |
| Michael C. THRELKELD 5307 S. Hyde Park Bv 07 May 79 | 14205562 lr | -30 May 99, Off. Walker, Dist. 021, First Degree Murder Release Without Charging |
| Michael  THRELKELD   07 MAY 79 | Juvenile Court IUU/JJH | -14 NOV 95,CPD,Poss contl Sub 24 JAN 96,PCS(95JD18099)Findg Delinquency,Judge Haberkorn 20 FEB 96,PCS(95JD18099)Minor Adjud ward of Court,Placed on Probation Judge Haberkorn |
| Michael THRELKELD   07 MAY 79 | Juvenile Court IUU/JJH | -09 JAN 96,CPD,Poss.Contl Sub 24 JAN 96,PCS(96JD00467)Finding of Delinquency,Judge Haberko 20 FEB 96,PCS(96JD00467)Minor adjud Ward of Court,Placed on Probation Judge Haberkorn |

NOTE! Juvenile Court Records and Juvenile Law
Enforcement Records are restricted for use
in accordance with 705 ILCS 405/1-7and405/1-8

CONFIDENTIAL   Further dissemination of information contained in this record is forbidden. When this record has served the purpose for which it was issued, it must be destroyed (U.S ...

EXHIBIT 2

## OFFICE OF THE STATE'S ATTORNEY
## COOK COUNTY, ILLINOIS

## INVESTIGATIVE REPORT

| CONTROL NO 00E2484 CASE NO: 00CR-4537 | REPORTING DATE(S): 8-14-00 | PREPARED BY INVESTIGATOR: HUGH CAHILL | SYNOPSIS OF REPORT: INTERVIEW |
|---|---|---|---|

**Date of Assignment:**  8-8-00

**Assignment:**  INTERVIEW DEFENSE WITNESS: AHMAND KENDALL, M/B/20YRS., DOB 19 OCT. 1979, OF 4551 S. ELLIS, TEL#548-1567

**Subject Information:**  DEFENDANT: MICHAEL THRELKELD

**Present:**  INVESTIGATOR DENNIS CULLOM

**Date/Time/Location:**  10 AUG.00, 11:20 AM, 4551 S. ELLIS

Reporting Investigator interviewed Mr. Kendall regarding this incident and he related the following: At the time of the incident he and Michael Threlkeld shared an apartment located at 5451 S. Cornell. On the night of the incident Michael told him he was going to a movie with Asha (his girlfriend). Mr. Kendall stated Michael appeared to be very happy. Michael then left the apartment.

The following mourning at approx. 9:30 am the police came to his apartment and informed him Michael had been involved in an auto accident. The police asked Mr. Kendall if he knew where Michael was. Mr. Kendall informed the police he had no idea, but thought he had spent the night at Asha's apartment.

Mr. Kendall also stated it did not surprise him that Michael was involved in an accident because he knew Michael was a reckless driver.

**INVESTIGATOR:** _____ HUGH CAHILL & DENNIS CULLOM

**SUPERVISORY REVIEW:** _____

EXHIBIT 3

## ILLINOIS STATE POLICE FIELD REPORT

| | 1 Type of Report | ROC# | | 3 Initial Notification | 4 Incident Occurrence | 5 Number |
|---|---|---|---|---|---|---|
| | 1,2,3,4 | 2 How Notified | | Date 01/13/00 | Date 01/13/00 | — 06-00-035 |
| | | | | Time 2:45 A | Time 2:45 A | |

| 1. TYPE OF REPORT | 6c. & 6e. RESPONDING VEHICLE | 5c. RACE | 8. MARITAL STATUS | 10b. INJURIES | 14a. WEAPON | 14c. CASE STATUS |
|---|---|---|---|---|---|---|
| 1. Incident Report | W -White | 8g. HAIR | 1. Married | 1. Killed | 1. Hands | 0. Unknown (False or Baseless Complaint) |
| 2. Case Data Report | 1. 1-Man Patrol Vehicle | 1. Bald | 2. Separated | 2. Fracture | 2. Feet | 1. Referred to Responsible Jurisdiction |
| 3. Prelim. Crim. Inv. | B -Black | 2. Black | 3. Divorced | 3. Stab Wounds | 3. Handgun | 2. Pending Investigation |
| Per History Info. | 2. 2-Man Patrol Vehicle | 3. Black/Strawberry | 4. Single | 4. Gunshot Wounds | 4. Shotgun | CLEARED BY ARREST |
| 5. Loss or damage of | Am. Indian/Alaskan | 4. Brown | 5. Remarried | 5. Lacerations/Bites: | 5. Rifle | 3. Adult |
| ISP equipment | M -Mexican | 5. Gray or Part. Gray | | Human | 6. Knife | 4. Juvenile |
| 6. Personal Injury | P -Puerto Rican | 6. Red/Auburn | | 6. Scratches/Bites: | 7. Club | EXCEPTIONAL CLEARANCE |
| 7. Encounters | N -Other Hispanic | 7. Sandy | | Animal | 8. Bottle | 5. Failed to File Complaint or Prosecute - Adult |
| 8. Pursuit Report | A -Asian Pacific | 8. White | | 7. Bruises/Abrasions | 9. Vehicle | 6. Failed to File Complaint or Prosecute - Juvenile |
| 9. Juvenile | | | | 8. Lacerations | 0. Other | 7. Other Exceptional Clearance - Adult |
| V. Vehicle | 7. SYMBOLS | 8f. EYES | | 9. Poison | | 8. Other Exceptional Clearance - Juvenile |
| | C. Complainant | 1. Black | | 10. Burns | | 9. Case Administratively Closed |
| 5. HOW ISP INITIALLY | D. Defendant | 2. Blue | | | | |
| NOTIFIED | I. Informant | 3. Brown | | | | |
| 1. On View | S. Suspect | 4. Gray | | | | |
| 2. Telephone | V. Victim | 5. Green | | 11d. A = arrest for offense reported to ISP | | |
| 3. In Person | W. Witness | 6. Hazel | | B = arrest for offense not yet reported to any agency; this entry reports BOTH an arrest and an offense | | |
| 4. U.S. Mail | R. Relative | 7. Maroon | | C = arrest for offense reported to another agency | | |
| 5. Other Agency | DR. Driver | 8. Pink | | O = offense being reported for the first time | | |
| 6. C.B. Radio | P. Passenger | | | N = to be used with "A", "B", "C", or "O" is not applicable | | |
| | O. Other | 8i. BUILD 1. Heavy 2. Medium 3. Thin 4. Slight | | | | |

| 6 | Brief Description Obstructing Justice, Driving while Revoked, Illegal Consumption by a Minor, Possession of Cannabis, Uninsured Motor Vehicle, Improper Lighting (One Headlamp) |
|---|---|

| | a. Location | | | City | | County/Township |
|---|---|---|---|---|---|---|
| | I-55-southbound milepost 177 | | | | McLean, Lexington | |
| | b. Investigating Officer (Print or Type) - Last, First, Middle | I.D. No. | Dist. No. | c. Response No. | d. Assisting Officer - Last, First, Middle | I.D. No. | Dist. No. | e. Response No. |
| D | Gray, Brian | 4994 | 06 | ★ 1 | Zappa, David | 4741 | 06 | ★ 1 |

| 7★ | a. Name - Last, First, Middle | b. Home Address | c. Telephone |
|---|---|---|---|
| | Threlkeld, Michael C. | 5451 S. Cornell Chicago, IL 60615 | 773/752-6547 |

| 8 | a. DOB | b. Sex | c. Race | d. Height | e. Weight | f. Eyes | g. Hair | h. Complex. | i. Build | j. Marital | k. Scars-Tattoos-Deformities-Amputations |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 05/07/79 | M | ★ B | 507 | 140 | ★ 3 | ★ 2 | dark | ★ 4 | ★ 4 | Tattoo Right Upper arm of Heart with an "M" in the middle |

| 9 | a. Driver's License No. | State | b. Social Security No. | c. Place of Birth | d. Business Name and Address |
|---|---|---|---|---|---|
| | T642-5437-9131 | IL | Unknown | Chicago | William's Furniture  Chicago |

| 10 | a. Occupation | b. Injuries ★ | c. Address where treatment given | d. Alias |
|---|---|---|---|---|
| | Mover | None | ———————— | None KEVIN TEVIN WILLIAMS |

| 11 | a. Date Arrested | Time | b. Location of Arrest | | | | e. Offense Section | d. A□ B□ |
|---|---|---|---|---|---|---|---|---|
| | 01/13/00 | 2:45 A | I-55 southbound milepost 177 | | | | 720 ILCS 5/7-701   615 ILCS 5/6-303 | ★ C□ O□ |
| | | | | | | | 235 ILCS 5/6-20 13a   720 ILCS 550/4B 704(b) | |
| | | | | | | | 625 ILCS 5/3-707   625 ILCS 5/12-211 | |

| 12 | a. Date Miranda Given | Time | A P | b. Officer Name | I.D. No. | c. Fingerprint | d. Bond | e. Court App. Date | f. Where Held |
|---|---|---|---|---|---|---|---|---|---|
| | 01/13/00 | 10:00 A | | Tpr. Gray, Brian | 4994 | ☒Yes □No | No Bond | 02/15/00 | Mclean Co Jail |

| 13 | a. ISP Ticket No. | b. Pursuit Termination Device Used? □Yes ☒No | c. FBI Case No. | d. BOI No. | e. LEADS Message No. | f. NCIC |
|---|---|---|---|---|---|---|
| | 06-0804841-0804846 | | | | | |

| 14 | a. Weapon | b. 1.□ Alcohol involved 2.☒ Drugs involved | c. Case Status | d. Place | e. Method | f. Property Code | g. Recovery Code | h. Property-Value STOLEN | RECOVERED | DAMAGED |
|---|---|---|---|---|---|---|---|---|---|---|
| | ★ None | | 3 | 238 | 411 | | | | | |

| 7★ | a. Name - Last, First, Middle | b. Home Address | c. Telephone |
|---|---|---|---|
| | | | |

| 8 | a. DOB | b. Sex | c. Race | d. Height | e. Weight | f. Eyes | g. Hair | h. Complex. | i. Build | j. Marital | k. Scars-Tattoos-Deformities-Amputations |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | ★ | | | ★ | ★ | | | ★ | |

| 9 | a. Driver's License No. | State | b. Social Security No. | c. Place of Birth | d. Business Name and Address |
|---|---|---|---|---|---|
| | | | | | |

| 10 | a. Occupation | b. Injuries ★ | c. Address where treatment given | d. Alias |
|---|---|---|---|---|
| | | | | |

| 11 | a. Date Arrested | Time | A P | b. Location of Arrest | | | | e. Offense Section | d. A□ B□ |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | ★ C□ O□ |

| 12 | a. Date Miranda Given | Time | A P | b. Officer Name | I.D. No. | c. Fingerprint □Yes □No | d. Bond | e. Court App. Date | f. Where Held |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

| 13 | a. ISP Ticket No. | | c. FBI Case No. | d. BOI No. | e. LEADS Message No. | f. NCIC |
|---|---|---|---|---|---|---|
| | | | | | | |

| 14 | a. Weapon | b. 1.□ Alcohol involved 2.□ Drugs involved | c. Case Status | d. Place | e. Method | f. Property Code | g. Recovery Code | h. Property-Value STOLEN | RECOVERED | DAMAGED |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | ★ | | | | | | | |

### VEHICLE OR BOAT INFORMATION

| 15 | a. Color | b. Year | c. Mfg. Trade Name | d. Body/Hull Style | e. Year/State | f. License No. | g. VIN/HIN | |
|---|---|---|---|---|---|---|---|---|
| | Gray | 1995 | Jeep | Grand Cherokee | 00/IL | Lic App for | 1J4GZ78Y7SC725422 | |
| | h. Owner | | | i. Address | | | | j. Est. Damage |
| | Unknown | | | Unknown | | | | $1500.00 |
| | k. Telephone | l. Vehicle Removed By | | | To | | m. Quality Check | I.D. No. |
| | Unknown | Joe's Towing | | | Joe's Bloomington | | Initials | |

| 16 | Signature of Investigating Officer | | a. Date | b. Copies to: | | Page 1 of 6 |
|---|---|---|---|---|---|---|
| | | | 01/15/00 | Mclean Co. S/A | | |

THE CONTENTS OF THIS DOCUMENT ARE CONFIDENTIAL AND CONTAIN NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF THE ILLINOIS STATE POLICE

## NARRATIVE OR ROAD BLOCK LOG

| TIME | COLOR OF VEHICLE | YEAR | MAKE | REGISTRATION NO. | STATE OF ISSUANCE |
|------|------------------|------|------|------------------|-------------------|

The purpose of this report is to document the arrest of Michael C. Threlkeld, date of birth 05/07/79, of 5451 S. Cornell Chicago, Illinois 60615 on 01/13/00 on I-55 southbound milepost 177. The arrest of Threlkeld was for Obstruction of Justice, Driving while Revoked, Illegal Consumption by a Minor, Possession of Cannabis 2.5 grams to 10 grams, Operating and Uninsured Motor Vehicle, and Improper Lighting (one headlamp).

On 01/13/00 at approximately 2:30 A.M., I (Tpr. Brian Gray #4994) was on a traffic stop at I-55 southbound milepost 191 when a truck tractor semi-trailer stopped, on the shoulder, behind me. I exited my vehicle and approached the truck driver. The driver stated there was a Gray Jeep Grand Cherokee southbound on I-55 about milepost 193. The vehicle was all over the roadway, slowing down in traffic and sometimes almost coming to a stop. The vehicle had no license plates and the right headlamp was inoperative. The truck driver turned around and stated the vehicle was approaching our location. I noticed the vehicle had a right headlight out. I attempted to motion the vehicle over with my flashlight and hand signals. The vehicle proceeded southbound on I-55. I noticed the description matched that of the truck driver's information obtained. I asked radio to broadcast an ISPERN Dispatch with the information obtained by the truck driver. Radio broadcasted the ISPERN Dispatch. I completed my traffic stop at approximately 2:38 A.M. and notified radio I was attempting to catch up to the Gray Jeep reference the ISPERN Dispatch.

I monitored citizen's band radio channel 19 for radio traffic. Channel 19 notified me the vehicle was still southbound on I-55. At approximately 2:45 A.M. I caught up to a Gray Jeep Grand Cherokee at I-55 southbound milepost 178. I noticed the vehicle did not have a rear registration plate light. Channel 19 notified me the vehicle in front of my squad car was the vehicle reported to be all over the roadway. The vehicle matched the ISPERN Dispatch. I affected a traffic stop at I-55 southbound milepost 177 by activating my emergency lights. I notified radio of my location. The driver of the vehicle slowed down extremely in the right lane of traffic. The vehicle came to a stop. I noticed one male occupant, the driver, in the vehicle. The subject immediately placed his hands on the roof of the vehicle. I approached the vehicle from the passenger side. I noticed extensive front end damage to the front passenger side of the vehicle. I asked the driver where he was coming from. The driver stated Chicago going to Champaign to see his girlfriend. I asked the driver to present a driver's license. The driver asked if he could look in his pockets. I stated use one hand at a time and to keep the other hand on the steering wheel. This was for officer safety. The driver stated he did not have his driver's license. I asked the driver what his name was. The driver stated Kevin Tevin Williams, date of birth 04/07/79. I asked William's to turn off the ignition to the vehicle. Williams complied. I walked around the front of the vehicle to check the Vehicle Identification Number (VIN). I approached the driver side window and asked Williams to place his hands on the steering wheel for officer safety. Williams complied. I asked radio to run a computer check on VIN: 1J4GZ78Y7SC725422. Radio notified me there was no record on file. I asked Williams to present proof of insurance for the vehicle. Williams opened the glove compartment. I noticed the temporary registration card in the glove compartment. I asked Williams if I could see the registration card. Williams handed me the

| | COURT LOCATION |
|--|----------------|
| | |
| | McLean County |

THE CONTENTS OF THIS DOCUMENT ARE CONFIDENTIAL AND CONTAIN NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF THE ILLINOIS STATE POLICE. THE CONTENTS OF THIS DOCUMENT ARE NOT TO BE DISTRIBUTED OUTSIDE THE ILLINOIS STATE POLICE.

| ILLINOIS STATE POLICE<br>Universal Addendum Form | 1. Original Report Type<br>1,2,3,4 | 2. Report Date<br>01/15/00 | 3. Original Report#<br>F-06-00-035 S |
|---|---|---|---|

NARRATIVE                         PASSENGER/WITNESS/OTHER LIST

| Name | Address | City/State | Age | Inj.<br>Code | Seat<br>Pos. | Unit<br># | Sex |
|---|---|---|---|---|---|---|---|

registration card. Williams could not present proof of insurance. I asked Williams to come back to my vehicle. I patted Williams

down for weapons. I placed Williams in my vehicle. I asked Williams when his birthday was again. Williams stated 04/07/79. I

asked radio to run a computer check on Williams. Radio notified me there was no record of file. I asked Williams for his address.

Williams stated 5327 N. Lake park Chicago, Illinois 60615. I asked Williams who the owner of the vehicle was. Williams stated

Bobby Petty, Williams uncle, of Chicago. The registration card was torn in half. The only information on the card was owner Bobby

Renolds of Chicago. I asked who Bobby Renolds was. Williams stated Renolds was a friend of his uncles. Williams stated Renolds

really owned the vehicle and gave Williams permission to drive the vehicle. I asked Williams how long Renolds owned the vehicle.

Williams stated about a month.


I noticed the smell of an alcoholic beverage emitting from Williams. I asked Williams if he had been drinking alcohol. Williams

stated yes. I asked what he was drinking. Williams stated Gin and orange juice. I asked where the bottle of gin was. Williams stated

he threw the bottle out somewhere in Chicago. I asked how much he drank. Williams stated the whole pint of Gin. I told Williams I

was placing him in handcuffs for his protection and mine. I stated he was not under arrest. I handcuffed Williams, checked for fit and

double locked. I placed Williams back in my vehicle.


I approached the vehicle and asked radio to run the VIN again. Radio stated there was no record on file. I walked around to the

passenger front of the vehicle where I noticed the right headlamp was inoperative. There was extensive damage to the right front of

the vehicle. The hood was wrinkled with an oval dent approximately 2 feet in diameter on the right side of the hood. The clear

headlamp cover was broken. The bumper had scratches on it. The front quarter panel was wrinkled. paint had chipped from the

hood approximately 3 inches long by 2 inches wide. I noticed there was no rust anywhere in the damaged area. Inside the headlamp

cavity was no sign of dirt or impression of being broken for a long period of time. I noticed there was no rust anywhere in the

damaged area. I was unable to determine any paint transfer. The conclusion I drew from the damage was it occurred very recently,

due to the fact there was no dirt around the damaged areas or rust on the exposed metal. I noticed a piece of paper in the passenger

seat with the name Agent Williams.

| Investigating/Reporting Officer's Signature | ID #<br>4994 | District #<br>06 | Date<br>01/15/00 |
|---|---|---|---|

| | | 1. Original Report Type | 2. Report Date | 3. Original Report# |
|---|---|---|---|---|
| **ILLINOIS STATE POLICE**<br>Universal Addendum Form | | 1,2,3,4 | 01/15/00 | F-06-00-035 S |

**NARRATIVE**                                 PASSENGER/WITNESS/OTHER LIST

| Name | Address | | City/State | Age | Inj.<br>Code | Seat<br>Pos. | Unit<br># | Sex |
|---|---|---|---|---|---|---|---|---|

I returned to my vehicle. I asked Williams where the damage to the vehicle came from. Williams stated his uncle hit something about a month ago. I ask Williams what his uncle hit. Williams did not know. I asked Williams for his name again. Williams stated Kevin Tevin Williams. I asked Williams for his date of birth. This time, Williams stated 06/07/79. I asked radio to run a computer check on Williams again. Radio notified me there was no record on file. I asked Williams if he had ever been in trouble. Williams stated no. I asked Williams who Agent Williams was. Williams stated that was his parole officer. I asked Williams for his parole officer's phone number. Williams did not know the number. I asked Williams for his Social Security Number. Williams stated he was in school at Robert Morris College, never had a job and did not know his Social Security Number. I asked Williams for his parole number. Williams stated K66118 out of Cook County. A computer check of parole number K66118 revealed no record on file. Due to the fact no information was obtained about Kevin Tevin Williams, this led me to believe the subject was not Kevin Tevin Williams.

Tpr. Zappa #4741 arrived to assist on the stop. I notified him of the information I have received.

I asked Williams what his address was. Williams stated this time 5451 S. Cornell Chicago, Illinois 60615. I asked Williams for his mothers phone number. Williams stated 773/ 752-6864, mother's name was Gladice Williams. Gladice was an Registered Nurse at Cook County Hospital. Gladice was unable to be contacted at home or at the hospital for information about her son. Williams stated his aunts name was Judy Carter 773/468-0599. No one answered upon calling the number. From the information obtained, I was unable to determine Williams had a valid driver's license.

I asked radio to call a Tow. Radio notified me Joe's Towing was en route. At 4:15 A.M. I asked Williams to submit to a preliminary breath test with the Alco-Sensor IV. Williams stated yes. The results of the preliminary breath test was .006. Williams fell under the Zero Tolerance law for being under age. At this time I placed Williams under arrest for No Valid Driver's License and Illegal Consumption by a Minor.

| Investigating/Reporting Officer's Signature | ID #<br>4994 | District #<br>06 | Date<br>01-15-00 |
|---|---|---|---|

| ILLINOIS STATE POLICE<br>Universal Addendum Form | 1. Original Report Type<br>1,2,3,4 | 2. Report Date<br>01/15/00 | 3. Original Report#<br>F-06-00-035 S |
|---|---|---|---|

**NARRATIVE**               **PASSENGER/WITNESS/OTHER LIST**

| Name | Address | City/State | Age | Inj.<br>Code | Seat<br>Pos. | Unit<br># | Sex |
|---|---|---|---|---|---|---|---|

I asked Williams if there were any weapons, drugs, or alcohol in the car before I inventoried the vehicle for the Tow. Williams stated

no. I inventoried the vehicle due to the Tow being en route. While inventorying the vehicle I noticed 3 small approximately 1 inch

by 1 inch bags tightly packed with a green leafy substance in the middle console by the parking break lever. I notice two cigars

wrapped in cellophane in the middle console by the parking break lever and a book of matches in a driver's side door compartment. I

field tested the green leafy substance for marijuana. The field test result was positive for marijuana. I continued the inventory. I

noticed a small Sentry safe Model 1100 approximately 1 foot by 1 foot by 6 inches in a plastic bag in the middle of the rear passenger

seat. I also notice a piece of paper with an address of 3216 Misty  Albin, Pennsylvania and a social security number on the back

(SSN: 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). I returned to my vehicle. I asked Williams what was in the safe. Williams stated approximately $2600.00 cash

was in the safe and that he was going to spend it on his girlfriend in Champaign. Williams asked if he could have his money before

the Tow truck left. I asked Williams if I could open the safe. Williams stated yes. Williams only request was that the safe be opened

in front of him. I stated yes. I asked Williams where the key to the safe was. Williams stated on his key chain in the ignition. I

removed the Sentry key from the key chain in the ignition of the vehicle. I opened the safe in front of Williams. Inside the safe was a

large sum of U.S. Currency seemed to be mostly $20 denominations. Also, there were various pictures in the safe. I locked the safe

and placed it in my trunk. I asked Williams what the green leafy substance was in the center console. Williams called the substance

herb. I asked what herb was. Williams stated weed. I asked Williams if it was marijuana. Williams stated yes. I asked Williams

why he lied to me about the drugs in the vehicle. Williams stated he thought I was looking for a large sum of drugs. At this time, I

place Williams under arrest for Possession of Cannabis.


Tpr. Zappa stated he would complete the Tow report (T-06-00-040).


District 06 Investigations was notified of the stop and items found in the vehicle. Investigations stated to tow the vehicle to the

Investigations Building in Bloomington and also transport Williams there for further interviewing. I secured the seatbelt around

Williams and transported him to investigations at approximately 5:47 A.M. (beginning mileage 109703). I arrived at investigations at

approximately 6:08 A.M. (mileage 109718).

| Investigating/Reporting Officers Signature | ID #<br>4994 | District #<br>06 | Date<br>01-15-00 |
|---|---|---|---|

| ILLINOIS STATE POLICE Universal Addendum Form | 1. Original Report Type 1,2,3,4 | 2. Report Date 01/15/00 | 3. Original Report# F-06-00-035 S |
|---|---|---|---|

**NARRATIVE**                    PASSENGER/WITNESS/OTHER LIST

| Name | Address | City/State | Age | Inj. Code | Seat Pos. | Unit # | Sex |
|---|---|---|---|---|---|---|---|

Sgt. Brendan Heffner #4625 took Williams for interviewing. A K-9 officer was called to investigations. Officer Les Stevens (Chenoa #4) responded. A K-9 alerted on the passenger side just below the A-Frame of the vehicle, the passenger door and center console. Further investigation resulted in no contraband found. The K-9 alerted on the model 1100 Sentry safe.

I took the Sentry safe into investigations and counted the currency in front of Williams. Total amount in the safe was $2600.00. The $2600.00 was placed into a single evidence bag and sealed. I entered the cash into evidence as well as the Sentry safe Model 1100. I weighed the 3 bags of green leafy substance. The total weight was 4.2 grams. I sealed the 3 bags of green leafy substance in a single evidence bag and sealed it. I sent the green leafy substance to the lab for analysis and amount.

Sgt. Brendan Heffner notified me Williams' real name was Michael C. Threlkeld, date of birth 05/07/79, of 5451 S. Cornell Chicago, Illinois 60615. At this time I attempted to contact McLean County States Attorneys Office to receive advise on charging the subject for Obstructing Justice. I was unable to contact a State's Attorney therefore charged Threlkeld for Obstructing Justice. I asked Threlkeld who owned the vehicle. Threlkeld stated Bobby Rental.

At approximately 9:21 A.M. I transported Threlkeld to McLean County Jail (mileage 109718). I arrived at McLean County Jail at approximately 9:33 A.M. (mileage 109723). At the jail I issued Threlkeld his copies of the citations. I issued Threlkeld warnings for No Rear Registration Light and No Driver's License on person (WW-06-2012566). I issued citations to Threlkeld for Operating an Uninsured Motor Vehicle (CC-06-0804841) 625 ILCS 5/3-707, Driving while Revoked (CC-06-0804842) 625 ILCS 5/6-303, Improper Lighting (One Headlamp) (CC-06-0804843) 625 ILCS 5/12-211, Illegal Consumption by a Minor (CC-06-0804844) 235 ILCS 5/6-20 134a, Possession of Cannabis 2.5 grams to 10 grams (CC-06-0804845 720 ILCS 550//4B 704(b), and Obstructing Justice (CC-06-0804846) 720 ILCS 5/31-4. At 9:45 A.M. I read Threlkeld his Written Warning to Motorist Zero Tolerance Under 21. Threlkeld understood the Warning and submitted to a breath test. At 9:59 A.M. Threlkeld issued the sample into the INTOX EC/IR. The subject result was .002. At 10:00 A.M. I read Threlkeld his Miranda Rights. Threlkeld stated he understood his rights. I asked Threlkeld if he would submit to the Alcohol Influence Interview. Threlkeld stated yes.

| Investigating/Reporting Officer's Signature | ID # 4994 | District # 06 | Date 01-15-00 |
|---|---|---|---|

IL 493-0567                    ISP 5-264 (1/88)          Page 5 of 6 Pages

| ILLINOIS STATE POLICE Universal Addendum Form | 1. Original Report Type 1,2,3,4 | 2. Report Date 01/15/00 | 3. Original Report# F-06-00-035 S |
|---|---|---|---|

**NARRATIVE**      PASSENGER/WITNESS/OTHER LIST

| Name | Address | City/State | Age | Inj. Code | Seat Pos. | Unit # | Sex |
|---|---|---|---|---|---|---|---|

I issued Threlkeld his copies of the Written Warning to Motorist and Law Enforcement Officer's Sworn Report. I turned Threlkeld over to McLean County Jail Division for further processing. I exited the jail.

| Investigating/Reporting Officer's Signature | ID # 4994 | District # 06 | Date 01-15-00 |
|---|---|---|---|

ISP 5-264 (1/88)     Page 6 of 6 Pages

II 493-0567

EXHIBIT 4

State Of Illinois)

   Cook County    )

       Affidavit Statement Of
       Terrance Coleman

In pursuant to the 28 U.S.C. Act,Penalty of Perjury, I Terrance
Coleman swear under the penalty of perjury that this affidavit is
correct and true as I know it. I understand that if anything I'm
saying is proven to be false,I could and will be prosecuted under
the law.

      I was a witness for the defense on the behalf of Michael
Threlkeld. I just want to clear up the wrong that have been done
by the attorney Mr. Martin Abrams. On March 13,2001 during the
trial of Michael Threlkeld,I was told by the attorney of Michael's
not to tell the real truth about what was going on with Michael,
and about the drinking problem that Michael had,and the fact that
every time I seen him in a car or anywhere he is always drunk.
Attorney Abrams told me to say a different story,and instead of
admitting that he was over intoxicated and driving during that night
of Jan.12,2000,that he was to only testify that he only drinked 2
shots of gin after the accident of Jan.12,2000.
Myself,Jasmine Carter and Ahmad Kendell all was there when Michael
Threlkeld's attorney was giving us the instructions of what we is
to say which I thought was the best thing to do,for Michael.
Mr. Abrams said the reason he did not want nothing said about Michael
being an alcoholic because if it was found out and Michael was in-
toxicated during that accident Jan.12,2000,that it will only make
the case aggravated and that the State Attorney will use it against
Michael to get him convicted and a lot of time.

Mr. Abrams then said that Michael got a D.U.I. already and some more other driving under the influence arrests and that Michael will be crazy to testify that he was a alcoholic and that he was drunk when he was behind the wheel of his car the night of the accident.

I will give this statement in person and under oath in court.the same that I've stated here. I know that if my words are not true that I will be prosecuted under the penalty of perjury.

I have not been promised anything in exchange for this statement; it is of my own free will and I have not been coerced.in ant way.

Respectfully Submitted;

Terrance Coleman

Subscribed before me and sworn to
on the ___ day of ___ 2005.

_____
Notary Public

"OFFICIAL SEAL"
MAXWELL A. FISHER
COMMISSION EXPIRES 11/27/05

2

EXHIBIT 5

STATE OF ILLINOIS )
                  )    AFFIDAVIT OF JASMINE CARTER
COUNTY OF COOK    )

Pursuant to the 28 USC § 1746, I certfy under the penalty of perjury
that the foregoing is true and correct and I understand that if any
of the foregoing is false, that I could be and will be prosecuted.

    My name is Miss Jasmine Carter who was a defense witness in
the trial of Michael Threlkeld. My reason for giving this sworn and
signed statement is because March 13, 2001 during the defense part
of Michael Threlkeld's trial I was told by the attorney of Michael's
not to reveal the truth about what I actually knew about Michael's
drinking problem and that he's always drunk when he drives and that
instead of Michael admitting that he was over intoxicated and driving
during that night of January 12th 2000, that he was to only testify
that he only drinked 2 shots of gin after the incident of January
12th 2000.

I, Miss Jasmine Carter, Terrance Coleman, and Ahmad Kendell all was
there when Michael Threlkeld's attorney was giving us these instruc-
tions about what to say, not admitting the truth.

Michale Threlkeld's attorney Martin Abrams also said that the reason
he did'nt want nothing said about Michael being an alcoholic because
if it was revealed that Michael was an alcoholic and was intoxicated
during that night January 12th 200, that it would only make the case
aggravated and that the state would use that against Michael to put
him away for a long time.

Michale's attorney Martin Abrams as well stated that Michael already
have a DUI and alot of other driving while intoxicated arrests,
under the influence, that Michael would be a fool to testify that
he was an alcoholic and was highly intoxicated in that car on the
night of the incident.

-1-

I will also testify under oath the actual truth about what I was told not to say at the trial of Michael Threlkeld if called to do so.

Any falsehoods in this affidavit could subject me to prosecuted under the penalty of perjury.

Sincerly; _Jasmine Cott_

Sworn to and subscribed before me;
__/1__ Day of __May__ 2005

"OFFICIAL SEAL"
AHISA HOLIDAY
NOTARY PUBLIC STATE OF ILLINOIS
COMMISSION EXPIRES 05/11/08

-2-

EXHIBIT 6

## Affidavit Of Ahmad Kendell

I,Ahmad Kendell,being first duly sworn upon oath is making this
sworn statement of these facts and do understand that if I am
found to be giving false information that I can and will be
prosecuted under the penalty of perjury. Pursuant to 28 U.S.C.§
1746 declare that the foregoing is true and correct.

My name is Ahmad Kendell,the defense primary witness within the
Michael Threlkeld's trial,and my reason and purpose for this typed
and signed affidavit is because in the month of March 2001 during
the defense of Michael Threlkeld's trial .I was cohersed by a Mr.
Martin Abrams,Michael Threlkeld's attorney to not testify about his
drinking problem and about how he drink when he drives.

That instead of Michael Threlkeld admitting that he was intoxica+
ted while driving during the night of Jan.12,2000,that he was to
only testify that he only consumed two shots of gin afterwards of
of the incident of Jan.12,2000.

Myself,Jasmine Carter,Michael Threlkeld's cousin,and also Terrance
Coleman were all present during the cohersed instructions given by
Michael Threlkeld's attorney Martin Abrams. Mr. Abrams also stated
that the reason why he did'nt want any statements mentioned about
Michael Threlkeld's drinking problem was because if it was found
out by the States Attorney that Michael Threlkeld was intoxicated
during the night of Jan.12,2000 that it would only make the case
aggravated and the State's Attorney would use it against Michael's
advantage and possibly put him away for a very long time.

He also stated that since Michael Threlkeld also has a D.U.I. and
also various arrests where he drove under the influence,and that

he would be a fool to admitt that he was drinking on the night of

the incident.

I,Ahmad Kendell under oath is willing to testify truthfully to

this statement if called to testify in the defense of Michael

Threlkeld.

_____
                          Affiant

Subscribed and sworn to before me,
this ___ day of ___May_____ 2005.
_____
Notary Public

```
Official Seal
Beverly Hudson
Notary Public State of Illinois
My Commission Expires 01/03/07
```

EXHIBIT 7

# ILLINOIS STATE POLICE
## INVESTIGATIVE REPORT

| File #: | Reporting/Incident Date(s): | Reporting Agent(s):        ID#: | Dictated/LEAD #: |
|---|---|---|---|
| 00G0379 | 01/13-14/00 | Sgt Brendan Heffner #4225 | |

| Title: | Case Agent: ID# | Office: | Typed by: | Date: |
|---|---|---|---|---|
| Michael C Threlkeld | Heffner #4225 | D6/Inv. | cmh | 011900 |

Purpose:

Documentation for request of search warrant

On 01/13/00, at approximately 12:00pm, after being informed by Sgt Salburra of the Chicago Police Department that **MICHAEL THRELKELD** was the suspect in a vehicular homicide in the Chicago area, I used the information to obtain the attached search warrant. I obtained the search warrant from Judge Prall in order and obtain evidence from a 1995 silver Jeep, VIN 1J4GZ78Y7SC725422, which **THRELKELD** had occupied at the time of his arrest by Trooper Gray.

On 01/14/00, I was informed by Detective Charles Williams of the Chicago Police Department that the time indicated on the search warrant of 11:30pm for the homicide was incorrect. The correct time was approximately 9:30pm.

See attached.

End of report.

Dissemination:

This document contains neither recommendations nor conclusions of the Illinois State Police.
It and its contents are not to be disseminated outside your agency.

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF MCLEAN

## COMPLAINT FOR SEARCH WARRANT

A.  Complainant: Sergeant Brendan Heffner of the Illinois State Police District 6.

B.  Place or Objects to be searched: the entire premises of a 1995 silver Jeep S.U.V., VIN # I J4GZ7847SC725422

C.  Items or Materials to be seized: any and all paint, blood and/or fiber transfer. Any documents in the car showing ownership and any latents lifted from within the vehicle.

D.  Applicant has probable cause to believe said items or materials are located in said vehicle based on the following:

1.  Affiant is a sergeant with the Illinois State Police. As a regular part of affiant's duties, affiant conducts investigations into criminal offenses, interviews of witnesses, seizes and collects evidence connected to the investigations.

2.  That on Wednesday, January 13, 2000 approximately 1 mile south of Lexington, Mclean County a 1995 Jeep silver SUV being driven by Michael Threlkeld was stopped by Trooper Gray after complaints of reckless driving, specifically, that the car had been reported driving all over the road, and at times, almost stopping in traffic. It was reported that the vehicle only had one headlight. During the traffic stop the trooper noticed an odor of alcohol. The driver advised his name was Kevin Williams, with a date of birth of 4/7/79. Later on, the driver provided a different date of birth, of 6/7/79. The driver was unable to provide insurance for the vehicle. In addition the trooper was unable to verify any record of the name Kevin Williams, and no record on file returned on the vehicle's VIN number. The driver opened the glove compartment and the trooper observed a registration card in the name of Bobby Reynolds which was ripped in half. A portable breath test was administered upon the driver which registered alcohol in the amount of .006 and the driver admitted drinking. As a result, the defendant was arrested for illegal consumption. The vehicle was towed and inventoried which revealed a small amount of cannabis in 3 small bags in the console and a safe box with a large amount of cash in the amount of $2600. Traffic citations were issued for no valid driver's license, improper lighting, uninsured motor vehicle, illegal consumption and possession of cannabis under the name of Kevin Williams.

The driver was later interviewed by Sergeant Heffner who admitted his name was Michael Threlkeld. During this interview, Michael Threlkeld advised that he lied about his name because his driver's license was revoked. He further advised Sergeant Heffner that he had left Chicago at approximately 1:00 a.m. 1/13/2000 and was enroute to see his girlfriend in Champaign. He stated that he borrowed the vehicle from his friend on 1/12/2000.

The driver was subsequently arrested for obstruction of justice for providing a false name.

At approximately noon on 1/13/2000 Sergeant Heffner was advised by Chicago Police Department that the driver of the above vehicle was a suspect in a murder which occurred on 1/12/2000. Based on conversation between Sergeant Heffner and Detective Charles Williams of the Chicago Police Department, Sergeant Heffner was advised that. witnesses initially reported to Chicago Police officers that they observed a vehicle strike another person at 6335 S. Stoney Island, Chicago, on 1/12/2000 at approximately 11:30 p.m.. Police responded and spoke to Edwina Quansah. Edwina reports that she was with Linton Douglas Robert Boyd Jr. (victim), in her vehicle when Michael Threlkeld approached in a silver jeep and words were exchanged. Michael Threlkeld drove off. The victim left Edwina Quansah's vehicle and headed toward his own vechicle. As the victim was entering his own vehicle, a silver Jeep drove toward the victim. The victim was struck by the silver jeep and killed. The silver Jeep then left the area. Edwina Quansah reported to officers that she is the former girlfriend of Michael Threlkeld and positively identified

him as the driver of the silver colored jeep.

Sgt. B.O. Neffner 4225
Applicant signature

Subscribed and sworn to before me this 13 day of Jan.    2000 at 5:35 p.m.

Circuit Judge G. Michael Prall

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF MCLEAN

## SEARCH WARRANT

TO ALL PEACE OFFICERS OF THE STATE:

On this date January 13, 2000, Sergeant Brendan Heffner has subscribed and sworn to a Complaint for Search Warrant before me. Upon examination of said Complaint, I find it states facts sufficient to establish probable cause for the issuance of a warrant to search the following described place, person or objects for the items listed.

## I THEREFORE COMMAND THAT YOU SEARCH:

The entire premises of a 1995 silver Jeep SUV, VIN I J4GZ7847SC725422 operated by Michael Threlkeld..

## AND, IF FOUND, SEIZE THE FOLLOWING:

Any paint transfers, blood transfer, fiber transfer and any documentation showing ownership of said vehicle and any latent prints processed fronm said vehicle.

ISSUED this 13 day of January , 2000 5:36 a.m./p.m.

Circuit Judge Prall

# ILLINOIS STATE POLICE
## Division of Criminal Investigation Evidence Log

Ex6-00-35

| EX. # | Time | Date | Description | Location Found | Found By | Witness | Storage Location |
|---|---|---|---|---|---|---|---|
| | 10:15pm | 1/14/00 | PAINT STANDARDS | SILVER 1995 JEEP CHEROKEE 1J4GZ78Y7SC1254\2 | CST. TRUMMEL | SGT. HEFFNER | CHICAGO LAB |
| | | | DAMAGED PIECES OF PASSENGERS SIDE FRONT GRILL | " | " | " | " |
| | | | DAMAGED PIECES OF PASSENGERS SIDE FRONT HEADLAMP | " | " | " | " |
| | | | DAMAGED FOG LIGHTS FROM DRIVER + PASSENGER SIDE | " | " | " | " |
| | | | DAMAGED SECTION OF FRONT BUMPER WITH RED PAINT TRANSFER | " | " | SGT. HEFFNER | CST. CHICAGO LAB |
| | | | \$6.00 USC (DRIVERS SIDE USED LETTER (BUSINESS) | " | SGT. HEFFNER | CST. TRUMMEL | DIST 06 INV. |
| | | | \$6.00 USC (DRIVERS SIDE USED LETTER (BUSINESS) | " | | | |
| | 2:00pm | 1/14/00 | AUDIOVOX PHONE (CELL) (UNDER DRIVERS SEAT) | SILVER 1995 JEEP CHEROKEE 1J4GZ78Y7SC1254\22 | SGT. HEFFNER | CST TRUMMEL | DIST 06 INV. |

ISP 4-41 (1/88)



# ILLINOIS STATE POLICE
## INVESTIGATIVE REPORT

| File #: | Reporting/Incident Date(s): | Reporting Agent(s):  ID#: | | Dictated/LEAD #: |
|---|---|---|---|---|
| 00G0379 | 01/13/00 | Sgt Brendan Heffner #4225 | | |

| Title: | Case Agent:  ID# | Office: | Typed by: | Date: |
|---|---|---|---|---|
| Michael Threlkeld | Heffner #4225 | D6/Inv. | cmh | 011800 |

Purpose:

Interview of **MICHAEL THRELKELD**

The following will reflect the summary of an interview conducted with **MICHAEL C THRELKELD** on 01/13/00 at approximately 7:15am at D6/I. The interview was conducted after **THRELKELD** had been taken into custody on charges of obstructing justice, possession of cannabis 2.5 - 10 grams, and zero tolerance violation (traffic violation.) **THRELKELD** was advised of his Miranda rights, waived them and was subsequently interviewed.

Upon first speaking with **THRELKELD**, I had been informed by Trooper Brian Gray that the person whom he had taken into custody had furnished him false information regarding his identity. I advised **THRELKELD** as to the charges he was facing, and prior to reading him his Miranda rights, advised him that continuing to provide false information would only aggravate matters in regards to his charges. It was at this time that **THRELKELD**, who had been informing Troopers Gray and Zappa that his identity was **KEVIN WILLIAMS** informed me that he was indeed **MICHAEL C THRELKELD**. **THRELKELD** advised he left his residence at approximately 1:00am en route to Champaign, Illinois to visit a girlfriend with whom he was going to spend approximate one week. **THRELKELD** refused to identify his girlfriend on three different occasions. **THRELKELD** stated he had been at the U of I on approximately five to six occasions in 1999 and this was his first time visiting during the year 2000. **THRELKELD** stated he had bought his vehicle from a friend named **ROBERT AMES**, who was home in Chicago visiting while on Christmas break from a college in Alabama. **THRELKELD** advised his intention was to go visit his girlfriend and stay with her approximately one week, then return to Chicago and resume working at his place of employment, Williams Discount Furniture. While discussing his arrest, **THRELKELD** stated he had purchased approximately two dime ($10.00 bags) of cannabis from an unnamed source in Chicago and stated the $2,600.00 in his possession was money he had saved while being employed at Williams Discount Furniture. **THRELKELD** advised me he works approximately five days per week and earns $100.00 per day in cash as a supervisor of a delivery team for the furniture company. **THRELKELD** stated he had the $2,600.00 secured in a safe for fear it might get stolen if left in his mother's residence, and advised that there was less of a chance of the money being stolen if it were in a safe. **THRELKELD** stated he does not believe in putting money in banks. **THRELKELD** advised he does not have any financial obligations other than paying his mother $400.00 per month to assist her with bills at their residence. I asked **THRELKELD** how much money he declared on his taxes last year and he advised he does not file taxes since he is paid in cash.

Dissemination:

This document contains neither recommendations nor conclusions of the Illinois State Police.
It and its contents are not to be disseminated outside your agency.

(LA93-0117                                                                                     ISP 4-3 (01/96)

00G0379
Sgt Brendan O Heffner #4220
January 13, 2000
Page 2

THRELKELD advised me he was untruthful about his identity with the troopers because he is scared of the police. THRELKELD stated he has a friend named DARRYL DAVIS who was arrested for an unknown driving offense somewhere in Central Illinois and had to post a $5,000.00 cash bond. THRELKELD advised he thought since his current driving status was revoked, he might meet with the same fate as his friend. THRELKELD stated the only reason the canine unit alerted on the safe which contained his money was because the owner of the Jeep is a cannabis smoker. THRELKELD stated he smokes marijuana regularly and had last smoked it on the morning of 01/12/00.

I then asked THRELKELD whom I could contact regarding confirming his employment and payment method. THRELKELD advised me speak to a BARRY WILLIAMS at a phone number THRELKELD provided. The first number he gave me was incorrect, however I obtained the number of a Williams Discount Furniture as 1-773-994-5066. I was informed by a SHARON R MORGAN, DOB 11/19/44, that it was now Supreme Furniture Store, 8557 S Cottage Grove, Chicago, Illinois 60619. MORGAN stated BARRY WILLIAMS had been deceased as recently as three months prior, but she was aware of Mr THRELKELD. MORGAN stated THRELKELD did indeed work at Supreme Furniture in the delivery Department and was paid $250.00 cash per week for his services.

I then asked THRELKELD again about the owner of the Jeep and he reiterated that it belonged to a friend of his named ROBERT AMES, whom he has known approximately two years. He stated that AMES currently attends school in Alabama. THRELKELD stated he did not know AMES correct address and that there was no phone at his residence to contact him.

The interview was then terminated and THRELKELD was transported to the McLean County Jail by Trooper Gray. THRELKELD was held in the McLean County Jail until later being picked up by the Chicago Police Department's Detective Williams, as he was later found to be a suspect in a vehicular homicide in the Chicago area. Trooper Gray will be filing charges against THRELKELD at a later date.

IDENTIFIERS:
NAME:            MICHAEL C THRELKELD
SEX/RACE:        M/B
DOB:             05/07/79
HEIGHT:          506
WEIGHT:          140 lbs
HAIR:            Black
EYES:            Brown
ADDRESS:         5451 S Cornell
                 Chicago, Illinois
TX:              773/325-6547

Dissemination:

This document contains neither recommendations nor conclusions of the Illinois State Police.
It and its contents are not to be disseminated outside your agency.

IL493-0117                                                                    ISP 4-3 (01/96)



# ILLINOIS STATE POLICE

## STATEMENT OF CONSTITUTIONAL RIGHTS AND WAIVER

Before we ask you any questions, it is my duty to advise you of your rights:

1. You have the right to remain silent.

2. Anything you say can be used against you in court or other proceedings.

3. You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning.

4. If you cannot afford a lawyer, one will be appointed for you, free of any cost to you, before any questioning if you wish.

STATEMENT OF RIGHTS GIVEN BY _____ SGT. B. O. HEFFNER _____

TO _____ MICHAEL T. THRELKELD ___, AT _____ 7:12 am _____ (Time),

ON _____ 01/13/00 _____ (Date).

## WAIVER

I understand what my rights are, and I am willing to answer questions.

_____ Sgt. B.O. Heffner 4225 _____
WITNESS

_____ Tpe Bua Quay 4994 _____
WITNESS

_____ Mike Threlkeld _____
Signature of person receiving rights

Case/File Report # 60G0379

IL493-0198

ISPS-49(1/86)

EXHIBIT 8



STATE OF ILLINOIS

COUNTY OF WILL

### AFFIDAVIT OF MICHAEL THRELKELD

I, Michael Threlked, being first duly sworn upon oath, makes this sworn statement of facts, and do so with the understanding that if I am found to have given false information, I can and will be prosecuted under the penalty of perjury.

Pursuant to 28 USC.§ 1746, I, Michael Threlkeld, declare the forgoing to be true and correct to the best of my knowledge.

1. I retained the legal services of attorney Martin Abrams to represent me in criminal Case No# 00 Cr 4537.

2. Accordingly, Mr. Abrams would visit me at the Cook County Jail, as well as accept collect phone calls for the purpose of developing a startegy and establishing a defense to the charges I was facing in Case No# 00 CR 4537. (I was charged with the Fisrt degree Murder Linton Boyd Jr., in that I allegedly ran him over with my vehicle. I contend now, as I did then, this was an accident).

3. After consultation with Mr. Abrams, we both agreed that this unfortunate incident was nothing more than an accident.

4. That during consultation with Mr. Abrams, after a status hearing. Mr. Abrams informed me that it would not be in my best interest to give testimony at my trial concerning my chronic alcohol abuse, reckless driving and history of driving under the influence.

5. Mr. Abrams would make this clear to me everytime we discussed the case. Mr. Abrams, after I insisted on presenting this evidence at trial, specifically would state over and over that, "testimony about you being an alcoholic and driving under the influence the night of the accident, would aggravate the charge, and make you eligible for an extended term up to natural life.

6. I kept explaining to Mr. Abrams this was an accident, and I would like for the evidence of my drinking and driving problems to be used in my favor. Mr. Abrams would reply, "it doesn't matter, if you tell them you were driving drunk, it will only aggravate the charge. And you could receive an extended term. And since this is a First Degree Murder charge, you could get life."

7. Some of our conversations were witnessed by Michael Flournoy, who also was a client of Mr. Abrams. Mr. Abrams, at times, would call us both out for legal visits simultaneously. Mr. Flournoy would overhear Mr. Abrams telling me that 'any testimony about being an alcoholic and driving drunk would aggravate my charge, and make me elgible for an extended term."

8. Further, Mr. Abrams had me set up a meeting with defense witnesses Terrance Coleman, Jasmine Carter and Ahmad Kendell. To which I learned the basis of this meeting was to instruct these defense witnesses not to testify about my history of drinking, reckless driving and driving under the influence. Mr. Abrams explained to the defense witnesses that if they testify to any of this information, it aggravate my charge and make me eligible for more time. Based Mr. Abrams instructions, defense witnesses withheld this crucial evidence.

9. Finally, affiant asserts that his history of chronic alcohol abuse, reckless driving and driving under the influence is well documented. And this information was more than available to Mr. Abrams. And refusal to use this vital evidence highlights Mr. Abrams' incompetence.

**FURTHER AFFIANT SAYETH NAUGHT–**

/s/ _____
Michael Threlkeld, Pro Se

SUBSCRIBED AND SWORN TO BEFORE ME
ON THIS _____ DAY OF JULY, 2005.

_____
NOTARY PUBLIC

```
"OFFICIAL SEAL"
Phyllis Baker
Notary Public, State of Illinois
My Commission Exp. 01/21/2007
```

EXHIBIT 9

STATE OF ILLINOIS)
                 )   AFFIDAVIT OF MICHAEL FLOURNOY
COUNTY OF COOK   )
                 )


I,Michael Flournoy,Pursuant to 28 U.S.C.§ 1746 declare under
penalty of perjury that the foregoing is true and correct,and will
testify if called to do so.

My reason for compiling this affidavit and signing it to the Circuit
Court of cook County is because I really want to expose an ineffect-
ive assistance of counsel issue on Mr.Michael Threlkeld's behalf
that was orchestrated and also played out by his previous attorney
Mr. Martin Abrams. In the month of March,the year of 2001,I Michael
Flournoy was incarcerated in the Cook County Department Of Corrections
in Division Eleven where I was Michael Threlkeld's cellmate and also
a client of Attorney Martin Abrams.

On various occasion while incarcerated there,Attorney Abrams would
come to visit both Michael and myself where he would call both of
us out at the same time within the same room and discuss both of
our cases. While doing so, I would overhear Mr. Abrams trial strategy
in regards to Michael's case. Mr. Abrams would continuously state
to Michael that in his defense he is instructed not to testify to
the actual fact that he was intoxicated during the night of January
12, 2000,but that he was only to testify that he was a bad driver
and that it was a simple accident.

I would comfort Michael Threlkeld on many occasions within the cell
concerning why Mr. Abrams instructed him to testify in such an un-
orthodox way and the only thing Michael would say was that Mr. Abrams
promised him that he could beat the case,and that with the release
of the statement being made that he was actually drunk could possibly

-1-

Page-2

Case 1:08-cv-01479    Document 8-4    Filed 05/01/2008    Page 91 of 99
Case 1:08-cv-01479    Document 1-2    Filed 03/10/2008    Page 91 of 99

hurt him in which would make the case aggravated!!!

On one occasion while on the phone speaking with Attorney Abrams, being that I am much older and I would say more muture asked him on a one on one basis as to why he was fighting Michale's case the way he was? <u>His exact words</u> to me were that, number one, his case is not a murder case, and number two, if there was any testimony from Michael stating that he was in fact intoxicated during the night of January 12, 2000 that the state would more than likely use it against him to convict him.

Everything that I, Michael Flournoy have stated within this affidavit is true and an absolute fact and I do understand that I could be prosecuted for signing false documents and making false statements under the penalty of perjury.

Respectfully: *Michael C. Flournoy*

"OFFICIAL SEAL"
LYNN ORI
Notary Public, State of Illinois
My Commission Expires June 11, 2007

Subscribed and sworn to before me,

Notary Public *Lynn Ori*

on this _26_ day of _MAY_ 2005.

1      MR. ABRAMS:  I will object to that as for

2   purposes even for credibility.  This is not a

3   drug-related case, has nothing to do with it.

4      THE COURT:  No, but it was a felony conviction

5   that does impact on the issue of credibility.

6         It will be received as to that issue and

7   that issue alone.

8                        (SHORT PAUSE.)

9      MR. ABRAMS:  Real far back to that jury room,

10  maybe 6th floor.

11     THE COURT:  I don't know.

12     MR. ABRAMS:  Takes a long time to call a witness,

13  doesn't it?

14     THE COURT:  Raise your right hand, please.

15                        (WITNESS SWORN.)

16     THE COURT:  Please be seated.

17         You may inquire.

18              SGT. CHARLES WILLIAMS,

19  called as a witness herein in rebuttal, having been

20  first duly sworn, was examined and testified as

21  follows:

22          D I R E C T   E X A M I N A T I O N

23  BY MS. FORESTER:

24      Q.   Sergeant, you previously testified in this

1    matter, is that correct?

2         A.    That's correct.

3         Q.    Can you state your name for the record.

4         A.    My name is Charles Williams, common

5    spelling, W-I-L-L-I-A-M-S.

6              My star number is 2548.  I'm assigned to

7    the Fifth District.

8         Q.    I'm going to direct again your attention

9    back to January 14th of the year 2000.  Were you

10   involved in the homicide investigation of Linton Boyd

11   which had occurred on January 12th of the year 2000?

12        A.    That's correct.

13        Q.    And at approximately 12:31 in the morning

14   on January 14th of the year 2000, did you interview

15   anybody that you see here in court today?

16        A.    Yes, I did.

17        Q.    Can you point to that person and tell us

18   what he's wearing.

19        A.    He's sitting at the table with the DOC tan

20   uniform on.

21        THE COURT:  Indicating the Defendant, Michael

22   Threlkeld.

23        MS. FORESTER:  Thank you, Judge.

24

1    BY MS. FORESTER:

2        Q.   And did the Defendant tell you he was drunk

3    yesterday, January 13th of the year 2000, and had an

4    accident?

5        A.   That's correct.

6        MR. ABRAMS:  Objection.

7        THE COURT:  Basis?

8        MR. ABRAMS:  Compound question and not rebuttal.

9        THE COURT:  Overruled.

10           Go ahead.

11       MS. FORESTER:  You can answer, Sergeant.

12       THE WITNESS:  A.   Yes, he did.

13   BY MS. FORESTER:

14       Q.   Did he tell you that he had consumed a pint

15   of Seagram's gin and stated he just happened to be

16   driving in the area of 67th and Stony Island when he

17   saw Asha in her vehicle?

18       A.   That's correct.

19       MS. FORESTER:  I have nothing further.

20       THE COURT:  Cross.

21           C R O S S - E X A M I N A T I O N

22   BY MR. ABRAMS:

23       Q.   Did he say he had an accident?

24       A.   Yes, he did.

CASR201

**CHICAGO POLICE DEPARTMENT**

Page 9 of 10

**CASE SUPPLEMENTARY REPORT**

1121 South State Street/Chicago, IL 60605

CPD-11.380(Rev.8-96)-C

| Case Report ID:  680935 | RD No.:  F024951 | SUP ID: 75492 |
| --- | --- | --- |

Address of Occurrence:  6335 S STONY ISLAND AV  CHICAGO IL

ROBBINS, Mike. GIBBS contacted ROBBINS, who is a former police officer, at his office and asked if he had a son by the name of THRELKELD, Michael. His response was , " Yes, do you have him in custody." GIBBS stated he didn't have his son in custody but wanted to know if he had spoken with his son. ROBBINS said that he hasn't spoken to his son in years. GIBBS told ROBBINS that the police were looking for his son for a hit and run accident which now has been classified as a homicide. GIBBS asked ROBBINS if he could contact THRELKELD's mother to see if she knows his whereabouts. ROBBINS informed GIBBS that he didn't have the number, so GIBBS called the mother of QUANSAH, Edwina and obtained the telephone number. GIBBS provided the number to ROBBINS, who called the mother, and learned that there was a message left on her answering machine from Michael. The message said that THRELKELD, Michael was under arrest in Bloomington for possession of cannabis. ROBBINS called the Bloomington police department to confirm the message, and was informed that THRELKELD, Michael was in custody for pcs, and a Chicago traffic warrant. ROBBINS immediately contacted area two violent crime and 003 district.

       Dets FRAZIER and WILLIAMS were assigned by Sgt Salabura, 1460, of the second watch to drive to Bloomington and extradite THRELKELD back to Chicago. A supplementary case report is forthcoming.

THRELKELD, Michael    Was read  his constitutional right from a pre-printed card at 0030 hrs in A2/VC interview room #1. Present were  Dets FORD, MORRISON, WILLIAMS and P.O. GIBBS. THRELKELD stated he wanted a lawyer and he declined to answer any questions until his lawyer was present. R/Dets left the interview room.

     0031 hrs THRELKELD initiated contact with Det. WILLIAMS stating his desire to talk. R/Dets re-entered the interview room and again advised THRELKELD the R/Dets could/would not ask any questions because he has requested an attorney. THRELKELD advised R/Dets he desired to waive his rights. THRELKELD acknowledged his desire to talk and voluntarily stated in summary not verbatim the following. THRELKELD stated that he was drunk yesterday, 13 Jan 2000, and had an accident. THRELKELD stated he consumed a pint of Seagram's gin and stated he just happened to be driving in the area of 63rd Stony Island when he saw QUANSAH in her vehicle. THRELKELD stated he remembered passing QUANSAH, his ex-girlfriend, and turned around. THRELKELD was driving southbound and QUANSAH was northbound. THRELKELD stated he turned around, loss control, hit a red car in the middle of the block, in front of the YMCA. He turned around to speak to QUANSAH, loss control and got scared.

      ASA Allen MURPHY arrived at A2/VC and conducted interviews with ESTER, SLATER and QUANSAH. Written statements were taken from QUANSAH, ESTER . All parties related verbatim the previous oral statements provided to R/Det.

      ASA MURPHY provided THRELKELD with his constitutional rights. THRELKELD gave conflicting statements. In his earlier statement THRELKELD stated he just happened to be in the area of 63rd Stony Island when he saw QUANSAH in her vehicle. THRELKELD

CASR201.

**CHICAGO POLICE DEPARTMENT**

**CASE SUPPLEMENTARY REPORT**

1121 South State Street/Chicago, IL 60605

Page 10 of 10

CPD-11.380(Rev.8-96)-C

| Case Report ID: 680935 | RD No.: F024951 | SUP ID: 75492 |
| --- | --- | --- |
| Address of Occurrence: 6335 S STONY ISLAND AV CHICAGO IL | | |

then changed his statement and stated he had a date that night with QUANSAH and he was driving around killing time when he saw QUANSAH in her vehicle and she held up one finger . THRELKELD stated QUANSAH's gesture meant one minute. THRELKELD said he then made a U turn and lost control of the car and hit a pedestrian in the street. THRELKELD stated he panicked and continued driving. THRELKELD said he attempted to call QUANSAH on his cell phone but was unable to reach her so he drove home. THRELKELD said he had $650.00 USC on his person so he got his safe which contains 2600.00 USC and drove to Champlain IL to visit a female friend.

When ASA MURPHY attempted to re interview THRELKELD he stated he wouldn't give any more statements until his lawyer is present.

R/Dets requested traffic accident RD #F-025127 be Unfounded; the vehicle in this himicide was used as a weapon. Felony charges of First Degree Murder were approved by ASA MURPHY at 1730 hours, 14 Jan 2000. THRELKELD was processed under CB # 14383704 in district 005. R/Dets request this case be CLEARED CLOSED via ARREST and PROSECUTION.

*** End of Record ***

Requested by: PC0N974

EXZIBIT 5-E

# OFFICE OF THE CIRCUIT COURT CLERKS OF COOK COUNTY
## 2650 S, CALIFORNIA – 5TH FLOOR
## CHICAGO ILLINOIS 60608
## (773) 869-3143

DATE: __AUGUST 2, 2005__ .

|  |  |
|---|---|
| PETITIONER | ) |
|  | ) |
| VS. | ) |
|  | ) |
| THE PEOPLE OF THE STATE OF ILLINOIS | ) |
| RESPONDENT | ) |

CASE NO: __00CR04537-01__

TO:   __MICHAEL THRELKELD K-66117__

ADDRESS:  __STATEVILLE CORRECTIONAL CENTER__
__P.O. BOX 112__

CITY & STATE:  __JOLIET, ILLINOIS 60434__

## NOTICE

Pursuant to Illinois Supreme Court Rule 651, as Amended and Adopted on January 25, 1996, and effective the same day to read as follows:

"You are hereby notified that on __AUGUST 1, 2005__ the court entered an order, a copy of which is enclosed herewith. You have a right to appeal. In the case of an appeal from a post-conviction proceeding involving a judgment imposing a sentence of death, the appeal is to the Illinois Supreme Court. In all other cases, the appeal is to the Illinois Appellate Court in the district in which the circuit court is located. If you are indigent, you have a right to a transcript of the record of the post-conviction proceedings and to the appointment of counsel on appeal, both without cost to you. To preserve your right to appeal you must file a notice of appeal in the trial court within 30 days from the date the order was entered."

_Clerk of the Circuit Court_



## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT – CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS )
)
)                    CASE NO. 00CR04537-01
VS.                           )
)
MICHAEL  THRELKELD            )
)

### CERTIFIED REPORT OF DISPOSITION

The following disposition was rendered before the Honorable Judge

JAMES LINN ON AUGUST 1, 2005 POST CONVICTION PETITION DENIED.

I hereby certify that the foregoing has been entered of record on the above

captioned case.

Date: __AUGUST 2, 2005__

_____ , Clerk of the Circuit Court

### CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

FILE/POSTCONVICTION3.WP