

IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**F I L E D**

JUL 1 8 2008 **YM**

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel.<br>MICHAEL THRELKELD, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 08 C 1479 |
| | ) | |
| TERRY McCANN, | ) | The Honorable |
| | ) | William J. Hibbler, |
| Respondent. | ) | Judge Presiding. |

## TO THE CLERK OF THE DISTRICT COURT

The below-named exhibits to respondent's Motion To Compel, filed pursuant to

Rule 7 of the Federal Rules of Civil Procedure, are filed under separate cover in this

case:

Exhibit A:   Petitioner's brief on direct appeal, *People v. Threlkeld*, No.
1-01-2879;

Exhibit B:   Petitioner's supplemental pro se brief on direct
appeal, *People v. Threlkeld*, No. 1-01-2879;

Exhibit C:   State's brief on direct appeal, *People v.
Threlkeld*, No. 1-01-2879;

Exhibit D:   Petitioner's reply brief on direct appeal, *People v.
Threlkeld*, No. 1-01-2879;

Exhibit E:   Ruling of the Illinois Appellate Court in petitioner's direct appeal,
*People v. Threlkeld*, No. 1-01-2879, filed 9/7/04 (unpublished order
under Illinois Supreme Court Rule 23);

1

Exhibit F:    Petitioner's PLA on direct appeal, *People v. Threlkeld*, No. 99355;

Exhibit G:    Order of the Illinois Supreme Court denying petitioner's PLA on direct appeal, *People v. Threlkeld*, No. 99355, filed 1/26/05;

Exhibit H:    Petitioner's postconviction petition, *People v. Threlkeld*, No. 00 CR 4537;

Exhibit I:    Order dismissing petitioner's postconviction petition, *People v. Threlkeld*, No. 00 CR 4537;

Exhibit J:    Petitioner's brief on appeal from dismissal of his postconviction petition, *People v. Threlkeld*, No. 1-05-2915;

Exhibit K:    State's brief in petitioner's postconviction appeal, *People v. Threlkeld*, No. 1-05-2915;

Exhibit L:    Petitioner's reply brief in his postconviction appeal, *People v. Threlkeld*, No. 1-05-2915;

Exhibit M:    Ruling of the Illinois Appellate Court in petitioner's direct appeal, *People v. Threlkeld*, No. 1-05-2915, filed 8/20/07 (unpublished order under Illinois Supreme Court Rule 23);

Exhibit N:    Petitioner's PLA in his postconviction appeal, *People v. Threlkeld*, No. 105378;

Exhibit O:    Order of the Illinois Supreme Court denying petitioner's PLA on direct appeal, *People v. Threlkeld*, No. 105378, filed 11/29/07; and

Exhibit P:    Notice of Appeal and Docketing Statement in petitioner's appeal from the denial of his petition for relief from judgment, *People v. Threlkeld*, No. 1-08-0961.

July 18, 2008                          Respectfully submitted,

                                       LISA MADIGAN
                                       Attorney General of Illinois

                                By:    _____
                                       JAY PAUL HOFFMANN, Bar # 6204296
                                       100 West Randolph Street, 12th Floor
                                       Chicago, Illinois 60601-3218
                                       PHONE: (312) 814-3421
                                       FAX: (312) 814-5166
                                       E-MAIL: jhoffmann@atg.state.il.us

3

No. 1-01-2879

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | |
| Plaintiff-Appellee, | ) ) | Appeal from the Circuit Court of Cook County, Illinois |
| vs. | ) ) | No. 00CR 4537 |
| MICHAEL THRELKELD, | ) ) | Honorable James B. Linn |
| Defendant-Appellant. | ) ) | |

# APPELLANT'S CORRECTED BRIEF IN SUPPORT OF APPEAL

Lee Ann Russo
Jeffrey R. Weiland
Jones, Day, Reavis & Pogue
77 West Wacker, 35th Floor
Chicago, Illinois 60601
(312) 782-3939

Counsel for Defendant-Appellant
MICHAEL THRELKELD

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

I.  THE TRIAL ABUSED ITS DISCRETION IN ADMITTING THE
    EVIDENCE OF THE DEFENDANT'S PRIOR BAD ACTS AND THE
    ERROR SUBSTANTIALLY PREJUDICED THE DEFENDANT'S
    RIGHT TO A FAIR TRIAL...........................................................................................6

    A.  The Defendant's Prior Bad Acts Are Not Probative Of His
        Intent Or Motive To Commit The Charged Offense ...........................................7

    B.  The Prejudicial Effect of the Other Crimes Evidence
        Substantially Outweighed Any Probative Value ...............................................16

    C.  The Introduction Of The Prior Bad Acts Substantially
        Prejudiced The Defendant's Right To A Fair Trial............................................17

II. THE EVIDENCE IN THE RECORD DOES NOT SUPPORT A
    CONVICTION FOR  FIRST-DEGREE MURDER .....................................................23

III. CONCLUSION............................................................................................................24



# TABLE OF AUTHORITIES

## Federal Cases

*Illinois v. Wardlow,*
528 U.S. 119, 120 S. Ct. 673 (2000)................................................................... 21

*In re Winship,*
397 U.S. 358, 90 S.Ct. 1068, 1073 (1970)................................................................. 23

*Jackson v. Virginia,*
443 U.S. 307, 99 S. Ct. 2781 (1979)................................................................. 6, 23

*Knick v. Commonwealth,*
15 Va. App. 103, 421 S.E.2d 479 (Ct. App. 1992).................................... 10

*Michelson v. United States,*
335 U.S. 469, 69 S. Ct. 213 (1948)................................................................ 6, 9

*Old Chief v. United States,*
519 U.S. 172, 117 S. Ct. 644 (1997)............................................................. 16

*People v. Bartall,*
98 Ill. 2d 294, 456 N.E.2d 59 (1983)............................................................... 8

*People v. Bedoya,*
325 Ill. App. 2d 926, 758 N.E.2d 366 (1st Dist. 2001)........................... 12, 19

*People v. Brown,*
319 Ill. App. 3d 89, 745 N.E.2d 173 (4th Dist. 2001).......................... 17, 19

*People v. Charles,*
238 Ill. App. 3d 752, 606 N.E.2d 603 (1st Dist. 1992)......................... 10, 12

*People v. Collins,*
106 Ill.2d 237, 478 N.E.2d 267 (1985).......................................................... 6

*People v. Cortes,*
181 Ill. 2d 249, 692 N.E.2d 1129 (1998)...................................................... 5

*People v. Curry,*
25 Ill. App. 3d 637, 323 N.E.2d 778 (1975).................................................. 6

*People v. Davis,*
248 Ill. App. 3d 886, 617 N.E.2d 1381 (1993).............................................. 7

*People v. Denny,*
241 Ill. App. 3d 345, 608 N.E.2d 1313 (1st Dist. 1993).............................. 17

*People v. Donaldson,*
   8 Ill. 2d 510, 134 N.E.2d 776 (1956) .......................................................................... 6

*People v. Funches,*
   59 Ill. App. 3d 71, 375 N.E.2d 135 (2d Dist. 1978) ................................................. 18

*People v. Heredia,*
   193 Ill. App. 3d 1073, 550 N.E.2d 1023 (1st Dist. 1989) ......................................... 13

*People v. Illgen,*
   145 Ill.2d 353, 583 N.E.2d 515 (1991) ......................................................... 7, 12, 23

*People v. Jeffries,*
   164 Ill. 2d 104, 646 N.E.2d 587 (1995) ................................................................... 23

*People v. Knight,*
   309 Ill. App. 3d 224, 722 N.E.2d 331 (2d Dist. 1999) ............................................. 13

*People v. Lampkin,*
   98 Ill.2d 418, 457 N.E.2d 50 (1983) ........................................................................ 10

*People v. Lehman,*
   5 Ill. 2d 337, 125 N.E.2d 506 (1955) .................................................................... 6, 15

*People v. Lindgren,*
   111 Ill. App. 3d 112, 443 N.E.2d 1129 (4th Dist. 1982) ........................................ 6, 19

*People v. Lindgren,*
   68 Ill. App. 3d 141, 386 N.E.2d 87 (4th Dist. 1979) ............................................. 6, 16

*People v. Lindgren,*
   79 Ill. 2d 129, 402 N.E.2d 238 (1980) ......................................................... 6, 7, 18, 20

*People v. Manning,*
   182 Ill. 2d 193, 695 N.E.2d 423 (1998) ................................................................... 18

*People v. Maounis,*
   309 Ill. App. 3d 155, 722 N.E.2d 749 (1st Dist. 1999) ............................................. 15

*People v. McKibbins,*
   96 Ill. 2d 176, 449 N.E.2d 821 (1983) ....................................................................... 7

*People v. Nicholson,*
   61 Ill. App. 3d 621, 377 N.E.2d 1063 (1st Dist. 1978) ............................................... 5

*People v. Olson,*
   96 Ill. App. 3d 193, 420 N.E.2d 1161 (1981) ......................................................... 8, 17

*People v. Peete,*
   318 Ill. App. 3d 961, 743 N.E.2d 689 (4th Dist. 2001) ............................................ 21

*People v. Placek,*
   184 Ill. 2d 370, 704 N.E.2d 393 (1998) ................................................................ 18

*People v. Radovick,*
   275 Ill. App. 3d 809, 656 N.E.2d 235 (1st Dist. 1995) ........................................... 16

*People v. Robinson,*
   167 Ill. 2d 53, 656 N.E.2d 1090 (1995) ................................................................ 5

*People v. Rogers,*
   324 Ill. 224, 154 N.E. 909 (1926) ........................................................................ 14

*People v. Spencer,*
   7 Ill. App. 3d 1017, 288 N.E.2d 612 (1st Dist. 1972) .............................................. 8

*People v. Watson,*
   55 Ill. App. 3d 564, 371 N.E.2d 113 (1st Dist. 1977) ............................................. 18

*People v. Wydra,*
   265 Ill. App. 3d 597, 637 N.E.2d 741 (1st Dist. 1994) ............................... 12, 13, 18

*People v. Young,*
   263 Ill. App. 3d 627, 635 N.E.2d 473 (1st Dist. 1994) ............................................. 7

*State v. Barnett,*
   141 N.C. App. 378, 540 S.E.2d 423 (Ct. App. 2000) .............................................. 15

*State v. Nieto,*
   129 N.M. 688, 12 P.3d 442 (2000) ....................................................................... 15

*Walker v. State,*
   997 P.2d 803 (2000) ............................................................................................ 11

## Statutes

720 ILCS § 5/9-1 ...................................................................................................... 23

## Other Authorities

IPI Criminal 3d No. 3.14, Committee Note (Supp. 1996) ............................................ 17

## NATURE OF THE CASE

This is a criminal case in which the defendant was charged with first-degree murder. Following a bench trial, the judge rendered a verdict of guilty from which this appeal is taken.

## ISSUES PRESENTED FOR REVIEW

1.    Whether the defendant's right to a fair trial under Illinois law and the Due Process Clause of the Fourteenth Amendment to the United States Constitution was prejudiced by the improper introduction of evidence of his prior bad acts?

2.    Whether the State failed to prove beyond a reasonable doubt that the defendant intended to kill or cause great bodily injury to the victim as required under Illinois law and the Fourteenth Amendment to the United States Constitution?

## JURISDICTION

Michael Threlkeld appeals from a final judgment of conviction in a criminal case. He was sentenced on May 15, 2002. (C. 7). Notice of appeal was timely filed on June 13, 2001. (C. 9). Jurisdiction therefore lies in this Court pursuant to Article VI, Section 6, of the Illinois Constitution, and Supreme Court Rules 603 and 606.

A- 46

## STATEMENT OF THE FACTS

In the late evening of January 12, 2000, a vehicle driven by Defendant-Appellant Michael Threlkeld fatally struck the victim, Linton Boyd. Michael Threlkeld, who was twenty at the time of the incident, was charged with murder in the first degree. (C. 18-19, 50). At trial, Defendant Threlkeld admitted that he drove the vehicle that struck Linton Boyd, but contended that it was an accident. (R. D23, D25). After a bench trial, the defendant was found guilty of first-degree murder and sentenced to thirty-five years in an Illinois State penitentiary. (R. D114, F38).

On the evening of January 12, 2000, the date of the alleged crime, Michael Threlkeld arrived home from work at approximately 6:30 p.m. (R. C23, D12). According to Michael's testimony, corroborated by Terrence Coleman and Ahmand Kendall, Michael had a date planned with his long-time girlfriend Edwina Asha Quansah, ("Asha").[1] (R. C24, D11). Michael left his apartment just after 9:00 p.m. and drove southbound on Stony Island Avenue in a silver 1995 Jeep Cherokee. (R. A30, D14, D18). Asha's two-door Red Blazer was double parked, facing the opposite direction on Stony Island, outside of the YMCA where she worked. (R. A30, D18). Linton Boyd was sitting in the passenger seat of Asha's vehicle. (R. A30). Michael pulled his vehicle next to Asha's vehicle such that the driver's side windows were adjacent to each other. (R. A31).

Two bystanders, Michelle Slater and Kyra Ester, were standing at a bus stop across the street from where Asha was parked. Ms. Slater arrived first at the bus stop. (R. A66). When she

---

[1] By way of background, Michael and Asha had what was frequently described as an on-again, off-again relationship. (R. A40). During the six and a half or seven years that they had been together, Michael and Asha had numerous arguments and broke up on several occasions. (R. A21, A40, D3-D4). At the time of the alleged crime, Asha testified that they were broken up and that there was a protective order entered preventing Michael from contacting Asha. (R. A21, A42). Asha admitted, however, that she still kept in contact with Michael despite the protective order. (R. A43-A44). Over the course of the relationship, several of the disagreements between Asha and Michael resulted in Michael causing property damage to her vehicle or threatening Asha. These incidents are the subject of the prior bad acts admitted against the defendant at trial and are detailed below. *See infra* Argument, I.A.

arrived, Asha's red truck already was parked across the street. (R. A60). Approximately fifteen minutes later, Michael's truck approached in the lane closest to the bus stop. (R. A60). The second bystander, Kyra Ester, arrived at the bus stop just as Michael's vehicle was pulling up. (R. B11-B12).

Ms. Ester testified that Asha rolled down her car window and began talking, but that the conversation was not loud enough for her to understand anything that was being said. (R. B13-B14). Ms. Slater also testified that she could not hear any of the conversation, except that at the end, Michael allegedly said, "Okay, well, I'll be back." (R. A60-A61). Asha testified that she did not remember any conversation, but that she put up a finger signaling for Michael to wait a minute. (R. A31). Michael testified that he interpreted Asha's motion with her finger to mean "follow her" and so he pulled forward. (R. D21, D-52, A31).

After Michael pulled his vehicle forward, Linton Boyd exited Asha's vehicle on the passenger side and began to open the driver's side door to his own car which was parked parallel to Asha's vehicle. (R. A31-A32, A-61). Asha then pulled away and stopped up the street at the next stoplight. (R. A32). While or just after Linton Boyd opened his own car's door, the defendant's vehicle made a U-turn and struck Linton Boyd, killing him. After striking the victim, the defendant's vehicle continued forward, paused briefly at the stoplight next to Asha's vehicle, and then departed the scene. (R. D26). Asha backed her car up and went to check on the victim. (R. A36). By that time several other people had come outside and someone had called 911. (R. A37). The police arrived on the scene several minutes later.

One of the officers that responded, Officer Ronald W. Gibbs of the Chicago Police Department, testified that while he was at the scene he had two telephone conversations with an individual that identified himself as Michael Threlkeld. (R. A39). Michael had called Asha's

cell phone hoping to talk with her, but one of Asha's co-workers with whom Asha had left her phone answered and handed the cell phone over to Officer Gibbs. (R. A88-A90, D28-D30). During their second conversation, the defendant admitted that he had hit a man with his vehicle. (R. A100, D30). After learning of the identity of the driver of the vehicle, the officer contacted Michael Robbins, Michael Threlkeld's father and a member of the Chicago Police Department. (R. A92). During a telephone conversation the following morning with Mr. Robbins, Officer Gibbs learned that Michael had been detained in Bloomington, Illinois. (R. A93).

The defendant testified that after he left the scene, he returned home to his mother's house, where he had two shots of gin. (R. D26). He then called Asha's cell phone in order to speak with her, but instead ended up talking to Officer Gibbs. (R. D28-D29). After his conversations with Officer Gibbs, the defendant got in his vehicle and drove south on I-55. (R. D30).

Trooper Brian Gray of the Illinois State Police testified that, while engaged in a traffic stop on northwest route 191, he witnessed a vehicle driving erratically. (R. B34-B35). Trooper Gray pursued the vehicle and pulled it over. (R. B35). When questioned, the defendant gave Trooper Gray his brother's name, Kevin Williams, instead of his own. (R. B36). The defendant also provided false information when asked about how the vehicle had been damaged. (R. B39-B40). Trooper Gray testified that he detected alcohol on the breath of the defendant. (R. B38). According to Trooper Gray's testimony, Michael admitted drinking a whole pint of gin the previous night. (R. B38). But when Trooper Gray administered a breathalyzer test to the defendant, the defendant registered only a .002 percent blood alcohol content. (R. B47). Because the defendant was a minor, Trooper Gray issued him a zero tolerance citation for underage drinking and took him into custody. (R. B42-B43). Pursuant to his inventory search of

the vehicle, Trooper Gray discovered three small baggies of cannabis and a white safe containing approximately two thousand six hundred dollars in cash. (R. B43-B44). Trooper Gray turned over the seized items to Officer Heffner.

Sergeant Brendon Heffner of the Illinois State Police testified regarding his interview of Michael Threlkeld at the Bloomington Police Station. (R. A102). At the inception of the interview, Michael again claimed to be Kevin Williams, but soon admitted his real identity. (R. A106-A107). Sergeant Heffner then obtained a warrant and searched the defendant's vehicle which had been impounded. (R. A112-A113). Sergeant Charles Williams and Detective Frazier of the Chicago Police Department then arrived in Bloomington and transported the defendant back to Chicago. (R. A129-A130).

## STANDARD OF REVIEW

The admissibility of other crimes evidence rests within the discretion of the trial court.[2] *People v. Cortes*, 181 Ill. 2d 249, 284, 692 N.E.2d 1129, 1144 (1998) (citing *People v. Robinson*, 167 Ill. 2d 53, 63, 656 N.E.2d 1090, 1094 (1995)). If a trial court abuses its discretion, a new trial should be granted unless the error was harmless. *See People v. Nicholson*, 61 Ill. App. 3d 621, 629, 377 N.E.2d 1063, 1070 (1st Dist. 1978). In determining whether the improper introduction of other crimes evidence constitutes prejudicial error, "a conviction will be upheld only if the properly admitted evidence is so overwhelming that no fair minded jury could have voted for acquittal or, to put it another way, only if the record affirmatively shows that the error was not prejudicial." *People v. Lindgren*, 79 Ill. 2d 129, 141, 402 N.E.2d 238, 244 (1980) (*Lindgren I*)[3] (citations omitted).

---

[2] The terms "prior bad acts," "prior misconduct," and "other crimes" are used interchangeably throughout Appellant's Brief.

[3] Charles Lindgren was charged with murder, armed robbery, and robbery. His original conviction was reversed by the Fourth District because evidence of his prior bad acts prejudiced his right to a fair trial. *People v.*

Appellant's second issue challenges the sufficiency of the evidence supporting his conviction. Both Illinois and federal law require this Court to reverse the defendant's conviction if, after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985).

## ARGUMENT

I.   **THE TRIAL ABUSED ITS DISCRETION IN ADMITTING THE EVIDENCE OF THE DEFENDANT'S PRIOR BAD ACTS AND THE ERROR SUBSTANTIALLY PREJUDICED THE DEFENDANT'S DUE PROCESS RIGHT TO A FAIR TRIAL UNDER ILLINOIS LAW AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION**

Evidence of other crimes or prior bad acts generally is not admissible to show conformity therewith because "the law distrusts the inference that because a man has committed other crimes he is more likely to have committed the current crime." *People v. Lehman*, 5 Ill. 2d 337, 342, 125 N.E.2d 506, 509 (1955). "Every defendant, be he sinner or a saint, has the right to expect that his fate will be fixed with reference only to the circumstances of the crime with which he is charged." *People v. Donaldson*, 8 Ill. 2d 510, 519, 134 N.E.2d 776 (1956). Accordingly, as a general rule, evidence tending to show that a defendant has committed prior acts of misconduct, unrelated to the current charge, is incompetent and prejudicial. *People v. Curry*, 25 Ill. App. 3d 637, 640, 323 N.E.2d 778, 780-81 (1975); *Michelson v. United States*, 335 U.S. 469, 475-76, 69 S. Ct. 213 (1948). An exception to the general rule exists, in appropriate circumstances, where

---

(continued...)
*Lindgren*, 68 Ill. App. 3d 141, 386 N.E.2d 87 (4th Dist. 1979). The Supreme Court affirmed and the cause was remanded for a new trial. *People v. Lindgren*, 79 Ill. 2d 129, 402 N.E.2d 238 (1979). References to his first set of appeals are cited as *Lindgren I*. Defendant was retried and convicted, the conviction was affirmed on appeal. *People v. Lindgren*, 111 Ill. App. 3d 112, 443 N.E.2d 1129 (4th Dist. 1982). His second appeal is designated as *Lindgren II*.

A- 51

CHI-1410475v1



the prior bad act is relevant to a material issue in the case other than to show the defendant's action in conformity therewith. *See People v. Davis*, 248 Ill. App. 3d 886, 891, 617 N.E.2d 1381 (1993). But even where such evidence is otherwise relevant, the trial court should exercise its discretion and exclude evidence of other crimes when the probative value is substantially outweighed by its prejudicial effect. *People v. Illgen*, 145 Ill.2d 353, 375, 583 N.E.2d 515 (1991). When the trial court abuses its discretion in improperly admitting evidence of a defendant's prior bad acts, "a conviction will be upheld only if the properly admitted evidence is so overwhelming that no fair minded jury could have voted for acquittal or, to put it another way, only if the record affirmatively shows that the error was not prejudicial." *Lindgren I*, 79 Ill. 2d at 141, 402 N.E.2d at 354 (citations omitted).

### A. The Defendant's Prior Bad Acts Are Not Probative Of His Intent Or Motive To Commit The Charged Offense

"It is well-established that evidence of crimes other than the one for which the accused is being tried is not generally admissible." *People v. Lindgren*, 68 Ill. App. 3d 141, 145, 386 N.E.2d 87, 89 (4th Dist. 1979). Evidence of prior bad acts is admissible only if relevant for a purpose other than to demonstrate the defendant's propensity to commit crime. *Illgen*, 145 Ill. 2d at 365 583 N.E.2d at 520. For example, the evidence may be relevant to a defendant's motive, intent, identity, absence of mistake or accident, the existence of a common plan or scheme or *modus operandi. Id.* To be relevant, "the other crimes evidence must possess some threshold level of similarity to the crime charged." *People v. Young*, 263 Ill. App. 3d 627, 639, 635 N.E.2d 473, 483 (1st Dist. 1994); *see People v. McKibbins*, 96 Ill. 2d 176, 185-86, 449 N.E.2d 821 (1983) (holding that evidence of prior bad acts is admissible for such purposes only where there is sufficient similarity between the prior bad act and the crime for which the defendant is being tried). When permitting the introduction of other crimes evidence, the trial court must carefully

limit evidence to that which is relevant for the purpose it was admitted and not permit the prior bad acts to be considered for an impermissible purpose. *People v. Bartall*, 98 Ill. 2d 294, 315, 456 N.E.2d 59, 69 (1983).

In its motion to produce other crimes evidence, the State argued that "[t]hese prior incidents bear directly on defendant's state of mind at the time of the murder including motive and intent." (C.38). Whether evidence of prior bad acts is relevant in a particular case is a fact specific inquiry that must be performed on a case-by-case basis. *See People v. Spencer*, 7 Ill. App. 3d 1017, 1021, 288 N.E.2d 612, 615 (1st Dist. 1972). Moreover, the trial court has a responsibility to independently evaluate the admissibility of each of the prior acts. *People v. Olson*, 96 Ill. App. 3d 193, 198, 420 N.E.2d 1161, 1165 (1981).

The State focused on five separate instances in which the defendant allegedly committed damage to property or acted in a threatening manner toward Asha. First, in June of 1999, the defendant allegedly broke the front and driver's side windows of Asha's vehicle. (R. A21). About five months later, the windshield wiper and side mirror on Asha's vehicle were bent. (R. A22). Then in December 1999, three of the tires on Asha's vehicle were flattened. (R. A22-A23). Shortly thereafter, the defendant cracked one of the taillights on Asha's car with a baseball bat. (R. A24). Finally, in December 1999, the defendant confronted Asha outside of her home attempting to get her to return an engagement ring and coat that he had given her. (R. A24). When Asha refused to return the items, the defendant allegedly exhibited a gun (a BB gun) and Asha returned the items. (R. A26). None of these prior bad acts had any bearing on defendant's motive for committing the offense or his intent to kill or seriously injure Linton Boyd.

The analytic framework for the introduction of other crimes evidence supported by Illinois authority underscores why the defendant's prior bad acts were improperly admitted in this

case. Initially, Illinois courts are far more likely to admit collateral crime evidence when such prior crimes were committed against the victim in the charged offense. In such cases, a defendant's prior actions toward the victim are potentially relevant to establish the defendant's intent to kill or cause serious bodily injury to that individual. Second, in a first-degree murder case, the prior acts must prove a defendant's intent to kill or cause serious bodily injury, not simply that a defendant has the propensity for violence or to commit an offense similar to the one charged.

The State in this case ostensibly offered the evidence of the defendant's prior actions towards Asha to prove that the defendant had the requisite intent to commit the premeditated and deliberate murder of Linton Boyd. Of course, in this case none of the defendant's prior acts was directed toward the victim. Further, at trial, the State went to considerable lengths to portray the defendant's prior bad acts as violent. (R. D100). This portrayal, however, lends nothing to the State's argument that the prior acts were probative of the defendant's intent to commit the charged offense. The relevant question was not whether the prior actions show that the defendant is violent. Rather, the relevant question was whether the prior acts proved an intent to kill or commit serious bodily injury in this case. Indeed, it was impermissible for the State to argue that simply because the defendant has a violent character or was violent on previous occasions he was more likely to have committed the crime charged.[4]

---

[4] As stated by the United States Supreme Court:

The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.

*Michelson v. United States*, 335 U.S. 469, 475-76, 69 S. Ct. 213 (1948).

A- 54

CHI-1410475v1

Nothing in the prior bad acts alleged by the State was probative of the defendant's capacity to commit first-degree murder. The most egregious act involved the use of a BB gun to force Asha to return a ring and coat. Crucially, Michael Threlkeld was not even carrying a real gun during the alleged incident. While Asha perhaps believed his threat was genuine, the critical fact is Threlkeld's intent, which could not have been to kill or cause her serious bodily injury. Indeed, the testimony establishes that Michael never physically harmed Asha or expressed an intent to kill her -- factors significant in the case law outlined below. (R. D5, A46, C20, C38). While some prior acts of violence, which are sufficiently proximate to the charged crime, may be create the inference that the defendant had the requisite intent to commit first-degree murder, none of the prior acts of misconduct in this case was probative of an intent to kill or cause serious bodily injury. *See People v. Charles*, 238 Ill. App. 3d 752, 606 N.E.2d 603 (1st Dist. 1992) (holding that a defendant's intent to commit murder could be inferred from his commission of a similar murder just fifteen minutes prior). Property damage to a vehicle or even perceived threats of physical violence simply do not equate with the intent to commit first-degree murder. *See People v. Lampkin*, 98 Ill.2d 418, 424-25, 457 N.E.2d 50, 53-54 (1983) (reversing defendant's conviction for murdering a police officer which was improperly influenced by the introduction of his statement that "[y]ou white honky coppers are [expletive deleted] with us now, and we will get you later.").

Specifically on this point, a Virginia court overturned the admission of testimony from a defendant's previous wife that he had assaulted her by pulling a revolver and threatening to kill her. *Knick v. Commonwealth*, 15 Va. App. 103, 421 S.E.2d 479 (Ct. App. 1992). The court concluded that such evidence was not competent to refute the defendant's claim that the death of his current wife resulted from an accidental discharge of his firearm. *Id.* at 105, 421 S.E.2d at

CHI-1410475v1

A- 55

480-81. In reversing the conviction, the court persuasively opined that "admitting this evidence [does] not tend to disprove defendant's contention that he accidentally discharged the firearm. It merely show[s] that the accused was guilty of prior bad acts and that he was disposed to commit an offense similar to that charged." *Id.* at 105, 421 S.E.2d at 480.

Likewise, the Nevada Supreme Court reversed a defendant's conviction in an alleged accidental shooting case in which evidence that the defendant had previously pointed a gun at the victim and threatened to kill him was introduced. *Walker v. State*, 997 P.2d 803 (2000). The court reasoned that "although the prior bad acts involve similar conduct towards the eventual victim in this case, we conclude that there is a crucial distinction between [defendant's] prior conduct and the charged conduct. Namely, [defendant's] prior acts do not involved [sic] the firing or attempted firing of the weapon at [her husband]. Importantly, [defendant] was tried for first-degree murder, a specific intent crime requiring, in addition to premeditation and deliberation, willful action that we have said requires an intent to kill. Therefore, because the prior bad acts offered here do not clearly establish an intent to kill, but more accurately show an intent to threaten, the logical relevance of the acts to show [defendant's] later intent is further diminished." *Walker*, 997 P.2d at 806-07. The analysis employed in *Knick* and *Walker* highlights why the court's admission of the defendant's prior bad acts was not only improper, but prejudicial.

Although no Illinois case presents the issue as squarely as *Knick* or *Walker*, the principles and analysis underlying several recent cases in this Appellate District and the Illinois Supreme Court provide helpful guidance. First, in *Illgen*, the Supreme Court affirmed the admission of the evidence of prior assaults by the defendant *against the victim*, but only after concluding that the prior assaults were probative "because the defendant did inflict *substantial bodily harm* in

several of the prior assaults." *Illgen*, 145 Ill. 2d at 375 (emphasis added). Additionally, the defendant had told people in the victim's presence that he would use deadly force against her. *Id.* at 374.

In a recent First District case, the State introduced evidence that the defendant had, earlier in the night, fired shots at two hotels and a residence to prove the defendant's intent to fire his gun at the victim and that the gun did not fire by accident. *People v. Bedoya*, 325 Ill. App. 2d 926, 938, 758 N.E.2d 366, 378 (1st Dist. 2001). Searching for the possible relevance of this evidence, the Court noted that "[t]he evidence could not have been offered to show [the defendant] was the kind of person who intentionally fires his gun at every opportunity; that would be propensity evidence, not relevant other offense evidence." *Id.* Citing *Illgen*, the Court noted that there were no common victims in the alleged acts. *Id.* The Court then, distinguishing a prior case, reasoned that, while a defendant's intent to commit murder could be inferred from his commission of a similar murder just fifteen minutes prior, the mere firing of a weapon at three buildings did not make it more probable that the defendant intended to kill the victim in the charged offense. *Id.* at 939, 758 N.E.2d at 378-79, citing *Charles*, 238 Ill. App. 3d at 752, 606 N.E.2d at 603 (holding that evidence that defendant fired a shotgun into the abdomen of an individual relevant to rebut defendant's claim that he accidentally discharged a shotgun into the abdomen of another victim fifteen minutes later).

The State's pre-textual argument as to intent in this case is analogous to the position the State took in *People v. Wydra*, 265 Ill. App. 3d 597, 637 N.E.2d 741 (1st Dist. 1994). In *Wydra*, the State introduced evidence of the defendant's prior arrest for battery to prove that he had intentionally battered a police officer. The prior battery occurred a week before the incident at issue in the case, but involved a third person -- his ex-girlfriend's new boyfriend -- unrelated to

the victim. *Wydra*, 265 Ill. App. 3d at 613, 637 N.E.2d at 753. Rejecting the State's position, the Court held that the prior battery of a third person was not probative of the defendant's motive or intent to batter the victim. *Id.* at 616, 637 N.E.2d at 754-55. Thus, the case law, as exemplified by *Illgen*, *Wydra*, and *Bedoya*, establishes two significant guideposts for the introduction of prior bad acts in a first-degree murder trial: (1) the other crimes evidence is much more likely to be probative when the prior acts were committed against the victim in the charged offense; and (2) the prior acts must prove the defendant's intent to kill or cause serious bodily injury, not just show that a defendant acted violently in conformity with his prior bad acts.

The authority the State cited in its motion to introduce evidence of prior crimes does not support its theory of admission and is distinguishable from the present case. *See People v. Heredia*, 193 Ill. App. 3d 1073, 550 N.E.2d 1023 (1st Dist. 1989). *Heredia* involved a domestic dispute in which the husband, Heredia, shot and killed his estranged wife. *Id.* at 1077-78, 550 N.E.2d 1026. While the court found the defendant's prior bad act of beating his wife was excepted from the propensity rule, the court admitted the evidence that the defendant sexually abused his child by way of stipulation, and never ruled on its admissibility. *Heredia*, 193 Ill. App. 3d at 1086, 550 N.E.2d at 1031-32. Thus, not inconsistent with other cases, the court admitted evidence that the defendant committed serious bodily injury to the victim, but did not rule on the admissibility of the evidence of the defendant's sexual abuse of his daughter.

The sole purpose served by introducing the defendant's prior bad acts against Asha in this case was to establish that the defendant had a general propensity to commit violence and to establish that the defendant acted in conformity with his prior misconduct -- an impermissible purpose. *See People v. Knight*, 309 Ill. App. 3d 224, 227, 722 N.E.2d 331, 333 (2d Dist. 1999) ("Evidence of other crimes, threats, or bad acts is not admissible to show the defendant's

character or propensity to commit crime or wrongful acts."). It is not permissible to introduce evidence to show that a defendant has the disposition to commit an offense similar to that charged. *People v. Rogers*, 324 Ill. 224, 233, 154 N.E. 909, 912 (1926). Even if marginally probative on the issues of intent or motive, the other crimes evidence was not limited by the court or prosecution to this purpose at trial. Instead, the State argued that the prior misconduct showed that the defendant generally acted in a violent, impulsive manner. The State's true purpose is captured in its statement that "[j]udge, this Defendant is no stranger to violence." (R. D78); *see also* (R. D100) ("what he does to deal with his anger, his frustration, and when he doesn't get his way. He resorts to violence."). Such comments illustrate that the State's theory was nothing more than a pretext to admit the inflammatory and prejudicial evidence of defendant's prior bad acts to show action in conformity with his prior violent behavior.

In its pre-trial motion, the State also asserted that the prior bad acts demonstrated the defendant's motive for committing the crime. The alleged motive argued by the State was that the victim sought revenge against a guy that he found in the car with the defendant's girlfriend. *See* (R. A7) ("He decided he was going to run down what he thought was a threat, another man with a woman that he was trying to get back."). Yet the defendant's motive was established by the fact that Asha was allegedly seen by the defendant in her car with the victim. The prior bad acts in this case added nothing to this evidence of motive and only established, impermissibly, the defendant's propensity to commit crime.

Properly introduced, the prior bad acts should establish the motive for the crime, not establish a propensity to act in conformity with prior behavior. The textbook example of a prior bad act establishing motive is the introduction of evidence of a defendant's drug habit to show his motive for robbery. *See, e.g. People v. Maounis*, 309 Ill. App. 3d 155, 159, 722 N.E.2d 749,

14

A-59

753 (1st Dist. 1999) (approving the admission of evidence of drug habit to prove motive in prosecution for robbery); *State v. Barnett*, 141 N.C. App. 378, 390, 540 S.E.2d 423, 431 (Ct. App. 2000) ("The evidence that defendant previously committed forgery to finance his drug habit could properly be admitted, not to show defendant had a propensity to commit forgery or other crimes, but rather to show that his need to support his drug habit and his lack of finances were the motive for the robbery and murder of the victim."); *see also State v. Nieto*, 129 N.M. 688, 696, 12 P.3d 442, 450 (2000) (admitting evidence of defendant's gang affiliation to show defendant's alleged motive to rise up in the ranks of the gang by performing a hit on its behalf). Absent such a relation, the court is relying on the prior bad act as evidence that the defendant acted in conformity with such prior conduct in committing the charged offense -- an impermissible purpose. Such impermissible reasoning is evident in the State's arguments in this case and the trial court's pronouncement of its verdict. (R. D78, D100, D102, D113).

The defendant's propensity toward violence may be highly probative of whether he was violent on this occasion, but the law does not permit such an inference. *See Lehman*, 5 Ill. 2d at 342, 125 N.E.2d at 509 (holding that evidence of prior bad acts is objectionable "not because it has no appreciable probative value, but because it has too much."). It is the willingness to employ such propensity logic that makes other crimes evidence so dangerous.[5] The trial judge in this case fell prey to such temptation:

> It occurs to this Court that Michael Threlkeld as had been indicative of everything that had gone on between he and Asha, when something went wrong, he had a habit of acting out in a criminal manner, impulsive manner, in a violent manner, slashing of tires, breaking of windows, taking property back at gunpoint.

---

[5] For example, one of my roommates in college was notorious for eating other people's food without permission. So naturally whenever food went missing, we all blamed Jon for the transgression. No one would think it is inappropriate to employ propensity logic in this situation. But Jon's freedom was not at stake, and when a person's liberty is in peril, as when they are on trial for a crime, the law does not permit us to use such logic.

(R. D113)

The prior bad acts evidence was impermissibly used to show the defendant's propensity toward violence and crime and that he acted in conformity therewith. Because it had no relevance to the defendant's intent or motive in this case, the trial court's admission of the evidence was improper.

### B.  The Prejudicial Effect of the Other Crimes Evidence Substantially Outweighed Any Probative Value

Evidence of a defendant's prior bad acts carries a substantial risk of unfair prejudice to the defendant's case. There is a significant likelihood that a trier of fact, influenced by the defendant's prior bad acts, will convict the defendant based solely upon his bad character or the presumption that the defendant acted in conformity with his prior misconduct. The evidence of the defendant's prior bad acts in this case exhibit such a strong probability of prejudice. Given the minimal, if any, probative value of the defendant's prior acts to prove the defendant's intent or motive in this case, the trial court abused its discretion in admitting the other crimes evidence.

"Evidence of another crime relevant to establish one of the exceptions to the general rule will still be excluded or stricken when its probative value is outweighed by its prejudicial impact upon the defendant." *People v. Lindgren*, 68 Ill. App. 3d 141, 145, 386 N.E.2d 87, 89 (4th Dist. 1979). The danger of unfair prejudice "speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180, 117 S. Ct. 644, 651 (1997).

Illinois courts are particularly aware of the inherently prejudicial nature of evidence of prior bad acts or other crimes. *People v. Radovick*, 275 Ill. App. 3d 809, 821, 656 N.E.2d 235, 243 (1st Dist. 1995) (discussing the prejudicial nature of other crimes evidence). Indeed, in light

A- 61

of the potential for the evidence to be misapplied, the Illinois Pattern Jury Instructions, quoting

*People v. Denny*, 241 Ill. App. 3d 345, 360-61, 608 N.E.2d 1313 (1st Dist. 1993), state:

> Because of the significant prejudice to a defendant's case that the
> admission of other crimes evidence usually risks, we hold that the
> trial court should not only instruct the jury [on the limited purpose
> of admitting the evidence] at the close of the case, but also orally
> from the bench (unless defendant objects) at the time the evidence
> is first presented to the jury.

IPI Criminal 3d No. 3.14, Committee Note, at 13 (Supp. 1996).

Compounding the inherent prejudice from the introduction of the prior bad acts evidence

was the fact that the prosecution focused a large portion of its case on the defendant's past

behavior as proof that he committed the instant offense. "Cumulative evidence of other conduct

can overpersuade the jury to convict the defendant as a bad person, rather than because he was

guilty of the crime charged." *People v. Brown*, 319 Ill. App. 3d 89, 96, 745 N.E.2d 173, 181 (4th

Dist. 2001), *citing People v. Olson*, 96 Ill. App. 3d 193, 198-99, 420 N.E.2d 1161, 1165 (1981).

The significant prejudice that accompanies the introduction of evidence of prior bad acts

substantially outweighed any probative value the defendant's actions had on the issues of intent

or motive. Accordingly, the trial court abused its discretion in permitting the introduction of the

prior bad acts evidence.

**C.    The Introduction Of The Prior Bad Acts Substantially Prejudiced The
Defendant's Right To A Fair Trial Under Illinois Law and the Due Process
Clause of the Fourteenth Amendment**

The evidence presented in this case, the testimony of the bystanders and the defendant's

actions in fleeing the scene, when viewed by the trier of fact without the tarnish of the

defendant's prior bad acts, are insufficient to establish the defendant's guilt beyond a reasonable

doubt. It is evident from the trial court's language that the defendant's conviction was based in

part on the trial court's improper reliance on the evidence of the defendant's prior bad acts.

Given the high risk of prejudice associated with the admission of other crimes evidence and the lack of overwhelming evidence proving the defendant's intent to commit first-degree murder, the trial's court admission of the prior bad acts evidence cannot constitute harmless error.

"The erroneous admission of evidence of other crimes carries a high risk of prejudice and ordinarily calls for reversal." *People v. Placek*, 184 Ill. 2d 370, 388, 704 N.E.2d 393 (1998), quoting *People v. Manning*, 182 Ill. 2d 193, 214, 695 N.E.2d 423 (1998); *People v. Funches*, 59 Ill. App. 3d 71, 74, 375 N.E.2d 135, 137 (2d Dist. 1978) (reversing the conviction based on the "probable impact" of the cumulative prejudicial evidence on the jury); *People v. Watson*, 55 Ill. App. 3d 564, 567-68, 371 N.E.2d 113, 116 (1st Dist. 1977) (refusing to speculate as to what the jury might have done absent the impermissible evidence being admitted). In determining whether the improper introduction of the other crimes evidence prejudiced the substantial rights of the defendant, "a conviction will be upheld only if the properly admitted evidence is so overwhelming that no fair minded jury could have voted for acquittal or, to put it another way, only if the record affirmatively shows that the error was not prejudicial." *Lindgren I*, 79 Ill. 2d at 141, 402 N.E.2d at 354 (citations omitted).

The First District followed these admonitions of the Illinois Supreme Court in *People v. Wydra*. In *Wydra*, the court found the defendant guilty of aggravated battery, which required the State to prove beyond a reasonable doubt that he intentionally and knowingly caused bodily harm to a peace officer, knowing that the individual was a peace officer. *Id.* at 606, 637 N.E.2d at 748. The evidence at trial showed that the officer had sustained injuries that required treatment at a hospital and thus qualified as bodily injury. *Id.* at 607, 637 N.E.2d 748. Further, the light was sufficient that the defendant could identify certain indicia that the individual he battered was a peace officer, including the officer's uniform and badge. *Id.* The officers had also

pursued the defendant in their marked squad car with the overhead, emergency lights on. *Id.* at 607-08. In addition to this evidence, the trial court permitted the introduction of evidence that the defendant battered his former girlfriend's new boyfriend and testimony that the defendant allegedly circulated a partially nude picture of his former girlfriend. *Id.* at 614. Despite the considerable evidence supporting the defendant's conviction, the court reversed, holding that "[w]e have already concluded that the properly admitted evidence in this case was sufficient to support the verdict of guilty of aggravated battery. However, the evidence was by no means overwhelming so as to withstand the impact of the prejudicial evidence of prior misconduct." *Id.* at 617, 637 N.E.2d at 755.

The manner in which the evidence of prior bad acts is "presented, received, and argued" can increase the prejudice suffered by the defendant. *Bedoya*, 325 Ill. App. 3d at 940, 758 N.E.2d at 379. The Court in *Lindgren II* found that the error, a statement by a State witness referencing the defendant's previous trial, was harmless because of the overwhelming evidence of guilt and because the reference "was not unnecessarily repeated, but was isolated and apparently inadvertent." *People v. Lindgren*, 111 Ill. App. 3d 112, 443 N.E.2d 1129 (4th Dist. 1982) (*Lindgren II*). Here, the State repeatedly referred to the prior bad acts, essentially shifting the focus of the trial from the events on the night of January 12, 2000, to the prior bad acts committed by the defendant against Asha. *Brown*, 319 Ill. App. 3d at 96, 745 N.E.2d at 181. The State referred to the prior misconduct in its opening statement (R. A6-A10), on direct examination of its witnesses (R. A21-27), on cross-examination of defense witnesses (R. A27, A31, A42-A43, A47-A49, C34-C45, C66-C68,) and in its closing argument (R. D78-D79, D100-D102).

The evidence presented by the State to establish Michael Threlkeld's intent to commit first-degree murder was not "so overwhelming that no fair minded jury could have voted for acquittal." *Lindgren I*, 79 Ill. 2d at 141, 402 N.E.2d at 354. And the testimony of the two bystanders along with the evidence that the defendant fled the scene was by no means so overwhelming as to withstand the impact of the prejudicial evidence of prior misconduct. In this regard, the Supreme Court has instructed that because of the substantial likelihood that the erroneous introduction of collateral crimes evidence violated the defendant's right to a trial by an unbiased jury, it is not appropriate for the reviewing court to "read the record and resolve all of the factual ambiguities against the defendant." *Lindgren I*, 79 Ill. 2d at 144, 402 N.E.2d at 355. Thus, in analyzing whether the error was harmless, it is not appropriate for the court to construe the remaining evidence in the light most favorable to the prosecution since it is likely that the trier of fact was biased by the prejudicial evidence of the defendant's prior bad acts. *Lindgren I*, 79 Ill. 2d at 144, 402 N.E.2d at 355.

The testimony of the bystanders, as well as Asha, tends to support, rather than contradict, the defendant's account of the incident. The defendant explained that after Asha motioned for him to follow her that, "I drove up a few feet, I tried to dip a little bit to the right, and then I made a left. I swooped around and made a left, a U-turn." (R. D22-D23). The defendant's testimony that he pulled slightly forward and then make a quick U-turn which resulted in his vehicle accidentally striking the victim is consistent with the accounts of Asha and Ms. Slater.

As Asha described the incident during the State's direct examination:

A    Well, I looked in the rearview, I mean I automatically saw the U-turn and the hit, and that was it.

Q    It happened pretty fast?

A    Yes.

(R. A34).

The testimony of Ms. Slater also bolsters the conclusion that this was an accident resulting from the defendant's attempt to make a hasty U-turn and follow Asha, not a deliberate and intentional killing. Ms. Slater testified that Michael's vehicle pulled forward "maybe five feet." (R. A61). And that:

> Q    About how far down the block was that car when you saw it come back towards where the man was standing by his car?
>
> A    It wasn't that far. It was just like -- all you had to do was turn the corner, and he was right there getting ready to get inside his car. So it took like a second for him to make the U-turn, hit the guy, and keep going.

(R. A62).

The defendant's testimony is even more reasonable in light of his poor driving record. The defendant's driving record contains numerous accidents resulting from his inattention and poor driving, including hitting a lamp post, a fire hydrant, a parked car, and a CTA bus. (R. C61-C62, D16-D17). The defendant's driving record when combined with the testimony of the bystanders and Asha strongly undercuts the State's allegation that he intentionally killed Linton Boyd.

The State also argued that the defendant's actions subsequent to the accident were evidence of his guilt. While the trier of fact is not prohibited from considering the defendant's flight from the scene as circumstantial evidence tending to show his consciousness of guilt, "flight alone is not necessarily indicative of criminal activity." *People v. Peete*, 318 Ill. App. 3d 961, 966, 743 N.E.2d 689, 693 (4th Dist. 2001), *quoting Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S. Ct. 673, 676 (2000). The defendant explained that he fled the scene after the accident because he was driving without a license and in a borrowed vehicle, which lacked proper registration. (R. D15, D56, D59). It is certainly not unreasonable to assume that an unbiased

trier of fact could have found the defendant's explanation of his flight credible, and not that his flight was indicative of a guilty conscience.

The State's evidence of the defendant's intent was entirely circumstantial. None of the State's witnesses testified that the defendant's actions were a deliberate attempt to kill or cause great bodily harm to the victim. When questioned on direct by the State, Asha stated that she could not tell whether it was deliberate. (R. A50). And while the State called several witnesses to the stand to establish the forensic evidence in this case, none of the witnesses could conclude that the defendant acted intentionally. Investigator Michael Trummel of the Illinois State Police testified that he could not conclude from the physical evidence that he collected from the defendant's vehicle while it was impounded in Bloomington that the defendant's actions were intentional. (R. A125). Investigator Leonard Stocker of the mobile crime lab unit of the Chicago Police Department examined the crime scene and collected evidence, he also did not testify that the defendant's actions were intentional. (R. B54). Dr. Rexene Worrell from the Cook County Medical Examiner's Officer performed the autopsy on Linton Boyd, but could not testify that the defendant's actions were intentional. (R. A78, A85). It was stipulated that, if called, Ellen Connolly of the Illinois State Police division of forensic services would testify that fragments of plastic from the scene matched those samples taken from the defendant's truck. (R. C2). Her stipulated testimony did not state that the defendant's actions were intentional.

The evidence of defendant's intent presented at trial was, at best, circumstantial. None of the evidence presented in this case was so overwhelming that a reasonable jury, unbiased by the defendant's prior bad acts, could not have voted for acquittal. The prejudicial impact of the State's repeated references to the defendant's prior acts, and the trial court's reliance thereupon in reaching its verdict, substantially prejudiced the defendant's right to a fair trial under Illinois law

and the Due Process Clause of Fourteenth Amendment to the United States Constitution.

Accordingly, Appellant respectfully requests that his conviction be reversed and he be granted a

new trial before an unbiased trier of fact.

## II.    THE EVIDENCE IN THE RECORD DOES NOT SUPPORT A CONVICTION FOR FIRST-DEGREE MURDER

In reviewing a challenge to the sufficiency of the evidence supporting a conviction under

state and federal law, "the relevant question is whether, after viewing the evidence in the light

most favorable to the prosecution any rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789

(emphasis omitted); *Illgen*, 145 Ill. 2d at 376; *People v. Jeffries*, 164 Ill. 2d 104, 114, 646 N.E.2d

587 (1995), quoting *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073 (1970) (holding that

the due process clause "'protects the accused against conviction except upon proof beyond a

reasonable doubt of every fact necessary to constitute the crime with which he is charged.'").

The defendant in this case was charged with first-degree murder. Accordingly, the State was

required to establish beyond a reasonable doubt that Defendant Threlkeld intended to kill or do

great bodily harm to the victim. 720 ILCS § 5/9-1. As described above, the evidence adduced at

trial by the State did not prove beyond a reasonable doubt that Defendant intended to kill or

cause great bodily harm to the victim. For the reasons articulated, the evidence of the

defendant's prior bad acts was not sufficiently probative of the defendant's intent to commit first-

degree murder. Even when considered in the aggregate with the other testimony introduced at

trial, and viewed in the light most favorable to the State, no reasonable jury could have

concluded that Michael Threlkeld had the requisite intent to commit first-degree murder. The

failure of the State to introduce sufficient evidence of Defendant Threlkeld's guilty requires

reversal under Illinois law and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## III.   CONCLUSION

The evidence of prior bad acts presented by the State against Defendant Threlkeld was probative of the defendant's intent to kill or cause great bodily harm to Linton Boyd nor do they establish a motive for his commission of the offense. Rather, at trial, the State impermissibly relied on the inference that, because he committed the prior misconduct, it was more likely that the defendant committed the crime charged. The trial court clearly abused its discretion because the significant prejudice that accompanies the introduction of evidence of prior bad acts substantially outweighed any probative value the defendant's collateral actions had on the issues of intent or motive. The defendant's conviction should thus be reversed because his right to a fair trial before an unbiased trier of fact was substantially prejudiced and the properly admitted evidence was not so overwhelming that no fair minded jury could have voted for acquittal. Finally, even assuming the trial court properly accepted the evidence of the defendant's prior bad acts, the State's evidence is insufficient to prove the defendant's intent beyond a reasonable doubt. Accordingly, Appellant respectfully requests that his conviction be reversed on the grounds that it violates Illinois law and the United States Constitution and the defendant be granted a new trial.

Respectfully submitted,

By: _____

Lee Ann Russo
Jeffrey R. Weiland
Jones Day
77 West Wacker, 35th Floor
Chicago, Illinois 60601
(312) 782-3939

Counsel for Defendant-Appellant
MICHAEL THRELKELD

CHI-1410475v1

# RECORD INDEX

PAGE:

## Common Law Record

Charging Instrument .................................................................................................................17-19

Presentence Investigation............................................................................................................ 50

Notice of Appeal ........................................................................................................................93-94

Judgment Order............................................................................................................................95-96


## Reported Proceedings

### Bench Trial

Jury Waiver.................................................................................................................................A-3

Opening Statement (State) .........................................................................................................A-5

Defense Reserves Opening .........................................................................................................A-12

### State's Case-in-Chief

Sue Estra Boyd ........................................................................................................................... A-13
  Direct Examination ................................................................................................................... A-17
  Cross Examination ...................................................................................................................

Edwina Asha Quansah ................................................................................................................ A-19
  Direct Examination ................................................................................................................... A-40
  Cross Examination..................................................................................................................... A-53
  Redirect Examination................................................................................................................ A-55
  Recross Examination .................................................................................................................

Michelle Slater ........................................................................................................................... A-58
  Direct Examination ................................................................................................................... A-66
  Cross Examination..................................................................................................................... A-74
  Redirect Examination................................................................................................................ A-75
  Recross Examination .................................................................................................................

Dr. Rexene Morrell ............................................................................................... A-76
   Direct Examination ......................................................................................... A-83
   Cross Examination .......................................................................................... A-85
   Redirect Examination ...................................................................................... A-86
   Recross Examination ....................................................................................... A-86

Officer Ronald W. Gibbs ...................................................................................... A-87
   Direct Examination ......................................................................................... A-94
   Cross Examination ..........................................................................................

Sergeant Brendon Heffner ................................................................................... A-102
   Direct Examination ......................................................................................... A-114
   Cross Examination ..........................................................................................

Investigator Michael Trummel .............................................................................. A-115
   Direct Examination ......................................................................................... A-124
   Cross Examination .......................................................................................... A-126
   Redirect Examination ......................................................................................

Sergeant Charles Williams ................................................................................... A-128
   Direct Examination .........................................................................................

Kyra Ester .......................................................................................................... B-9
   Direct Examination ......................................................................................... B-23
   Cross Examination ..........................................................................................

Trooper Brian Gray ............................................................................................. B-33
   Direct Examination ......................................................................................... B-46
   Cross Examination ..........................................................................................

Investigator Leonard Stocker ............................................................................... B-54
   Direct Cross Examination ............................................................................... B-67
   Cross Examination ..........................................................................................

State Rests .......................................................................................................... C-5

Motion Directed Verdict ...................................................................................... C-5

Judge's Ruling .................................................................................................... C-7

Defense Opening ................................................................................................. C-8

A-72

## Defense's Case-in-Chief

Terrence Coleman ........................................................................................................ C-17
   Direct Examination ................................................................................................ C-25
   Cross Examination ................................................................................................. C-30
   Redirect Examination ............................................................................................ C-31
   Recross Examination .............................................................................................

Ahmand Kendall .......................................................................................................... C-33
   Direct Examination ................................................................................................ C-40
   Cross Examination ................................................................................................. C-40
   Redirect Examination ............................................................................................ C-51
   Recross Examination .............................................................................................

Jasmine Carter ............................................................................................................. C-55
   Direct Examination ................................................................................................ C-65
   Cross Examination ................................................................................................. C-68
   Redirect Examination ............................................................................................ C-71
   Recross Examination .............................................................................................

Michael Threlkeld ....................................................................................................... D-3
   Direct Examination ................................................................................................ D-32
   Cross Examination .................................................................................................

Sgt. Williams ............................................................................................................... D-70
   Direct Examination ................................................................................................ D-72
   Cross Examination .................................................................................................

State's Rebuttal Evidence ............................................................................................ D-69

State Rests in Rebuttal ................................................................................................. D-76

Closing Argument (State) ............................................................................................ D-77

Closing Argument (Defense) ....................................................................................... D-87

Rebuttal Argument (State) ........................................................................................... D-99

Ruling by The Court .................................................................................................... D-107

CHI-1316721v1

Sentencing

Lt. Chester Plaxico ................................................................................................21
   Direct Cross ....................................................................................................
   Cross Examination..........................................................................................26

Dep. Margaret Anderson ....................................................................................36
   Direct Cross ....................................................................................................40
   Cross Examination..........................................................................................

Sue Boyd..............................................................................................................F-6

Linton Boyd, Sr....................................................................................................F-8

Lakeysha Vauthan...............................................................................................F-11

Marnie Boyd ........................................................................................................F-13
   Direct Cross ....................................................................................................

Glenn Harston ......................................................................................................F-16
   Direct Cross ....................................................................................................

Mitigation............................................................................................................F-20

Aggravation.........................................................................................................F-25

Sentence ..............................................................................................................F-32

Motion to reduce sentence ..................................................................................G-3

No. 1-01-2879

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

PEOPLE OF THE STATE OF ILLINOIS,)
            Plaintiff-Appellee,   )
                                  )
                                  )
        vs.                       )
                                  )
                                  )
MICHAEL THRELKELD,                )
            Defendant-Appellant.  )

Appeal from the Circuit Court
of Cook County, Illinois

No. 00 CR 4537

Honorable James B. Linn

## PROOF/CERTIFICATE OF SERVICE

**TO;**

  Steven M. Ravid, Clerk of Appellate Court, 1st. District, 160 N.
  La Salle St., Room S1400, Chicago, Illinois 60601

**TO;**

  Lee Ann Russo, Jeffery R. Weiland Jones, Day, Reavis & Pogue,
  Attorneys At Law, 77 West Wacker, 35th Floor, Chicago, Illinois
  60601.

  **PLEASE TAKE NOTICE,** that on the___day of November, 2002, I have
caused the attached **PRO SE SUPPLEMENTAL AMENDMENT** to be placed in the
institutional mail at Stateville Correctional Center, properly addressed
to the party(ies) above for mailing through the United States Postal
Service.

  Pursuant to **28 USC 1746, 18 USC 1621 or 735 ILCS 5/109,** I declare
under penalty of perjury, that I am a named party in the above action,
that I have read the above documents, and that the information contained
therein is true and correct to the best of my knowledge.

**DATE;**_____

                              MICHAEL THRELKELD
                              REG. NO. K-66117
                              P.O. Box 112
                              Joliet, Il. 60434-0112

EXHIBIT B

A- 153

No. 1-01-2879

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

PEOPLE OF THE STATE OF ILLINOIS, )
　　　　　　　　　　　　　　　　　 )     Appeal from the Circuit Court
　　　　　　Plaintiff-Appellee,    )     of Cook County, Illinois
　　　　　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　 )     No. 00 CR 4537
　　　vs.                         )
　　　　　　　　　　　　　　　　　 )     Honorable James B. Linn
　　　　　　　　　　　　　　　　　 )
MICHAEL THRELKELD,               )
　　　　　　　　　　　　　　　　　 )
　　　　　　Defendant-Appellant.   )


PRO SE SUPPLEMENTAL AMENDMENT TO PENDING APPEAL


Michael Threlkeld
Reg. No. K-66117
P.O. Box 112
Joliet, Illinois 60434


PRO SE

A- 154

## TABLE OF CONTENTS

Table of Contents................................................i

Table of Authorities...........................................ii

Constitutional Provision.......................................ii

Brief..........................................................1

     I.

        **Trial counsel failed to call a person to testify that was crucial to the defense that could have disputed the state's theory of the defendant and the case.**

Conclusion.......................................................4

A-155

## TABLE OF AUTHORITIES

**Cases**                                                    **Page**

<u>Strickland v. Washington</u>, 466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct.
2052 (1984)............................................................2,3

<u>United States v. Cronic</u>, 466 U.S. 648, 80 L.Ed.2d 657, 104 S.Ct.
2039 (1984)............................................................2

<u>Gideon v. Wainwright</u>, 372 U.S. 335 (1963)........................2

<u>Power v. Alabama</u>, 287 U.S. 45 (1932)............................2

**U.S. Constitutional Amendment:**

Sixth Amendment

ii

nothing else but for mitigation purposes until the very last minute and was only able to obtain an affidavit. She should have been placed on the list from the very beginning.

Ms. Nikki Whitingham's testimony would have been relevant in showing the defendant in a different light as she knew him to be instead of the inaccurate picture the state presented to the court of the defendant's character, personality and mind-set.

Trial counsel's performance fell short of the standards to which an attorney is held under <u>Strickland v. Washington</u>, 466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct. 2052 (1984).

-3-

## CONCLUSION

**WHEREFORE,** Defendant, **Michael  Threlkeld,** prays that this Honorable Court allow his Pro Se Supplemental Amendment to his already pending appeal and request that his conviction be reversed and he be granted a new trial.

Respectfully submitted,

_____

**MICHAEL THRELKELD, PRO SE**
**REG. NO. K-66117**
**P.O. BOX 112**
**JOLIET, IL. 60434-0112**

-4-

STATE OF ILLINOIS )
                  )  SS
COUNTY OF WILL    )


### AFFIDAVIT


 I, **Michael Threlkeld**, deposes and says that as to the matter herein he is the Defendant-Appellant in the above entitled cause.

 He has read the foregoing document, by him signed, and that the statements contained therein are true in substance and in fact.

 Further affiant sayeth not.


           _____

           **MICHAEL THRELKELD**


Subscribed and sworn to before me

This___day of November, 2002.

_____
   **NOTARY PUBLIC**

A-161

NO. 01-2879

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

---

PEOPLE OF THE STATE OF ILLINOIS,

                                  Plaintiff-Appellee,

                   vs.

MICHAEL THRELKELD,

                                    Defendant-Appellant.

---

Appeal from the Circuit Court of Cook County, Criminal Division.
Honorable **JAMES B. LINN**, Judge Presiding.

BRIEF AND ARGUMENT FOR
PLAINTIFF-APPELLEE

———

                                RICHARD A. DEVINE,
                                 State's Attorney,
                                 County of Cook,
                                 Room 309 - Richard J. Daley Center,
                                 Chicago, Illinois 60602

                                 Attorney for Plaintiff-Appellee

RENEE GOLDFARB,
JAMES FITZGERALD,
MAUREEN MCGEE,
Assistant State's Attorneys,
     Of Counsel.

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

vs.

MICHAEL THRELKELD,

Defendant-Appellant.

## POINTS AND AUTHORITIES

### I.

THE TRIAL COURT PROPERLY EXERCISED
ITS DISCRETION WHEN IT PERMITTED THE
STATE TO INTRODUCE EVIDENCE OF OTHER
CRIMES WHERE THAT EVIDENCE SHOWED
DEFENDANT'S INTENT, MOTIVE AND ABSENCE OF
INNOCENT FRAME OF MIND ..........................................    25

People v. Lee, 151 Ill.App.3d 510,
    502 N. E.2d 399 (1st Dist. 1986)...........................................    25

People v. McKibbins, 96 Ill.2d 176, 449 N.E.2d 821,
    cert. denied, 464 U.S. 844, 78 L. Ed. 2d, 104 S. Ct. 145 (1983) .......    25

People v. Bedoya, 325 Ill.App.3d 926,
    758 N.E.2d 366 (1st Dist. 2001)...........................................    25,33,43,46

People v. Eastland, 257 Ill.App.3d 394,
    627 N.E.2d 1006 (1993) ...................................................    25

People v. Jones, 328 Ill.App.3d 233,
    764 N.E.2d 1232 (1st Dist. 2002) .........................................    25

1

People v. Kimbrough, 138 Ill.App.3d 481,
    485 N.E.2d 1292 (1st Dist. 1985) .................................................... 25-26

People v. Patterson, 314 Ill. App. 3d 962,
    734 N.E.2d 462 (2000) ................................................................. 26

People v. Illgen, 145 Ill. 2d 353,
    583 N.E.2d 515 (1991) ................................................................ passim

Commonwealth v. Donahue, 519 Pa. 532,
    549 A.2d 121 (1988)................................................................... 26

People v. Herdia, 193 Ill. App. 3d 1073,
    550 N.E.2d 1023 (1st Dist. 1989)........................................................ 28,47

People v. Heard, 187 Ill. 2d 36,
    718 N.E.2d 58 (1999) ................................................................. 28,33

People v. Bartall, 98 Ill. 2d 294,
    456 N.E.2d 59 (1983)................................................................. 31,41

People v. Robinson, 167 Ill. 2d 53,
    656 N.E.2d 1090 (1995)................................................................ 31,33

People v. Brisbon, 106 Ill. 2d 342,
    478 N.E.2d 402 (1985) ................................................................ 32

People v. Placek, 184 Ill. 2d 370,
    704 N.E.2d 393 (1998) ................................................................ 33,40

Peek v. United States, 321 F.2d 934 (9th Cir. 1963) ........................................ 33

People v. Teffertiller, 158 Ill. App. 3d 72,
    510 N.E.2d 1322 (5th Dist. 1987)........................................................ 33

People v. Robinson, 30 Ill. 2d 437,
    197 N.E.2d 45 (1964) ................................................................. 33

People v. Medina, 238 Ill. App. 3d 871,
    607 N.E 2d. 619 (2nd Dist. 1993)........................................................ 33,35,40

People v. Nuley, 271 Ill. App. 3d 427,
    648 N.E.2d 1015 (1st Dist. 1995) ....................................................... 34

People v. Brown, 199 Ill. App. 3d 860,
    557 N.E.2d 611 (1st Dist. 1990)........................................................ 35,45

2

People v. Moorehead, 45 Ill. 2d 326,
    259 N.E.2d 8 (1970) ................................................................... 35

People v. Parker, 192 Ill. App. 3d 779,
    549 N.E.2d 626 (1st Dist. 1989) ............................................... 35

In re L.E., 119 Ill. App. 3d 406,
    456 N.E.2d 646 (2nd Dist. 1983) ............................................. 35

People v. Funches, 59 Ill. App. 3d 71,
    375 N.E.2d 135 (2nd Dist. 1998) ............................................. 40

People v. Watson, 55 Ill. App. 3d 564,
    371 N.E.2d 113 (1st Dist. 1977) ............................................... 40

People v. Lindgren, 79 Ill. 2d 121,
    402 N.E.2d 238 (1980) ............................................................. 40

People v. Wydra, 265 Ill. App. 3d 597,
    637 N.E.2d 741 (1st Dist. 1994) ............................................... 40,43,46

People v. Lindgren, 111 Ill. App. 3d 112,
    443 N.E.2d 1129 (4th Dist. 1982) ............................................ 40

People v. Brown, 319 Ill. App. 3d 89,
    745 N.E.2d 173 (4th Dist. 2001) ............................................... 40

People v. Oaks, 169 Ill. 2d 409,
    662 N.E.2d 1328 (1996) ........................................................... 41,58

People v. Lampkin, 98 Ill. 2d 418,
    457 N.E.2d 50 (1983) ............................................................... 42

Knick v. Commonwealth of Virginia, 15 Va. App. 103,
    421 S.E.2d 479 (Ct. App. 1992) ............................................... 43

Walker v. State, 97 P2d. 803 (2000) ................................................ 43

People v. Evans, 125 Ill. 2d 50,
    530 N.E.2d 1360 (1988) ........................................................... 43,44

People v. Deenadayalu, 331 Ill. App. 3d 442,
    772 N.E.2d 323 (2nd Dist. 2002) ............................................. 44

3

People v. Novak, 163 Ill. 2d 93,
    643 N.E.2d 762 (1994) .................................................................    44

People v. Curtis, 296 Ill. App. 3d 991,
    696 N.E.2d 372 (4th Dist. 1998)...............................................    50

People v. Hall, 194 Ill. 2d 305,
    743 N.E.2d 521 (2000) .................................................................    51

People v. Buss, 187 Ill. 2d 144,
    718 N.E.2d 1 (1999) .....................................................................    51

People v. Williams, 182 Ill. 2d 171,
    695 N.E.2d 380 (1998) .................................................................    51

## II.

**THE STATE PROVED BEYOND A REASONABLE DOUBT THAT DEFENDANT WAS GUILTY OF FIRST DEGREE MURDER WHERE THE EVIDENCE PROVED THAT DEFENDANT BECAME UPSET AFTER SEEING HIS EX-GIRLFRIEND WITH THE VICTIM, WAITED UNTIL THE VICTIM WAS ON THE STREET, DROVE HIS CAR DIRECTLY INTO THE VICTIM, FLED THE SCENE, DID NOT CALL FOR HELP AND THEN LIED TO THE POLICE** .........    52

Jackson v. Virginia, 433 U.S. 307,
    99 S.Ct. 334 (1991)......................................................................    52

People v. Nitz, 143 Ill. 2d 82,
    572 N.E.2d 895 (1991); cert denied, 112 S. Ct. 334 (1991) ...............    52

People v. Slim, 127 Ill. 2d 302,
    537 N.E.2d 317 (1989) .................................................................    52

People v. Pintos, 133 Ill. 2d 286,
    549 N.E.2d 344 (1989) .................................................................    53

People v. Bennett, 329 Ill. App. 3d 502,
    769 N.E.2d 117 (2nd Dist. 2001).................................................    57

## III.

**DEFENDANT FAILED TO ESTABLISH THAT HIS TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO CALL NIKKI WITTINGHAM AS A WITNESS AT TRIAL AND SENTENCING SINCE HER TRIAL TESTIMONY WOULD HAVE BEEN EXCLUDED BY THE RULES OF EVIDENCE AND SINCE THE TRIAL JUDGE CONSIDERED THE CONTENTS OF HER AFFIDAVIT AS MITIGATION AT SENTENCING**................................................................ 58

Strickland v. Washington, 466 U.S. 668,
    104 S. Ct. 2052 (1984) ............................................................ 58

People v. Montgomery, 327 Ill. App. 3d 180,
    763 N.E.2d 369 (2001)............................................................ 58,59

People v. Gonzalez, 238 Ill. App. 3d 303,
    606 N.E.2d 304 (1st Dist. 1992) ............................................ 58

People v. Flores, 128 Ill. 2d 66,
    538 N.E.2d 481 (1989) ............................................................ 60

A- 80

## ISSUES PRESENTED FOR REVIEW

1. Whether the trial court abused its discretion in admitting proof of other crimes where those other crimes showed defendant's motive, intent and absence of an innocent state of mind.

2. Whether the State proved defendant guilty beyond a reasonable doubt where the evidence proved that defendant became upset after seeing his ex-girlfriend with the victim, waited until the victim was on the street, drove his car directly into the victim, fled the scene, did not call for help and then lied to the police.

3. Whether defendant established that his counsel was ineffective for failing to call Nikki Wittingham as a witness at trial and at sentencing where her trial testimony would have been excluded by the rules of evidence and where the trial judge considered the contents of her affidavit as mitigation at sentencing.

## STATEMENT OF FACTS

Defendant was indicted for first degree murder in the death of Linton Boyd. (C. R. 17-19) Prior to trial, the State's Motion to Introduce Proof of Other Crimes Evidence was granted. (Supp. R. 15-16)[1] After a bench trial, defendant was convicted of first degree murder. (R. Vol. II D11, C. R. 2) Defendant was sentenced to thirty five years in the Illinois Department of Corrections. (R. Vol. III F38, C. R. 3) Defendant now appeals.

Defendant and Edwina Asha Quansah (Asha) had been dating for six and a half years. (R. Vol. I A21) In approximately September of 1999, their relationship ended. (R. Vol. I A21) In June of

---

[1] The People have filed a motion to supplement the record with the transcript of August 21, 2000. On that date, both sides presented arguments and the trier of fact ruled on the admissibility of other crimes evidence.

1999, there was an incident where defendant broke Asha's front windshield and side window on her 1991 red Blazer. (R. Vol. I A21)  About five months later, defendant bent her windshield wiper and side mirror. (R. Vol. I A22)  Defendant admitted to Asha that he did both of these things because he was angry that she would not talk to him. (R. Vol. I A22)  In December of 1999, defendant slashed three of the tires on Asha's Blazer because he was angry that she would not talk to him. (R. Vol. I A22-23)  Also, in December of 1999, while Asha was in her car in the back of the YMCA about to take an older lady home, defendant approached the car with a bat, attempted to speak to Asha and then cracked her rear light with the bat. (R. Vol. I A23)  Another time, at about 4:00 a.m., Asha was in the alley on her way home when she saw defendant driving a van towards her. (R. Vol. I A24)  Asha reversed down the alley, crashed into a gate and jumped out of her car while defendant exited his vehicle, approached her and demanded, at gun point, that she return the leather coat and diamond ring that he had given her. (R. Vol. I A24-26)  Asha struggled with defendant over the gun and the gun fell. (R. Vol. I A26)  Defendant ran for the gun and when he returned, Asha gave him the coat and the ring and defendant left. (R. Vol. I A26)  Asha contacted the police, went to court and obtained an order of protection against defendant, which stated in part that defendant was to stay away from Asha's home and work. (R. Vol. I A26-27)

On January 2, 2000, at about 2:00 a.m., Asha was at Stony Subs when she saw defendant with Terrance Coleman and Armanis Kendall. (R. Vol. I A44)  Asha and defendant talked, and although Asha did not remember what the conversation was about, she did remember that she did not make a date to go to the movies with defendant. (R. Vol. I A45)

On January 12, 2000, Asha was working at the YMCA as a membership representative and a switchboard operator and the victim, Linton Boyd, was working as the director of aquatics. (R. Vol.

7

A- 82

I A27-28)  Asha and the victim had been friends and co-workers for about a year and they hung out all the time, but they were not dating. (R. Vol. I A27, A46)  At about 9:20-9:25 p.m., Asha and the victim went to her car that was parked in the back of the building and she drove him around to the front of the building where his car was parked. (R. Vol. I A28-29)  Asha double parked next to the victim's car and they talked for a minute until defendant, who was prohibited by an active order of protection from going to Asha's work, drove up in a silver gray Jeep Cherokee. (R. Vol. A26, A29)  Defendant had been calling Asha at work and had been asking her to go out with him, however she kept telling him no, that she would think about it and that she would call him back. (R. Vol. I A30)  Asha never called defendant back, did not know if she was going to call him back and did not have plans with him on January 12, 2002. (R. Vol. I A30)  Asha did not expect to see defendant outside her work that night, she did not tell him to pick her up and this was the only time defendant ever saw her in the presence of another man. (R. Vol. I A53-54)

Asha's car was double parked next to the victim's car facing north and the victim was in the passenger seat. (R. Vol. I A30)  Defendant pulled up and stopped next to Asha's car. (R. Vol. I A30-31)  Defendant's car was facing south and the driver's side of his car was closest to Asha's car. (R. Vol. I A30-31)  Defendant said something and Asha put up her finger "like one minute." (R. Vol. I A31)  At some point, defendant drove away going South. (R. Vol. I A31)  The victim got out of Asha's car and opened the door of his car, which was parked directly next to Asha's car, while Asha drove off. (R. Vol. I A31-32)  As the victim was opening his car door, defendant, who was waiting in the next intersection, made a U-turn, accelerated, hit the victim with his vehicle and continued driving. (R. Vol. I A32, A61-62)  Asha, who was at the light at 63rd Street, saw the entire incident in her rear view mirror and did not hear the screech of brakes. (R. Vol. I A32-33)  After defendant hit the victim,

8

the victim flew 78 feet in the air and fell to the ground. (R. Vol. I A35, B17, B63) Asha testified that defendant drove up next to her at the traffic light, stopped, stared at her and then kept driving. (R. Vol. I A35) Asha then drove back to the victim's car and found the victim unconscious and unable to talk. (R. Vol. I A36) Asha attempted to call 911, but someone had already called, so she called the victim's mother, told her that he had been hit and that she would call her back when she knew what hospital he was going to. (R. Vol. I A36-37)

After defendant hit the victim and fled, Asha received two voice mails from defendant. (R. Vol. I A54) While Asha did not remember the exact words, the first voice mail was basically about defendant hitting or smashing the victim with his car and he did not say that it was an accident. (R. Vol. I A55) In the second voice mail, defendant said something about an accident. (R. Vol. I A58)

On January 12, 2000, at about 9:30-9:40 p.m., Michelle Slater, a dental assistant who worked at Walgreens, was waiting for the bus at 63rd and Stony Island when she saw Asha sitting in the driver's seat and the victim sitting in the passenger seat of Asha's truck. (R. Vol. I A59-60) About 15 minutes later, Slater saw a white truck pull up on the side of Asha's truck and heard them have "a couple of words." (R. Vol. I A60) Slater could not hear what they were saying until it got "kind of loud" and she heard the guy in the white truck say loudly "okay, well, I'll be back." (R. Vol. I A60-61) Slater testified that when the man in the truck said this, he seemed kind of upset or agitated. (R. Vol. I A74) After he said that he would be back, he pulled up about five feet to the stop sign and waited. (R. Vol. I A61-62) At that time, Slater saw the victim exit the red truck and saw Asha drive away towards the stop light at 63rd Street. (R. Vol. I A61) Slater saw the victim trying to enter the red car and then saw the white truck make a U-turn, hit the victim and continue driving. (R. Vol. I A62) Slater testified that the white truck was going "really fast" when it struck the victim; that it never

9

slowed down, stopped or came back; that it hit the victim at full speed and that it did not appear to be out of control because it was going straight, did not swerve and did not slow down either before or after striking the victim. (R. Vol. I A62-65) Slater testified that there was no traffic on the street and that she had never seen defendant, the victim or Asha before. (R. Vol. I A69, A73)

Kyra Ester testified that on January 12, 2000, at approximately 9:00 p.m., she was waiting at the bus stop at 63rd and Stony. (R. Vol. I B10) When Ester arrived at the bus stop, Michelle Slater was already there and there was a red truck double parked in the middle of the street with a male and a female inside. (R. Vol. I B11) About four to five minutes after she arrived, a silver jeep approached from the south and stopped next to the red truck. (R. Vol. I B12, B26) Ester saw the lady in the red truck lower her window and say something and even though she was only ten feet away, she could not hear the conversation. (R. Vol. I B13) The Jeep then pulled off going southbound and it waited at the stop sign at 64th and Stony Island for about two minutes, while the victim got out of the red truck and proceeded to get into the red car. (R. Vol. I B13-14) The Jeep then made a U-turn, proceeded northbound at a high rate of speed, hit the red car, then hit the man getting into the red car and kept going towards 62nd Street. (R. Vol. I B15-17, B32) The man that the Jeep hit flew in the air and then fell to the ground. (R. Vol. I B17) According to Ester, the Jeep never swerved, stopped or hesitated, in fact, it increased speed before it struck the victim. (R. Vol. I B17-18, B32)

Chicago Police Officer Ronald W. Gibbs testified that on January 12, 2000, while working in the Third District on routine patrol, he heard a call of an accident at 6335 Stony Island, went to that location, found other police officers already there and learned that a person named Michael Threlkeld was wanted in the hit and run accident. (R. Vol. I A88-90) Gibbs spoke to Ms.

Serena Hill-Pratt, an employee of the YMCA, who was standing outside talking on Asha's cell phone. (R. Vol. I A88-89) After having a conversation with her, he listened to the cell phone, heard a male voice on the other end of the phone talking and then sent three officers to look for defendant. (R. Vol. I A89) Gibbs also spoke to Robert Culverson, who walked up and was trying to enter the crime scene. (R. Vol. I A90, A98) Culverson gave Gibbs defendant's cell phone number and told him that defendant had sent him to the scene. (R. Vol. I A90-91) Gibbs contacted the cell phone number and spoke to someone who identified himself as defendant and who admitted hitting the victim with his car. (R. Vol. I A91, A98-99) The next morning, Gibbs called defendant's father, Michael Robbins and asked Robbins to contact him if he heard anything. (R. Vol. I A92-93) About fifteen minutes after this conversation with defendant's father, Gibbs had a second conversation with him and learned that defendant was being held in custody in Bloomington, Illinois. (R. Vol. I 93)

Forensic Investigator Leonard Stocker testified that on January 12, 2000, while working in the mobile crime lab, he processed a homicide scene at 6335 Stony Island. (R. Vol. I B55-56) At the scene, Stocker did not see any skid marks. (R. Vol. I B58) Stocker recovered a right hand glove, a black knit cap and a black scarf from the street at approximately 6335 to 6331 S. Stony. (R. Vol. I B56) Stocker also recovered glass fragments; pieces of mirror; a gray plastic piece and several pieces of black, clear and red plastic. (R. Vol. I B56-57) Additionally, Stocker recovered paint scrapings from the left rear quarter panel of a red Escort located at 6335 Stony Island. (R. Vol. I B57) Stocker took photographs of the damage on the rear right bumper; the driver's door; the hood; the left front quarter panel; the steering wheel area that showed an exposed drivers side air bag and the gear shift area. (R. Vol. I B58-62) Stocker also photographed the clothing and debris in the street near the car.

11

(R. Vol. I B58-62)  Stocker noted that the victim's body was found at the far north end of the two parked cars at 6331 Stony Island, which was 78 feet from where the initial impact occurred.  (R. Vol. I B63)

Illinois State Trooper Brian Gray testified that on January 13, 2000, while working patrol in the Sixth District, a trucker pulled beside him at a traffic stop and told him that there was a gray Jeep slowing down almost coming to a complete stop in the roadway that had a headlight out and no registration.  (R. Vol. I B33-35)  Gray saw the Jeep coming southbound and unsuccessfully tried to wave the driver over with his flashlight and hand signals.  (R. Vol. I B35)  After finishing his traffic stop, at approximately 2:30 a.m., Gray caught up with the Jeep and asked defendant for a license and proof of insurance.  (R. Vol. I B35, B36, B48)  Defendant looked for a license and proof of insurance, but could not find either.  (R. Vol. I B36)  Defendant told Gray that his name was Kevin Tevin Williams and that his date of birth was April 7, 1979.  (R. Vol. I B36)  Defendant gave Gray the orange temporary registration sticker that was in the glove compartment and Gray noticed that it was ripped in half and had the name of Bobby Reynolds, so he asked defendant to come back to his car for further questioning.  (R. Vol. I B37)  Gray ran the VIN on the Jeep and there was no record on file. (R. Vol. I B37)

Gray noticed that defendant was very nervous and was shaking and after detecting an odor of alcohol, Gray asked defendant if he had been drinking and defendant responded that he drank a whole pint of gin with orange juice and that he threw the bottle out somewhere in Chicago.  (R. Vol. I B37-38)  Gray noticed that the right quarter panel had massive damage, that the taillight was broken and that there was massive body damage on the Jeep, so he asked defendant about the damage and defendant said that his uncle hit something a month ago.  (R. Vol. I B39)  It was apparent to Gray that

12

the damage was recent because there was no rust on where the paint had chipped and there was no dirt or debris inside the glass cavity of the headlight, so he asked defendant what his uncle hit and defendant said that he did not know. (R. Vol. I B40)  Gray asked defendant for his name and date of birth again and defendant again said that his name was Kevin Tevin Williams, but this time he gave the birth date of June 7, 1979. (R. Vol. I B39-40)  Gray checked this name and date of birth and did not get any information. (R. Vol. I B41)  Gray asked defendant for his address and defendant initially said that his address was 5327 N. Lake Park, then later said that it was 5451 Cornell. (R. Vol. I B41) Based in the information defendant provided, Gray could not determine whether defendant had a valid driver's license, so he called for a tow truck.  (R. Vol. I B42)  At approximately 4:15 a.m., Gray administered a breathalyzer test on defendant and the preliminary results were .006, so he advised defendant that he was under the legal age for drinking and was in violation of the zero tolerance policy. (R. Vol. I B42, B47)  Gray issued citations and after conducting an inventory search of the Jeep, recovered three small baggies of marijuana, a safe that contained $2,600 and some pictures. (R. Vol. I B43, B44, B46)  Defendant was then taken to the Illinois State Police Department Investigations Section. (R. Vol. I B44)

On cross-examination, Gray testified that at the time of defendant's arrest, he had been a sworn officer for about four months and that he had mistakenly put in his handwritten report that the alcohol concentration of the breathalyzer test was .000. (R. Vol. I B46-47)  Gray testified that he later amended his report to .002. (R. Vol. I B47)  Gray admitted that he thought it was unusual that a person who drank a pint of gin would come up with a concentration of .002. (R. Vol. I B47)

Illinois State Police Sergeant Brendon Heffner testified that on January 12, 2000, at about 6:00 a.m., he was called to the Sixth District police station. (R. Vol. I A101)  At approximately 7:00

13

a.m., Heffner, who was unaware of the investigation in Chicago, had a conversation with defendant wherein defendant stated that his name was Kevin Williams. (R. Vol. I A106-107) After Heffner explained why defendant was at the police station and informed him that providing false information would make matters worse, defendant gave the name Michael Threlkeld. (R. Vol. I A107) Heffner looked into the safe that was recovered from defendant's car and found photos and money. (R. Vol. I A109) Later, after receiving a phone call from the Chicago Police Department and learning of the Chicago investigation involving defendant, Heffner obtained a search warrant for the 1995 Silver Jeep. (R. Vol. I A112)

Illinois State Police Crime Scene Investigator Michael Trummel testified that on January 14, 2000, he went to Joe's towing services in Bloomington to examine and process a 1995 silver Jeep Cherokee pursuant to a search warrant. (R. Vol. I A115-116) Trummel noted that the Jeep had damage around the passenger side front headlight, fog lamp, hood area and front bumper; scratches and red paint transfers on the front driver's side bumper and red paint particles on the tow hook that was attached to the front frame of the car. (R. Vol. I A118-119) Further, the lens cover of the passenger side front headlight was broken, the headlight fixture was loose, there were pieces of glass over the headlight and it appeared as though some of the glass was missing. (R. Vol. I A120) Trummel verified that the Vehicle Identification Number (VIN) on the search warrant matched the VIN on the Jeep. (R. Vol. I A117) Trummel collected nineteen exhibits from the car, including exhibits from the front passenger side area, the headlight assembly, the passenger side fog light, the front passenger side bumper and paint samples from the under carriage. (R. Vol. I A117-118) Based on his experience, Trummel believed that the car had been involved in an accident and that the red paint transfer on the driver's side was consistent with someone striking a red car that had it's door

14

open and consistent with someone striking the rear of another red car. (R. Vol. I A125-127)

Chicago Police Sergeant Charles Williams testified that on January 13, 2000, he and Detective Fraizer picked up defendant in Bloomington, Illinois. (R. Vol. I A129) Williams noted that defendant had two tattoos, one that said "Asha" and another that said "mom did not raise no fool." (R. Vol. I A130)

It was stipulated that Illinois State Police Forensic Scientist Ellen Connolly qualified as an expert in the field of trace analysis and that she found that some of the fragments of the possible light cover fit together to form a portion of a single larger item. (R. Vol. II C2-3) Further, she compared the eleven plastic fragments recovered from the scene to defendant's passenger side headlight and turning light assembly and it was her expert opinion that some of the colorless fragments of plastic recovered from the scene physically matched the broken light cover on defendant's Jeep. (R. Vol. II C3-4) Additionally, she determined that the four mirrored gray plastic fragments recovered from the scene fit together to form a portion of single item, which may be a reflector. (R. Vol. II C3) Also, she observed that there was a broken lose reflector ball assembly on defendant's passenger side front fog lamp, that part of the reflector was broken and that pieces of the reflector were missing. (R. Vol. II C3) Further, the reflector fragments recovered from the scene matched the dressing reflector housing of the fog light on defendant's vehicle. (R. Vol. II C3-4) Moreover, while the four red plastic fragments recovered from the scene formed a possible light cover, that light cover did not match defendant's car. (R. Vol. II C4) Additionally, there were red paint chips on defendant's front bumper that were not analyzed. (R. Vol. II C4)

Assistant Medical Examiner Dr. Rexene Worrell testified as an expert in the field of forensic pathology. (R. Vol. I A77-78) On Jan. 13, 2000, Dr. Worrell performed a post mortem exam

15

on the victim and the external exam revealed abrasions on the victim's forehead, upper back, mid back, right back, right elbow, knee, buttock and penis; small lacerations on his right arm and left elbow and a bruise on his groin. (R. Vol. I A79) The internal exam revealed that the victim's cervical spine (neck) was fractured in several places, that his head was dislocated, that he had blood in the peritoneal cavity, that he had hemorrhages in the fat surrounding the intestines and that he had a hemorrhage around the pelvis. (R. Vol. I A80) The victim died as a result of multiple injuries resulting from being struck by an automobile. (R. Vol. I A80)

Defendant's motion for directed finding was denied. (R. Vol. II C5-7) Terrence Coleman, a convicted felon who was on probation for Delivery of a Controlled Substance and who had previously been convicted of Intimidating a Witness, testified that in January of 2000, he lived with defendant and Ahmad Kendall at 5451 S. Cornell. (R. Vol. II C18-19, C29) Coleman testified that he knew defendant and Asha for nine years; that defendant and Asha were a couple for six and a half years and that during their relationship, there were about four to five break ups that each ended with a reconciliation. (R. Vol. II C19-20) Coleman testified that he never knew defendant to cause harm to Asha or any other person, that defendant never dated other woman and that Asha never dated other men. (R. Vol. II C20-21)

Coleman testified that on January 2, 2000, at approximately 2:00 am, he was with defendant and Kendall at Stony Subs Restaurant and they saw Asha. (R. Vol. II C21-22) At that time, defendant and Asha were split up and there was an order of protection against defendant prohibiting him from seeing her. (R. Vol. II C22) Coleman testified that after they arrived, defendant and Asha spoke for a minute and he heard them agree to go out on a date, however they did not make specific plans. (R. Vol. II C22)

16

Coleman testified that on January 12, 2000, at about 6:30 pm, he was in his apartment with defendant and Kendall. (R. Vol. II C23) Coleman testified that he had a conversation with defendant and learned that defendant was going out with Asha that evening to get something to eat and to go to a movie. (R. Vol. II C24) Coleman testified that defendant was in good spirits because he was looking forward to seeing Asha and because they were reconciling. (R. Vol. II C29) At about 9:00 p.m., defendant left the apartment, which was about five minutes from the YMCA where Asha worked. (R. Vol. II C24)

Coleman testified that people knew about defendant and Asha's problems because they talked about them. (R. Vol. II C25) A lot of times, defendant and Asha fought about "jealousies" and whether or not they were seeing other people and these fights made each of them upset and angry. (R. Vol. II C26) Defendant and Asha also accused each other of seeing other people, which caused them both to get really upset. (R. Vol. II C26) Coleman testified that although Asha talked to him about defendant, he was not aware that defendant slashed her tires, broke out her rear view mirror, broke off her windshield wiper or used a gun to take back a ring and a coat. (R. Vol. II C27)

Ahmand Kendall, a convicted felon, testified that in January of 2000, he lived with defendant, that no one else lived with them and that Terrence Coleman just came in and out. (R. Vol. II C34, 48) Kendall testified that he has known Asha for as long as he has known defendant and that he has seen them break up and get back together many times. (R. Vol. II C35) Kendall testified that on January 2, 2000, he was at Stony Subs with defendant and Coleman and they saw Asha and her friend. (R. Vol. II C35) Defendant and Asha talked and they made plans to go see a movie and get something to eat. (R. Vol. II C36-37) Kendall knew that there was a restraining order against defendant at that time, but during that restraining order, defendant and Asha still talked. (R. Vol. II

17

C36-37) On January 12, 2000, at about 6:30 p.m., Kendall and Coleman were at Kendall's apartment when defendant arrived, having just gotten off work. (R. Vol. II C37) Kendall testified that when defendant got home, he was ecstatic and was telling them that he was going out with Asha. (R. Vol. II C37) According to Kendall, defendant left about 8:30-9:00 p.m. and went to Asha's work. (R. Vol. II C38)

Kendall testified that defendant drives fast and erratic and that he would describe defendant's driving skills as poor. (R. Vol. II C38) Kendall testified that he has never known defendant to harm Asha or anyone else. (R. Vol. II C38) Kendall knew that Asha had brought charges against defendant, but did not know the details of the incidents. (R. Vol. II C39) Kendall knew that defendant gave Asha a diamond ring and a leather coat; that he forcefully took them away from her; that as a result of that incident, she obtained a restraining order against him and that he was forced to give those items back to her, however Kendall did not know that defendant had pulled a gun on Asha when he took the items back. (R. Vol. II C39, C42, C43) Kendall did not know that defendant slashed Asha's tires, that defendant approached her at work with a baseball bat or that he damaged her car. (R. Vol. II C42) Kendall never knew defendant to go out with other women or Asha to go out with other men. (R. Vol. II C40) Kendall testified that when defendant and Asha would break up, defendant would take it badly and would want her back the next day. (R. Vol. II C50)

Defendant's cousin, Jasmine Carter testified that she had been friends with Asha for about eight or nine years, that she knew defendant and Asha had a relationship and that she knew they broke up and got back together all the time. (R. Vol. II C55-56) Carter testified that Asha confided in her all the time and at no time did Asha ever tell her that she went out with another man. (R. Vol. II C57) According to Carter, defendant never went out with any other girls and neither defendant nor Asha

18

ever accused each other of going out with other people. (R. Vol. II C57) Carter testified that Asha confided in her about a male friend at work and that Carter then told defendant about this. (R. Vol. II C58) Carter testified that on January 12, 2000, she called defendant on his cell phone and asked him to take her to the movies, but he said that he couldn't because he was going to the movies with Asha. (R. Vol. II C62-64)

Carter was aware that Asha had an order of protection against defendant and that Asha had brought charges against defendant on previous occasions. (R. Vol. II C59-60) Carter testified that both defendant and Asha told her that in June of 1999, defendant busted out Asha's front windshield; that in November and December of 1999, defendant vandalized Asha's car; that defendant slashed Asha's tires and that defendant pulled a gun on Asha and demanded that she return a coat and a ring. (R. Vol. II C66-67) Carter testified that defendant did not tell her that he went to Asha's work with a baseball bat to damage her car. (R. Vol. II C67) According to Carter, defendant is a terrible driver, can never keep the car straight and has a hard time controlling the car. (R. Vol. II C61)

Defendant testified that on January 12, 2000, he was 20 years old, was living at 5451 S. Cornell and had been dating Asha for 6½ -7 years. (R. Vol. II D3) Defendant testified that he and Asha fought a lot while they were dating, but they never fought about either of them seeing anyone else. (R. Vol. II D10) Defendant testified that there was no reason for him to be jealous of Asha because she was not seeing anyone else. (R. Vol. II D34) Defendant testified that he and Asha broke up many times, but each time they got back together. (R. Vol. II D4)

Defendant testified that Asha brought criminal charges against him many times, but since she never went to court, the cases were dropped. (R. Vol. II D4) Defendant admitted that he caused property damage to some of Asha's things, but he could not remember how many times and he denied

19

ever physically hitting her. (R. Vol. II D4-5) Defendant testified that he broke out the front windshield of Asha's car with a brick and while he couldn't remember why he did it, he did remember that he was angry when he did it. (R. Vol. II D35-36) Defendant testified that in November of 1999, he broke the side mirror and windshield wiper on Asha's car because he was angry with her. (R. Vol. II D38) Defendant testified that he did not remember what he was angry about. (R. Vol. II D39) Defendant testified that in December of 1999, he slashed the tires on Asha's car while it was parked outside of her work because he was mad. (R. Vol. II D39-40)

Defendant testified that when he and Asha broke up, he wanted the diamond ring and leather coat that he had given her back, but she did not want to return them. (R. Vol. II D5) Defendant admitted that when Asha would not return the coat and the ring, he got very upset and forcibly took them back, while armed with a weapon. (R. Vol. II D5-7) Defendant claimed that the weapon was a BB gun, and that he did not point the gun at her, threaten her with the gun or hit her with the gun. (R. Vol. II D7) After defendant forcibly took the leather coat and ring back, Asha obtained an order of protection against defendant. (R. Vol. II D7) Defendant testified that Asha had never obtained an order of protection against him in the past and when he and Asha broke up they stayed in contact, would call each other and would pass on information thru his cousin Jasmine Carter. (R. Vol. II D8) Defendant testified that thru all of these problems he was in love with Asha, that he still is in love with her, that they both intended to get married and that they have each others names tattooed on their chests. (R. Vol. II D9) According to defendant, all of their fights were just "little stupid things" and they never had any fights about her going out with another guy. (R. Vol. II D10)

On direct examination, defendant testified that on January 2, 2000, at about 4:00 a.m., he met Asha at Stony Subs and they made a date to go to dinner and a movie on January 12, 2000. (R.

20

Vol. II D11)  On cross-examination, defendant testified that when they saw each other at the sub shop, they just agreed to go out and that they did not set up a date until the next morning when they talked again.  (R. Vol. II D47-48)  Defendant testified that on January 12, 2000, Asha was going to meet him in front of her house when she got off work between 9:00 and 9:30 p.m.  (R. Vol. II D50)  Defendant wanted to take her to the Ford City Olive Garden to eat and then to the theater to see the movie "Next Friday."  (R. Vol. II D11)  On January 12, 2000, defendant got home from work about 6:30 p.m.  (R. Vol. II D12)  At that time, defendant lived at 5451 S. Cornell with Mike Nis and Terrence Coleman. (R. Vol. II D12)  Defendant testified that when he got home he was happy and excited, that he prepared for his date and that he did not drink, eat or smoke anything.  (R. Vol. II D13)

Defendant testified that although he never had a driver's license, he was driving under a revoked license, was uninsured and did not have registration on the car, he did have the orange tag on the car.  (R. Vol. II D15-16)  Defendant testified that he had received numerous tickets and had been in numerous accidents.  (R. Vol. II D16)  Specifically, defendant testified that he ran into Wyler's Children's Hospital wall, hit four parked cars, hit a CTA bus driver, hit a car and knocked off the "so I can see mirror", hit fireplugs and hit light poles.  (R. Vol. II D16-17)  Nevertheless, defendant testified that he left his house at about 9:15 p.m., got gas, drove to Asha's job and arrived there at about 9:30 p.m.  (R. Vol. II D14-15)  Defendant testified that even though he and Asha agreed to meet at her house, he went to her job instead and saw her sitting in a parked car.  (R. Vol. II D51)

Defendant testified that although he did not know any of Asha's friends at work, she did speak of a male friend.  (R. Vol. II D14)  Defendant testified that he never saw this male friend and that he did not feel threatened by him or jealous of him.  (R. Vol. II D14)  Defendant testified that when he arrived at the YMCA he saw Asha on the east side of the street, facing northbound in her

21

A- 96

vehicle. (R. Vol. II D19)  Defendant testified that he pulled alongside of her, rolled down his window and told her that the movie started at 10:30 p.m.  (R. Vol. II D19)  Defendant testified that he was using a normal tone of voice, that his window was down and that Asha could not hear him because her window was up. (R. Vol. II D20)  Defendant testified that Asha did not roll down her window and did not say anything, but that she did hold up her finger and defendant thought that she meant for him to follow her.  (R. Vol. II D19-20)  Defendant testified that he never had a conversation with Asha, that he only sat there for 15-20 seconds, that there was traffic in both directions and that he never uttered the words "I'll be back." (R. Vol. II D21)

Defendant testified that he drove up a few feet, accelerated, tried to dip a little to the right, made a left, sped up, "swooped around" and tried to make a u-turn. (R. Vol. II D23)  Defendant admitted that when he sped up, he noticed that the door was open and that he had hit someone.  (R. Vol. II D23)  Defendant testified that he did not know the person that he hit, that he never saw him before, that he couldn't recall seeing him in Asha's car because he was not paying attention, that he did not see him at any time on the street before he hit him and that the first time he noticed him was when the car door opened.  (R. Vol. II D25-26)  Defendant testified that he did not mean to hit the victim, that it was an accident and that he did not see where the victim went after he hit him. (R. Vol. II D25-27)  Defendant testified that he that he got scared because he knew that he had a revoked drivers license and just hit someone, so he fled the scene and drove home to his mother's house at 5307 S. Hyde Park Blvd.  (R. Vol. II D25-27)  At his mother's house, defendant called a friend named Ronald, told him that he hit someone and told him to go to the scene so he could tell defendant what was going on.  (R. Vol. II D27)  Defendant then had two drinks and called Asha on her cell phone. (R. Vol. II D27)  Defendant did not speak to Asha when he called her, instead, he spoke to a police officer who

<div style="text-align: center">22</div>

A- 97

told him that he needed to turn himself in because he hit someone. (R. Vol. II D27-28) Defendant testified that he told the police officer that he would turn himself in, that he was sorry and that it was an accident. (R. Vol. II D28)

Defendant testified that Ronald called him and told him that he needed to turn himself in. (R. Vol. II D29) Defendant testified that he never spoke to Asha, any of his roommates, or his mother that evening. (R. Vol. II D29) Defendant testified that about 30 minutes after he got to his mother's house, the police officer he previously spoke to called him and told him that the guy he hit was dead. (R. Vol. II D30) Defendant testified that he got scared, got his safe and fled. (R. Vol. II D30) Defendant testified that he needed to get a lawyer because his driver's license was revoked, so he took his safe, entered I-55 and kept driving. (R. Vol. II D30-31) Defendant testified that as he was driving, he was thinking that he had just hit someone and that he needed to turn himself in, but he knew that he needed to do it the right way and get a lawyer. (R. Vol. II D31) Defendant testified that eventually he was stopped by a state trooper gave his brother's name, Kevin Williams and said that he was going to Champaign. (R. Vol. II D31) Defendant testified that he now realizes that I-55 is the wrong way to Champaign. (R. Vol. II D32)

In rebuttal, the State entered a certified copy of conviction for defendant which showed that defendant was convicted of Delivery of a Controlled Substance in June of 1988. (R. Vol. II D70) Sergeant Williams testified that on January 14, 2000 at about 12:31 am, he interviewed defendant and defendant told him that he was drunk on Jan 13, 2000, that he had an accident; that he hit a red car, that he had consumed a pint of Seagrams gin and that he just happened to be driving in the area of 67th and Stony Island when he saw Asha in her car. (R. Vol. II D71)

After hearing closing arguments, the trial court found defendant guilty of first degree

23

murder. (R. Vol. II D77-114) On May 2, 2001, defendant's post trial motion was denied. (R. Vol. II D16) After hearing aggravation and mitigation, the trial court sentenced defendant to thirty five years in the Illinois Department of Corrections. (R. Vol. III F38)

## ARGUMENT

### I.

### THE TRIAL COURT PROPERLY EXERCISED ITS DISCRETION WHEN IT PERMITTED THE STATE TO INTRODUCE EVIDENCE OF OTHER CRIMES WHERE THAT EVIDENCE SHOWED DEFENDANT'S INTENT, MOTIVE AND ABSENCE OF INNOCENT FRAME OF MIND.

Defendant contends that the trial court abused its discretion in admitting the evidence of the defendant's prior bad acts and that the error substantially prejudiced his right to a fair trial. (Deft. Br. 6)  The record reveals that the trial court properly exercised its discretion when it permitted the State to introduce evidence of other crimes where that evidence showed defendant's intent, motive and the absence of an innocent frame of mind.

Illinois has adopted a broad standard for determining whether to accept evidence of other uncharged crimes. People v. Lee, 151 Ill.App.3d 510, 520, 502 N. E.2d 399 (1st Dist. 1986).  Such evidence is admissible if it is relevant for any purpose other than showing a defendant's propensity to commit crime. People v. McKibbins, 96 Ill.2d 176, 184, 449 N.E.2d 821, cert. denied, 464 U.S. 844, 78 L. Ed. 2d, 104 S. Ct. 145 (1983); Lee, 151 Ill.App.3d at 520; People v. Bedoya, 325 Ill.App.3d 926, 937, 758 N.E.2d 366 (1st Dist. 2001).  "Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence in the case more probable or less probable than it would be without the evidence." People v. Eastland, 257 Ill.App.3d 394, 627 N.E.2d 1006 (1993); People v. Jones, 328 Ill.App.3d 233, 238, 764 N.E.2d 1232 (1st Dist. 2002).  Relevant purposes for admitting other crimes evidence include showing modus operandi, motive, knowledge, absence of mistake, criminal intent, state of mind, circumstances of defendant's arrest, or a common scheme or design. Lee, 151 Ill.App.3d at 520; People v. Kimbrough, 138 Ill.App.3d 481, 485 N.E.2d 1292

25

(1st Dist. 1985).

The mental state with which an act is committed may be inferred from the act itself and the surrounding circumstances. People v. Patterson, 314 Ill. App. 3d 962, 969, 734 N.E.2d 462 (2000). The trier of fact makes the factual determination regarding a defendant's mental state, and that determination will not be disturbed on review unless the evidence is so improbable that a reasonable doubt about defendant's guilt is raised. Id. at 969. Evidence, which shows that an event was not caused by accident, tends to show that it was caused intentionally. People v. Illgen, 145 Ill. 2d 353, 366, 583 N.E.2d 515 (1991)(evidence of defendant's prior unprovoked assaults on the victim tended to negate the likelihood that the shooting was an accident and thereby tended to prove his intent). The more often a person acts in a particular way and achieves a particular result, the more likely it is that he intended the result. Id; citing, Commonwealth v. Donahue, 519 Pa. 532, 549 A.2d 121 (1988)(while a single incident may occur without intentional conduct on the part of the defendant, as the number of incidents grows, the likelihood that the defendant's conduct was unintentional decreases).

Here, defendant was charged with murdering the victim, who was his ex-girlfriend's friend from work. (C. R. 17-19; R. Vol. I A21, A27-28) At trial, defendant's presented the defense of accident. The record reveals that immediately before the murder, defendant pulled up to Asha's car; attempted to have a conversation with her; got upset and agitated; stated that he'd be back and then drove to the corner, where he waited until the victim exited Asha's car. (R. Vol. I A59-62, B14-16, B23) The record further reveals that as soon as the victim exited Asha's car, defendant made a U-turn, accelerated, hit the victim, kept going and fled the jurisdiction. (R. Vol. I A61-63, B14-16; R. Vol. II D26-27, 30-32)

26

The State introduced five incidents of other crimes. The first incident showed that in June of 1999, defendant "busted" Asha's front windshield and side window on her vehicle. (R. Vol. I A21)  In the second incident, which was about five months later, defendant broke Asha's windshield wiper and side mirror on her vehicle. (R. Vol. I A21)  In the third incident, which was in December of 1999, defendant slashed the tires on Asha's vehicle while she was at work. (R. Vol. I A22-23)  In the fourth incident, also in December of 1999, Asha was driving an older lady home from the YMCA when defendant, while armed with a bat, came up to her car and began talking to her. (R. Vol. I A23-24)  Asha did not get out of her car, so defendant cracked her rear light with the bat. (R. Vol. I A24-25)  In the fifth incident, Asha was coming home at about 4:00 a.m., and while she was driving down her alley, she saw defendant driving a van in her direction. (R. Vol. I A24)  Asha reversed down the alley in an attempt to get away from defendant, but she crashed into a gate. (R. Vol. I A24)  After Asha got out of her car, defendant got out of his car, approached her with a gun and demanded that she return a coat and a ring that he had given her. (R. Vol. I A24-25)  Asha grabbed the gun, they "tussled" over the gun and the gun fell. (R. Vol. I A25)  Defendant ran for the gun and then caught up to Asha, who then gave defendant the coat and ring. (R. Vol. I A25-26)  After this fifth incident, Asha obtained an order of protection against defendant. (R. Vol. I A25)  Defendant admitted that the reason he did all of these things was because he was angry or upset with Asha. (R. Vol. I A21-25; R. Vol. II D6, D35, D38, D39, D43)

It is clear that the trial court did not abuse its discretion in admitting the evidence of other crimes since that evidence was probative of defendant's motive and intent and clearly showed that defendant did not have an innocent state of mind. The other crimes evidence showed that when defendant was upset or angry with Asha, he intentionally acted out in a violent manner. (R. Vol. I

27

A21, A22, A24; R. Vol. II D6, D35, D38, D39, D40, D43)  The evidence at trial and its reasonable inferences showed that defendant, who wanted to go out with Asha on the evening of the murder, saw her in the presence of the victim; became angry and upset; stated that he'd be back; drove off; waited until the victim exited Asha's car; made a U-turn; accelerated; drove directly at the victim and hit him without swerving, slowing down or stopping,  (R. Vol. I A28, A31, A61-62, A65, A69, A74) Clearly, the evidence of defendant's prior unprovoked crimes against Asha suggest that when he hit the victim with his car, he was acting deliberately and intentionally.  Further, the evidence of defendant's prior crimes, taken together with the other evidence in the case, tended to make it more probable that defendant acted with the criminal intent required for murder and less probable that his actions were inadvertent or the product of an innocent state of mind.  See, People v. Herdia, 193 Ill. App. 3d 1073, 1086, 550 N.E.2d 1023 (1st Dist. 1989)(evidence of prior violence towards the victim was relevant to a determination of whether her death was more likely the result of an accident or violence).

In addition to evidencing intent or the absence of an innocent state of mind, defendant's prior crimes provide evidence of motive.  Here, the prior crimes tended to establish defendant's hostility and animosity toward Asha, his tendency to take out his frustrations upon her when they were broken up and the nature of their relationship. (R. Vol. I A21, A22, A24; R. Vol. II D6, D35, D38-40, D43); See, Illegen, 145 Ill. 2d at 367 (evidence of defendant's prior assaults upon his wife throughout their marriage was relevant to show their antagonistic relationship and, thus tended to establish the defendant's motive); People v. Heard, 187 Ill. 2d 36, 59, 718 N.E.2d 58 (1999)(evidence of other crimes admissible to prove the defendant's motive and intent to commit murder because they revealed the defendant's continuing hostility and animosity toward his ex-

28

girlfriend and her new boyfriend); Herrdia, 193 Ill. App. 3d at 1086 (evidence of other crimes properly admitted since they shed light on the nature of the relationship between the defendant and one of the victims).

Further, the other crimes evidence shows how the events, which occurred on January 12, 2000, were based on a series of events that escalated and cumulated in the victim's murder. (R. Vol. I A21, A22, A24; R. Vol. II D6, D35, D38-40, D43) The other crimes evidence illustrates that there was a history of inappropriate criminal acts between defendant and Asha and how those criminal acts escalated in violence. In the first few instances, defendant committed property damage to Asha's vehicle while she was not present, then defendant committed property damage to Asha's vehicle while she was present and then defendant committed a violent felony against Asha, while armed with a handgun. (R. Vol. I A21-22, A24-27) The evidence in the instant case showed how defendant again continued on in his escalation of violence. Here, the evidence and its reasonable inferences prove that defendant saw Asha in the presence of another man; that he unsuccessfully tried to have a conversation with her; that he became agitated and upset; that he loudly said that he would be back; that he drove off; that he waited at the corner until the victim exited Asha's car and that he made a U-turn, accelerated and hit the victim. (R. Vol. I A27-35) While Asha was not the actual victim in the instant case, she was with the victim immediately before his death and she clearly was the reason why defendant became angry and upset. Thus, since the evidence showed that the events, which occurred on January 12, 2000 were based on a series of events which escalated and cumulated in the victim's death, the evidence was relevant for a purpose other than to show defendant's propensity to commit crime.

Further, it is clear from the record that the State did not introduce the evidence of other

29

crimes simply to show that defendant had a propensity to commit crime. Here, defendant had a substantial criminal history including at least twenty arrests, one misdemeanor conviction and two felony convictions. (R. C. 60-62) The State did not seek to introduce any of the crimes that did not pertain to Asha and their relationship. Instead, the State sought only to introduce evidence of other crimes that showed that when defendant got upset with Asha, he purposefully and intentionally acted out. Therefore, it is clear that the State did not seek to introduce the evidence of other crimes solely to show propensity.

Moreover, in its ruling, the trial court made clear that it admitted the other crimes evidence for a purpose other than propensity. In admitting the other crimes evidence, the trial court stated:

> [This] Court finds that what the government is seeking is other crimes evidence, is in the nature of trying to put into context an ongoing relationship between [defendant] and a woman that was present in the company of the deceased who was the male right before he was killed.
>
> I find that from what I'm being told by the parties that everything about the relationship between this woman and [defendant] is of extreme relevance and extreme importance. I find that its probative value, if true, would by far outweigh the prejudicial value. It is the only way to put in context, at least through the government's theory what [defendant] was doing that night.

(Supp. R 16)

In conclusion, the evidence of other crimes, when considered with all of the other evidence in this case, could provide the basis for an inference that defendant had the criminal intent required for murder and that he did not have an innocent state of mind. Thus, the evidence was relevant for a purpose other than to show defendant's propensity to commit crime. Consequently, the trial court did not abuse its discretion in allowing such evidence.

<div align="center">30</div>

Evidence of another crime may be used only when the other crime has some threshold similarity to the crime charged. People v. Bartall, 98 Ill. 2d 294, 310, 456 N.E.2d 59 (1983). It is this similarity, which increases the relevance of the evidence and ensures that it is not being used solely to establish the defendant's criminal propensities. Id. However, the same degree of identity of the two offenses is not necessary when evidence of defendant's involvement in another offense is offered to prove the absence of an innocent frame of mind or the presence of criminal intent. McKibbins, 96 Ill. 2d at 185-6. In such a case, mere general areas of similarity will suffice. Id. If these general similarities are shown, evidence of the defendant's involvement in another offense may be shown to establish the necessary criminal intent of the defendant in the crime charged. Id. The test is not one of exact, rigorous identity, and some dissimilarity will always exist between independent crimes. People v. Robinson, 167 Ill. 2d 53, 65, 656 N.E.2d 1090 (1995).

The principle issue in this case was whether defendant possessed the mental state required for murder or whether his actions were accidental. Since the trial court ruled that the State could use the evidence of other crimes to show intent, mere general areas of similarity will suffice. Id; See also, McKibbins, 96 Ill. 2d at 185-6. In the instant case, there were a number of general similarities between the prior crimes and the crime charged. The first area of similarity is that all of the prior crimes and the instant crime involve defendant's ex-girlfriend, Asha. (R. Vol. I A21, A22, A24, A43, A31) Next, in all of the prior crimes and in the instant crime, defendant was either mad or upset at Asha. (R. Vol. I A21, A22, A24, A60, A64; R. Vol. II D35, D38, D40, D43) Further, in all of the prior crimes and in the instant crime, there was evidence that the reason defendant was angry was because Asha either would not talk to him or do what he wanted. (R. Vol. I A22, A24, A30-31, A60, A62, A64; R. Vol. II D20-21, D43) In the first three incidents, defendant admitted to Asha that he

31

committed those crimes because he was angry that she would not talk to him. (R. Vol. I 22)  In the fourth incident, Asha testified that while defendant was standing outside her car talking to her, she stayed inside the car and could not hear him so at some point he broke out her back light with a baseball bat. (R. Vol. I 23-24)  A reasonable inference from this evidence is that defendant got angry when Asha would not talk to him.  See, People v. Brishon, 106 Ill. 2d 342, 478 N.E.2d 402 (1985)(the reasonable inferences to be drawn from the evidence are the responsibility of the trier of fact).   In the fifth incident, the victim refused to give defendant back the coat and ring that he had given her and he became angry and took the property back at gunpoint. (R. Vol. I 25, II 43-45)  In the victim's murder, the evidence revealed that on January 12, 2000, defendant wanted to go to dinner and the movies with Asha and that he was "ecstatic" about going out with her, but when he pulled up to her car, she did not speak to him.  (R. Vol. I A31, R. Vol. II C37, D20)  The evidence also revealed that defendant became upset and agitated and stated that he would be back. (R. Vol. I A60-61, A74) Therefore, since in both the prior crimes and the instant case, defendant was either mad or upset at Asha for not talking to him or doing what he wanted, it is clear that there are general areas of similarity between the prior crimes and the crime for which defendant was tried.

Additionally, all of the other crimes that were admitted were close in time to the charged offense.  As a general rule, other offenses, which are close in time to the charged offense, will have more probative value than those, which are remote.  Illegen, 145 Ill. 2d at 370.  Here, all of the prior crimes occurred within the six months preceding the murder, therefore they were all close in time to the crime charged and thus were probative.

Once the trial court determines that the other crimes evidence is relevant to show that defendant in fact committed the crime charged, it must then conduct a balancing test by weighing

the probative value of that evidence against its prejudicial effect. Heard, 187 Ill.2d at 58; Placek, 184 Ill. 2d at 385. The more relevant a certain piece of evidence is to prove a point, the less ability it has to lure the fact finder into using it to assign guilt on an improper basis. Bedoya, 325 Ill.App.3d at 940. Whether the danger of unfair prejudice outweighs the probative value of other crimes evidence is a determination that rests within the sound discretion of the trial court. Illgean, 145 Ill.2d at 375; Robinson, 167 Ill.2d at 63; Placek, 184 Ill. 2d at 385. Although reasonable minds may differ as to the weight of relevancy versus prejudice, the trial court's determination shall not be reversed absent a clear abuse of that discretion. Illegan, 145 Ill.2d at 375. Such an abuse of discretion will be found only where the trial court's decision is "'arbitrary, fanciful or unreasonable'" or "'where no reasonable man would take the view adopted by the trial court.'" Illgen, 145 Ill. 2d at 365, quoting Peek v. United States, 321 F.2d 934, 942 (9th Cir. 1963). Although the danger in admitting evidence of other crimes is that the trier of fact might infer the accused is prone to commit crime, it is presumed that an experienced judge is less susceptible to being misled by the undesirable facet of such evidence than a jury would be. People v. Teffertiller, 158 Ill. App. 3d 72, 75, 510 N.E.2d 1322 (5th Dist. 1987); People v. Robinson, 30 Ill. 2d 437, 439, 197 N.E.2d 45, 47 (1964)(the trial court is presumed to have considered only admissible evidence and to have discarded inadmissible evidence in reaching his conclusion). When a defendant is tried in a bench trial rather than a jury trial, it is presumed that the judge considered only admissible evidence in reaching his conclusion, and the defendant seeking reversal bears the burden of showing on appeal that the improper evidence influenced the court. People v. Medina, 238 Ill. App. 3d 871, 880, 607 N.E 2d. 619 (2nd Dist. 1993).

Here, defendant was tried in a bench trial before an experienced judge and he has made no showing that the trial judge considered the other crimes evidence for any improper purpose. Therefore, since defendant has not met his burden of showing that the trial judge improperly considered the other crimes evidence, there was no abuse of discretion.

Nevertheless, the trial court did not abuse its discretion in admitting the evidence of other crimes since the probative value of the evidence clearly outweighed any prejudicial effect. As argued above, the probative value of this evidence was great. Further, since this was a bench trial, any prejudicial effect was minimized. Moreover, the method by which the State presented the other crimes evidence minimized any prejudice to defendant. Here, the only information about the prior crimes that was adduced was that which was necessary to "illuminate the issue for which the other crime[s] w[ere] introduced." See, People v. Nuley, 271 Ill. App. 3d 427, 432, 648 N.E.2d 1015 (1st Dist. 1995). The evidence of other crimes was not the focal point of the trial, in fact, the only witness the State called to testify as to the other crimes was Asha and the State did not go into great detail in questioning her about the prior incidents. The State did not call any additional witnesses to corroborate her testimony and did not submit any photographs or physical evidence to support her testimony. Therefore, the manner in which the State elicited the prior crimes information minimized any prejudice to defendant. Consequently, since the probative value of the evidence outweighed any prejudicial effect, the trial court did not abuse its discretion in admitting the other crimes evidence in this case.

Defendant argues that the prejudicial effect of the other crimes evidence substantially outweighed any probative value. (Deft. Br. 16-17) Defendant's entire argument is distinguishable since all of the authority he cites refers to jury trials. All of the cases cited by defendant are cases

34

where the defendants were tried before a jury, not a judge and defendant cites to the Illinois Pattern Jury instruction.    (Deft. Br. 16-17)    In making his argument that defendant was prejudiced, defendant fails to address the law that states that a trial court is presumed to only consider other crimes evidence for its lawful purpose. See, People v. Medina, 238 Ill. App. 3d 871, 880, 607 N.E 2d. 619 (2nd Dist. 1993).    Therefore, since the instant case was a bench trial, defendant's entire argument is distinguishable.

Nevertheless, if this Court were to hold that the trial court abused its discretion in admitting the evidence of other crimes, then any error that occurred was harmless.  First, this was a bench trial, not a jury trial and the court had ample evidence from which to find defendant guilty. See, People v. Brown, 199 Ill. App. 3d 860, 879, 557 N.E.2d 611 (1st Dist. 1990) )(the improper reception of other crimes evidence in a bench trial was not so prejudicial that the defendant's conviction should be reversed); People v. Moorehead, 45 Ill. 2d 326, 332, 259 N.E.2d 8 (1970)(it is not the policy of the court to reverse a conviction merely because error was committed unless it appears that real justice had been denied or that the finding of guilty may have resulted from such error).   Where the evidence of guilt is overwhelming, any error in admitting evidence of other crimes committed by a defendant is harmless beyond a reasonable doubt. People v. Parker, 192 Ill. App. 3d 779, 787, 549 N.E.2d 626 (1st Dist. 1989); People v. Teffertiller, 158 Ill. App. 3d 72, 510 N.E.2d 1322 (5th Dist. 1987); In re I. E., 119 Ill. App. 3d 406, 456 N.E.2d 646 (2nd Dist. 1983).

Here, the evidence of defendant's guilt was overwhelming.  The evidence proved that on January 12, 2000, Asha was sitting in her vehicle in front of the YMCA with the victim in her passenger seat when defendant drove up and stopped next to her car. (R. Vol. I A28-29) On that evening, there was an order of protection in effect which prohibited defendant from having contact

35

with the victim and from being at her place of work. (R. Vol. I A42) Asha did not expect to see defendant outside her work that night and she did not tell him to pick her up. (R. Vol. I A53) When defendant pulled up, he said something to Asha and looked into the car. (R. Vol. I A31, A47) Asha did not say anything in return, instead she put up her finger, "like one minute." (R. Vol. I A31, A47; R. Vol. II D20-21) Michelle Slater, a dental assistant who did not know defendant, Asha or the victim was waiting for the bus when she saw defendant pull up, attempt to have a conversation with Asha and say, in a loud voice, "[o]kay, well, I'll be back." (R. Vol. I A61) According to Slater, when defendant said that he'd be back, he was upset and agitated. (R. Vol. I A74) Asha testified that this was the only time defendant ever saw her in the presence of another man and that defendant did not know about her friendship with the victim. (R. Vol. I A46, A54)

After defendant stated that he'd be back, he pulled up about five feet to the stop sign and waited there while the victim exited Asha's vehicle and she drove off. (R. Vol. I A61-62, A64-65, B21, B23) The victim was attempting to enter his car when defendant made a U-turn; accelerated until "he was going really fast;" hit the victim at "full speed" and kept going; without hesitating, stopping or slowing down. (R. Vol. I A62-63, A66, B17-19) After being hit, the victim's body flew into the air and came to rest 78 feet from where the initial impact occurred. (R. Vol. I B17, B63) Dr. Rexene Worrell, an expert in the field of forensic pathology, testified that the victim died as a result of being struck by an automobile. (R. Vol. I A80)

Even though defendant testified that his actions were accidental, the trier of fact, who was responsible for assessing the credibility of the witnesses, did not believe that testimony. In making his ruling, the trial court stated: "[defendant] knew that this act had the absolute probability of causing death or great bodily harm. He meant to strike [the victim] and kill him. He did kill him.

36

He did so knowingly, he did so by criminal means, he did so by committing the offense of first degree murder, I so find him guilty of first degree murder". (R. Vol. II D114)

Further, the evidence proved that defendant fled the scene and lied to the police. On January 12, 2000, at about 2:30 a.m., Illinois State Trooper Brian Gray was engaged in a traffic stop on I55 when a truck driver pulled beside him and told him that there was a grey jeep, with one headlight out and no registration that was slowing down and almost coming to a stop on I55. (R. Vol. I B34-35) Gray located this jeep going southbound, approached the vehicle and asked defendant for a drivers license. (R. Vol. I B36, B48) Defendant attempted to look for a license and proof of insurance, but could not find either. (R. Vol. I B36) Defendant stated several times that his name was Kevin Tevin Williams and first stated that his date of birth was April 7, 1979, but later stated that it was June 7, 1979. (R. Vol. I B36, B39, B40) Initially, defendant stated that his address was 5327 N. Lake Park ,but later said that it was 5451 Cornell. (R. Vol. I B41) Defendant also said that he was on his way to his girlfriend's house in Champaign, even though I55 was the wrong way to Champaign. (R. Vol. II B32, B67)

Gray noticed that defendant was very nervous, was shaking and smelled like alcohol. (R. Vol. I B37-38) Defendnat stated that drank a whole pint of gin and orange juice and that he threw out the bottle in Chicago. (R. Vol. I B38) Gray noticed that there was massive damage to the right quarter panel, that the tail light was broken and that there was body damage, so he asked defendant about the damage and defendant said that his uncle hit something about a month ago. (R. Vol. I B39-40) Gray testified that since there was no rust where the paint had chipped and since there was no dirt or debris inside the glass cavity of the headlight, it was apparent that the damage was recent. (R. Vol. I B40) Gray was unable to determine that defendant had a valid driver's license, so he

37

placed him in handcuffs and called for a tow truck. (R. Vol. I B41-42) Gray administered a breath test and the preliminary results revealed a .006, so he advised defendant that he was in violation of the zero tolerance policy since he was under the legal age for drinking. (R. Vol. I B42-43) Gray performed an inventory search of defendant's vehicle and recovered a safe that contained $2,600 and some pictures. (R. Vol. I B44)

Moreover, the damage on defendant's vehicle was consistent with the witness testimony. The vehicle that defendant was driving when he hit the victim had damage on the passenger side front end and had some red paint transfer on the front bumper and passenger side of the car. (R. Vol. I A116-119) Also, the plastic recovered from the scene physically matched defendant's vehicle. (R. Vol. II C2-4)

Additionally, defendant admitted to hitting the victim with his car. After striking the victim with his car, defendant called Asha's cell phone, spoke to Officer Ronald Gibbs and admitted that he hit the victim. (R. Vol. I A100) Asha testified that after defendant hit the victim, she received two voice mails from defendant and while she did not remember the exact words, she did remember that in the first voice mail, defendant said that he either smashed, smacked or hit the victim with the car. (R. Vol. I A55, A57) Also, defendant testified that after he fled the scene, he called his friend, Ronald and told him that he hit someone. (R. Vol. II D27)

Also, defendant's conduct before, during and after the crime clearly shows that his actions were intentional and not the result of an accident. After defendant approached Asha and the victim, looked into the car and unsuccessfully attempted to have a conversation with her, he got upset, agitated and stated that he would be back. (R. Vol. I A59-61) Defendant then drove off and waited at the end of the block for several minutes, until the victim exited the car. (R. Vol. I A61-62,

B14-16, B23)  After the victim exited the car and Asha drove off, defendant made a U-turn, accelerated, drove straight at the victim and hit him.  (R. Vol. I A61-63, B14-16)  At no time, did defendant ever slow down, swerve, hesitate or stop.  (R. Vol. I A65, B17-18)  After he hit the victim, defendant fled the scene, went home, got his safe that contained a large sum of money and then fled the county.  (R. Vol. II D26-27, D30-32)  At no time did defendant ever call the police or an ambulance.

Further, defendant's witnesses establish a motive for killing the victim.  Terrence Coleman, defendant's friend of nine years, testified that a lot of times defendant and Asha would have fights "about jealousies and whether or not each of them was seeing other people" and this "would prompt each of them to get upset and angry." (R. Vol. II 26)  Coleman also testified that when defendant and Asha fought about one of them seeing another person, both of them would get really upset. (R. Vol. II 31)  Ahmand Kendall, defendant's roommate testified that when defendant and Asha broke up, defendant took it bad and "would want her back like the next day." (R. Vol. II 50)  A reasonable inference from this evidence is that after defendant, who wanted to go out with Asha that night, saw the victim sitting in her car, he became angry and upset, thereby providing a motive for killing the victim.

Consequently, the evidence of defendant's guilt was overwhelming and any error that occurred as a result of the admission of other crimes evidence was harmless.

Defendant argues that the "[g]iven the high risk of prejudice associated with the admission of other crimes evidence and the lack of overwhelming evidence proving that the defendant's intent to commit first-degree murder, the trial's [sic] court admission of the prior bad acts evidence cannot constitute harmless error." (Deft. Br. 17)  In support of this argument,

39

defendant cites to: People v. Placek, 184 Ill. 2d 370, 388, 704 N.E.2d 393 (1998); People v. Funches, 59 Ill. App. 3d 71, 74, 375 N.E.2d 135, 137 (2nd Dist. 1998); People v. Watson, 55 Ill. App. 3d 564, 567-68, 371 N.E.2d 113, 116 (1st Dist. 1977), People v. Lindgren, 79 Ill. 2d 121, 141, 402 N.E.2d 238, 354 (1980); People v. Wydra, 265 Ill. App. 3d 597, 637 N.E.2d 741 (1st Dist. 1994); People v. Bedoya, 325 Ill. App. 3d 926, 758 N.E.2d 366 (1st Dist. 2001); People v. Lindgren, 111 Ill. App. 3d 112, 443 N.E.2d 1129 (4th Dist. 1982) and People v. Brown, 319 Ill. App. 3d 89, 745 N.E.2d 173 (4th Dist. 2001). (Deft. Br. 17-20)  All of these cases are distinguishable from the instant case, because all of the defendants in these cases were tried before a jury, not an experienced trial judge.  See, People v. Medina, 238 Ill. App. 3d 871, 880, 607 N.E 2d. 619 (2nd Dist. 1993)(it is presumed that the judge considered only admissible evidence in reaching his conclusion).  Since it is presumed that the trial judge considered the other crimes evidence for its relevant purpose and since the evidence of defendant's guilt was overwhelming, defendant's argument is without merit.

Defendant argues that "[t]he testimony of the bystanders, as well as Asha tends to support, rather than contradict the defendant's account of the incident." (Deft. Br. 20)  In making this argument, defendant completely ignores the testimony of the independent bystanders that after defendant drove away from Asha's car, he drove to the stop sign and waited for several minutes before making a U-turn. (R. Vol. I A61, B23)  The fact that defendant sat at the stop sign and waited until the victim exited Asha's car clearly supports the State's contention that defendant intentionally hit him with his car and contradicts the defendant's account of the incident.  Therefore, defendant's argument is without merit.

Defendant argues that "in a first-degree murder case, the prior acts must prove a defendant's intent to kill or cause serious bodily injury..." (Deft. Br. 9)  This is an incorrect

40

statement of the law. To prove the crime of murder, it is not necessary to show that the defendant has a specific intent to kill or do great bodily harm or that he knows with certainty that his acts will achieve those results. People v. Bartall, 98 Ill. 2d 294, 307, 456 N.E.2d 59 (1983). Rather, the necessary mental state may be inferred from evidence that defendant committed a voluntary and wilful act which has the natural tendency to cause death or great bodily harm. People v. Oaks, 169 Ill. 2d 409, 459, 662 N.E.2d 1328 (1996). Since the State need not prove that defendant intended to kill or cause serious bodily injury, it is unnecessary that the prior acts prove such intent.

Defendant also argues that "[t]he State in this case ostensibly offered the evidence of the defendant's prior actions towards Asha to prove that the defendant had the requisite intent to commit the premeditated and deliberate murder of [the victim]" and that "the relevant question was whether the prior acts proved an intent to kill or commit serious bodily injury in this case." (Deft. Br. 9)  Again, defendant confuses the mental state required for murder. Here, the State was not required to prove the "premeditated and deliberate murder" or "an intent to kill or commit serious bodily injury." Instead, the relevant question was whether the prior acts proved that defendant, in this case, committed a voluntary and wilful act, which had the natural tendency to cause death or great bodily harm. Id. Here, the State offered the other crimes to prove that defendant intentionally and voluntarily, as opposed to accidentally, drove his vehicle into the victim.    Therefore, defendant's arguments are without merit.

Defendant argues that "it was impermissible for the State to argue that simply because the defendant has a violent character or was violent on previous occasions he was more likely to have committed the crime charged." (Deft. Br. 9) Defendant misunderstands the State's argument. The State did not argue that defendant simply had a violent character, instead, the State argued that

41

defendant's previous violent reactions when he did not get his way with Asha were probative of his intent on this occasion. In fact, every time the State mentioned defendant' prior crimes in rebuttal argument, they also mentioned intent. Specifically, the State argued: "he made a series of decisions over a period of time that should scream out to you what his **intent** is, and what he does to deal with his anger, his frustration, and when he doesn't get his way. He resorts to violence." (R. Vol. II D100)(emphasis added) Further, the State argued: "[h]is weapon of choice was his car, and he's a little man in a big car who suddenly decides that this time he's going to once again act out and do something deliberate. Your Honor, the **intent** of the Defendant is so clear in the precision of what he did that night." (R. Vol. II D100)(emphasis added) Additionally, the State argued: "[a]nd he voluntarily and wilfully certainly drove that car, running down a man who he believed was involved with his girlfriend. That's **intent** and that's what happened here." (R. Vol. II D102)(emphasis added) Therefore, since the State did not argue that "because the defendant ha[d] violent character or was violent on previous occasions he was more likely to have committed the crime charged," defendant's argument is misplaced.

Defendant cites <u>People v. Lampkin</u>, 98 Ill. 2d 418, 424-25, 457 N.E.2d 50, 53-54 (1983) in support of his argument that "[p]roperty damage to a vehicle or even perceived threats of physical violence simply do not equate with the intent to commit first-degree murder." (Deft. Br. 10) <u>Lampkin</u> is clearly distinguishable from the instant case. In <u>Lampkin</u>, during the defendant's trial for murdering three white men, two of them police officers, the State introduced a statement made by the defendant almost six years prior to the incident in question where defendant, who was black, stated: "[y]ou white honky coppers are [expletive deleted] with us now, and we will get you later." <u>Id</u> at 424. The Court held that the statement was irrelevant and had no probative value because it

<div align="center">42</div>

was too general and impersonal to be reasonably characterized as being directed towards anyone in particular. Id. Further, the Court held that the prosecutor improperly highlighted the statement in closing argument by arguing that defendant had carried out his threat, improperly failed to inform the jury that the defendant's comment was made in a setting totally unrelated to the crime charged and improperly failed to inform the jury that the comment was made six years earlier to a police officer who had nothing to do with the case for which he was on trial. Id. at 425-26. Additionally, the Court noted that the prejudicial impact was great because the evidence against the defendant was entirely circumstantial and the prosecutor was describing to an all white jury an alleged threat made by a black defendant to a white policeman. Id. at 426-27. In the instant case, all of defendant's other crimes occurred within the six months preceding the murder; the trial judge was informed that all of the other crimes were directed at Asha and not the victim; none of the other crimes were general in nature, instead they were all directed at Asha and there were no racial issues in defendant's trial. Consequently, the instant case is distinguishable from Lampkin.

Defendant cites to Knick v. Commonwealth of Virginia, 15 Va. App. 103, 421 S.E.2d 479 (Ct. App. 1992) and Walker v. State, 97 P2d. 803 (2000) in support of his argument that the other crimes evidence was improperly admitted. (Deft. Br. 10, 11) Since these cases are not from Illinois, they are not precedent and should not be relied upon.

Defendant cites People v. Illegen, 145 Ill.2d 353, 583 N.E.2d 515 (1991); People v. Bedoya, 325 Ill. App. 3d 926, 938, 758 N.E.2d 366, 378 (1st Dist. 2001) and People v. Wydra, 265 Ill. App. 3d 597, 637 N.E.2d 741 (1st Dist. 1994) and concludes, that "the case law, as exemplified by [those cases,] establishes two significant guideposts for the introduction of prior bad acts in a first-degree murder trial: (1) the other crimes evidence is much more likely to be probative when the

43

prior acts were committed against the victim in the charged offense; and (2) the prior acts must prove the defendant's intent to kill or cause serious bodily injury, not just show that a defendant acted violently in conformity with his prior bad acts." (Deft. Br. 12-13)  In reaching this conclusion, defendant again confuses the mental state required for first degree murder.  While the prior bad acts may show intent to kill or to cause serious bodily injury, it is not required that they do, since intent to kill or cause serious bodily injury is not the required mental state for first degree murder. Moreover, even though, Asha was not the victim in this case, she was present with the victim immediately before his death, she was the reason that defendant was at the YMCA and she was the reason that defendant became upset.  Therefore, even though the prior acts were committed against someone other than the victim, there is clearly a link between the other crimes evidence and the victim's murder.

Further, while Illegen and Bedoya note that the fact that there is a common victim between the prior bad acts and the charged offense is a factor that may be considered in determining if the crimes were sufficiently similar so as to be probative of the defendant's intent, it is simply one factor to be considered and there are numerous cases where prior bad acts have been held to be admissible where there are no common victims between the prior bad acts and the charged offense. See: People v. Evans, 125 Ill. 2d 50, 530 N.E.2d 1360 (1988)(armed robbery, aggravated battery and rape of other victims properly admitted in defendant's murder and attempted rape trial to show defendant's intent); People v. Deenadayalu, 331 Ill. App. 3d 442, 772 N.E.2d 323 (2nd Dist. 2002)(defendant's sexual assaults of other patients properly admitted in defendant's criminal sexual abuse and battery trial as they established defendant's intent and lack of mistake); People v. Novak, 163 Ill. 2d 93, 643 N.E.2d 762 (1994)(evidence of other crimes committed against other children

44

A- 119

properly admitted in defendant's aggravated criminal sexual assault trial); People v. Brown, 199 Ill. App. 3d 860, 557 N.E.2d 611 (1st Dist. 1990)(evidence that defendant had previously caused the death of another child was properly admitted in defendant's murder trial to show intent and the absence of an accident).

Additionally, Bedoya and Wydra are distinguishable from the instant case because, even though a common victim is not required, in those cases there was absolutely no connection between the victim of the charged offense and the other crimes evidence. In Bedoya, the defendant was charged with shooting the victim at close range during a struggle. Id. at 927. The other crimes evidence showed that the defendant had widly fired his gun at random buildings from a moving car and there was no evidence that the defendant saw any people in those buildings or that he was trying to hit anyone when he fired those shots. Id. at 939. Here, there clearly is a connection between the victim and the other crimes evidence. The victim was with Asha immediately before getting killed, Asha was the reason defendant was at the YMCA that evening, Asha was the reason defendant became upset immediately before the murder and Asha was the victim in all of the incidents of other crimes. (R. Vol. I A21-25, A27, A60, A74; R. Vol. II D13) Further, a reasonable inference from the evidence is that defendant got upset when he saw Asha in the presence of the victim, another man, on a night that he so badly wanted to go out with her. Thus, in the instant case, unlike in Bedoya, there clearly was a connection between the victim of the charged offense and the other crimes evidence. Bedoya is further distinguishable because in that case, the evidence of other crimes was the focal point of the trial. In the Bedoya trial, the State presented seven witnesses and 27 exhibits to prove the other crimes evidence. Id. at 927. Here, Asha was the only witness the State presented to testify as to the other crimes evidence and there was no physical evidence

45

introduced to corroborate her testimony. (R. Vol. I A21-26)  Also, Bedoya was a jury trial, so there was a danger present that the jury would convict the defendant only because it felt that he was a bad person deserving of punishment. Bedoya, 325 Ill. App. 3d at 937.  Here, defendant was tried before an experienced trial judge who was presumed to have only considered the other crimes evidence for its relevant purpose.  Consequently, Bedoya is distinguishable from the instant case.

Also, while the court in Illegan noted that the prior bad acts were probative because they were against the victim and because the defendant had inflicted substantial bodily harm on the victim in the previous instances, those were just two of the many reasons that the court found the prior acts admissible. Illegan, 145 Ill. 2d at 373-75)  In finding that the prior bad acts had enough general similarities to the charged offense so as to be probative, the court noted that the charged shooting, like the prior assaults, occurred with little or no provocation on the part of the victim; that on at least one occasion prior to the shooting, the defendant threatened to shoot the victim with a gun; that after the shooting, as in prior instances of abuse the defendant claimed that the victim caused her own injuries and that the victim's injuries occurred while he was sleeping or sleepwalking. Id. at 373-75.

Wydra is also distinguishable from the instant case.  In Wydra, the defendant was charged with four traffic offenses and aggravated battery to a police officer. Wydra, 265 Ill. App. 3d at 598. The State introduced evidence that the defendant committed a battery against his former girlfriend's new boyfriend, that his former girlfriend's father's house had recently been set on fire and although he had been found not guilty of obscenity charges, that defendant had circulated a nude photo of his former girlfriend at her place of work. Id. at 613-14.  The Court held that there was no basis for making any connection between the prior acts and the crime for which the defendant was charged.

46

Id. In the instant case, there clearly is a connection between the prior acts and the crime for which defendant is charged. Here, in all of the other crimes, defendant acted out against Asha when they were broken up and when he was upset with her. In the crime for which defendant was charged, defendant and Asha were broken up and immediately after defendant saw he victim in Asha's car, he became upset and hit the victim with his car. (R. Vol. I A26-29, A74) Therefore, there is a basis for making a connection between the prior acts and the crime for which defendant was charged. Consequently, Wydra is distinguishable from the instant case. Wydra is further distinguishable since in that case, the defendant was tried before a jury and in the instant case, defendant was tried before an experienced trial judge, who is presumed to have considered the other crimes evidence only for a lawful purpose.

In attempting to distinguish the case of People v. Herdia, 193 Ill. App. 3d 1073, 550 N.E2d 1023 (1st Dist. 1989), a case cited by the State in its Motion to Introduce Proof of Other Crimes, defendant claims "[w]hile the [Herdia] court found the defendant's prior bad act of beating his wife was excepted from the propensity rule, the court admitted the evidence that the defendant sexually abused his child by way of stipulation, and never ruled on its admissibility." (Deft. Br. 13) Defendant then concludes "[t]hus, not inconsistent with other cases, the court admitted evidence that the defendant committed serious bodily injury to the victim but did not rule on the admissibility of the evidence of the defendant's sexual abuse of his daughter." (Deft. Br. 13) Defendant's analysis of Herdia is incorrect. While the trial court did accept a stipulation to the admission of a certified copy of defendant's conviction for taking indecent liberties with a child, there was also testimony at trial concerning defendant's sexual abuse of his daughter. Id. at 1086. Defendant himself testified as to the sexual abuse both on direct and cross-examination. Id. Further, the court

47

ruled that the evidence was properly admitted because "these family circumstances shed light on the tension between [the victim] and [the defendant] as well as [the victim's] reasons for asking him to leave the home." Id. Therefore, defendant's contention that the Herdia court admitted the evidence that the defendant sexually abused his child by way of stipulation and never ruled on its admissibility is incorrect. Further, defendant's contention that "the court admitted evidence that the defendant committed serious bodily injury to the victim" is incorrect. (Deft. Br.13) During cross-examination, the defendant denied physically abusing his wife or threatening her with a weapon. Id. at 1085. Defendant did admit that he was arrested, but did not think that the charge was for aggravated assault, instead, he believed it was for unlawful use of a weapon. Id. Defendant also testified that the charges were dropped after he spent the night in jail. Id. There was never any testimony that the defendant committed serious bodily injury to the victim, therefore, defendant's contention is incorrect.

Defendant claims that "[e]ven if marginally probative on the issues of intent or motive, the other crimes evidence was not limited by the court or prosecution to this purpose at trial." (Deft. Br. 14) This assertion is not supported by the record. In admitting the evidence of other crimes, the trial court stated:

> ...there was a history of inappropriate criminal acts, violent acts between [defendant] toward this woman. That he drove up, he saw her in the company of another man and continued his rage and took it out on the man that he saw her with and he did so intentionally because it was a continuation of his history of conduct towards her as opposed to just being a fortuitous accident, he just happened to be there at that location, this woman that he's got this history of conduct with and happens to see her with another man and just happens to drive accidentally into him and kill him.
> (Supp. R. 14)

48

The trial court further stated that:

> [the] Court finds that what the government is seeking is other crimes evidence, is in the nature of trying to put into context an ongoing relationship between [defendant] and a woman that was present in the company of the deceased who was the male right before he was killed.
>
> I find that what I'm being told by the parties that everything about the relationship between this woman and [defendant] is of extreme relevance. I find that its probative value, if true, would by far outweigh the prejudicial value. It's the only way to put in context, at least through the government's theory what [defendant] was doing that night.
>
> …I find that what has been told to me would fall clearly in the exception. This is exactly what the exception is for use of, these other crimes evidence….
>
> (Supp. R. 15-16)

Thus, it is clear the trial court limited the purpose of the other crimes evidence to intent, motive and absence of an innocent state of mind. Consequently, defendant's assertion is not supported by the record.

Defendant claims that the trial court employed "propensity logic" in finding defendant guilty. In support of his argument, defendant extracts one sentence out of the court's ruling. (Deft. Br. 15) By extracting this one sentence, defendant has taken the trial court's ruling out of context. Further reading of the trial court's ruling clearly shows that the trial court was only considering the prior misdeeds of defendant as they pertained to intent, motive and absence of an innocent state of mind. (R. Vol. III F113-114)

In making his propensity argument, defendant gives the example of his college roommate, Jon, who was notorious for eating other people's food without permission and concludes that it would be inappropriate to conclude that Jon was to blame every time food was missing, because that is employing propensity logic. (Deft. Br. 15, footnote 5)   However, if Jon were on trial for theft of



someone's food and his defense was accident, then clearly his past incidents of eating other people's food would be admissible to show that he intended to steal the food and that he did not have an innocent state of mind.

Defendant contends that "[I]t is certainly not unreasonable to assume that an unbiased trier of fact could have found the defendant's explanation of his flight credible, and not that his flight was indicative of a guilty conscience." (Deft. Br. 21)  It is irrelevant whether it is "not unreasonable to assume that an unbiased trier of fact could have found the defendant's explanation credible," since this is not the appropriate standard of review.  Reviewing courts defer to the trial court on matters of credibility of witnesses.  Determinations of the credibility of witnesses, the weight to be given to their testimony, and the reasonable inferences to be drawn from the evidence lie within the province of the trier of fact.  People v. Curtis, 296 Ill. App. 3d 991, 999, 696 N.E.2d 372 (4th Dist. 1998); People v. Oaks, 169 Ill. 2d 409, 457, 662 N.E.2d 1328 (1996).  The trier of fact is in a better position to assess witness credibility because it may observe the witness's demeanor and consider any conflicts or inconsistencies in their testimony.  Id.  Here, the trial court observed defendant's testimony, made a credibility determination, determined the weight to be given to defendant's testimony and found that defendant's explanation of his flight was not credible.  In fact, the court specifically noted that:  "[a]s soon as [defendant hit the victim, he] keeps on going, and runs and starts another series of what could be described as frantic behavior....He runs home, he grabs his belongings, he gets in the car and heads on the highway trying to get out of town as quickly as he can."  (R. Vol. II D112-113)  Therefore, since reviewing courts defer to the trial court on matters of credibility, it is irrelevant whether it is "not unreasonable to assume that an unbiased

trier of fact could have found the defendant's explanation of his flight credible" and the trial court's finding that defendant's flight was evidence of his guilt should stand.

Defendant argues that the "State's evidence of the defendant's intent was entirely circumstantial." (Deft. Br. 21)  It is well established that circumstantial evidence alone is sufficient to sustain a conviction, provided that such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged.  People v. Hall, 194 Ill. 2d 305, 330, 743 N.E.2d 521 (2000); People v. Buss, 187 Ill. 2d 144, 211, 718 N.E.2d 1 (1999); People v. Willaims, 182 Ill. 2d 171, 192, 695 N.E.2d 380 (1998).  Here, there was clearly sufficient evidence to satisfy the intent element of first degree murder beyond a reasonable doubt, therefore, it is of no consequence that the State's evidence of intent was entirely circumstantial.

In conclusion, the trial court properly exercised its discretion when it permitted the State to introduce evidence of other crimes where those other crimes showed defendant's intent, motive and absence of an innocent state of mind.

## II.

**THE STATE PROVED BEYOND A REASONABLE DOUBT THAT DEFENDANT WAS GUILTY OF FIRST DEGREE MURDER WHERE THE EVIDENCE PROVED THAT DEFENDANT BECAME UPSET AFTER SEEING HIS EX-GIRLFRIEND WITH THE VICTIM, WAITED UNTIL THE VICTIM WAS ON THE STREET, DROVE HIS CAR DIRECTLY INTO THE VICTIM, FLED THE SCENE, DID NOT CALL FOR HELP AND THEN LIED TO THE POLICE.**

Defendant contends that the evidence in the record does not support a conviction for first-degree murder. (Deft. Br. 22)  The record reveals that the State proved beyond a reasonable doubt that defendant was guilty of first degree murder where the evidence proved that defendant became upset after seeing his ex-girlfriend with the victim, waited until the victim was on the street, drove his car directly into the victim, fled the scene, did not call for help and then lied to the police.

When a reviewing court is presented with a challenge to the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense proved beyond a reasonable doubt. Jackson v. Virginia, 433 U.S. 307, 319, 99 S.Ct. 334 (1991); People v. Nitz, 143 Ill. 2d 82, 95-96, 572 N.E.2d 895 (1991); cert denied, 112 S. Ct. 334 (1991).  Once a defendant has been found guilty of the crime charged, the fact finder's role as the weigher of evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. (emphasis in original). Jackson, 433 U. S. at 319; Nitz, 143 Ill. 2d at 96.  On review, the trial court's judgment will not be set aside unless the proof is so unsatisfactory, improbable or implausible as to justify a reasonable doubt of defendant's guilt. People v. Slim, 127 Ill. 2d 302, 307, 537 N.E.2d 317 (1989).  This standard of

52

review applies in all criminal cases, whether the evidence is direct or circumstantial. People v.
Pintos, 133 Ill. 2d 286, 291, 549 N.E.2d 344 (1989).

After reviewing all of the evidence in the light most favorable to the State, it is clear that
any rational trier of fact could have found defendant guilty of first-degree murder beyond a reasonable
doubt. The evidence proved that on January 12, 2000, Asha was sitting in her vehicle in front of the
YMCA with the victim in her passenger seat when defendant drove up and stopped next to her car,
even though there was an order of protection in effect which prohibited him from having contact
with her or from being at her place of work. (R. Vol. I A28-29, A142) When defendant pulled up
he said something to Asha and looked into the car. (R. Vol. I A31, A47) Asha, who did not expect
to see defendant outside her work that night, did not say anything in return, instead she put up her
finger, "like one minute." (R. Vol. I A31, A47, A53; R. Vol. II D20-21) Michelle Slater, a dental
assistant who did not know defendant, Asha or the victim, was waiting for the bus when she saw
defendant pull up and heard him say in a loud voice, "Okay, well, I'll be back." (R. Vol. I A61)
According to Slater, when defendant said that he'd be back, he was upset and agitated. (R. Vol. I
A74) Asha testified that this night was the only time defendant saw her in the presence of another
man and that defendant did not know about her friendship with the victim. (R. Vol. I A46, A54)
Both Slater and Kyra Ester, another independent witness, saw defendant pull up to the stop sign at
the end of the block and wait there while the victim exited Asha's vehicle and she drove off. (R.
Vol. I A61, A62, A64, A65, B 21, B23) As the victim was attempting to enter his car, defendant
made a U-turn, accelerated until "he was going really fast," hit the victim at "full speed" and kept
going without hesitating, stopping or slowing down. (R. Vol. I A62-63, A66, B17-19) After being
hit, the victim's body flew into the air and came to rest 78 feet from where the initial impact

53

occurred. (R. Vol. B17, B63)  Dr. Rexene Worrell, an expert in the field of forensic pathology, testified that the victim died as a result of being struck by an automobile. (R. Vol. I A80)

Further, the evidence proved that defendant fled the scene and lied to the police.  On January 13, 2000, at about 2:30 a.m., Illinois State Trooper Brian Gray approached defendant's vehicle and asked him for a driver's license. (R. Vol. I B36, B48)  Defendant attempted to look for a license and proof of insurance, but could not find either. (R. Vol. I B36)  Defendant stated several times that his name was Kevin Tevin Williams and first stated that his date of birth was April 7, 1979, but later stated that it was June 7, 1979. (R. Vol. I B36, B39, B40; R. Vol. II D31)  Initially, defendant stated that his address was 5327 N. Lake Park, but later said that it was 5451 Cornell. (R. Vol. I B41)  Defendant also said that he was on his way to his girlfriend's house in Champaign, even though I55 was the wrong way to Champaign. (R. Vol. II D32, D67)

Gray noticed that defendant was very nervous, was shaking and smelled like alcohol. (R. Vol. I B37-38)  Gray noticed that there was massive, recent damage to the right quarter panel, that the tail light was broken and that there was body damage, so he asked defendant about the damage and defendant said that his uncle had hit something about a month ago. (R. Vol. I B39-40)  Defendant was arrested and an inventory search of his vehicle revealed a safe containing $2,600 and some pictures. (R. Vol. I B44)

Moreover, the damage on defendant's vehicle was consistent with the witness testimony. The vehicle that defendant was driving when he hit the victim had damage on the passenger side front end, red paint transfer on the front bumper and red paint transfer on the passenger side. (R. Vol. I A116-119)  Also, the plastic recovered from the scene physically matched defendant's vehicle. (R. Vol. II C2-5)

<center>54</center>

A- 129

Additionally, defendant admitted to hitting the victim with his car. After striking the victim with his car, defendant called Asha's cell phone and spoke to Officer Ronald Gibbs. (R. Vol. I A100) In that conversation, defendant admitted that he hit the victim. (R. Vol. I A100) Asha testified that after defendant hit the victim, she received two voice mails from defendant and while she did not remember the exact words, she did remember that in the first voice mail, defendant said that he either smashed, smacked or hit the victim with the car. (R. Vol. I A55, A57) Also, defendant testified that after he fled the scene, he called his friend Ronald and told him that he hit someone. (R. Vol. II D27)

Also, defendant's conduct before, during and after the crime clearly show that his actions were intentional and not the result of an accident. After defendant approached Asha and the victim, looked into the car and unsuccessfully attempted to have a conversation with her, he got upset, agitated and stated that he would be back. (R. Vol. I 59-61) Defendant then drove off and waited at the end of the block for several minutes, while the victim exited the car. (R. Vol. I A61-62, B14-16, B23) After the victim exited the car and Asha drove off, defendant made a U-turn, accelerated, drove straight at the victim and hit him. (R. Vol. I A61-63, B14-16) At no time did defendant ever slow down, swerve, hesitate or stop. (R. Vol. I A65, B17-18) After he hit the victim, defendant fled the scene, went home, got his safe that contained a large sum of money and then fled the county. (R. Vol. II D26-27, D30-32) At no time did defendant ever call the police or an ambulance.

Further, defendant's witnesses establish a motive for killing the victim. Terrence Coleman, defendant's friend of nine years, testified that a lot of times defendant and Asha would have fights "about jealousies and whether or not each of them was seeing other people" and this "would prompt each of them to get upset and angry." (R. Vol. II 26) Coleman also testified that

55

when defendant and Asha fought about one of them seeing another person, both of them would get really upset. (R. Vol. II 31) Ahmand Kendall, defendant's roommate testified that when defendant and Asha broke up, defendant took it bad and "would want her back like the next day." (R. Vol. II 50) A reasonable inference from this evidence is that after defendant, who wanted to go out with Asha that night, saw the victim sitting in her car, he became angry and upset, thereby providing a motive for killing the victim.

Moreover, the other crimes evidence showed that when defendant and Asha are broken up and she will not talk to him, defendant gets angry and intentionally acts out against her. (R. Vol. I A21-22, A24; R. Vol. II D6, D35, D38-43)

Therefore, it is clear that after reviewing all of the evidence in the light most favorable to the State, any rational trier of fact could have found defendant guilty of first-degree murder beyond a reasonable doubt

Defendant contends: that "the State was required to establish beyond a reasonable doubt that Defendant Threlkeld intended to kill or do great bodily harm to the victim." (Deft. Br. 23) A argued in Argument I, defendant has confused the mental state required for first-degree murder.  To sustain a charge of first-degree murder, as charged in this case, the State had to prove beyond a reasonable doubt that defendant, without lawful justification, intentionally or knowingly struck and killed the victim with a motor vehicle **or** that he, without lawful justification, struck and killed the victim with a motor vehicle knowing that such action created a strong probability of death or great bodily harm. (emphasis added)(C. R. 18-19) It was unnecessary for the State to directly prove that defendant had the intent to murder or do great bodily harm if the State proved that defendant voluntarily and wilfully committed an act, the natural tendency of which was to cause death or great

56

bodily harm.   See, People v. Bennett, 329 Ill. App. 3d 502, 512, 769 N.E.2d 117 (2nd Dist.

2001)(defendant's conviction for first-degree murder affirmed where the evidence revealed that

defendant voluntarily and wilfully drove his vehicle into the victim).   Since the State showed that

defendant, without lawful justification, struck and killed the victim with a motor vehicle knowing

that such action created a strong probability of death or great bodily harm, it was unnecessary for the

State to prove that defendant had the intent to kill or do great bodily harm and consequently,

defendant's argument is without merit.

In conclusion, the State proved beyond a reasonable doubt that defendant was guilty of

first degree murder where the evidence proved that defendant became upset after seeing his ex-

girlfriend with the victim, waited until the victim was on the street, drove his car directly into the

victim, fled the scene, did not call for help and then lied to the police.

## III.

### DEFENDANT FAILED TO ESTABLISH THAT HIS TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO CALL NIKKI WITTINGHAM AS A WITNESS AT TRIAL AND SENTENCING SINCE HER TRIAL TESTIMONY WOULD HAVE BEEN EXCLUDED BY THE RULES OF EVIDENCE AND SINCE THE TRIAL JUDGE CONSIDERED THE CONTENTS OF HER AFFIDAVIT AS MITIGATION AT SENTENCING.

In a pro se Supplemental Amendment to Pending Appeal, defendant contends that his "trial counsel failed to call a person to testify that was crucial to the defense that could have disputed the State's theory of the defendant and the case." (Deft. Supp. Am. 1) The record reveals that defendant's trial counsel was not ineffective for failing to call Nikki Wittingham as a witness since her testimony would have been excluded by the rules of evidence and since the trial judge considered the contents of her affidavit as mitigation at sentencing.

Ineffective assistance of counsel is established when it is proven that counsel's representation fell below an objective standard of reasonableness and that, but for counsel's deficient performance, the outcome of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 687 694, 104 S. Ct. 2052, 2064, 2068 (1984); People v. Montgomery, 327 Ill. App. 3d 180, 184-5, 763 N.E.2d 369 (2001). A defendant is entitled to competent, not perfect, representation, and the fact that in retrospect a tactic proved unsuccessful does not demonstrate incompetence. People v. Gonzalez, 238 Ill. App. 3d 303, 324, 606 N.E.2d 304 (1st Dist. 1992). The defendant must overcome a "strong presumption that his lawyer's conduct falls within the wide range of reasonable professional assistance and that the challenged conduct constitutes sound trial strategy. Id. If the

58

ineffectiveness claim can be disposed of on the basis that the defendant did not suffer sufficient prejudice, a court need not consider whether counsel's performance was deficient. Id. At 697; Montgomery, 327 Ill. App. 3d at 185.

Here, defendant did not suffer any prejudice by his counsel's failure to call Wittingham as a witness. In his supplemental amendment to the pending appeal, defendant claims that "[t]rial counsel failed to pursue [Wittingham] to testify if for nothing else but for mitigation purposes until the very last minute and was only able to obtain an affidavit. She should have been placed on the list from the beginning." (Deft. Supp. Am. 2-3) In ruling on the admissibility of the affidavit, the trial court held that in Wittingham's affidavit, she states that "she knows him personally and she states it's her opinion he didn't leave his house on January 12, 2000, with the intention of killing [the victim.] I believe that. I think that's true. I think I may have even said that when I made my finding of facts." (R. Vol. II E17) The Court then said that he would accept the affidavit for mitigation purposes. (R. Vol. II E17) Therefore, since the trial court agreed with Wittingham and made such a factual finding and since the trial court considered the affidavit for mitigation purposes, defendant was not prejudiced by his attorney's failure to call Wittingham as a witness.

Further, defendant was not prejudiced by his attorney's failure to call Wittingham as a witness since her testimony would not have been admissible at trial. (R. Vol. III F20-24) All of the background information on defendant's upbringing was irrelevant and her opinion that defendant "did not leave his house on January 12, 2000 with the intention of killing [the victim] was irrelevant and inadmissible. (R. Vol. III F20-24) Moreover, contrary to defendant's assertion, nothing in the affidavit would have been admissible to show "defendant's character, personality and mind-set."

59

(Deft. Supp. Am. 3) Therefore, since Wittingham would not have been able to testify at trial as to the contents of her affidavit, defendant was not prejudiced by his attorney's failure to call her as a witness.

Consequently, since defendant did not suffer sufficient prejudice, this Court need not consider whether counsel's performance was deficient. Nevertheless, trial counsel's representation did not fall below an objective standard of reasonableness. Generally, the decision of whether or not to call a particular witness is a matter of trial strategy or tactics, which cannot support a claim of ineffective assistance of counsel. People v. Flores, 128 Ill. 2d 66, 538 N.E.2d 481 (1989). As argued above, nothing in Wittingham's affidavit would have been admissible at trial. Therefore, the value of the witness that was not presented is diminutive and clearly the decision not to call this witness was a matter of trial strategy.

In conclusion, since trial counsel's representation did not fall below an objective standard of reasonableness and since defendant did not suffer any prejudice for trial counsel's failure to call the witnesses, defendant failed to establish that his counsel was ineffective.

60

## CONCLUSION

The People of the State of Illinois respectfully request that this Honorable Court affirm defendant's conviction for First Degree Murder.

Pursuant to People v. Nicholls, 71 Ill. 2d 166, 374 N.E.2d 194 (1978) and relevant statutory provisions 725 ILCS 5/110-7(h)(1992); 725 ILCS 130/13 (1992); 55 ILCS 5/4-2002.1 (1992), the People of the State of Illinois respectfully request that this Court grant the People costs and incorporate as part of its judgment and mandate a fee of $100.00 for defending this appeal. In addition, pursuant to People v. Agnew, 105 Ill. 2d 275, 473 N.E.2d 1319 (1985) and 55 ILCS 5/4-2002.1 (1992), the People respectfully request that this Court also grant the People an additional fee of $50.00 in the event oral argument is held in this case.

Respectfully Submitted,

RICHARD A. DEVINE,
State's Attorney,
County of Cook,
Room 309 - Richard J. Daley Center,
Chicago, Illinois 60602

Attorney for Plaintiff-Appellee

RENEE GOLDFARB,
JAMES FITZGERALD,
MAUREEN MCGEE,
Assistant State's Attorneys.
  Of Counsel.

A- 136

CASE NO. $\quad$ O8cv 1479 $\quad\rule{3cm}{0.4pt}$

ATTACHMENT NO. $\rule{5cm}{0.4pt}$

EXHIBIT $\quad$ D- H $\rule{3cm}{0.4pt}$

TAB (DESCRIPTION) $\rule{5cm}{0.4pt}$

No. 1-01-2879

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | Appeal from the Circuit Court of Cook County, Illinois |
| | ) | |
| vs. | ) | No. 00CR 4537 |
| | ) | |
| MICHAEL THRELKELD, | ) | Honorable James B. Linn |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

## APPELLANT'S REPLY BRIEF

Lee Ann Russo
Jeffrey R. Weiland
Jones, Day, Reavis & Pogue
77 West Wacker, 35th Floor
Chicago, Illinois 60601
(312) 782-3939

Counsel for Defendant-Appellant
MICHAEL THRELKELD

## ORAL ARGUMENT REQUESTED


EXHIBIT D

A-137

## TABLE OF CONTENTS

I.    DEFENDANT'S PRIOR BAD ACTS ARE NOT PROBATIVE OF HIS INTENT
      TO COMMIT FIRST-DEGREE MURDER........................................................................ 1

      A.    The Prior Bad Acts Only Show That The Defendant Has A Propensity To
            Act In A Violent Manner .............................................................................................. 1

      B.    The State Must Prove That The Defendant Either Intentionally Or
            Knowingly Caused Death Or Great Bodily Harm ................................................. 2

II.   THE DEFENDANT'S DUE PROCESS RIGHT TO A FAIR TRIAL WAS
      PREJUDICED BY THE INTRODUCTION OF THE EVIDENCE OF HIS
      PRIOR MISCONDUCT ............................................................................................. 6

      A.    A Defendant May Not Be Convicted Based On Prejudicial and
            Incompetent Evidence............................................................................................. 7

      B.    The Properly Admitted Evidence Is Not So Overwhelming That No Fair
            Minded Jury Could Have Voted For Acquittal.................................................... 8

III.  CONCLUSION.................................................................................................... 12

i

# TABLE OF AUTHORITIES

## STATE CASES

*Knick v. Commonwealth of Virginia,*
   15 Va. App. 103, 421 S.E.2d 479 (Ct. App. 1992) ..............................................5

*People v. Bartell,*
   98 Ill. 2d 294, 456 N.E.2d 59 (1983) ...........................................................3, 4

*People v. Bedoya,*
   325 Ill. App. 2d 926, 758 N.E.2d 366 (1st Dist. 2001)....................................5, 6

*People v. Curry,*
   25 Ill. App. 3d 637, 323 N.E.2d 778 (1st Dist. 1975)..........................................1

*People v. Funches,*
   59 Ill. App. 3d 71, 375 N.E.2d 135 (2d Dist. 1978) .........................................10

*People v. Gonzalez,*
   40 Ill. 2d 233, 239 N.E.2d 783 (1968) ..............................................................4

*People v. Illgen,*
   145 Ill. 2d 353, 583 N.E.2d 515 (1991) .............................................................6

*People v. Lindgren,*
   79 Ill. 2d 129, 402 N.E.2d 238 (1979) .............................................8, 9, 10, 11

*People v. Oaks,*
   169 Ill. 2d 409, 662 N.E.2d 1328 (1996) ...................................................3, 4, 5

*People v. Radovick,*
   275 Ill. App. 3d 809, 656 N.E.2d 235 (1st Dist. 1995).........................................1

*People v. Watson,*
   55 Ill. App. 3d 564, 371 N.E.2d 113 (1st Dist. 1977).......................................10

*People v. Wydra,*
   265 Ill. App. 3d 597, 637 N.E.2d 741 (1st Dist. 1994)................................5, 6, 8

*State v. McKee,*
   52 Ill. App. 3d 689, 367 N.E.2d 1000 (1977) ......................................7, 8, 9, 10

*Walker v. State,*
   97 P.2d 803 (2000)............................................................................................6

A- 139

## STATE STATUTES

720 ILCS 5/9-1(a)(1) ...................................................................................................................3

A- 140

# ARGUMENT

**I.  DEFENDANT'S PRIOR BAD ACTS ARE NOT PROBATIVE OF HIS INTENT TO COMMIT FIRST-DEGREE MURDER.**

The admission of prior bad acts evidence is the exception, not the rule. *People v. Curry*, 25 Ill. App. 3d 637, 640, 323 N.E.2d 778, 780-81 (1st Dist. 1975). An exception that applies only when the evidence of prior bad acts is probative of some material issue in the case other than to show conformity with the defendant's prior acts of misconduct. *People v. Radovick*, 275 Ill. App. 3d 809, 821, 656 N.E.2d 235, 243 (1st Dist. 1995). Here, the State argues principally that the prior bad acts were admissible to prove the defendant's intent to commit first-degree murder. The State's argument regarding the probative value of the prior bad acts evidence, although cloaked in terms of intent, demonstrates that the evidence was not probative of any issue other than the defendant's propensity to resort to violence or act in a violent manner. In the same regard, because none of the acts introduced are probative of whether the defendant would intentionally or knowingly cause serious bodily injury or death, the trial court erred in considering them as substantive evidence of the defendant's guilt.

**A.  The Prior Bad Acts Only Show That The Defendant Has A Propensity To Act In A Violent Manner.**

Citing numerous instances from the record, the defendant demonstrated in his opening brief that the State and the trial court used evidence of the defendant's prior bad acts to show that he generally acted in a violent manner or had a propensity towards violence, a use specifically prohibited under Rule 404(b). (Appellant's Brief in Support of Appeal ("App's Br.") at 14-15.) In response, the State asserts that the defendant "misunderstood" its argument and "takes out of context" the trial court's statements. In clarifying its argument in its Response, the State again makes the same propensity arguments.

| Defendant's Understanding | State's Clarification |
|---|---|
| The State argued that the prior misconduct showed that the defendant generally acted in a violent, impulsive manner. (App's Br. at 14.) | The other crimes evidence showed that when defendant was upset or angry with Asha, he intentionally acted out in a violent manner. (State's Brief at 27.) |
| It was impermissible for the State to argue that simply because the defendant has a violent character or was violent on previous occasions he was more likely to have committed the crime charged. (App's Br. at 9.) | He made a series of decisions over a period of time that should scream out to you what his intent is, and what he does to deal with his anger, his frustration, and when he doesn't get his way. He resorts to violence. (State's Brief at 42.) |

Although the State interjects the terms intent and intentionally into its statements, the crux of its argument remains: because the defendant had acted in a violent manner and resorted to violence in the past, the defendant likely acted in conformity with his past behavior in committing the crime charged.

Admittedly, the State's theory of relevance has superficial appeal – when the defendant becomes upset with Asha, he responds in a violent manner. But such is the trap of propensity logic and the reason that evidence of a defendant's prior bad acts is excluded. Further, the fact that the defendant intentionally acted violently in the past is not probative of an intent to commit first-degree murder. To be actually probative of the defendant's intent to commit first-degree murder, the prior bad acts must show that he intentionally or knowing caused death or serious bodily injury to the victim or another. Because none of the prior bad acts is probative of this intent, the trial court abused its discretion in admitting the defendant's prior bad acts as substantive evidence that the defendant committed the crime charged, first-degree murder.

### B. The State Must Prove That The Defendant Either Intentionally Or Knowingly Caused Death Or Great Bodily Harm.

The State has not shown that any of the prior bad acts admitted at trial is relevant to the defendant's intent to commit an intentional or knowing act which causes death or great bodily

2

harm to another individual. To bridge this evidentiary gap the State argues that it need not prove

such intent or knowledge. (State's Brief at 41.) The Illinois Criminal Code states that an

individual commits first-degree murder if, in performing the acts which cause the death:

(1)     he either intends to kill or do great bodily harm to that individual or another, or
        knows that such acts will cause death to that individual or another; or

(2)     he knows that such acts create a strong probability of death or great bodily harm
        to that individual or another.

720 ILCS 5/9-1(a)(1) and (2).

Relying on *People v. Oaks*, 169 Ill. 2d 409, 662 N.E.2d 1328 (1996) and *People v.

Bartell*, 98 Ill. 2d 294, 456 N.E.2d 59 (1983), the State argues that it was not required to prove

that the defendant committed an act with the intent or knowledge that it would cause death or

serious bodily injury. The State misreads its cases. First, rather than relieve the State of its

burden of proving the necessary mental state, these cases hold that the mental state, the intent or

knowledge, may be inferred from the defendant's commission of a voluntary and willful act that

has the natural tendency to cause death or great bodily injury. Second, such a distinction is

important only in cases where the defendant admitted to intentionally and willfully committing

an act, but argues that he did not intend the consequences of that act. Because the defendant did

not admit that he struck Linton Boyd willfully and voluntarily, the *Oaks/Bartell* line of cases has

no application here.

In *Oaks*, the defendant admitted to striking and shaking the victim, a three year-old child,

but argued that he did not know that shaking the child would cause death or great bodily harm or

would create a strong probability of death or great bodily harm. 169 Ill. 2d at 437-38, 457, 662

N.E.2d at 1340, 1349. The court concluded that "given the disparity in size between the

defendant and the victim, the extent of the victim's injuries and the force needed to cause them,

it is an absurdity for defendant to argue that he did not know his actions would create a strong

3

probability of death or great bodily harm to the three-year old child." *Id.* at 460, 662 N.E.2d at 1351. Similarly in *Bartell*, the defendant admitted that he willfully and voluntarily fired his pistol toward a parking lot, but denied that his action created the strong probability of death or great bodily injury. 98 Ill. 2d at 308, 456 N.E.2d at 65. After finding considerable evidence in the record to show that the defendant knew individuals were standing in the parking lot, the court concluded that there was sufficient evidence for the jury to infer that the defendant intended or knew that his actions would create a strong probability of death or serious bodily injury. 98 Ill. 2d at 308-309, 456 N.E.2d at 66. Thus, contrary to the State's characterization, neither *Oaks* nor *Bartell* removed the State's burden of proving that the defendant intended or knew that his actions created the strong probability of death or serious bodily harm.

Moreover, the inference relevant in *Oaks* and *Bartell* has no significance under the facts of this case. Where the defendant in both *Oaks* and *Bartell* admitted voluntarily committing the act, the only remaining question before the court was whether the defendant knew that his actions created a strong probability of death or serious bodily injury. *See also People v. Gonzalez*, 40 Ill. 2d 233, 241-42, 239 N.E.2d 783, 789 (1968) (affirming conviction where defendant admitted that he voluntarily and willfully fired gun in the decedent's direction). The ultimate question in our case, however, was not whether the defendant intended or knew the consequences of his action, but whether he intended to commit the act – striking the victim with his vehicle.[1] In this regard, whether the State had to prove that the defendant committed a voluntary and willful act which had the natural tendency to cause death or serious bodily injury, or that the defendant intentionally or knowingly committed an act which created a strong

---

[1] The State acknowledges that it must prove that the defendant intentionally and voluntarily drove his vehicle into the victim. (State's Brief at 41.) But the State must also show that this action was accompanied by the necessary intent for first-degree murder otherwise its argument would lead to the absurd result that any individual who admitted intentionally and willfully driving a vehicle which struck someone would be guilty of first-degree murder.

4

probability of death or serious bodily injury, is a distinction without a difference. The

defendant's prior bad acts are equally inapplicable to either question because none of the prior

bad acts involved instances where the defendant caused an individual death or great bodily harm.

Or, in the State's terms, none of the defendant's prior bad acts involved circumstances in which

the defendant committed an act which had the natural tendency to cause death or great bodily

harm.

The State's position that it need not prove intent or knowledge is also inconsistent with

the holdings in *Illgen, Bedoya* and *Wydra* that, to be probative of the intent to commit first-

degree murder, the prior bad acts must show the defendant's intent or knowledge to commit

death or serious bodily injury. (*See* App's Br. at 11-13)[2]; *see also Oaks*, 169 Ill. 2d at 455, 662

N.E.2d at 1348 (allowing the introduction of prior incidents because the bruises and internal

injuries suffered previously by the victim were similar to the fatal acts). The only connection

that the State identifies between the prior acts and the crime charged is that the defendant was

allegedly upset or agitated with Asha on each occasion.[3] But, unlike *Illgen* and *Oaks*, this

connection does not relate to the proffered purpose of the evidence – that is, whether the

defendant had the intent to commit first-degree murder. *See Illgen*, 145 Ill. 2d at 375 (admitting

evidence "because the defendant did inflict substantial bodily harm in several of the prior

assaults.").

---

[2] *People v. Illgen*, 145 Ill. 2d 353, 375, 583 N.E.2d 515 (1991); *People v. Bedoya*, 325 Ill. App. 2d 926, 938, 758 N.E.2d 366, 378 (1st Dist. 2001); *People v. Wydra*, 265 Ill. App. 3d 597, 637 N.E.2d 741 (1st Dist. 1994)

[3] Even assuming the State may introduce the defendant's propensity for violence as evidence of his intent to commit the crime charged, the State offered very little evidence to show that he was actually upset or agitated at the time of the alleged crime. The only evidence that the State offered is the statement from Mrs. Slater that she heard him elevate his voice when he said to Asha, "I'll be back." (R. A60-A61). None of the other witnesses including Asha, who was just feet from the defendant, testified that the defendant made any such statement, however. (R. A31).

Although not controlling on this Court, both *Knick v. Commonwealth of Virginia*, 15 Va. App. 103, 421 S.E.2d 479 (Ct. App. 1992), and *Walker v. State*, 97 P.2d 803 (2000), persuasively opine why, to be relevant in a first-degree murder case, the acts must show a defendant's intent to cause death or serious bodily injury to an individual. The State does not challenge the reasoning of these cases or, for that matter, the defendant's argument generally that the prior bad acts are not probative unless they demonstrate the defendant's intent to intentionally or knowingly commit an act which may cause death or serious bodily injury. Because the logic of these cases is sound and consistent with decisions in Illinois, including *Illegen*, *Bedoya* and *Wydra*, this Court should follow their reasoning and conclude that the defendant's prior acts of misconduct were improperly admitted.

Accordingly, because the prior bad acts admitted by the State only go to show the defendant's propensity towards violence and do not establish that he had the requisite intent for first degree murder, the trial court abused its discretion in considering them as substantive evidence that the defendant committed the offense charged.

## II.    THE DEFENDANT'S DUE PROCESS RIGHT TO A FAIR TRIAL WAS PREJUDICED BY THE INTRODUCTION OF THE EVIDENCE OF HIS PRIOR MISCONDUCT.

The State's contention that, even if the prior bad acts evidence was improperly admitted, it did not prejudice the defendant's right to a fair trial, is incorrect for several reasons. First, the State wrongly asserts that a defendant may be convicted on prejudicial and incompetent evidence merely because it was a bench trial. Next, the State relies on inapposite cases regarding the role of the judge as a trier of fact. Finally, the State uses the wrong legal standard in analyzing the prejudice to the defendant's due process right caused by the improper admission of the prior bad acts evidence.

A- 146

A.    **A Defendant May Not Be Convicted Based On Prejudicial and Incompetent Evidence.**

As an initial matter, the law recognizes that even judges are human and may be improperly influenced, especially by the admission of prior bad acts. *See State v. McKee*, 52 Ill. App. 3d 689, 693, 367 N.E.2d 1000, 1004 (1977) ("Nonetheless, judges are human and as such may err."). And when a court relies on improper evidence in convicting a defendant, that conviction must be reversed:

> Courts have no more right than a jury to convict the accused on incompetent evidence. . . . While we recognize that it is, of course, presumed that a court in a bench trial considers only proper evidence, it is obvious that the record herein discloses that the judge did in fact consider improper evidence in arriving at his verdict, even though the guilt or innocence of the defendant could have been ascertained if the improper evidence had been excluded. Notwithstanding this, the defendant is entitled to a fair trial upon evidence properly admitted.

*Id.* at 693-694, 367 N.E.2d at 1004.

Next, the State tries to distinguish the wealth of cases holding that the erroneous admission of prior bad acts evidence carries a high risk of prejudice and ordinarily calls for reversal by arguing that most cases are tried before a jury, not a judge. Specifically, the State asserts "it is presumed that the Judge considered only admissible evidence in reaching his conclusion, and that the Defendant seeking reversal bears the burden of showing on appeal that the improper evidence influenced the court." (State's Brief at 33.) Assuming such a presumption exists, it is rebutted by the record in this case, which demonstrates that the trial judge considered, and was strongly influenced by, the inadmissible evidence of the defendant's prior bad acts in reaching his verdict. *See, e.g.*, D-109; D-110; D-113 ("[the defendant] had a habit of acting out in a criminal manner, impulsive manner, in a violent manner.").

7

The State also relies on the presumption that the trial judge considered the other crimes evidence only for its relevant purpose. This presumption necessarily assumes that there is a permissible purpose for introducing the disputed evidence. In this regard, the State's cited cases are distinguishable because the evidence admitted had both a permissible and impermissible purpose, whereas there is no permissible purpose for the admission of the bad acts evidence in this case. Thus, because it is evident from the record that the trial judge improperly relied upon the evidence of the defendant's prior bad acts in reaching his verdict, the State's cited cases are inapposite and the defendant's conviction must be reversed. *See McKee*, 52 Ill. App. 3d at 694, 367 N.E.2d at 1004 (reversing the defendant's conviction where the record disclosed that the judge relied on improper evidence of defendant's prior bad acts in reaching his verdict).

**B.     The Properly Admitted Evidence Is Not So Overwhelming That No Fair Minded Jury Could Have Voted For Acquittal.**

The State challenges the defendant's conclusion that he was denied due process by arguing that the defendant applied the wrong standard of review to the evidence. But it is actually the State that applied the wrong framework for its analysis, one incorrectly derived from cases not involving the improper admission of prior bad acts evidence. By using the wrong standard, the State incorrectly concludes that the defendant's right to a fair trial was not violated. Weighing the evidence and its sufficiency under the proper test laid out in Illinois' prior bad acts jurisprudence, the evidence is not so overwhelming that no fair minded jury could have voted for acquittal.

The proper standard for weighing the prejudice to the defendant's right to a fair trial from the admission of prior bad acts was articulated by the Illinois Supreme Court in *People v. Lindgren*: "a conviction will be upheld only if the properly admitted evidence is so overwhelming that no fair minded jury could have voted for acquittal or, to put it another way, if

the record affirmatively shows that the error was not prejudicial." *Lindgren I*, 79 Ill. 2d 129, 141, 402 N.E.2d 238, 245 (1979) (citations omitted). Following this admonition in *Lindgren I*, this Court in *People v. Wydra*, reversed a defendant's conviction, finding that, although there was sufficient evidence in the record to support a conviction, the evidence was not so overwhelming that no fair minded jury could have voted for acquittal. *Id.* at 617, 637 N.E.2d at 755. The requirement that the State point to overwhelming evidence of the defendant's guilt in the record applies regardless of whether the trier of fact sits on the bench or in the jury box. *See McKee*, 52 Ill. App. 3d at 694, 367 N.E.2d at 1004 (reversing defendant's conviction in bench trial "even though the guilt or innocence of the defendant could have been ascertained if the improper evidence had been excluded.").

Further, the deference afforded the trier of fact's findings and the light in which the evidence below is viewed, is altered when prejudicial evidence of a defendant's prior bad acts is improperly admitted. In *Lindgren I*, the Supreme Court noted that, historically, appellate courts give substantial deference to the trier of fact's role in making inferences, weighing conflicting testimony, and determining witness credibility. 79 Ill. 2d at 142-143, 402 N.E.2d at 245. The court concluded, however, that because of the strong prejudice that accompanies the introduction of other crimes evidence, this traditional deference is not appropriate. *Id.* at 143, 402 N.E.2d at 355. While typically an Appellate Court views all of the evidence in the light most favorable to the prosecution, when evidence of prior misconduct is improperly admitted "the court should not read the record and resolve all factual ambiguities against the defendant." *Id.* at 143, 402 N.E.2d at 245. Likewise, under such circumstances, it is improper to speculate whether an "uncontaminated" trier of fact might have examined the evidence and, for example, concluded that a witness was credible. *Id.* at 142, 402 N.E.2d at 245. Instead, when the defendant's

collateral actions are improperly admitted and relied upon, the case should be reversed and remanded for a new trial before an untainted trier of fact. *McKee*, 52 Ill. App. 3d at 694, 367 N.E.2d at 1004.

The defendant cited numerous cases in which the improper introduction of prior bad acts evidence prejudiced a defendant's right to a fair trial. (App's Br. at 17-19.) The State has not shown that the evidence here is so overwhelming that no fair minded jury could have voted for acquittal. Like the circumstances in *Lindgren I*, the verdict here hinged largely on the credibility of one witness, the defendant. Relying again on the wrong standard of review to support its position, the State incorrectly charges that it is irrelevant whether "an unbiased trier of fact could have found the defendant's explanation credible." (State's Brief at 50.) Under the correct standard of review -- that being whether no fair minded jury could have voted for acquittal -- this question becomes highly relevant. In fact, courts often go a step further, holding that it is improper to even speculate whether an untainted trier of fact would have found the defendant's testimony credible. *Lindgren I*, 79 Ill. 2d at 142, 402 N.E.2d at 245.[4] Instead, the appropriate course of action is to remand the case to the trial court for adjudication before an uncontaminated trier of fact:

> There is . . . the matter of the integrity of the system. A litigant's right to a trial by an unbiased jury is violated where the jury in fact based its decision on extraneous matters. This is a substantial right normally afforded to guilty and innocent defendants alike. Therefore, we hold that the defendant deserves a new trial with a jury unbiased with evidence of the [prior bad acts].

*Lindgren I*, 79 Ill. 2d at 143, 402 N.E.2d at 245.

---

[4] *See also People v. Funches*, 59 Ill. App. 3d 71, 74, 375 N.E.2d 135, 137 (2d Dist. 1978) (reversing the conviction based on the "probable impact" of the cumulative prejudicial evidence on the jury); *People v. Watson*, 55 Ill. App. 3d 564, 567-68, 371 N.E.2d 113, 116 (1st Dist. 1977) (refusing to speculate as to what the jury might have done absent the impermissible evidence being admitted)

Finally, while the State correctly argues that circumstantial evidence alone is sometimes sufficient to sustain a conviction, none of its cited cases involved the improper admission of prior bad acts evidence. However, when considering whether the record affirmatively shows overwhelming evidence of the defendant's guilt, the State's circumstantial evidence is insufficient to overcome the prejudicial impact of the admission of the prior bad acts evidence. Viewed under the proper standard, the State's evidence does not establish beyond a reasonable doubt that the defendant intended to cause death or serious bodily injury to the victim or that he knew his actions created a strong probability of creating death or serious bodily injury. Accordingly, because the judge was improperly influenced by the admission of the defendant's prior bad acts and because the remaining evidence is not so overwhelming that a fair-minded jury, uncontaminated by the prejudicial evidence, could not have voted for acquittal, the defendant's conviction should be reversed.

## III.    CONCLUSION

Wherefore, the defendant respectfully requests that this Court reverse his conviction for

first-degree murder.

Respectfully submitted,

By:

Lee Ann Russo
Jeffrey R. Weiland
Jones, Day, Reavis & Pogue
77 West Wacker, 35th Floor
Chicago, Illinois  60601
(312) 782-3939

Counsel for Defendant-Appellant
MICHAEL THRELKELD

A- 152

NOTICE

The text of this order may be
changed or corrected prior to the
time for filing of a Petition for
Rehearing or the disposition of
the same.

SECOND DIVISION
SEPTEMBER 07, 2004

No. 1-01-2879

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff-Appellee, | ) Cook County. |
| | ) |
| v. | ) No. 00 CR 4537 |
| | ) |
| MICHAEL THRELKELD, | ) The Honorable |
| | ) James B. Linn |
| Defendant-Appellant. | ) Judge Presiding. |

### O R D E R

Following a bench trial, the defendant, Michael Threlkeld, was convicted of first-degree murder (720 ILCS 5/9-1(a) (West 2000)), and sentenced to 35 years' imprisonment. On appeal, the defendant contends (1) he was denied his right to a fair trial because he was prejudiced by the improper introduction of evidence of his prior bad acts; (2) the State failed to prove him guilty beyond a reasonable doubt; and (3) his trial counsel was ineffective for failing to call a witness at trial.

1-01-2879

## BACKGROUND

In the late evening of January 12, 2000, a vehicle driven by the defendant struck and killed Linton Boyd. The defendant was charged with first-degree murder. At trial, the defendant admitted that he drove the vehicle that struck Boyd, but contended that it was an accident.

Prior to trial, the trial court granted the State's motion to introduce proof of other crimes evidence. This evidence was presented at trial through the testimony of Edwina Asha Quansah (Asha). Asha testified that she had dated the defendant for six and a half years, but their relationship ended around September 1999. Asha testified that in June 1999, the defendant broke her front windshield and side window on her 1991 red Blazer. About five months later, the defendant bent her windshield wiper and side mirror. The defendant admitted to Asha that he did these things because he was angry that she would not talk to him. Asha testified that in December 1999, the defendant approached her car with a bat, attempted to speak to her, and then cracked her rear light with the bat. Asha further testified that on another occasion, she was in an alley on her way home when she saw the defendant driving a van toward her. She reversed down the alley, crashed into a gate, and jumped out of her car. The defendant approached her and demanded, at gun point, that she return a leather coat and diamond ring that he had given to her. Asha testified that she struggled with the defendant over the gun, and

2

1-01-2879

the gun fell. The defendant ran for the gun and Asha gave him
the coat and the ring. Once he obtained the coat and ring, the
defendant left. Asha testified that she called the police, went
to court, and obtained an order of protection against the
defendant. The order of protection ordered the defendant to stay
away from Asha's home and work.

Asha testified that on January 2, 2000, she saw the
defendant at Stony Subs with Terrance Coleman and Ahmand Kendall.
Asha and the defendant talked. Asha testified that she did not
remember what the conversation was about, but she did not make a
date to go to the movies with the defendant. On January 12,
2000, Asha was working at the YMCA as a membership representative
and a switchboard operator. Linton Boyd also worked at the YMCA
as the director of aquatics. Asha testified that she and Boyd
had been friends and co-workers for about a year. She testified
that they "hung together all the time," but were not dating.
Around 9:20 p.m., on January 12, 2000, Asha and Boyd went to her
car, which was parked in the back of the YMCA building. She
drove Boyd to the front of the building, where his car was
parked. Asha testified that she double parked next to Boyd's car
and they talked for a minute until the defendant pulled up in a
silver-gray Jeep Cherokee. Asha testified that the defendant had
been calling her at work and had been asking her to go out with
him, but she kept saying no, that she would think about it, and
she would call him back. Asha testified that she never called

3

A-3

1-01-2879

the defendant back, did not know if she was going to call him back, and did not have plans with him on January 12, 2000. Asha did not expect to see the defendant outside her work that evening. She had not told the defendant to pick her up at work that evening, and this was the only time the defendant saw her with another man.

Asha testified that her car was double parked next to Boyd's car, facing north, and Boyd was in the passenger seat. The defendant pulled up and stopped next to Asha's car. The defendant's car was facing south and the driver's side of his car was closest to Asha's car. Asha testified that the defendant said something to her, and she put up her finger, "like one minute." At some point, the defendant drove away, going south. Boyd got out of Asha's car and opened the door of his car, which was parked directly next to Asha's car. Asha then drove away. Asha testified that as Boyd was opening his car door, the defendant, who was waiting at the next intersection, made a u-turn, hit Boyd with his vehicle, and continued driving. Asha testified that she was at a light at 63rd Street and Stony Island, and saw the entire incident in her rear view mirror. She did not hear the screech of brakes. After the defendant hit Boyd, Boyd flew in the air and fell to the ground. Asha testified that the defendant drove up next to her at the traffic light, stopped, stared at her, and then kept driving. Asha drove back to Boyd's car, and found Boyd unconscious and unable to

4

A-4

1-01-2879

talk.  Asha attempted to call 911, but someone had already
called, so she called Boyd's mother.  She told Boyd's mother that
he had been hit and she would call back when she knew what
hospital he was being taken to.  After the defendant hit Boyd and
fled, Asha received two voice mails on her cellular phone from
the defendant.  She did not remember the exact words of the voice
mails, but testified that the first voice mail was about the
defendant hitting Boyd with his car.  Asha testified that in the
first voice mail the defendant did not say that it was an
accident.  In the second voice mail, the defendant said something
about an accident.

The State called Michelle Slater to testify.  Slater
testified that on January 12, 2000, at around 9:30-9:40 p.m., she
was waiting for the bus at 63rd and Stony Island.  She saw Asha
sitting in the driver's seat and Boyd sitting in the passenger
seat of Asha's truck.  About 15 minutes later, Slater saw a white
truck pull up next to Asha's truck.  Slater heard the defendant
and Asha have "a couple of words."  Slater could not hear what
they were saying until it became "kind of loud."  She heard the
defendant say loudly, "okay, well, I'll be back."  Slater
testified that the defendant seemed kind of upset or agitated.
After he said he would be back, he pulled up about five feet to
the stop sign and waited.  At that time, Slater saw Boyd exit
Asha's truck.  Asha drove away towards the stop light at 63rd
Street.  As Boyd tried to enter his car, the white truck made a

5

1-01-2879

u-turn, hit Boyd, and continued driving. Slater testified that the white truck was going "really fast" when it struck Boyd, that it never slowed down, stopped or came back. Slater testified that the white truck hit Boyd at full speed. The white truck did not appear to be out of control because it was going straight, did not swerve, and did not slow down before or after hitting Boyd. Slater had never seen the defendant, Boyd, or Asha before January 12, 2000.

The State called Kyra Ester to testify. Ester testified that on January 12, 2000, at approximately 9:00 p.m., she was waiting at the bus stop at 63rd and Stony Island. When Ester arrived at the bus stop, Slater was already there. Ester saw a red truck double parked in the middle of the street with a male and female inside. Ester testified that about four or five minutes after she arrived at the bus stop, a silver Jeep approached from the south and stopped next to the red truck. Ester saw Asha lower her window and say something. Even though she was only ten feet away, Ester could not hear the conversation. Ester testified that the Jeep pulled away, going southbound, and waited at the stop sign at 64th and Stony Island for about two minutes, while Boyd got out of the red truck and proceeded to get into a red car. Ester testified that the Jeep then made a u-turn, proceeded northbound at a high rate of speed, hit the red car, then hit Boyd. The Jeep kept going towards 62nd Street. Ester testified that Boyd flew in the air and then fell

6

A-6

1-01-2879

to the ground. Ester testified that the Jeep never swerved, never stopped, and never hesitated; but rather, increased speed before it struck Boyd.

Officer Ronald W. Gibbs, a Chicago police officer, testified that on January 12, 2000, he received a call about an accident at 6335 Stony Island. Upon arriving at the location, he learned that the defendant was wanted in the hit and run accident. Officer Gibbs spoke to Serena Hill-Pratt, an employee of the YMCA, who was standing outside talking on Asha's cellular phone. After having a conversation with her, Officer Gibbs listened to the voice mails on the cellular phone and heard a male voice on the other end of the phone. Officer Gibbs sent three officers to look for the defendant. Officer Gibbs spoke to Robert Culverson, who was trying to enter the crime scene. Culverson gave Officer Gibbs the defendant's cellular phone number and told him that the defendant had sent him to the scene. Officer Gibbs called the cellular phone number provided by Culverson and spoke to someone who identified himself as the defendant. The defendant admitted to hitting Boyd with his car. The next morning, Officer Gibbs called the defendant's father, Michael Robbins, and asked Robbins to contact him if he heard from the defendant. About fifteen minutes after his first conversation with Robbins, Officer Gibbs had a second conversation with Robbins, and learned that the defendant was being held in custody in Bloomington, Illinois.

7

A-7

1-01-2879

Leonard Stocker, a forensic investigator, testified that on January 12, 2000, he processed a homicide scene at 6335 Stony Island. At the scene, Stocker did not see any skid marks. Stocker recovered paint scrapings from the left rear quarter panel of a red Escort located at 6335 Stony Island. Stocker took photographs of the scene and the damage to the red Escort. Stocker also photographed the clothing and debris in the street near to the car. Stocker testified that Boyd's body was found at the far north end of the two parked cars at 6331 Stony Island, which was 78 feet from where the initial impact occurred.

Brian Gray, an Illinois state trooper, testified that on January 13, 2000, at approximately 2:30 a.m., he pulled the defendant over. He asked the defendant for his license and proof of insurance, but the defendant could not find either. The defendant told Gray that his name was Kevin Tevin Williams and that his birth date was April 7, 1979. The defendant gave Gray the orange temporary registration sticker that was in the glove compartment. Gray noticed that it was ripped in half and had the name of Bobby Reynolds. Gray ran the Vehicle Identification Number (VIN) on the Jeep, but there was no record on file.

Gray testified that the defendant was very nervous and shaking. After detecting an odor of alcohol, Gray asked the defendant if he had been drinking. The defendant told Gray he had drank a whole pint of gin with orange juice and threw the bottle out somewhere in Chicago. Gray noticed that there was

8

1-01-2879

massive body damage on the Jeep.  Gray asked the defendant about
the damage, and the defendant said that his uncle hit something a
month earlier.  Gray testified that it was apparent that the
damage was recent because there was no rust where the paint had
chipped, and there was no dirt or debris inside the glass cavity
of the headlight.  Gray asked the defendant what his uncle had
hit, but the defendant said he did not know.  Gray asked the
defendant for his name and date of birth again, and the defendant
again said his name was Kevin Tevin Williams, but this time he
gave a birth date of June 7, 1979.  Gray checked this name and
date of birth, but did not obtain any information.  Gray asked
the defendant for his address, and the defendant initially said
that his address was 5327 N. Lake Park, but later said that it
was 5451 Cornell.

At approximately 4:15 a.m., Gray administered a breathalyzer
test on the defendant.  The preliminary results were .006.  Gray
advised the defendant that he was under the legal age for
drinking and was in violation of the zero tolerance policy.
After conducting an inventory search of the Jeep, Gray recovered
three small baggies of marijuana, a safe that contained $2,600,
and some pictures.  The defendant was taken to the Illinois State
Police Department Investigations Section.

On cross-examination, Gray testified that at the time of the
defendant's arrest, he had been a police officer for about four
months.  Gray testified that he had mistakenly put in his

9

1-01-2879

handwritten report that the alcohol concentration of the breathalyzer test was .000.  Gray testified that he later amended his report to .002.

Sergeant Brendon Heffner, with the Illinois State Police, testified that on January 12, 2000, at about 6:00 a.m., he was called to the sixth district police station.  At approximately 7:00 a.m., Sergeant Heffner, who was unaware of the investigation in Chicago, had a conversation with the defendant.  The defendant said that his name was Kevin Williams.  After Sergeant Heffner explained that providing false information would make matters worse, the defendant provided the name Michael Threlkeld.  Sergeant Heffner looked in the safe that was recovered from the defendant's car and found photographs and money.  After receiving a phone call from the Chicago police, Sergeant Heffner obtained a search warrant for the 1995 silver Jeep.

Michael Trummel, a crime scene investigator with the Illinois State Police, testified that on January 14, 2000, he examined and processed a 1995 silver Jeep Cherokee, pursuant to a search warrant.  Trummel examined the damage to the Jeep.  Trummel verified that the VIN on the search warrant matched the VIN on the Jeep.  Based on his experience, Trummel believed that the car had been involved in an accident and that the red paint transfer on the driver's side was consistent with someone striking a red car that had its door open.

10

1-01-2879

Sergeant Charles Williams, with the Chicago Police
Department, testified that on January 13, 2000, he and Detective
Frazier picked up the defendant in Bloomington, Illinois.

The State then proceeded by way of stipulation. If called
to testify, Ellen Connolly, a forensic scientist, would testify
that she was employed by the Illinois State Police. She would
testify that she qualified as an expert in the field of trace
analysis. Her testimony connected the defendant's Jeep to the
accident scene.

Dr. Rexene Worrell, an assistant medical examiner, testified
as an expert in the field of forensic pathology. On January 13,
2000, Dr. Worrell performed a post mortem examination on Boyd.
The external examination revealed abrasions on the victim's
forehead, upper back, mid back, right back, right elbow, knee,
buttock, and penis; small lacerations on his right arm and left
elbow; and a bruise on his groin. The internal examination
revealed that the victim's cervical spine (neck) was fractured in
several places, that his head was dislocated, that he had blood
in the peritoneal cavity, that he had hemorrhages in the fat
surrounding the intestines, and that he had a hemorrhage around
the pelvis. Boyd died as a result of multiple injuries resulting
from being struck by an automobile.

At the conclusion of the State's case, the defendant made a
motion for a directed finding, which was denied. Terrence
Coleman testified for the defense. Coleman testified that in

11

1-01-2879

January 2000, he lived with the defendant and Ahmand Kendall at 5451 S. Cornell. Coleman testified that he had known the defendant and Asha for nine years, that the defendant and Asha dated for six and a half years, and that during their relationship there were about four or five break-ups that ended in reconciliation. Coleman testified that the defendant had never harmed Asha or any other person. Coleman testified that the defendant never dated other women, and that Asha never dated other men.

On January 2, 2000, at approximately 2:00 a.m., Coleman was with the defendant and Kendall at Stony Subs Restaurant, and they saw Asha. At that time, the defendant and Asha were not dating and there was an order of protection against the defendant prohibiting him from seeing her. Coleman testified that after they arrived, the defendant and Asha spoke for a minute. He heard them agree to go out on a date, but they did not make specific plans.

Coleman testified that on January 12, 2000, at about 6:30 p.m., he was in his apartment with the defendant and Kendall. Coleman testified that the defendant was going to dinner and a movie with Asha that evening. Coleman testified that the defendant was in good spirits because he was looking forward to seeing Asha and because they were reconciling. Around 9:00 p.m., the defendant left the apartment, which was about five minutes from the YMCA where Asha worked.

12

1-01-2879

Coleman testified that the problems with the defendant and
Asha's relationship were well-known.  Coleman testified that the
defendant and Asha often fought about "jealousies" and whether
they were seeing other people.  Coleman testified that these
fights made both Asha and the defendant upset and angry.  The
defendant and Asha also accused each other of seeing other
people, which caused them both to get really upset.  Coleman
testified that he was not aware that the defendant slashed Asha's
tires, broke her rear view mirror, broke off her windshield
wipers, or used a gun to take back a ring and a coat.  Coleman is
a convicted felon, who was on probation for delivery of a
controlled substance and who had previously been convicted of
intimidating a witness.

Ahmand Kendall testified that in January 2000, he lived with
the defendant, and no one else lived with them, but Coleman "was
in and out."  Kendall testified that the has known Asha as long
as he has known the defendant.  He has seen them break up and get
back together many times.  Kendall testified that on January 2,
2000, he was at Stony Subs with the defendant and Coleman, and
they saw Asha.  The defendant and Asha talked and made plans to
go to dinner and a movie.  Kendall knew there was a restraining
order against the defendant at that time, but the defendant and
Asha still talked.  On January 12, 2000, around 6:30 p.m.,
Kendall and Coleman were at Kendall's apartment when the
defendant arrived home from work.  Kendall testified that the

13

1-01-2879

defendant was ecstatic and told them he was going out with Asha. According to Kendall, the defendant went to Asha's work around 8:30-9:00 p.m.

Kendall testified that the defendant drives fast and erratic. Kendall testified that the defendant has poor driving skills. Kendall testified that the defendant has never harmed Asha or anyone else. Kendall knew Asha had brought charges against the defendant, but did not know the details of the incidents. Kendall knew that the defendant gave Asha a diamond ring and leather coat. Kendall knew that the defendant forcefully took the ring and coat from Asha, and that as a result of that incident, she obtained a restraining order against him. However, Kendall did not know that the defendant had pulled a gun on Asha when he took the items back. Kendall did not know that the defendant slashed Asha's tires, that the defendant approached her at work with a baseball bat, or that he damaged her car. Kendall testified that the defendant did not date other women, and Asha did not date other men. Kendall testified that when the defendant and Asha broke up, the defendant "took it bad" and would want her back the next day.

Jasmine Carter, the defendant's cousin, testified that she has been friends with Asha for about eight or nine years. Carter testified that she knew the defendant and Asha had a relationship and that they broke up and got back together all the time. Carter testified that Asha confided in her all the time and that

14

1-01-2879

Asha never told her that she dated another man.  According to
Carter, the defendant never dated any other girls and neither the
defendant nor Asha ever accused each other of dating other
people.  Carter testified that Asha confided in her about a male
friend at work and Carter told the defendant about this.  Carter
testified that on January 12, 2000, the defendant told her he was
going to the movies with Asha.  Carter was aware that Asha had an
order of protection against the defendant, and that Asha had
brought charges against the defendant on previous occasions.
Carter testified that both the defendant and Asha told her that
in June 1999, the defendant broke Asha's front windshield, that
in November and December 1999, the defendant vandalized Asha's
car, that the defendant slashed Asha's tires, and that the
defendant pulled a gun on Asha and demanded that she return a
coat and ring.  Carter testified that the defendant did not tell
her he went to Asha's work with a baseball bat to damage her car.
According to Carter, the defendant is a terrible driver, can
never keep the car straight, and has a hard time controlling the
car.

     The defendant testified on his own behalf.  On January 12,
2000, he was 20 years old and lived at 5451 S. Cornell.  The
defendant had dated Asha for six and a half or seven years.  The
defendant testified that he and Asha fought a lot while they were
dating, but they never fought about either of them dating other
people.  The defendant testified that he had no reason to be

15

1-01-2879

jealous about Asha because she was not dating anyone else.  The
defendant testified that he and Asha broke up many times, but
each time they reconciled.  The defendant testified that Asha
brought criminal charges against him many times, but because she
never went to court the charges were dropped.  The defendant
admitted that he caused property damage to some of Asha's things,
but he could not remember how many times.  He denied ever
physically hitting her.  The defendant testified that he broke
the front windshield of Asha's car with a brick.  Even though he
could not remember why he did it, he remembered that he was angry
when he did it.  The defendant testified that in November 1999,
he broke the side mirror and windshield wiper on Asha's car
because he was angry with her; however, he did not remember what
he was angry about.  The defendant testified that in December
1999, he slashed the tires on Asha's car while it was parked
outside of her work because he was angry.  The defendant admitted
that when Asha would not return the diamond ring and leather coat
he had given her, he got very upset and forcibly took them back,
while armed with a weapon.  The defendant claimed that the weapon
was a BB gun, and that he did not point the gun at her, threaten
her with the gun, or hit her with the gun.  After that incident,
Asha obtained an order of protection against the defendant.  The
defendant testified that through all of these problems he was
still in love with Asha and they both intended to get married.

16

A-16

1-01-2879

According to the defendant, their fights were "little stupid things" and they never fought about her dating another man.

On direct examination, the defendant testified that on January 2, 2000, around 4:00 a.m., he saw Asha at Stony Subs and they made plans to go to dinner and a movie on January 12, 2000. However, on cross examination, the defendant testified that on January 2, 2000, at Stony Subs, they agreed to go out, but did not make plans until the next morning. The defendant testified that on January 12, 2000, he was supposed to meet Asha in front of her house when she got off work, between 9:00-9:30 p.m. The defendant wanted to take her to dinner and a movie. Around 6:30 p.m., the defendant got home from work. The defendant testified that he was happy and excited, and did not drink, eat, or smoke.

The defendant testified that he was driving under a revoked license, was uninsured, and did not have registration on the car, but he did have the orange tag on the car. He testified that he had received numerous tickets and had been in numerous accidents. The defendant testified that some of his accidents included running into a wall at Wyler's Children's Hospital, hitting four parked cars, hitting a CTA bus driver, hitting a car and knocking off the "so I can see mirror," hitting fireplugs, and hitting light poles.

The defendant testified that on January 12, 2000, he left his house around 9:15 p.m., and arrived at Asha's work around 9:30 p.m. The defendant testified that even though he and Asha

17

1-01-2879

agreed to meet at her house, he went to her work instead. He saw
her sitting in a parked car. The defendant testified that
although he did not know any of Asha's friends from work, she had
talked abut a male friend. The defendant testified that he never
saw this male friend, but did not feel threatened by him or
jealous of him. The defendant testified that when he arrived at
the YMCA, he saw Asha on the east side of the street, facing
northbound in her car. The defendant pulled alongside her,
rolled down his window and told her that the movie started at
10:30 p.m. The defendant testified that he was using a normal
tone of voice, that his window was down, and that Asha could not
hear him because her window was up. The defendant testified that
Asha did not roll down her window and did not say anything, but
that she held up her finger and the defendant thought that she
wanted him to follow her. The defendant testified that he did
not have a conversation with Asha, that he sat there for 15-20
seconds, and he never said "I'll be back."

The defendant testified that he drove up a few feet,
accelerated, tried to dip a little to the right, made a left,
sped up, "swooped around," and tried to make a u-turn. The
defendant admitted that when he sped up, he noticed that he had
hit someone. He testified that he did not know the person he had
hit, had never saw him before, and did not recall seeing him in
Asha's car. The defendant testified that he did not see Boyd on
the street before he hit him, and the first time he noticed him

18

1-01-2879

was when the car door opened. The defendant testified that he
did not mean to hit Boyd, and that it was an accident. The
defendant testified that he got scared because his driver's
license was revoked and he had just hit someone. He fled the
scene and drove to his mother's house at 5307 S. Hyde Park
Boulevard. At his mother's house, the defendant called a friend
named Ronald and told him that he had hit someone. The defendant
told Ronald to go to the scene so he could tell the defendant
what was happening. The defendant then had two drinks and called
Asha's cellular phone. The defendant did not speak to Asha when
he called her, but instead spoke to a police officer, who told
him that he needed to turn himself in because he had hit someone.
The defendant testified that he told the police officer that he
would turn himself in, he was sorry, and it was an accident. The
defendant testified that he never spoke to Asha, any of his
roommates, or his mother that evening. About 30 minutes after he
arrived at his mother's house, the police officer he had
previously spoken to called him and told him that Boyd was dead.
The defendant testified that he got scared, retrieved his safe,
and fled. The defendant testified that he needed to get a lawyer
because his driver's license was revoked, so he took his safe,
entered I-55, and kept driving. As he was driving, he was
thinking that he had just hit someone and needed to turn himself
in, but he knew that he needed to get a lawyer first. The
defendant testified that he was stopped by a state trooper. He

19

1-01-2879

gave the trooper his brother's name, Kevin Williams, and said that he was going to Champaign.  The defendant testified that he now realizes that I-55 is the wrong way to Champaign.

In rebuttal, the State entered a certified copy of a conviction, which showed that in June 1998, the defendant had been convicted of delivery of a controlled substance.  In rebuttal, Sergeant Williams testified that on January 14, 2000, around 12:31 a.m., he interviewed the defendant.  Sergeant Williams testified that the defendant told him that he was drunk on January 13, 2000, that he had an accident, that he had hit a red car, that he had consumed a pint of Seagrams gin, and that he just happened to be driving in the area of 67th and Stony Island when he saw Asha in her car.

After the presentation of the evidence, the trial court found the defendant guilty of first-degree murder.  After hearing aggravation and mitigation, the trial court sentenced the defendant to 35 years' imprisonment.

### ANALYSIS

On appeal, the defendant contends (1) he was denied his right to a fair trial because he was prejudiced by the improper introduction of evidence of his prior bad acts; (2) the State failed to prove him guilty beyond a reasonable doubt; and (3) his trial counsel was ineffective for failing to call Nikki Wittingham as a witness at trial.

20

1-01-2879

## I.   Admission of Prior Bad Acts

The defendant first contends that the trial court erred in admitting evidence of the defendant's prior bad acts and that the error substantially prejudiced the defendant's due process right to a fair trial under Illinois law and the due process clause of the fourteenth amendment to the United States Constitution.  The defendant argues that the other crimes evidence was prejudicial and irrelevant to any issue in the trial.  The defendant contends that the prior bad acts had no bearing on the defendant's motive for committing the offense or his intent to kill or seriously injure Boyd because none of the prior bad acts were directed towards Boyd.  The defendant claims that the sole purpose served by the State's introduction of the defendant's prior bad acts against Asha was to establish that the defendant had a general propensity to commit violence and to establish that the defendant acted in conformity with his prior misconduct.

On the other hand, the State claims that the other crimes evidence was admissible because it was relevant and probative of the defendant's guilt.  Specifically, the State contends that the trial court properly exercised its discretion in admitting the other crimes evidence because the evidence showed the defendant's intent, motive, and the absence of an innocent frame of mind.

The admissibility of evidence at trial is a matter within the sound discretion of the trail court, and the court's decision will not be overturned on appeal absent a clear abuse of

21

1-01-2879

discretion.  People v. Cortes, 181 Ill. 2d 249, 284, 692 N.E.2d
1129 (1998); People v. Illgen, 145 Ill. 2d 353, 364, 583 N.E.2d
515 (1991).  "Such an abuse of discretion will be found only
where the trial court's decision is 'arbitrary, fanciful or
unreasonable' or 'where no reasonable man would take the view
adopted by the trial court.'" Illgen, 145 Ill. 2d at 364, quoting
People v. M.D., 101 Ill. 2d 73, 90, 461 N.E.2d 367 (1984).

Evidence of other crimes or prior bad acts is not admissible
for the purpose of showing the defendant's disposition or
propensity to commit a crime.  Illgen, 145 Ill. 2d at 364; People
v. McKibbins, 96 Ill. 2d 176, 182, 449 N.E.2d 821 (1983).  "Such
evidence is admissible, however, where relevant to prove modus
operandi, intent, identity, motive or absence of mistake."
Illgen, 145 Ill. 2d at 364-65, citing McKibbins, 96 Ill. 2d at
182.  Other offense evidence is admissible if it is relevant for
any purpose other than to show the defendant's disposition or
propensity to commit crime.  People v. Bedoya, 325 Ill. App. 3d
926, 937, 758 N.E.2d 366 (2001).  Evidence is relevant if it has
any tendency to make the existence of a fact that is of
consequence in the case more probable or less probable than it
would be without the evidence.  Illgen, 145 Ill. 2d at 365-66;
Bedoya, 325 Ill. App. 3d at 937.  When other offense evidence is
presented, the trial court must weigh the probative value of the
evidence against its prejudicial effect, and the trial court may

1-01-2879

exclude the evidence if the prejudicial effect substantially outweighs the probative value.  <u>Illgen</u>, 145 Ill. 2d at 365.

Other offense evidence may be used only when the other offense has some threshold similarity to the crime charged. <u>Illgen</u>, 145 Ill. 2d at 372.  The similarity of the evidence increases the relevance of the evidence and ensures that the evidence is not being used solely to establish the defendant's propensity to commit a crime.  <u>Illgen</u>, 145 Ill. 2d at 372.  When the other crime evidence is used to prove *modus operandi* or a common design or plan, there must be a high degree of similarity between the facts of the crime charged and the other offenses, and must share distinctive common features.  <u>Illgen</u>, 145 Ill. 2d at 372-73; <u>McKibbins</u>, 96 Ill. 2d at 185-86.  However, where the other crime evidence is offered to prove motive, intent, or the absence of an innocent frame of mind, "mere general areas of similarity will suffice."  <u>Illgen</u>, 145 Ill. 2d at 373; <u>McKibbins</u>, 96 Ill. 2d at 185-86; <u>Bedoya</u>, 325 Ill. App. 3d at 938.  "The test is not one of exact, rigorous identity, and some dissimilarity will always exist between independent crimes."  <u>Bedoya</u>, 325 Ill. App. 3d at 938.

In the instant case, the State introduced five incidents of other crimes.  The first incident occurred in June 1999, when the defendant broke the front windshield and side window of Asha's vehicle.  The second incident occurred about five months later, when the defendant broke the windshield wiper and side mirror on

23

1-01-2879

Asha's vehicle.  The third incident occurred in December 1999, when the defendant slashed the tires on Asha's vehicle while she was at work.  The fourth incident occurred in December 1999, when the defendant cracked the rear light of Asha's vehicle with a baseball bat, while Asha was in the vehicle.  The fifth incident occurred in December 1999, when the defendant exhibited a gun and forced Asha to return a coat and ring.  The defendant admitted that he did all of these things because he was angry or upset with Asha.

The trial court heard arguments on the State's motion to introduce other crimes evidence.  In granting the State's motion, the trial court reasoned:

> "the defense is stating that their defense is going to be that this is an accident.  It was just an accidental killing, some kind of reckless act without any criminal mind, without any criminal intention.  The government claims that they had police reports that have been generated and there was a history of conduct towards this woman.  The woman was present at the time of the offense, was in the immediate company of the deceased moments before he was killed, from what both sides are telling me.  It was the car being driven by Mr. Threlkeld.

* * *

24

A-24

1-01-2879

> [The] Court finds that what the government is
> seeking is other crimes evidence, is in the nature
> of trying to put into context an ongoing
> relationship between Mr. Threlkeld and a woman
> that was present in the company of the deceased
> who was the male right before he was killed.
>
> I find that from what I'm being told by the
> parties that everything about the relationship
> between this woman and Mr. Threlkeld is of extreme
> relevance and extreme importance. I find that its
> probative value, if true, would far outweigh the
> prejudicial value. It's the only way to put in
> context, at least through the government's theory
> what Mr. Threlkeld was doing that night."

It is clear that the trial court clearly weighed the
relevancy of the other crimes evidence and considered the
probative value in relation to the prejudicial effect of the
evidence. Furthermore, the court carefully considered the reason
for the presentation of this evidence. The court concluded that
the evidence was being presented to rebut the defense that this
was an accident, and to show the motive behind the defendant's
actions. These are all permissible reasons for the presentation
of other crimes evidence. See Illgen, 145 Ill. 2d at 364-65.
Furthermore, the court considered the similarities between the
other crimes evidence and the crime charged. As discussed above,

25

1-01-2879

when the other crime evidence is offered to prove motive, intent,
or the absence of an innocent frame of mind, "mere general
similarity will suffice." Illgen, 145 Ill. 2d at 373.  The trial
court noted the similarities in the offenses because the
defendant demonstrated a history of conduct towards Asha and Asha
was present at the time of the offense, and was in the company of
Boyd moments before he was killed.

   The other crime evidence taken together with the other
evidence in the case, tends to make it more probable that the
defendant acted with the criminal intent required for murder,
and, consequently, less probable that the defendant's actions
were inadvertent or the product of an innocent state of mind.
Furthermore, the instant case was presented at a bench trial and
the trial judge is presumed to know that law.  People v. McCoy,
207 Ill. 2d 332, 355, 799 N.E.2d 269 (2003).  We will not indulge
the defendant's claim that the trial judge was unduly prejudiced
by this evidence absent a clear showing to the contrary.  In a
jury trial, the trial court should examine the evidence for the
potential over persuasive impact this type of evidence may have
on a jury.  See People v. Wydra, 265 Ill. App. 3d 597, 615, 637
N.E.2d 741 (1994).  However, in the instant case, the other
crimes evidence was presented in a bench trial for the limited
purpose of showing motive and intent.  "When other-crimes
evidence is introduced for a limited purpose in a bench trial, it
is presumed that the trial judge considered it only for that

                              26

1-01-2879

purpose." <u>People v. Hart</u>, 338 Ill. App. 3d 983, 993, 789 N.E.2d 905 (2003). We will not indulge the defendant's claim that the trial judge was unduly prejudiced by this evidence absent a clear showing to the contrary. We find that the trial court did not abuse its discretion in admitting the prior bad acts evidence to show the defendant's intent and motive and to establish that the defendant's acts were not an accident.

II.  Sufficiency of the Evidence

The defendant also contends that the State failed to prove him guilty beyond a reasonable doubt. Specifically, the defendant contends that the evidence was insufficient to prove that he had the specific intent to kill Boyd. Where a defendant challenges the sufficiency of the evidence against him, the inquiry is whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could have found the essential elements of the crime beyond a reasonable doubt. <u>People v. Hagberg</u>, 192 Ill. 2d 29, 33-34, 733 N.E.2d 1271 (2000). The standard for reviewing the sufficiency of the evidence in a bench trial is the same as it is in a jury trial. <u>People v. Howery</u>, 178 Ill. 2d 1, 38, 687 N.E.2d 836 (1997). The trier of fact bears the responsibility of determining the credibility of the witnesses, the weight to be given their testimony, and reasonable inference to be drawn from the evidence. <u>People v. Williams</u>, 324 Ill. App. 3d 419, 433, 753 N.E.2d 1089 (2001). It is not the function of the reviewing court to retry the defendant

27



1-01-2879

or to substitute its judgment for that of the trier of fact on questions involving the credibility of witnesses, the weight of the evidence, or resolution of conflicting testimony. <u>Williams</u>, 324 Ill. App. 3d at 433; <u>People v. Campbell</u>, 146 Ill. 2d 363, 375, 586 N.E.2d 1261 (1992). Accordingly, a reviewing court will overturn a conviction only when a rational trier of fact, viewing the evidence in the light most favorable to the State, could not have found beyond a reasonable doubt that the defendant committed the elements of the criminal offense. <u>People v. McCoy</u>, 295 Ill. App. 3d 988, 995, 692 N.E.2d 1244 (1998). Ultimately, a conviction will not be set aside unless the evidence is so palpably contrary to the verdict, or so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of guilt. <u>Campbell</u>, 146 Ill. 2d at 375. The defendant bears the burden of showing the State's evidence is "so improbable or unsatisfactory that a reasonable doubt exists about the defendant's guilt." <u>People v. Taylor</u>, 186 Ill. 2d 439, 445, 712 N.E.2d 326 (1999).

The defendant contends that the State failed to prove beyond a reasonable doubt that the defendant intended to kill or inflict great bodily harm to Boyd. The intent with which an act is committed may be inferred from the act itself and the surrounding circumstances. <u>People v. Patterson</u>, 314 Ill. App. 3d 962, 969, 734 N.E.2d 462 (2000); <u>People v. Sutton</u>, 252 Ill. App. 3d 172, 185, 624 N.E.2d 1189 (1993). "The trier of fact makes the factual determination regarding a defendant's intent, and that

28

1-01-2879

determination will not be disturbed on review unless the evidence is so improbable that it raises a reasonable doubt about the defendant's guilt." Patterson, 314 Ill. App. 3d at 969, citing People v. Cosby, 305 Ill. App. 3d 211, 219, 711 N.E.2d 1174 (1999).

Viewing the evidence presented at trial in the light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt that the defendant intended to kill or inflict great bodily harm upon Boyd. Through the admission of the defendant's prior bad acts and the testimony of Asha, the State showed that the defendant had done property damage to Asha's vehicle, including breaking her windshield, slashing her tires, and breaking her rear light with a baseball bat while she was in the vehicle. The defendant also forced Asha to return a ring and leather coat while armed with a BB gun. After this last incident, Asha obtained an order of protection against the defendant. In addition to the prior bad acts against Asha, testimony about the relationship between the defendant and Asha was presented through numerous witnesses.

At the time of Boyd's murder, the defendant and Asha were broken up, but the defendant had expressed his desire to reconcile with her. On the evening of January 12, 2000, Asha and the defendant were broken up and Asha had an order of protection against the defendant. Despite the order of protection, the defendant claims that he had a date scheduled with Asha on

29

A- 29

1-01-2879

January 12, 2000, to go to dinner and a movie. However, Asha denies having plans with the defendant on January 12, 2000. In fact, Asha testified that she did not expect to see the defendant outside her work that evening, and she had not told him to pick her up at work that evening. Asha had an order of protection against the defendant that ordered him to stay away from her home and work. Furthermore, Asha testified that this was the first time the defendant had seen her with another man.

Terrence Coleman testified on behalf of the defendant. Coleman testified that on January 12, 2000, the defendant said he was going to dinner and a movie with Asha. Coleman testified that the defendant was looking forward to seeing Asha because they were reconciling. Coleman testified that the defendant and Asha fought about "jealousies" and whether they were seeing other people. Ahmand Kendall also testified on the defendant's behalf. Kendall testified that the defendant and Asha had made plans to go to dinner and a movie. Kendall testified that when the defendant and Asha broke up, the defendant "took it bad" and would want her back the next day. Jasmine Carter, the defendant's cousin, testified that the defendant and Asha never accused each other of dating other people. Carter testified that Asha confided in her about a male friend at work, and Carter told the defendant about this.

The defendant admitted that he caused property damage to some of Asha's things. The defendant admitted that he broke the

30

1-01-2879

front windshield of Asha's car with a brick.  Even though he
could not remember why he did it, he remembered that he was angry
when he did it.  The defendant admitted that in November 1999, he
broke the side mirror and windshield wiper on Asha's car because
he was angry with her, but he did not remember what he was angry
about.  The defendant admitted that in December 1999, he slashed
the tires on Asha's car while it was outside of her work because
he was angry with her.  The defendant admitted that when Asha
would not return the diamond ring and leather coat he had given
her, he became very upset and forcibly took them back, while
armed with a BB gun.

Furthermore, Asha testified that on January 12, 2000, when
she drove away from Boyd's car, the defendant, who was waiting at
the next intersection, made a u-turn, hit Boyd, and continued
driving.  Asha did not hear the screech of brakes.  The defendant
drove up next to her at the traffic light, stopped, stared at
her, and then kept driving.

Slater, a witness that did not know Asha or the defendant,
testified that she heard Asha and the defendant have "a couple of
words," but she could not hear what they were saying until it
became "kind of loud."  She heard the defendant say loudly,
"okay, well, I'll be back."  Slater testified that the defendant
was kind of upset or agitated.  She saw the defendant make a u-
turn, hit Boyd, and continue driving.  Slater testified that the
defendant was driving "really fast" when he hit Boyd.  She said

31

1-01-2879

that the defendant never slowed down, never stopped, and never came back.  Slater testified that the defendant hit Boyd at full speed and the vehicle did not appear to be out of control because it was going straight, did not swerve, and did not slow down before or after hitting Boyd.

Ester, another witness that did not know Asha or the defendant, testified that the defendant made a u-turn, proceeded at a high rate of speed, and hit Boyd.  Ester testified that the defendant never swerved, never stopped, and never hesitated, but rather increased speed before he struck Boyd.

After hitting Boyd, the defendant fled the scene.  He went to his mother's house and upon learning that Boyd was dead, retrieved his safe and fled on I-55.  When the defendant was stopped by Officer Gray, he provided Gray with false information about his name and address.

All of the above evidence, taken in the light most favorable to the State is sufficient to infer that the defendant acted intentionally when he hit Boyd.  The intent with which an act is committed may be inferred from the act itself and the surrounding circumstances.  Patterson, 314 Ill. App. 3d at 969; Sutton, 252 Ill. App. 3d at 185.  "The trier of fact makes the factual determination regarding a defendant's intent, and that determination will not be disturbed on review unless the evidence is so improbable that it raises a reasonable doubt about the defendant's guilt."  Patterson, 314 Ill. App. 3d at 969.  In the

32

1-01-2879

instant case, the evidence is not so improbable that it raises a reasonable doubt about the defendant's guilt. The evidence was sufficient for the trial court to infer the defendant intentionally hit and killed Boyd.

Viewing the evidence in the light most favorable to the State, we find the evidence was sufficient for a rational trier of fact to find the defendant guilty beyond a reasonable doubt of the first-degree murder of Linton Boyd.

### III.   Ineffective Counsel

In his pro-se supplemental amendment brief, which this court gave him leave to file, the defendant contends that trial counsel was ineffective for failing to call Nikki Wittingham as a witness at trial.  Defense counsel has "an overreaching duty to advocate the defendant's cause [and] a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process."  Strickland v. Washington, 466 U.S. 668, 688, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).  The benchmark inquiry in addressing a claim of ineffective assistance of counsel is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on having produced a just result."  Strickland, 466 U.S. at 686. Under Strickland, when counsel's performance falls below an objective standard of reasonableness and when those deficiencies undermine confidence in the outcome of the proceedings or deprive the defendant of a fair trial, the sixth amendment has been

33

1-01-2879

violated and reversal is required. Strickland, 466 U.S. at 687-88; People v. House, 141 Ill. 2d 323, 388, 566 N.E.2d 259 (1990).

A defendant claiming ineffective assistance of counsel must show: (1) counsel made errors so serious and his performance was so deficient that he was not functioning in the way guaranteed by the sixth amendment of the United States Constitution; and (2) these deficiencies on the part of counsel so prejudiced the defendant as to deprive him of a fair trial. Strickland, 466 U.S. at 687. A reviewing court must judge the challenged conduct on the facts of the particular case at the time of the counsel's performance. Strickland, 466 U.S. at 693. "With regard to the first prong, judicial scrutiny of a counsel's performance is highly deferential so that a respondent claiming ineffective assistance of counsel must overcome a strong presumption that the challenged actions of counsel were the product of sound trial strategy." People v. Metcalfe, 202 Ill. 2d 544, 561, 782 N.E.2d 263 (2002), citing Strickland, 466 U.S. at 689.

"Decisions concerning which witnesses to call at trial and what evidence to present on defendant's behalf ultimately rest with trial counsel. [Citation]. As matters of trial strategy, such decisions are generally immune from claims of ineffective assistance of counsel. [Citation]. The only exception to this rule is when counsel's chosen trial strategy is so unsound that counsel entirely fails to conduct any meaningful adversarial

34

1-01-2879

testing. [Citation]." <u>People v. Reid</u>, 179 Ill. 2d 297, 310, 688 N.E.2d 1156 (1997).

The defendant claims that his trial counsel was ineffective because he failed to call Nikki Wittingham as a witness at trial. With respect to a failure to call witnesses at trial, "any contention by [a] defendant that his counsel was ineffective for failing to call a witness to testify must be viewed in light of the fact that the decision to call a particular witness is a matter of trial strategy." <u>People v. Garland</u>, 254 Ill. App. 3d 827, 835, 627 N.E.2d 377 (1993). Errors in judgement or trial strategy do not establish incompetence, even if clearly wrong in retrospect. <u>People v. Palmer</u>, 162 Ill. 2d 465, 479, 643 N.E.2d 797 (1994). The mere fact that the strategy proved unsuccessful does not render it incompetent. <u>Palmer</u>, 162 Ill. 2d at 479.

At the mitigation stage of the proceedings, defense counsel presented the court with the affidavit of Nikki Wittingham, Asha's mother. Defense counsel requested that the trial court consider the affidavit in mitigation, but told the court that he believed the affidavit showed that the defendant's act was not intentional based on Wittingham's personal knowledge of the defendant. Defense counsel requested the court to consider the affidavit as substantive evidence and reconsider its finding that the defendant acted intentionally. The trial court stated that it would consider the affidavit in mitigation, but not as substantive evidence. In the affidavit, Wittingham stated that

35

1-01-2879

the defendant loved Asha very much. Wittingham stated that the defendant confided in her his personal problems including problems from his upbringing. Wittingham stated that the defendant loved Asha, and because he loved her so much, he would never do anything to hurt her. Wittingham stated that she personally knows the defendant and in her opinion, the defendant did not leave his house on January 12, 2000, with the intention of killing Boyd.

The defendant claims that Wittingham could have shown his true character, nature and mind-set. He contends that Wittingham knew him well enough to have given testimony contrary to the State's depiction of the defendant, and that her testimony could have changed the outcome of the trial. The defendant claims that trial counsel had plenty of time and opportunities to list Wittingham as a witness. However, during the mitigation proceedings, defense counsel informed the trial court that Wittingham contacted him after the court's finding in the matter.

Even though the defendant contends that Wittingham could have testified to his true character, nature, and mind-set, he has presented no persuasive authority that this testimony would have been admissible. Judicial scrutiny of trial counsel's performance is highly deferential and the defendant must overcome a strong presumption that the actions were not the product of sound trial strategy (Metcalfe, 202 Ill. 2d at 561). Setting aside the dubious admissibility of Wittingham's testimony, we find the testimony was not vital to the defendant's case.

36

A-36

1-01-2879

Furthermore, defense counsel was contacted by Wittingham only after the trial court's finding of guilt. Due to the late discovery of Wittingham, defense counsel could not have presented her as a witness at trial. Defense counsel would have had to attempt to have her testimony presented as newly discovered evidence, and the trial court stated that it was unlikely that this testimony would meet the standards for newly discovered evidence. Therefore, the failure to call Wittingham as a witness does not constitute ineffective assistance of counsel.

### CONCLUSION

For the foregoing reasons, we affirm the defendant's conviction.

Affirmed.

GARCIA, J., with CAHILL and BURKE, JJ., concurring.

37

A-37

No. _____

## IN THE SUPREME COURT OF ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS,<br><br>          Plaintiff-Appellee,<br><br>vs.<br><br>MICHAEL THRELKELD,<br><br>          Defendant-Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Appeal from the Circuit Court of Cook County, Illinois<br><br>No. 00CR 4537<br><br>Honorable James B. Linn |

Petition for Leave to Appeal from the Illinois Appellate Court, First District, No. 1-01-2879, Affirming the Defendant's Conviction from the Circuit Court of Cook County, Illinois, No. 00CR 4537, Honorable James B. Linn, Judge Presiding

## DEFENDANT'S PETITION FOR LEAVE TO APPEAL FROM THE FIRST DISTRICT APPELLATE COURT'S ORDER AFFIRMING DEFENDANT'S CONVICTION

Lee Ann Russo
Jones Day
77 West Wacker, 35th Floor
Chicago, Illinois 60601
(312) 782-3939

Jeffrey R. Weiland

Counsel for Defendant-Appellant
MICHAEL THRELKELD

EXHIBIT F

# PRAYER FOR LEAVE TO APPEAL

Pursuant to Illinois Supreme Court Rule 315, Defendant Michael Threlkeld, respectfully requests leave to appeal from the September 7, 2004 Order and Opinion of the Illinois Appellate Court, First District, affirming the Circuit Court's conviction of the defendant. (Appendix ("App.") at A1-A37).

The Petitioner respectfully submits that the Order of the First District affirming the defendant's conviction raises substantial constitutional questions, misapplies the precedent of this Court, and directly conflicts with the holdings of courts in other jurisdictions. By permitting the defendant's prior bad acts to be admitted as substantive proof of his intent in this case, the First District's Order, affirming the trial court, violates the defendant's due process rights under both the Illinois and United States Constitutions. This constitutional violation is a direct result of the First District's failure to properly apply the prior bad acts jurisprudence of this Court.[1]  As applied here, the First District's approach to the introduction of prior bad acts actually embraces, rather than rejects, the use of impermissible propensity logic. Indeed, the First District's interpretation of this Court's precedent rewards the State for arguing that the evidence demonstrates a propensity to act in conformity with prior criminal or violent misconduct. Such error is highlighted by the language of the trial court in rendering its verdict and the arguments presented by the State in the trial court and on appeal. Further, the error in the First District's application of this Court's prior bad acts precedent, particularly the precedent involving specific-intent crimes, is explained persuasively through conflicting authority existing in other jurisdictions.

---

[1] The terms "prior bad acts," "prior misconduct," and "other crimes" are used interchangeably throughout this Petition.

Through this appeal, this Court has the opportunity to clarify the proper analysis to be applied to the introduction of evidence of prior bad acts, particularly in cases involving specific-intent crimes. It is also critical that the Court clarify the analytical framework for determining whether the improper introduction of prior bad acts constitutes reversible error. Contrary to this Court's express holdings, the State contended on appeal that the traditional sufficiency of the evidence review applies even in cases involving evidence of prior bad acts. As this Court has recognized previously, more than the defendant's interests are at stake when a defendant's due process rights are infringed – if not accepted, the integrity of the criminal justice system, and its goal of fundamental fairness to all defendants, will be impugned.

## TIMELINESS OF PETITION AND PROCEEDINGS BELOW

On September 7, 2004, the First District entered its Order affirming the trial court's conviction of the defendant. (App. at A1-A37). On September 27, 2004, the defendant filed in the First District Appellate Court his notice of intent to petition for leave to appeal its Order. (App. at A38-A40). Defendant then filed this Petition for Leave to Appeal on October 12, 2003 within the time limit prescribed by Rule 315(b).

## POINTS RELIED UPON FOR REVERSAL

This Court should grant this petition for review for any one of the following reasons:

1.      The defendant's right to a fair trial under Illinois law and the Due Process Clause of the Fourteenth Amendment to the United States Constitution was prejudiced by the improper introduction of evidence of his prior bad acts.

2.      The State failed to prove beyond a reasonable doubt that the defendant intended to kill or cause great bodily injury to the victim as required under Illinois law and the Fourteenth Amendment to the United States Constitution.

3.      The defendant's trial counsel was ineffective in failing to call Nikki Wittingham to testify as a witness at trial.

## STATEMENT OF THE FACTS

In the late evening of January 12, 2000, a vehicle driven by Defendant-Appellant Michael Threlkeld fatally struck the victim, Linton Boyd. Michael Threlkeld, who was twenty at the time of the incident, was charged with murder in the first degree. (C. 18-19, 50). At trial, Defendant Threlkeld admitted that he drove the vehicle that struck Linton Boyd, but contended that it was an accident. (R. D23, D25). After a bench trial, the defendant was found guilty of first-degree murder and sentenced to thirty-five years in an Illinois State penitentiary. (R. D114, F38).

On the evening of January 12, 2000, the date of the alleged crime, Michael Threlkeld arrived home from work at approximately 6:30 p.m. (R. C23, D12). According to Michael's testimony, corroborated by Terrence Coleman and Ahmand Kendall, Michael had a date planned with his long-time girlfriend Edwina Asha Quansah, ("Asha"). (R. C24, D11). Michael left his apartment and drove southbound on Stony Island Avenue in a silver 1995 Jeep Cherokee. (R. A30, D14, D18). Asha's two-door Red Blazer was double parked, facing the opposite direction on Stony Island, outside of the YMCA where she worked. (R. A30, D18). Linton Boyd was sitting in the passenger seat of Asha's vehicle. (R. A30). Michael pulled his vehicle next to Asha's vehicle such that the driver's side windows were adjacent to each other. (R. A31).

Michelle Slater and Kyra Ester, were standing at a bus stop across the street from where Asha was parked. Ms. Slater arrived first at the bus stop. (R. A66). When she arrived, Asha's red truck already was parked across the street. (R. A60). Approximately fifteen minutes later, Michael's truck approached in the lane closest to the bus stop. (R. A60). Kyra Ester, arrived at the bus stop just as Michael's vehicle was pulling up. (R. B11-B12).

Ms. Ester testified that Asha rolled down her car window and began talking, but that the conversation was not loud enough for her to understand anything that was being said. (R. B13-B14). Ms. Slater also testified that she could not hear any of the conversation, except that at the

end, Michael allegedly said, "Okay, well, I'll be back." (R. A60-A61). Asha testified that she did not remember any conversation, but that she put up a finger signaling for Michael to wait a minute. (R. A31). Michael testified that he interpreted Asha's motion with her finger to mean "follow her" and so he pulled forward. (R. D21, D-52, A31).

After Michael pulled his vehicle forward, Linton Boyd exited Asha's vehicle on the passenger side and began to open the driver's side door to his own car which was parked parallel to Asha's vehicle. (R. A31-A32, A-61). Asha then pulled away and stopped up the street at the next stoplight. (R. A32). While or just after Linton Boyd opened his own car's door, the defendant's vehicle made a U-turn and struck Linton Boyd, killing him. After striking the victim, the defendant's vehicle continued forward, paused briefly at the stoplight next to Asha's vehicle, and then departed the scene. (R. D26). Asha backed her car up and went to check on the victim. (R. A36). By that time several other people had come outside and someone had called 911. (R. A37). The police arrived on the scene several minutes later.

The defendant testified that after he left the scene, he returned home to his mother's house, where he had two shots of gin. (R. D26). He then called Asha's cell phone in order to speak with her, but instead ended up talking to Officer Gibbs, who was at the scene of the incident. (R. D28-D29). After his conversations with Officer Gibbs, the defendant got in his vehicle and drove south on I-55. (R. D30). Trooper Brian Gray of the Illinois State Police testified that, while pulled over the defendant's vehicle for driving erratically. (R. B34-B35). Trooper Gray testified that he detected alcohol on the defendant's breath. (R. B38). Because the defendant was a minor, Trooper Gray issued him a zero tolerance citation for underage drinking and took him into custody. (R. B42-B43). Upon learning that the defendant had been detained

in Bloomington, members of the Chicago Police Department traveled to Bloomington and

transported the defendant back to Chicago. (R. A129-A130).

## ARGUMENT

**I.   The Defendant's Prior Bad Acts Are Not Probative Of His Intent Or Motive To Commit The Charged Offense As Required by This Court's Precedent Governing the Admission of Evidence of Prior Bad Acts.**

"It is well-established that evidence of crimes other than the one for which the accused is

being tried is not generally admissible." *People v. Lindgren*, 68 Ill. App. 3d 141, 145, 386

N.E.2d 87, 89 (4th Dist. 1979). Evidence of prior bad acts is admissible only if relevant for a

purpose other than to demonstrate the defendant's propensity to commit crime. *People v. Illgen*,

145 Ill.2d 353, 365, 583 N.E.2d 520 (1991). For example, the evidence may be relevant to a

defendant's motive, intent, identity, absence of mistake or accident, the existence of a common

plan or scheme or *modus operandi*. *Id*. In its motion to produce other crimes evidence, the State

argued that "[t]hese prior incidents bear directly on defendant's state of mind at the time of the

murder including motive and intent." (C.38). To be probative of the defendant's motive or

intent, the other crimes evidence must possess "general areas of similarity" to the offense

charged. *People v. McKibbins*, 96 Ill. 2d 176, 185-86, 449 N.E.2d 821 (1983); *People v. Bartall*,

98 Ill. 2d 294, 315, 456 N.E.2d 59, 69 (1983).

While the admissibility of other crimes evidence rests within the discretion of the trial

court, *People v. Cortes*, 181 Ill. 2d 249, 284, 692 N.E.2d 1129, 1144 (1998) (citing *People v.

Robinson*, 167 Ill. 2d 53, 63, 656 N.E.2d 1090, 1094 (1995)), if a trial court abuses its discretion,

a new trial must be granted unless the error was harmless. *See People v. Nicholson*, 61 Ill. App.

3d 621, 629, 377 N.E.2d 1063, 1070 (1st Dist. 1978). In determining whether the improper

introduction of other crimes evidence constitutes prejudicial error, "a conviction will be upheld

only if the properly admitted evidence is so overwhelming that no fair minded jury could have

voted for acquittal or, to put it another way, only if the record affirmatively shows that the error was not prejudicial." *People v. Lindgren*, 79 Ill. 2d 129, 141, 402 N.E.2d 238, 244 (1980) (*Lindgren I*)[2] (citations omitted).

At trial, the State introduced evidence of five separate instances in which the defendant allegedly committed damage to property or acted in a threatening manner toward Asha. First, in June of 1999, the defendant allegedly broke the front and driver's side windows of Asha's vehicle. (R. A21). About five months later, the windshield wiper and side mirror on Asha's vehicle were bent. (R. A22). Then in December 1999, three of the tires on Asha's vehicle were flattened. (R. A22-A23). Shortly thereafter, the defendant cracked one of the taillights on Asha's car with a baseball bat. (R. A24). Finally, in December 1999, the defendant confronted Asha outside of her home attempting to get her to return an engagement ring and coat that he had given her. (R. A24). When Asha refused to return the items, the defendant allegedly exhibited a gun (a BB gun) and Asha returned the items. (R. A26). Because none of the prior acts involved the defendant willfully or intentionally committing an act that caused death or serious bodily injury or established his motive for committing the offense charged, these acts can be relevant only to establish that the defendant had a propensity towards violence and, as such, the trial court committed reversible error in permitting their introduction as substantive evidence of his intent.

## A. The First District Wrongly Affirmed the Trial Court's Use of Impermissible Propensity Logic to Affirm the Defendant's Conviction.

The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The

---

[2] Charles Lindgren was charged with murder, armed robbery, and robbery. His original conviction was reversed by the Fourth District because evidence of his prior bad acts prejudiced his right to a fair trial. *People v. Lindgren*, 68 Ill. App. 3d 141, 386 N.E.2d 87 (4th Dist. 1979). This Court affirmed and the cause was remanded for a new trial. *People v. Lindgren*, 79 Ill. 2d 129, 402 N.E.2d 238 (1979). References to his first set of appeals are cited as *Lindgren I*. Defendant was retried and convicted, the conviction was affirmed on appeal. *People v. Lindgren*, 111 Ill. App. 3d 112, 443 N.E.2d 1129 (4th Dist. 1982). His second appeal is designated as *Lindgren II*.



inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.

*Michelson v. United States*, 335 U.S. 469, 475-76, 69 S. Ct. 213 (1948); *People v. Donaldson*, 8 Ill. 2d 510, 519, 134 N.E.2d 776 (1956) ("Every defendant, be he sinner or a saint, has the right to expect that his fate will be fixed with reference only to the circumstances of the crime with which he is charged"); *People v. Lehman*, 5 Ill. 2d 337, 342, 125 N.E.2d 506, 509 (1955) ("the law distrusts the inference that because a man has committed other crimes he is more likely to have committed the current crime."). Despite these admonitions, the State specifically argued that the defendant's propensity towards violence and crime, as exhibited through his prior bad acts, proved that the defendant acted in conformity with such prior behavior on this occasion, "[j]udge, this Defendant is no stranger to *violence*. . . . what he does to deal with his anger, his frustration, and when he doesn't get his way. He resorts to *violence*."). (R. D78, D100) (emphasis added). Again, on appeal, the State reiterated the same impermissible logic for the introduction of the prior bad acts evidence, stating "[t]he other crimes evidence showed that when defendant was upset or angry with Asha, he intentionally acted out in a *violent* manner." (App. at A102 (emphasis added)).

Admittedly, the State's theory of relevance has superficial, if not intuitive, appeal – when the defendant became upset with Asha, he responded in a violent manner. But, as explained in *Michelson*, such is the trap of propensity logic and the reason that evidence of a defendant's prior bad acts must be excluded. *See Old Chief v. United States*, 519 U.S. 172, 180, 117 S. Ct. 644, 651 (1997) (explaining that the danger of unfair prejudice "speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different

from proof specific to the offense charged."). In fact, the defendant's propensity toward violence may be highly probative of whether he was violent on this occasion, but the law does not permit such an inference. *See Lehman*, 5 Ill. 2d at 342, 125 N.E.2d at 509 (holding that evidence of prior bad acts is objectionable "not because it has no appreciable probative value, but because it has too much."). It is the inherent willingness to employ such propensity logic that makes other crimes evidence so dangerous. Indeed, the trial judge in this case fell prey to its temptation:

> It occurs to this Court that Michael Threlkeld as had been indicative of everything
> that had gone on between he and Asha, when something went wrong, he had a
> habit of acting out in a *criminal* manner, *impulsive* manner, in a *violent* manner,
> slashing of tires, breaking of windows, taking property back at gunpoint.

(R. D113) (emphasis added).

As the quotations above indicate, the State went to considerable lengths to portray the defendant's prior acts as violent. (R. D78, D100). This portrayal, however, lends nothing to the State's argument that the prior acts were probative of the defendant's intent to commit the charged offense. The relevant question was not whether the prior actions showed that the defendant had a propensity towards violence. Rather, the relevant question should have been the defendant's intent to commit first-degree murder. And in order to be probative of that question, the prior bad acts would need to show that he intentionally or knowingly committed an act that caused death or serious bodily injury to the victim or another.[3] *See infra* Section I.B. In fact, it was impermissible for the State even to argue that because the defendant had a violent character

---

[3] The Illinois Criminal Code states that an individual commits first-degree murder if, in performing the acts which cause the death:

> 1.  he either intends to kill or do great bodily harm to that individual or another, or knows
>     that such acts will cause death to that individual or another; or
>
> 2.  he knows that such acts create a strong probability of death or great bodily harm to that
>     individual or another.

720 ILCS 5/9-1(a)(1) and (2).

or was violent on previous occasions he was more likely to have committed the crime charged. Because the prior bad acts admitted by the court were relevant only to the defendant's propensity to act in a violent manner, the First District erred in holding that the trial court did not abuse its discretion in admitting the defendant's prior bad acts as substantive evidence that the defendant committed the crime charged, first-degree murder.

**B.    The First District Misinterpreted and Misapplied This Court's Requirement That The Prior Bad Acts Bear a Sufficient Similarity to the Crime Charged.**

Evidence of prior bad acts is admissible only where there are "general areas of similarity" between the prior bad act and the crime for which the defendant is being tried. *McKibbins*, 96 Ill. 2d at 185-86. The only connection that the State identified between the prior acts and the crime charged is that the defendant was allegedly upset or agitated with Asha on each occasion. The trial court relied on this connection and the First District accepted the trial court's conclusion that there were "similarities in the offenses because the defendant demonstrated a history of conduct towards Asha and Asha was present at the time of the offense, and was in the company of Boyd moments before he was killed." (App. at A26).

Lest the exception swallow the rule, the "general areas of similarity" between the prior bad acts and the offense charged must relate to the proffered purpose of the prior bad acts evidence. The case law of this Court is consistent with such a requirement. In *Illgen*, for example, this Court affirmed the admission of the evidence of prior assaults by the defendant *against the victim*, but only after concluding that the prior assaults were probative "because the defendant did inflict *substantial bodily harm* in several of the prior assaults." *Illgen*, 145 Ill. 2d at 375 (emphasis added). Additionally, the defendant had told people in the victim's presence that he would use deadly force against her. *Id.* at 374. Following this precedent, courts have held that prior acts involving death or serious bodily injury to another, which are sufficiently

proximate to the charged crime, may create the inference that the defendant had the requisite intent to commit first-degree murder. *See People v. Charles*, 238 Ill. App. 3d 752, 606 N.E.2d 603 (1st Dist. 1992) (holding that a defendant's intent to commit murder could be inferred from his commission of a similar murder just fifteen minutes prior). But property damage to a vehicle or even perceived threats of physical violence simply do not equate with the specific intent to commit first-degree murder. *See People v. Lampkin*, 98 Ill.2d 418, 424-25, 457 N.E.2d 50, 53-54 (1983) (reversing defendant's conviction for murdering a police officer which was improperly influenced by the introduction of his statement that "[y]ou white honky coppers are [expletive deleted] with us now, and we will get you later."); *People v. Bedoya*, 325 Ill. App. 2d 926, 938, 758 N.E.2d 366, 378 (1st Dist. 2001), citing *Illgen*, 145 Ill. 2d at 375 (explaining that evidence the defendant had, earlier in the night, fired shots at two hotels and a residence was not probative of the defendant's intent to fire his gun at the victim and that the gun did not fire by accident).

In this case, the State offered the prior bad acts as substantive evidence of the defendant's intent to commit first-degree murder.[4] Thus, in order to establish the requisite "areas of similarity" the evidence of prior bad acts must have involved circumstances which exhibit the defendant's intent to commit an act that caused death or serious bodily injury, the substantial risk of death or bodily injury, or had the natural tendency to cause death or great bodily harm.

---

[4] In its pre-trial motion, the State also asserted that the prior bad acts demonstrated the defendant's motive for committing the crime. The alleged motive argued by the State was that the victim sought revenge against a guy that he found in the car with the defendant's girlfriend. *See* (R. A7) ("He decided he was going to run down what he thought was a threat, another man with a woman that he was trying to get back."). But properly introduced, the prior bad acts should establish the motive for the crime, not establish a propensity to act in conformity with prior behavior. *See, e.g. People v. Maounis*, 309 Ill. App. 3d 155, 159, 722 N.E.2d 749, 753 (1st Dist. 1999) (approving the admission of evidence of drug habit to prove motive in prosecution for robbery); *State v. Barnett*, 141 N.C. App. 378, 390, 540 S.E.2d 423, 431 (Ct. App. 2000) ("The evidence that defendant previously committed forgery to finance his drug habit could properly be admitted, not to show defendant had a propensity to commit forgery or other crimes, but rather to show that his need to support his drug habit and his lack of finances were the motive for the robbery and murder of the victim.").

Absent such scrutiny, the defendant's prior behavior proves nothing more than a propensity to engage in criminal or violent conduct. None of the prior acts admitted against the defendant even arguably involved the circumstances necessary to show the specific intent for first-degree murder. Under neither the case law nor common sense can a defendant's willingness to slash at tire or bust a taillight serve as competent evidence that he would willingly commit first-degree murder. In fact, the unrebutted testimony of several witnesses here established that Michael never physically harmed Asha or expressed any intent to do so. (R. D5, A46, C20, C38). Thus, the State, trial court, and First District impermissibly relied on the defendant's propensity towards violence and that he acted in conformity therewith in committing the crime charged, logic which is unmistakeable in the State's arguments and the language of the trial court.

This exact point and the reasons prohibiting the logic advocated by the State was explained in two cases directly addressing the introduction of evidence of prior bad acts in cases involving the specific intent for first-degree murder. First, a Virginia court overturned the admission of testimony from a defendant's previous wife that he had assaulted her by pulling a revolver and threatening to kill her. *Knick v. Commonwealth*, 15 Va. App. 103, 421 S.E.2d 479 (Ct. App. 1992). The court concluded that such evidence was not competent to refute the defendant's claim that the death of his current wife resulted from an accidental discharge of his firearm. *Id.* at 105, 421 S.E.2d at 480-81. In reversing the conviction, the court persuasively opined that "admitting this evidence [does] not tend to disprove defendant's contention that he accidentally discharged the firearm. It merely show[s] that the accused was guilty of prior bad acts and that he was disposed to commit an offense similar to that charged." *Id.* at 105, 421 S.E.2d at 480.

Likewise, the Nevada Supreme Court reversed a defendant's conviction in an alleged accidental shooting case in which evidence that the defendant had previously pointed a gun at the victim and threatened to kill him was introduced. *Walker v. State*, 997 P.2d 803 (2000). The court reasoned that "although the prior bad acts involve similar conduct towards the eventual victim in this case, we conclude that there is a crucial distinction between [defendant's] prior conduct and the charged conduct. Namely, [defendant's] prior acts do not involved [sic] the firing or attempted firing of the weapon at [her husband]. Importantly, [defendant] was tried for first-degree murder, a specific intent crime requiring, in addition to premeditation and deliberation, willful action that we have said requires an intent to kill. Therefore, because the prior bad acts offered here do not clearly establish an intent to kill, but more accurately show an intent to threaten, the logical relevance of the acts to show [defendant's] later intent is further diminished." *Walker*, 997 P.2d at 806-07. The analysis employed in *Knick* and *Walker* highlights why the trial court's admission of the defendant's prior bad acts and the First District's analysis of the issue in this case were wrong.

This Court has not previously been presented the issue as squarely as in *Knick* or *Walker*, but the principles and analysis underlying recent cases in this Court should have guided the First District. This appeal, however, presents the Court with the opportunity to expressly protect the due process rights of all defendants by holding, as has been implicit in its previous holdings, that the "general areas of similarity" must relate to the proffered purpose of the prior bad acts evidence. In the case of a defendant on trial for first-degree murder, evidence of prior bad acts must establish an intent to commit serious bodily injury or death, not merely a propensity towards violence or crime.

C.   **The Prejudicial Effect of the Other Crimes Evidence Substantially Outweighed Any Probative Value.**

"Evidence of another crime relevant to establish one of the exceptions to the general rule will still be excluded or stricken when its probative value is outweighed by its prejudicial impact upon the defendant." *People v. Lindgren*, 68 Ill. App. 3d at 145, 386 N.E.2d at 89. Following this Court's lead, Illinois courts are acutely aware of the inherently prejudicial nature of evidence of prior bad acts or other crimes. *People v. Radovick*, 275 Ill. App. 3d 809, 821, 656 N.E.2d 235, 243 (1st Dist. 1995) (discussing the prejudicial nature of other crimes evidence). Indeed, in light of the potential for the evidence to be misapplied, the Illinois Pattern Jury Instructions state:

> Because of the significant prejudice to a defendant's case that the admission of other crimes evidence usually risks, we hold that the trial court should not only instruct the jury [on the limited purpose of admitting the evidence] at the close of the case, but also orally from the bench (unless defendant objects) at the time the evidence is first presented to the jury.

IPI Criminal 3d No. 3.14, Committee Note, at 13 (Supp. 1996).

The manner in which the evidence of prior bad acts is "presented, received, and argued" also can increase the prejudice suffered by the defendant. *Bedoya*, 325 Ill. App. 3d at 940, 758 N.E.2d at 379. The court in *Lindgren II* found that the error, a statement by a State witness referencing the defendant's previous trial, was harmless because of the overwhelming evidence of guilt and because the reference "was not unnecessarily repeated, but was isolated and apparently inadvertent." *People v. Lindgren*, 111 Ill. App. 3d 112, 443 N.E.2d 1129 (4th Dist. 1982) (*Lindgren II*). Here, the State repeatedly referred to the prior bad acts, essentially shifting the focus of the trial from the events on the night of January 12, 2000, to the prior bad acts committed by the defendant against Asha. The State referred to the prior misconduct in its opening statement (R. A6-A10), on direct examination of its witnesses (R. A21-27), on cross-

examination of defense witnesses (R. A27, A31, A42-A43, A47-A49, C34-C45, C66-C68) and in its closing argument (R. D78-D79, D100-D102).

The First District improperly dismissed any claim of prejudice because the evidence was presented in a bench trial.[5] The law, however, recognizes that even judges are human and may be improperly influenced, especially by the admission of prior bad acts.

> Courts have no more right than a jury to convict the accused on incompetent evidence. . . . While we recognize that it is, of course, presumed that a court in a bench trial considers only proper evidence, it is obvious that the record herein discloses that the judge did in fact consider improper evidence in arriving at his verdict, even though the guilt or innocence of the defendant could have been ascertained if the improper evidence had been excluded. Notwithstanding this, the defendant is entitled to a fair trial upon evidence properly admitted.

*State v. McKee*, 52 Ill. App. 3d 689, 693-94, 367 N.E.2d 1000, 1004 (1977).

In its Opinion here, the First District presumed that the trial judge was not unduly prejudiced and did not consider the prior bad acts evidence for an impermissible purpose, stating that no clear evidence existed to the contrary. (App. at A26-A27). While such a presumption is not warranted by the case law, it is rebutted also by the record in this case, which demonstrates that the trial judge considered, and was influenced strongly by, the inadmissible evidence of the defendant's prior bad acts in reaching his verdict. *See, e.g.*, D-109; D-110; D-113 ("[the defendant] had a habit of acting out in a criminal manner, impulsive manner, in a violent manner."). Moreover, the First District's opinion relies on case law that necessarily assumes a permissible purpose for introducing the disputed evidence, a fact not true in this case. Because it is evident from the record that the trial judge improperly relied upon the evidence of the defendant's prior bad acts in reaching his verdict, the defendant's conviction must be reversed. *See McKee*, 52 Ill. App. 3d at 694, 367 N.E.2d at 1004 (reversing the defendant's conviction

---

[5] This reasoning is particularly troubling in light of the fact that the defendant elected a bench trial only because of the trial court's decision to admit the evidence of his prior misconduct.

where the record disclosed that the judge relied on improper evidence of defendant's prior bad acts in reaching his verdict).

**D.    The Introduction Of The Prior Bad Acts Substantially Prejudiced The Defendant's Right To A Fair Trial Under Illinois Law and the Due Process Clause of the Fourteenth Amendment.**

"The erroneous admission of evidence of other crimes carries a high risk of prejudice and ordinarily calls for reversal." *People v. Placek*, 184 Ill. 2d 370, 388, 704 N.E.2d 393 (1998), *quoting People v. Manning*, 182 Ill. 2d 193, 214, 695 N.E.2d 423 (1998). Because the First District found that the trial court did not abuse its discretion in admitting the defendant's prior acts, the First District did not reach the issue of the consequent prejudice to the defendant's due process right to a fair trial. On appeal, the State challenged the defendant's conclusion that he was denied due process by arguing that the defendant applied the wrong standard of review to the evidence. But it is actually the State that applied the wrong framework for its analysis, one incorrectly derived from cases not involving the improper admission of prior bad acts evidence. By using the wrong standard, the State incorrectly argued that the defendant's right to a fair trial was not violated. Weighing the evidence and its sufficiency under the proper test laid out in this Court's prior bad acts jurisprudence, the evidence is not so overwhelming that no fair minded jury could have voted for acquittal.

**1.    Under this Court's Precedent, The Traditional Sufficiency of The Evidence Standard and Appellate Deference Do Not Apply in Cases Involving the Improper Introduction of Evidence of a Defendant's Prior Bad Acts.**

The proper standard for weighing the prejudice to the defendant's right to a fair trial from the admission of prior bad acts was articulated by the Illinois Supreme Court in *People v. Lindgren*: "a conviction will be upheld only if the properly admitted evidence is so overwhelming that no fair minded jury could have voted for acquittal or, to put it another way, if

the record affirmatively shows that the error was not prejudicial." *Lindgren I*, 79 Ill. 2d 129, 141, 402 N.E.2d 238, 245 (1979) (citations omitted). The requirement that the State point to overwhelming evidence of the defendant's guilt in the record applies regardless of whether the trier of fact sits on the bench or in the jury box. *See McKee*, 52 Ill. App. 3d at 694, 367 N.E.2d at 1004 (reversing defendant's conviction in bench trial "even though the guilt or innocence of the defendant could have been ascertained if the improper evidence had been excluded.").

Further, the deference afforded the trier of fact's findings and the light in which the evidence is viewed, is altered when evidence of a defendant's prior bad acts is improperly admitted. In *Lindgren I*, this Court noted that appellate courts generally give substantial deference to the trier of fact's role in making inferences, weighing conflicting testimony, and determining witness credibility. 79 Ill. 2d at 142-143, 402 N.E.2d at 245. But this Court concluded that the prejudice accompanying the introduction of other crimes evidence, makes this traditional deference inappropriate. *Id.* at 143, 402 N.E.2d at 355. And while typically an Appellate Court views all of the evidence in the light most favorable to the prosecution, when evidence of prior misconduct is improperly admitted "the court should not read the record and resolve all factual ambiguities against the defendant." *Id.* at 143, 402 N.E.2d at 245.

Like the circumstances in *Lindgren I*, the verdict here hinged largely on the credibility of one witness, the defendant. Relying again on the wrong standard of review to support its position, the State incorrectly charged that it is irrelevant whether "an unbiased trier of fact could have found the defendant's explanation credible." (App. at A125.) Under the correct standard of review -- that being whether no fair minded jury could have voted for acquittal -- this question becomes highly relevant. In fact, this Court has gone a step further, holding that it is improper to even speculate whether an "uncontaminated" trier of fact would have found the defendant's



testimony credible. *Lindgren I*, 79 Ill. 2d at 142, 402 N.E.2d at 245. Instead, the appropriate course of action is to remand the case to the trial court for adjudication before an uncontaminated trier of fact:

> There is . . . the matter of the integrity of the system. A litigant's right to a trial by an unbiased jury is violated where the jury in fact based its decision on extraneous matters. This is a substantial right normally afforded to guilty and innocent defendants alike. Therefore, we hold that the defendant deserves a new trial with a jury unbiased with evidence of the [prior bad acts].

*Lindgren I*, 79 Ill. 2d at 143, 402 N.E.2d at 245.

### 2. Viewed Under the Proper Standards, the State's Evidence Was Not So Overwhelming That No Reasonable Trier of Fact Could Have Voted For Acquittal.

The defendant testified that after speaking to Asha he pulled forward and quickly performed a U-turn in order to follow her vehicle. (R. D21, D-52, A31). The testimony of the bystanders, as well as Asha, tends to support, rather than contradict, the defendant's account of the incident. The defendant explained that after Asha motioned for him to follow her that, "I drove up a few feet, I tried to dip a little bit to the right, and then I made a left. I swooped around and made a left, a U-turn." (R. D22-D23). The defendant's testimony that he pulled slightly forward and then made a quick U-turn which resulted in his vehicle accidentally striking the victim is consistent with the accounts of Asha and Ms. Slater.

As Asha described the incident during the State's direct examination:

A   Well, I looked in the rearview, I mean I automatically saw the U-turn and the hit, and that was it.

Q   It happened pretty fast?

A   Yes.

(R. A34).

The testimony of Ms. Slater also bolsters the conclusion that this was an accident resulting from the defendant's attempt to make a hasty U-turn and follow Asha, not a deliberate and intentional act. Ms. Slater testified that Michael's vehicle pulled forward "maybe five feet," and that:

Q   About how far down the block was that car when you saw it come back towards where the man was standing by his car?

A   It wasn't that far. It was just like -- all you had to do was turn the corner, and he was right there getting ready to get inside his car. So it took like a second for him to make the U-turn, hit the guy, and keep going.

(R. A61-A62).

The State also argued that the defendant's actions subsequent to the accident were evidence of his guilt. While the trier of fact is not prohibited from considering the defendant's flight from the scene as circumstantial evidence tending to show his consciousness of guilt, "flight alone is not necessarily indicative of criminal activity." *People v. Peete*, 318 Ill. App. 3d 961, 966, 743 N.E.2d 689, 693 (4th Dist. 2001), *quoting Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S. Ct. 673, 676 (2000). The defendant explained that he fled the scene after the accident because he was driving without a license and in a borrowed vehicle, which lacked proper registration. (R. D15, D56, D59). It is certainly not unreasonable to assume that an unbiased trier of fact could have found the defendant's explanation of his flight credible.

Ultimately, the State's evidence of the defendant's intent was entirely circumstantial. None of the State's witnesses testified that the defendant's actions were a deliberate attempt to kill or cause great bodily harm to the victim. While circumstantial evidence may sometimes be enough to support a verdict, none of the evidence presented in this case was so overwhelming that a reasonable jury, unbiased by the defendant's prior bad acts, could not have voted for acquittal. The prejudicial impact of the State's repeated references to the defendant's prior acts, and the trial court's reliance thereupon in reaching its verdict, substantially prejudiced the

defendant's right to a fair trial under Illinois law and the Due Process Clause of Fourteenth Amendment to the United States Constitution. Accordingly, the defendant respectfully requests that his conviction be reversed and he be granted a new trial before an unbiased trier of fact.

## II. THE EVIDENCE IN THE RECORD DOES NOT SUPPORT A CONVICTION FOR FIRST-DEGREE MURDER.

In reviewing a challenge to the sufficiency of the evidence supporting a conviction under state and federal law, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789 (emphasis omitted); *Illgen*, 145 Ill. 2d at 376; *People v. Jeffries*, 164 Ill. 2d 104, 114, 646 N.E.2d 587 (1995), quoting *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073 (1970) (holding that the due process clause "'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'"). The defendant in this case was charged with first-degree murder, requiring the State to establish beyond a reasonable doubt that Defendant Threlkeld intended to kill or do great bodily harm to the victim. 720 ILCS § 5/9-1. As described above, the evidence adduced at trial by the State did not prove beyond a reasonable doubt that Defendant intended to kill or cause great bodily harm to the victim. For the reasons articulated, the evidence of the defendant's prior bad acts was not sufficiently probative of the defendant's intent to commit first-degree murder. Even when considered in the aggregate with the other testimony introduced at trial, and viewed in the light most favorable to the State, no reasonable jury could have concluded that Michael Threlkeld had the requisite intent to commit first-degree murder. The failure of the State to introduce sufficient evidence of Defendant Threlkeld's guilt requires reversal under Illinois law and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

III.    **The Failure of the Defendant's Trial Counsel to Call Nikki Wittingham as a Witness Constituted Ineffective Assistance of Counsel.**

As the defendant argued in his pro se supplement brief, his right to effective assistance of counsel under the Illinois Constitution and the Sixth Amendment to the United States Constitution was violated by his counsel's actions at trial, including the failure to call Nikki Wittingham, Asha's mother, as a character witness. (App. at A153-A161).

### CONCLUSION

This appeal raises critical issues involving the constitutional limitations on the admission of evidence of a defendant's prior bad acts. Further, it poses two critical questions in this area of jurisprudence for which the Appellate Courts would benefit from guidance: (1) the standard for admissibility in cases involving specific-intent crimes, such as first-degree murder; and (2) the proper analytical framework for reviewing the sufficiency of the evidence when such evidence has been tainted by the improper introduction of prior bad acts evidence. For the foregoing reasons, the defendant respectfully requests that this Court grant his petition for leave to appeal and reverse the First District's Order affirming the defendant's conviction.

Dated: October 12, 2004                     Respectfully submitted,

Lee Ann Russo
Jones Day
77 West Wacker, 35th Floor
Chicago, Illinois 60601

Jeffrey R. Weiland

Counsel for Defendant-Appellant
MICHAEL THRELKELD

## CERTIFICATE OF SERVICE

I, Jeffrey R. Weiland, certify that true and correct copies of **DEFENDANT'S PETITION FOR LEAVE TO APPEAL FROM THE FIRST DISTRICT'S ORDER AFFIRMING THE DEFENDANT'S CONVICTION** were deposited on October 12, 2004 in the United States Mail at Jones Day, 77 West Wacker, Chicago, Illinois 60601, proper first-class postage prepaid, to:

> Richard A. Devine, State's Attorney, 300
> Daley Center, Chicago, IL 60602;
>
> Cook County Judicial Advisory Council,
> 69 W. Washington, Room 2610, Chicago,
> IL 60602;
>
> Mr. Michael Threlkeld, Register No. K-
> 66117, Stateville Correctional Center,
> P.O. Box 112, Joliet, IL 60434.

## CERTIFICATE OF MAILING

I, Jeffrey R. Weiland, certify that, on October 12, 2004, I filed with the Clerk of the Illinois Supreme Court, the foregoing **DEFENDANT'S PETITION FOR LEAVE TO APPEAL FROM THE FIRST DISTRICT'S ORDER AFFIRMING THE DEFENDANT'S CONVICTION**, and copies of the same, by depositing the documents in an envelope addressed to the Court address below, affixing the appropriate first-class postage to the envelope, and placing the envelope in the United States Mail at Jones Day, 77 W. Wacker, Chicago, Illinois 60601, on November 5, 2003.

> Juleann Hornyak
> Supreme Court Clerk
> Supreme Court Building
> 200 E. Capitol Avenue
> Springfield, Illinois 62701

Jeffrey R. Weiland

99355

**SUPREME COURT OF ILLINOIS**
**CLERK OF THE COURT**
SUPREME COURT BUILDING
SPRINGFIELD, ILLINOIS 62701
(217) 782-2035

January 26, 2005


Hon. Lisa Madigan
Attorney General, Criminal Appeals Div.
100 West Randolph St., 12th Floor
Chicago, IL 60601

No.  99355 - People State of Illinois, respondent, v. Michael
           Threlkeld, petitioner.  Leave to appeal, Appellate
           Court, First District.


    The Supreme Court today DENIED the petition for leave to

appeal in the above entitled cause.


    The mandate of this Court will issue to the Appellate Court

on February 17, 2005.


EXHIBIT G

IN THE CIRCUIT COURTOF THE FIRST

JUDICIAL CIRCUIT, COOK COUNTY, ILLINOIS

# RECEIVED

JUL 2 1 2005

PEOPLE OF THE STATE OF ILLINOIS,

    Plaintiff,

CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

-v-

CASE NO. 00 CR 4537

MICHAEL THRELKELD,

    Defendant.

PETITION FOR POST CONVICTION RELIEF

# FILED

JUL 2 2 2005

## DOROTHY BROWN
CLERK OF CIRCUIT COURT

MICHAEL THRELKELD

REG.# K66117

P.O. BOX 112

JOLIET, ILLINOIS 60434

**PRO SE LITIGANT**

EXHIBIT H

IN THE CIRCUIT COURT OF THE FIRST

JUDICIAL CIRCUIT, COOK COUNTY, ILLINOIS

**RECEIVED**

JUL 2 1 2005

CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS,

    Plaintiff,

—v—

                           CASE NO. 00 CR 4537

MICHAEL THRELKELD,

    Defendant.

**FILED**

JUL 2 2 2005

DOROTHY BROWN
CLERK OF CIRCUIT COURT

PETITION FOR POST CONVICTION RELIEF

NOW COMES, Michael Threlkeld, pro se, and pursuant to 725 ILCS 5/122, et seq, moves this Honorale Court for relief from his conviction and sentence, and states the following in support hereof:

1. The Petitioner was convicted in 00 CR 4537, of the offense of First Degree Murder. After a bench trial before the Honorable Judge James Linn, the Petitioner was sentenced to 36 years.

2. A direct appeal was taken from the judgment and sentence to the First District Appellate Court. First District entered its Order affirming the trial court's conviction of the defendant. Petitioner then filed his petition for leave to appeal. Petitioner now files this timely petition for post conviction relief.

3. Petitioner asserts that his constitutional rights were violated. Petitioner request relief from his conviction and sentence based upon the following violations of his rights under the Illinois and United States Constitutions.

4. Petitioner was denied his constitutional right to due process, effective assistance of counsel, fair trial and equal protection of the laws, due to

trial counsel's failure to adequately represent petitioner in accordance
with constitutional guarantees.

5. It is well established that, a defendant's right to trial by a fair and
impartial trier of fact is a constitutional cornerstone of the judicial
system. This right should be guarded zealously; neither a trial judge's
inadvertant omissions, nor a trial attorney's laxness can be allowed to
impair this fundamental right.

The 'bench mark' in determining whether there has been ineffective
assistance of counsel is "whether counsel's conduct so undermined the proper
functioning of the adversarial process that the trial can not be relied on
as having produced a just result." Strickland v. Washington, 466 U.S. 668, at
686 (1984).

The U.S. Supreme Court developed a fact sensitive analysis in Strickland
which seeks to measure "the quality and impact of counsel's representation
under the circumstances of the individual case", see People v. Garza, 535
N.E.2d 968 (1989). A defendant must prove (1) that counsel's fell below an
objective standard of reasonableness and the shortcomings of counsel were so
severe as to deprive defendant of a fair trial; and (2) that there is a
reasonable probability that, but for counsel's unprofessional errors, the
result of the proceedings would have been different, Strickland 466 U.S. at
687. A reasonable probability is " a probability sufficient to undermine
confidence in the outcome," see People v. Davis, 560 N.E.2d 1072; also
People v. Garza, 535 N.E.2d 968.

A reviewing court must evaluate the attorney's performance from counsel's
perspective considering the circumstances at the time of trial, without the
distorting effects of hindsight, and the defendant must overcome the strong
presumption that the challenged action might be considered sound trial
strategy. Strickland, 466 U.S. at 689.

Traditionally, courts have not reviewed an attorney's choices when made
on the basis of strategic considerations. However, these strategic decision
may be made  only after there has been a **"thorough investigation of all
matters relevant to plausible options."** Strickland, 466 U.S. at 690; see
People v. Whittaker, 577 N.E.2d 468 (1990).

Petitioner contends that trial counsel's representation fell far below the
objective reasonableness standard so as to have denied the Petitioner his
right to a fair trial, due process and equal protection of the laws. Petitioner
further contends that if not for counsel's incoherent representation the

outcome of the proceedings would have been different.

Petitioner will illustrate trial counsel's ineffectiveness, which includes, but is not limited to the following: a) failure to seek a reduce charge to reckless homicide, when there was ample amounts of evidence available to counsel to pursue such a course of action; b) encouraging defense witnesses to testify falsely by withholding key testimony that could have exonerated the Petitioner of First Degree Murder charges; c) failing to expose the perjury committed by the State through out the entire proceeding, which eventually led to Petitioner's conviction. Petitioner herein incorporates these allegations within this petitition for post conviction relief, see paragraphs 7-9.


6. Post conviction petition is a vehicle by which an individual that has been convicted of a crime, and as a result, imprisoned, may complain of substantial deprivations of his constitutional rights under the Illinois and United States Constitutions, see 725 ILCS 5/122 et. seq.. Petitioner herein complains of constitutional deprivations that are a direct result of the **ineffective assistance of trial counsel.**

Thus, to claim that matters of which the Petitioner complains have not been raised on direct appeal would be fruitless, as such an argument does not State a ground for dismissal of this petition. " An ineffective assistance claim will not be barred if 'what ought to have been done...[depends] on proof of matters which could not have been included in the record **precisely** because of the allegedly deficient representation'". People v. Keener, 655 N.E.2d 294 (2nd Dist. 1995)(emphasis added), quoting, People v. Erickson, 641 N.E.2d 455 (1994).

For example, "[W]here charges of incompetence are based on trial counsel's failure to call certain witnesses or **introduce certain evidence,** the substance of which does not appear in the record, it therefore cannot be claimed that such charges should have been raised in the direct appeal." People v. Edmonds, 558 N.E.2d 230, at 233 (1st Dist. 1979).

Furthermore, even if the matters were sufficiently set out in the record to be capable of being raised on appeal, this does not bar proceeding by way of a post conviction petition in this case. Even though claims that could have been presented to the reviewing court on direct appeal, if not presented, are barred under the doctrine of waiver, if the post conviction petition alleges the ineffective assistance of appellate counsel for a failure to raise such issues, then the issues are not waived. see e.g., People v. Winsett, 583 N.E.2d 589, 592-93 (2nd Dist. 1991).



Therefore, the Petitioner is within the guidelines of 725 ILCS 5/122, and any applicable State laws and all Illinois and United States Constitutional guarantees Petitioner is afforded to bring this action.

7. Petitioner contends that he should have been charged with Reckless Homicide, 720 ILCS 5/9-3, and not First Degree Murder, 720 ILCS 5/9-1. And that trial counsel was wholly ineffective for not seeking a reduced charge when ample amount of evidence was available to pursue a reduction in charge.

Petitioner contends that trial counsel was wholly ineffective for failing to seek a reduced charge from First Degree Murder to Reckless Homicide. There was ample amount of evidence adduced during the investigation of this case that clearly establishes the Petitioner lacked the requisite mental state of intent to be charged or convicted of First Degree Murder. However, the evidence clearly shows that the Petitioner is guilty of Reckless Homicide.

Petitioner asserts in support of this contention, evidence that establishes on the night of January 12, 2000 the Petitioner actions were unintentional and reckless. First, the elements of the offense of Reckless Homicide are, "Person commits Reckless Homicide if, while driving a motor vehicle, he or she **unintentionally kills individual,** and the **acts that caused the death are performed recklessly** or as to create **likelihood of death or great bodily harm to some person.**" People v. Edmundson, 617 N.E.2d 446; People v. Testin, 632 N.E.2d 645; People v. Wilson, 572 N.E.2d 937; specifically see, People v. Camberis, 130 N.E.2d 712 (1921). The instant matter, Petitioner contends that he unintentionally killed Linton Boyd, after driving his vehicle under the influence of alcohol and in a reckless manner which caused the death of Mr. Boyd. And though the consumption of alcohol is not central to the element of reckless homicide, being under the influence of alcohol to the degree that it rendered the Petitioner incapable of safely driving his vehicle can be considered under the statue, 720 ILCS 5/9-3(a)(c)(2).

According to defense witnesses, police reports, State expert witnesses & testimony of the State's chief witness and even this Honorable Court doubted rather this was an intentional act committed by the Petitioner. And it because of trial counsel's shear listless representation and incompetence that this available evidence was not utilized to Petitioner's benefit. Petitioner will take this evidence in order so as to illustrate trial counsel's ineffective representation.

A) Petitioner has been arrested on several occasions for driving under the influence (DUI), January 31, 1998, March 17, 1999 and the most recent arrest coming 6 months prior to this unfortunate accident June 16, 1999. see arrest record attached as (Ex. 1).

B) Petitioner has a history of driving recklessly, as demonstrated in Ahmad Kendell's statement to Cook County State's Attorney's investigator Dennis Cullom that, "...it did not surprise him that Michael was involved in an accident because he knew Michael was a reckless driver." see statement attached as (Ex. 2).

C) Petitioner was witnessed driving recklessly by a truck driver on I-55. The truck driver described the Petitioner's driving as "The vehicle was all over the roadway, slowing down in traffic and sometimes almost coming to a stop." The truck driver when on to alert Illinois State Police Trooper Brian Gray (Star No#4994) of the Petitioner's vehicle description and the erratic driving displayed by Petitioner. see report of Trp. Gray attached as (Ex. 3).

D) Petitioner was stopped by Trp. Gray at 2:45am, and smelled of alcohol. see (Ex. 3).

E) Petitioner was asked to submit to a preliminary breath test with the ALCO-SENSOR IV, Petitioner agreed to take the preliminary breath test, and results were .006. Petitioner was arrested for illegal consumption by a minor. see (Ex. 3).

F) Petitioner still had alcohol in his system at 10:00am when Petitioner submitted to a second breath test INTOX EC/IR with the result being .002. see (Ex. 3).

G) Affidavits of Terrance Coleman, Jasmine Carter and Ahmad Kendell all support the fact Petitioner was intoxicated before the accident (it has been established the Petitioner was intoxicated after the accident, see (Ex. 3)) . Further, these affidavits taken separately paint a vivid picture of the history of Petitioner's drinking and driving recklessy!

G1) Affidavit of Terrance Coleman, attached as (Ex. 4), states in part that, "...every time I seen him in a car or anywhere he is always drunk." And "...he was over intoxicated and driving during that of Jan. 12, 2000."

G2) Affidavit of Jasmine Carter, attached as (Ex. 5), states in part that, "...I actually knew about Michael's drinking problem and that he's always drunk when he drives..."

G3) Affidavit of Ahmad Kendell, attached as (Ex. 6), states in part that, "...his drinking problem and about how he drinks and drives."

H) Honorable Judge James Linn agreed with the defense, That the Petitioner did not set out to "intentionally kill" the deceased Linton Boyd. see (Tr. F36).

I) Sgt. Brendan Heffner (Star No#4225), while swearing out a complaint for a search warrant before the Honorable Judge Prall, Eleventh Judicial Circuit, Mc Lean County, relied on the information contain in Trp. Brian Gray's arrest report of the Petitioner. Further, lending credibility to the fact Petitioner was drunk and driving recklessly. see complaint for search warrant attached as (Ex. 7).

Petitioner contends that all of the evidence, paragraphs A-I, was available to trial counsel. And in comparison to the State's evidence at trial, the Petitioner would have prevailed on the lesser charge of Reckless Homicide, if not for trial counsel's incompetence.

Further, the State has no evidence, circumstantial, direct or otherwise that could legally support a conviction of First Degree Murder. The evidence adduced at trial by the State does not support, nor cannot sustain a charge of First Degree Murder or a conviction for the same. When looking at the crux of the State's case, it is incomprehensible that trial counsel would fail the Petitioner's right to effective assistance of counsel and right to fair trial.

None of the State's witnesses testified that the Petitioner's actions were a deliberate attempt to kill or cause great bodily harm to the victim. When

questioned on direct by the State, Asha stated that she could not tell
whether it was deliberate, (Tr. A50). And while the State called several
witnesses to the stand to establish the forensic evidence in this case, none
of the witnesses could conclude that the defendant acted intentionally.
Investigator Michael Trummel of the Illinois State Police testified that he
could not conclude from the physical evidence that he collected from the
defendant's vehicle while it was impounded in Bloomington that the defendant's
actions were intentional (Tr. A125). Investigator Leonard Stocker of the mobile
crime lab unit of the Chicago Police Department examined the crime scene and
collected evidence, he also did not testify that the defendant's actions were
intentional, (Tr. B54). Dr. Rexene Worrell from the Cook County Medical
Examiner's Office performed the autopsy on Linton Boyd, but could not testify
that the defendant's actions were intentional, (Tr. A78, A85). Simply put
there is no evidence that this was an "intentional act" under First Degree
Murder.

Finally, when looking at this case in the light most favorable to State.
There is no "intentional act" present, no iota of evidence supporting this
court's finding of guilt on the charge of First Degree Murder. And if not
for trial counsel's incompetent shortcomings the outcome of the trial would
have been different.

8. Petitoiner contends: that trial counsel was egregiously ineffective
for instructing defense witnesses to withhold 'exculpatory evidence' that
would have proved Petitioner innocent of First Degree Murder.

Trial counsel was informed by defense witnesses terrance Coleman,
Jasmine Carter and Ahmad Kendell, that Petitioner has a history of chronic
alcohol abuse, driving recklessly and driving under the influence, see
(Ex. 4, 5, & 6). Trial counsel was further informed by Terrance Coleman that
on the night of this unfortunate accident, Petitioner was in fact "over
intoxicated", see (Ex. 4)

The compulsory process clause provides that "[I]n all criminal prosecutions
the accused shall enjoy the right...to have compulsory process for obtaining
witnesses in his FAVOR" (emphasis added); U.S. Const. Amed. 14; this right is
held applicable to the States through the Fourteenth Amendmnet, see Washington
v. Texas, 388 U.S. 14, 19 (1967)

Trial counsel denied the petitioner the right to a fair trial when he
intentionally lied to defense witnesses in order to get them to withhold
the truth. That in fact if they had revealed the truth of Petitioner's

chronic drinking problem, reckless driving and driving under the influence, particularly on the night of the offense, the information would only 'aggravate' the Fisrt Degree Murder charge and expose the Petitioner to grave penalties, see (Ex. 4-6).

Further trial counsel induced Petitioner to testify under these same circumstances. Misleading Petitioner to believe that he would be given the maximum penalty or he may receive more time than Petitioner was actually facing under statue. see Petitioner's affidavit attached as (Ex. 8); see also, affidavit of Michael Flournoy attached as (Ex. 9). (Mr. Flournoy was present when trial counsel Martin Abrams coerced the Petitioner into testifying falsely about the 'true events' on the night of January 12, 2000).

It is reasonable to presume, based upon the evidence available to trial counsel, a reduce charge to reckless homicide should have been pursued. As Petitioner's 'acts' were performed recklessly, and under the influence of alcohol. When counsel fails to pursue a defense which is availabl, counsel fails to be effective, especially when the evidence supports such a pursuit. see, Hart v. Gomez, 174 F.3d 1067,1073 (9th Cir. 1999) the court held, "counsel's failure to introduce exculpatory records into evidence was ineffective assistance because objectively reasonable performance by counsel would have created reasonable probability of different verdict", and U.S. v. Span, 75 F.3d 1383,1390 (9th Cir. 1996)(counsel's failure to request jury instruction on self-defense was ineffective assistance because self-defense was the only defense available). Here, Petitioner contends that counsel had available evidence to pursue a reduced charge of reckless homicide, but his incompetence failed the Petitioner in this regard.

Finally, it is not sound strategy to have defense witnesses who possesss exculpatory evidence, to withhold that evidence and expose the defendant to an unfair verdict, and then promulgate a shiftless attempt at effective representation. This notion violates every principle of STRICLAND, as well as Petitioner's rights to fair trial, due process and equal protection of the law. And, if there ever was a prototype for incompetence and incoherent representation, this is it.

## CONCLUSION

Trial counsel was ineffective for withholding exculpatory evidence that would have exonerated Petitioner of First Degree Murder; trial counsel was ineffective for encouraging defense witnesses to withhold exculpatory evidence; trial counsel was ineffective for not a reduced charger to Reckless Homicide.

The cumulative effect of trial counsel's ineffective representation denied the Petitioner his right to fair trial, effective assistance of counsel, due process and equal protection guarantees unde the Illinois and United States Constitutions.

It is not mandatory that the Petitioner show a cumulative effect of errors, only that a constitutional violation took place, "[T]he right to effective assistance of counsel...may in a particular case be violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial". Murray v. Carrier, 477 U.S. 478,496 (1986). Petitioner has done so, vehemently.

**WHEREFORE**, Petitioner prays this Honorable Court vacates his conviction and sentence, and remand this cause back to the Circuit Court for a new trial.

Respectfully Submitted,

_____

MICHAEL THRELKELD, PRO SE

EXHIBIT 1

CHICAGO DEPARTMENT OF POLICE
DEPT F CHICAGO DEPT

THRELKELD, Michael C.    M/B

26 July 96

07 May 79

**Youth Division(Y.D.)283342
Is Identical by Fingerprint
comparison to IR#1167457**

| 1167457 | 41369 CB4 | 36811920 |

---

Michael C THRELKELD
5307 S Hyde Park
07 May 79
11023070 —07 Apr 98 Off. Turner Dist. 021 Traffic Warrant
or.

---

Michael C. THRELKELD
5307 S. Hyde Park
07 May 79
11043119 — 30 Apr 93, Off. Camp, Dist. 021, CPD WRT Cannabis
jmr

---

Michael THRELKELD
5307 S Hyde Pk
07 May 79
11053204 —12 May 98, Off. Jones, 021st. Dist., Disorderly Conduct
PW

---

Michael C. THRELKELD
5307 S. Hyde Park Bv
#1004
07 May 79
14143748 =17 Mar 99, Off. Williams Dist. 021 Driving Under Influ Of Alcohol
sb

---

Michael C. THRELKELD
5307 S. Hyde Park Bv
07 May 79
14146355 —20 Mar 99 Off. Artz, Dist. 02 Crim Trespass To Residence
AJ

---

Michael C. THRELKELD
5307 S Hyde Park Bv
07 May 79
14189984 —12 May 99, Off. Chan, Dist. 021, Poss Cannabis
gd

---

SEE CR# 10537020  26 Jun 98, VOP SUST. (97CR-21406), Resent To 3 YRS IDOC, Impact Incar. Program, CC#/98CR-6123, Judge Flannery

---

SEE CB# 10887627  15 Jun 98, Mfg/DCS. (98CR-6123), PG 3 YRS IDOC, Impact Incar Program, Judge Sacks
09 Dec 98, Paroled From Vienna CC#K66117, (97CR-21406, 98CR-6123)

---

Michael C. THRELKELD
5307 S. Hyde Park Bv
07 May 79
14205562 —30 May 99, Off. Walker, Dist. 021, First Degree Murder Release Without Charging
lw

---

Michael THRELKELD
07 MAY 79
Juvenile Court
IUU/JJH
—14 NOV 95, CPD, Poss contl Sub
24 JAN 96, PCS(95JD18099)Findg Delinquency, Judge Haberkorn
20 FEB 96, PCS(95JD18099)Minor Adjud ward of Court, Placed on Probation Judge Haberkorn

---

Michael THRELKELD
07 MAY 79
Juvenile Court
IUU/JJH
—09 JAN 96, CPD, Poss Contl Sub
24 JAN 96, PCS(96JD00467)Finding of Delinquency, Judge Haberkor
20 FEB 96, PCS(96JD00467)Minor adjud Ward of Court, Placed on Probation Judge Haberkorn

---

NOTE! Juvenile Court Records and Juvenile Law Enforcement Records are restricted for use in accordance with 705 ILCS 405/1-7and405/1-8

JAN-13-00  03:35                +3127475981                P.04/04   F-584

Jan-13-00  02:38    From-IDENT 435 WINDOW              +3127475981        T-846  P.04/04  F-584

THRELKELD. Michael C.    M/B **Youth Division (Y.D.)number
283342** is Identical by fingerprint
comparison to **IR#1167457**

26 July 96

07 May 79

_____   1162457 _____        41369CB4                  36811920

| | | |
|---|---|---|
| Michael C. THRELKELD <br> 5307 S. Hyde Park <br> 07 May 79 | 10289061 <br><br> bw | -25 Jul 96 Off. Fowler Dist. 21 Assault <br> 29 Aug 96, Aslt (720-5/12-1a1) BF SOL, Judge Sheridan, <br> Doc#96339730 |
| Michael C. THRELKELD <br> 5307 S. Hydepark <br> 07 May 79 | 10324573 <br><br> lbs | -05 Sep 96 Off. Creer Dist. 21 Battery <br> 08 Oct 96, Batt (720-5/12-3a1) CDTV (720-5/21-1) BF SOL, <br> Judge Morrissey, Doc#96383728 |
| Michael C. THRELKELD <br> 5307 S. Hyde Pk <br> 07 May 79 | 10330918 <br><br> jmm | - 12 Sep 96, Off. King, Dist. 002. Battery <br> 28 Oct 96, Batt (720-5/12-3a1). CDTV (720-5/21-1) BF SOL, <br> Judge Cepero, Doc#96383672 |
| Michael T. THRELKELD <br> 5307 S. Hyde Park <br> 07 May 79 | 10537020 <br><br> IUU/jw | -06 Jun 97, Off. Thompson, Dist. 021, PCS, Unlawful Use of <br> Firearm, No FOID, <br> -12 Aug 97, INFO#97CR-21406, Carry/Possess Firearm, Carry/ <br> Possess Firearm In Public |
| Michael THRELKELE <br> 5307 S. Hyde <br> 07 May 79 | 10636498 <br><br> vw | -10 Aug 97 Off. Williams Dist. 02 Disorderly Conduct <br> -16 Sep 97, Disorderly Conduct, 720-5/26-1a1. BF SOL, Judge <br> Toole, DOC# 97387792 |
| Michael C. THRELKED <br> 5307 S. Hyde Park Blvd <br> 07 May 79 | 10686037 <br><br> vw | -03 Sep 97, Off. Cousens, Dist. 21, Disorderly Conduct <br> 24 Sep 97, D/C 720-5/26-1, BF-SOL, Judge Divsne, DOC# <br> (97379073) |
| Michael C. THRELKELD <br> 5307 S. Hyde Pk <br> 07 May 79 | 10692149 <br><br> cb/remp | -06 Sep 97 Off. Mcdonald Dist. 21 Aslt <br> 20 Oct 97, . Assault , 5/12-1) BF SOL, Jdge Toole, DO |
| Michael C. THRELKELD <br> 5307 S. Hyde Park <br> 07 May 79 | 10725613 <br><br> vw | -08 Oct 97 Off. Singleton Dist. 21 Crim Trespass to Land <br> -01 Dec 97, C.T.T.L. 720-5/21-3, BF SOL. Poss of Cann, <br> 720-550/4c, BF SOL, Judge Toole, DOC# 97426534 |
| | SEE CB <br> 1053/020 | 09 Dec 97, Carry/Possess Firearm, Carry/Possess Firearm In <br> Public, (97CR-21406)PG 18Mos Prob, $25.00 Monthly Prob Fee, <br> Judge Flannery |
| Michael C THRELKELD <br> 5507 S Hyde Park <br> 07 May 79 | 10884921 <br><br> cc | - 31 Jan 98,off.Randle, Dist.02.., DUI Other Drugs |
| Michael THRELKELD <br> 5307 S. Hyde Park <br> 07 May 79 | 10887627 <br><br> pb | -03 FEb. 98 Off. Smith Crim. Enterprise Inv. Gr. (021) Poss <br> Amt. Cont. Sub. Except (A)/(D) <br> -3 Mar 98, GJ IND#98CR-0.23, Mfg/Del Cont Sub |
| Michael C. THRELKELD <br> 5307 So. Hyde Park <br> 07 May 79 | 11000802 <br><br> sp | -11 Mar 98, Off. Metcalf, Dist. 021., Poss Cann Less Than 2. <br> Crams <br> 20 Apr 98, POC 720-550/4, BFV, Judge Divns,eDOC398226852 |

CITY OF CHICAGO / DEPARTMENT OF POLICE / 1121 South State Street
IDENTIFICATION SECTION   Chicago Illinois 6060?

CRIMINAL HISTORY C    **THRELKELD**  Michael C. M/B

DATE          26    JUL    96

DATE OF BIRTH   07    MAY    79

| IR N. | | | |
|---|---|---|---|
| 1167457 | | roll. 41369 CB4 | 36811920 |

| | | |
|---|---|---|
| Michael C. THRELKELD 5307 S. Hyde Park Bv 7 May 79 | 14219446 cal | -16 Jun 99, Off. Willis, Dist. 002, Driving Under Infu Of Alcohol |
| Michael C THRELKELD 5307 S Hyde Park Bv 07 May 79 | 14268200 om | -18 Aug 99 Off. Skokal Dist. 021 Aid/Abet/Poss/Sell Stolen Veh |

CHICAGO POLICE DEPARTMENT
IDENTIFICATION SECTION
THIS CRIMINAL HISTORY CONTAINS
CPD ARREST INFORMATION
AS OF THE INDICATED DATE

DATE: JAN 1 0 2000  PROCESSED BY:

**CLASS X FELONY**

on parole (uuu.)
wlt
l-ly

CITY OF CHICAGO / DEPARTMENT OF POLICE / 1121 South State Street
IDENTIFICATION SECTION Chicago, Illinois 60605

CRIMINAL HISTORY OF THRELKELD Michael C. M/B

DATE 2 JUL '96

15 JAN 00

2F

10 FTA

DATE OF BIRTH 07 MAY 79

| | | | | | |
|---|---|---|---|---|---|
| **I R NO** 1167457 | | **FBI NO** 41369 CB4 | | **SID NO** 36811920 | |
| **NAME & ADDRESS** | **C # NO** | **DATE OF ARREST** | **ARRESTING OFFICER & DISTRICT** | **CHARGE** | **DISPOSITION** |
| Michael C. THRELKELD 5307 S. Hyde Park Bv 7 May 79 | 14219446 cal | -16 Jun 99, Off. Willis, Dist. 002, Driving Under Infu Of Alcohol | | | |
| Michael C THRELKELD 5307 S Hyde Park Bv 07 May 79 | 14268200 cm | -18 Aug 99 Off. Skokal Dist. 021 Aid/Abet/Poss/Sell Stolen Veh | | SOL | |
| MIHAEL C THRELKELD 5451 South Cornell 07 May 79 | 14383704 sb | -14 Jan 00, Off. Willims Dist. 005 First Degree Murder | | | |
| | | | | | |

**RETURN TRANSMITTED**

AS OF 09 DEC 98

ON **PAROLE**

INSTITUTION VIENNA

REL'S DATE 09 DEC 00

PER # K66117

REVIEWED BY
INSTANT UPDATE UNIT

JAN 15 2000

TEL # 312 747-

**CLERK'S COMPUTER DOWN**

CONFIDENTIAL Further dissemination of information contained in this record is forbidd When this record has served the purpose for which it was issued. it must be destroyed

116745.7

CITY OF CHICAGO / DEPARTMENT OF POLICE / 1121 South State Street
IDENTIFICATION SECTION  Chicago, Illinois 60605

CRIMINAL HISTORY OF THRELKELD, Michael C.    M/B Youth Division (Y.D.)number
283342  is Identical by Fingerprint
comparison to IR#1167457

DATE          26 July 96

DATE OF BIRTH    07 May 79

| IR NO | FBI NO | SID NO |
|---|---|---|
| 1167457 | 41369CB4 | 36811920 |

| NAME & ADDRESS | CB NO | DATE OF ARREST | ARRESTING OFFICER & DISTRICT | CHARGE | DISPOSITION |
|---|---|---|---|---|---|
| Michael C. THRELKELD 5307 S. Hyde Park 07 May 79 | 10289061 bw | -25 Jul 96 Off. Fowler Dist. 21 Assault 29 Aug 96, Aslt (720-5/12-1a1) BF SOL Judge Sheridan, Doc#96339730 | | | |
| Michael L. THRELKELD 5307 S. Hydepark 07 May 79 | 10324573 lbs | -05 Sep 96 Off. Greer Dist. 21 Battery 08 Oct 96, Batt (720-5/12-3a1) CDTV (720-5/21-1) BF SOL Judge Morrissey, Doc#96383728 | | | |
| Michael C. THRELKELD 5307 S. Hyde Pk 07 May 79 | 10330918 jmm | - 12 Sep 96, Off. King, Dist. 002, Battery 28 Oct 96, Batt (720-5/12-3a1), CDTV (720-5/21-1) BF SOL Judge Cepero, Doc#96383672 | | | |
| Michael T. THRELKELD 5307 S. Hyde Park 07 May 79 | 10537020 IUU/jw | -06 Jun 97, Off. Thompson, Dist. 021, PCS, Unlawful Use of Firearm, No FOID. -12 Aug 97, INFO#97CR-21406, Carry/Possess Firearm, Carry/ Possess Firearm In Public | | | |
| Michael THRELKELE 5307 S. Hyde 07 May 79 | 10636498 vw | -10 Aug 97 Off. Williams Dist. 02 Disorderly Conduct -16 Sep 97, Disorderly Conduct, 720-5/26-1a1, BF SOL Judge Toole, DOC# 97387792 | | | |
| Michael C. THRELKED 5307 S. Hyde Park Blvd 07 May 79 | 10686037 vv | -03 Sep 97, Off. Cousens, Dist. 21, Disorderly Conduct 24 Sep 97, D/C 720-5/26-1, BF SOL, Judge Divane, DOc# (97379073) | | | |
| Michael C. THRELKELD 5307 S. Hyde PK 07 May 79 | 10692149 cb/temp | -08 Sep 97 Off. Mcdonald Dist. 21 Aslt 20 Oct 97, Assault 5/12-1) BF SOL, Jdge Toole, D | | | |
| Michael C. THRELKELD 5307 S. Hyde Park 07 May 79 | 10725613 vw | -08 Oct 97 Off. Singleton Dist. 21 Crim Trespass to Land -01 Dec 97, C.T.T.L. 720-5/21-3, BF SOL, Poss of Cann, 720-550/4c, BF SOL Judge Toole, DOC# 97426534 | | | |
| | SEE CB 1053/020 | 09 Dec 97, Carry/Possess Firearm, Carry/Possess Firearm In Public, (9/CR-21406)PG 15Mos Prob, $25.00 Monthly Prob Fee, Judge Flannery | | | |
| Michael C THRELKELD 5307 S Hyde Park 07 May 79 | 10884921 cc | - 31 Jan 98,off.Randle, Dist.021., DUI Other Drugs | | | |
| Michael THRELKELD 5307 S. Hyde Park 07 May 79 | 10887627 pb | -03 FEb. 98 Off. Smith Crim. Enterprise Inv. Cr. (021) Poss Amt. Cont. Sub. Except (A)/(D) Mar 98, GJ IND#98CR-6123, Mfg/Del Cont Sub See previous page | | | |
| Michael C. THRELKELD 5307 So. Hyde Park 07 May 79 | 11000802 sp | -11 Mar 98, Off. Metcalf, Dist. 021., Poss Cann Less Than 2 Grams 20 Apr 98, POC 720-550/4, BFW, Jduge Divna, eDoC398226853 | | | |

CONFIDENTIAL    Either dissemination of information contained in this record is forbidden When this record has served the purpose for which it was issued it must be destroyed (U S Dept. of Justice Rules & Regulations S S 20 33)

CITY OF CHICAGO / DEPARTMENT OF POLICE / 1121 South State Street
IDENTIFICATION SECTION  Chicago, Illinois 60605

| CRIMINAL HISTORY OF | THRELKELD, Michael C. | M/B |
|---|---|---|

Youth Division(Y.D.)283342
Is Identical by Fingerprint
comparison to IR#1167457

DATE  26 July 96

DATE OF BIRTH  07 May 79

| IR NO 1167457 | FBI NO 41369 CB4 | SID NO 36811920 |
|---|---|---|

| NAME & ADDRESS | IR NO | DATE OF ARREST   ARRESTING OFFICER & DISTRICT   CHARGE | DISPOSITION |
|---|---|---|---|
| Michael C THRELKELD 5307 S Hyde Park 07 May 79 | 11023070 om | -07 Apr 98, Off. Turner Dist. 021 Traffic Warrant | |
| Michael C. THRELKELD 5307 S. Hyde Park 07 May 79 | 11043119 jmm | - 30 Apr 98, Off. Camp, Dist. 021, CPD WRT Cannabis | |
| Michael THRELKELD 5307 S Hyde Pk 07 May 79 | 11053204 PW | -12 May 98, Off. Jones, 021st. Dist., Disorderly Conduct   BFSOL | |
| Michael C. THRELKELD 5307 S. Hyde Park Bv #1004 07 May 79 | 14143743 gb | -17 Mar 99, Off. Williams Dist. 021 Driving Under Influ Of Alcohol | |
| Michael C. THRELKELD 5307 S. Hyde Park Bv 07 May 79 | 14146355 cl | -20 Mar 99 Off. Artz, Dist. 02 Crim Trespass  To Residence   Nolle | |
| Michael C. THRELKELD 5307 S. Hyde Park Bv 07 May 79 | 14189984 gd | -12 May 99, Off. Chan, Dist. 021, Poss Cannabis   BFSOL | |
| (F) | SEE CR# 10537020 | 26 Jun 98, VOP SUST. (97CR-21406), Resent To 3 YRS IDOC, Impact Incar. Program, CCW/98CR-6123, Judge Flannery | |
| (F) | SEE CR# 10887627 | 15 Jun 98, Mfg/DCS, (98CR-6123), PG 3 YRS IDOC, Impact Incar Program, Judge Sacks 09 Dec 98, Paroled From Vienna CC#K66117, (97CR-21406, 98CR-6123)  See next page | |
| Michael C. THRELKELD 5307 S. Hyde Park Bv 07 May 79 | 14205562 lr | -30 May 99, Off. Walker, Dist. 021, First Degree Murder Release Without Charging | |
| Michael THRELKELD 07 MAY 79 | Juvenile Court IUU/JJH | -14 NOV 95,CPD,Poss contl Sub 24 JAN 96,PCS(95JD18099)Findg Delinquency,Judge Haberkorn 20 FEB 96,PCS(95JD18099)Minor Adjud ward of Court,Placed on Probation Judge Haberkorn | |
| Michael THRELKELD 07 MAY 79 | Juvenile Court IUU/JJH | -09 JAN 96,CPD,Poss Contl Sub 24 JAN 96,PCS(96JD00467)Finding of Delinquency,Judge Haberk 20 FEB 96,PCS(96JD00467)Minor adjud Ward of Court,Placed on Probation Judge Haberkorn | |

NOTE! Juvenile Court Records and Juvenile Law
Enforcement Records are restricted for use
in accordance with 705 ILCS 405/1-7and405/1-8

CONFIDENTIAL  Further dissemination of information contained in this record is forbidden. When this record has served the purpose for which it was issued it must be destroyed (U S Dep: of Justice Rules & Regulations S.S 20.33)

EXHIBIT 2

OFFICE OF THE STATE'S ATTORNEY
COOK COUNTY, ILLINOIS

## INVESTIGATIVE REPORT

| CONTROL NO 00E2484 | REPORTING DATE(S): | PREPARED BY INVESTIGATOR: | SYNOPSIS OF REPORT: |
|---|---|---|---|
| CASE NO: 00CR-4537 | 8-14-00 | HUGH CAHILL | INTERVIEW |

Date of Assignment:  8-8-00

Assignment:  INTERVIEW DEFENSE WITNESS: AHMAND KENDALL, M/B/20YRS., DOB 19 OCT. 1979, OF 4551 S. ELLIS, TEL#548-1567

Subject Information:  DEFENDANT: MICHAEL THRELKELD

Present:  INVESTIGATOR DENNIS CULLOM

Date/Time/Location:  10 AUG.00, 11:20 AM, 4551 S. ELLIS

Reporting Investigator interviewed Mr. Kendall regarding this incident and he related the following: At the time of the incident he and Michael Threlkeld shared an apartment located at 5451 S. Cornell. On the night of the incident Michael told him he was going to a movie with Asha (his girlfriend). Mr. Kendall stated Michael appeared to be very happy. Michael then left the apartment.

The following mourning at approx. 9:30 am the police came to his apartment and informed him Michael had been involved in an auto accident. The police asked Mr. Kendall if he knew where Michael was. Mr. Kendall informed the police he had no idea, but thought he had spent the night at Asha's apartment.

Mr. Kendall also stated it did not surprise him that Michael was involved in an accident because he knew Michael was a reckless driver.

INVESTIGATOR: _____ HUGH CAHILL & DENNIS CULLOM

SUPERVISORY REVIEW: _____

EXHIBIT 3

| ILLINOIS STATE POLICE<br>FIELD REPORT | **1** Type of Report<br>1. Incident Report<br>2. Case Basis Report<br>3. Prelim. Crim. Inv.<br>4. Per History Info.<br>5. Loss or damage of ISP equipment<br>6. Personal Injury<br>7. Encounters<br>8. Pursuit Report<br>9. Juvenile<br>V. Valeyria<br><br>1,2,3,4 | ROC#<br><br>**2** How Notified<br>1. On View<br>2. Telephone<br>R. In Person<br>4. U.S. Mail<br>5. Other Agency<br>C.B. Radio<br><br>1 | **3** Initial Notification<br>Date 01/13/00<br>Time 2:45 A | **4** Incident Occurrence<br>Date 01/13/00<br>Time 2:45 A | **5** Number<br>06-00-035 |

| 1. TYPE OF REPORT | 6c. & 6a. RESPONDING VEHICLE | 6c. RACE | 6g. HAIR | 9j. MARITAL STATUS | 10b. INJURIES | 14a. WEAPON | 14c. CASE STATUS |
|---|---|---|---|---|---|---|---|

**6** Other Description
Obstructing Justice, Driving while Revoked, Illegal Consumption by a Minor, Possession of Cannabis, Uninsured Motor Vehicle, Improper Lighting (One Headlamp)

| a. Location | City | County/Township |
|---|---|---|
| I-55-southbound milepost 177 | McLean, Lexington | |

| **7** | b. Investigating Officer (Print or Type)—Last, First, Middle<br>Gray, Brian | I.D. No.<br>4994 | Dist No.<br>06 | c. Response No.<br>★ 1 | d. Assisting Officer — Last, First, Middle<br>Zappa, David | I.D. No.<br>4741 | Dist. No.<br>06 | e. Response No.<br>★ 1 |
|---|---|---|---|---|---|---|---|---|

| **D** | a. Name — Last, First, Middle<br>Threlkeld, Michael C. | b. Home Address<br>5451 S. Cornell  Chicago, IL  60615 | c. Telephone<br>773/752-6547 |
|---|---|---|---|

| **8** | a. DOB<br>05/07/79 | b. Sex<br>M | c. Race<br>★ B | d. Height<br>507 | e. Weight<br>140 | f. Eyes<br>★ 3 | g. Hair<br>★ 2 | h. Complex.<br>dark | i. Build<br>★ 4 | j. Marital<br>★ 4 | k. Scars-Tattoos-Deformities-Amputations<br>Tatto Right Upper arm of Heart with an "M" in the middle |
|---|---|---|---|---|---|---|---|---|---|---|---|

| **9** | a. Driver's License No.<br>T642-5437-9131 | State<br>IL | b. Social Security No.<br>Unknown | c. Place of Birth<br>Chicago | d. Business Name and Address<br>William's Furniture  Chicago |
|---|---|---|---|---|---|

| **C** | **10** | a. Occupation<br>Mover | b. Injuries ★<br>None | c. Address where treatment given | d. Alias<br>Kevin Tevin Williams |
|---|---|---|---|---|---|

| **A** | **11** | a. Date Arrested<br>01/13/00 | Time<br>2:45 A | b. Location of Arrest<br>I-55 southbound milepost 177 | c. Offense Section<br>720 ILCS 5/31-4 625 ILCS 5/6-303<br>235 ILCS 5/6-20 134a 720 ILCS 550/4B 704(b)<br>625 ILCS 5/3-707 625 ILCS 5/12-211 | d. A☐ B☐<br>★ CC☐ M☐ |
|---|---|---|---|---|---|---|

| **U** | **12** | a. Date Miranda Given<br>01/13/00 | Time<br>10:00 A | b. Officer Name<br>Tpr. Gray, Brian | I.D. No.<br>4994 | c. Fingerprint<br>☒Yes ☐No | d. Bond<br>No Bond | e. Court App. Date<br>02/15/00 | f. Where held<br>Mclean  Co Jail |
|---|---|---|---|---|---|---|---|---|---|

| **T** | **13** | a. ISP Ticket No.<br>06-0804841-0804846 | b. Pursuit Termination Devices Used?<br>☐ Yes  ☒ No | c. FBI Case No. | d. BOI No. | e. LEADS Message No. | f. NCIC |
|---|---|---|---|---|---|---|---|

| **I** | **14** | a. Weapon<br>★None | b. 1.☒ Alcohol Involved<br>2.☒ Drugs Involved | c. Case Status<br>★ 3 | d. Place<br>238 | e. Method<br>411 | f. Property Code | g. Recovery Code | h. Property- Value<br>STOLEN  RECOVERED  DAMAGED |
|---|---|---|---|---|---|---|---|---|---|

| **O** | **7** | a. Name — Last, First, Middle | b. Home Address | c. Telephone |
|---|---|---|---|---|

| **N** | **8** | a. DOB | b. Sex | c. Race ★ | d. Height | e. Weight | f. Eyes ★ | g. Hair ★ | h. Complex. | i. Build ★ | j. Marital ★ | k. Scars-Tattoos-Deformities-Amputations |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

| **9** | a. Driver's License No. | State | b. Social Security No. | c. Place of Birth | d. Business Name and Address |
|---|---|---|---|---|---|

| **C** | **10** | a. Occupation | b. Injuries ★ | c. Address where treatment given | d. Alias |
|---|---|---|---|---|---|

| **A** | **11** | a. Date Arrested | Time  A  P | b. Location of Arrest | c. Offense Section | d. A☐ B☐ CC☐ M☐ |
|---|---|---|---|---|---|---|

| **U** | **12** | a. Date Miranda Given | Time  A  P | b. Officer Name | I.D. No. | c. Fingerprint ☐Yes ☐No | d. Bond | e. Court App. Date | f. Where held |
|---|---|---|---|---|---|---|---|---|---|

| **T** | **13** | a. ISP Ticket No. | | c. FBI Case No. | d. BOI No. | e. LEADS Message No. | f. NCIC |
|---|---|---|---|---|---|---|---|

| **I** | **14** | a. Weapon | b. 1.☐ Alcohol Involved 2.☐ Drugs Involved | c. Case Status ★ | d. Place | e. Method | f. Property Code | g. Recovery Code | h. Property- Value  STOLEN  RECOVERED  DAMAGED |
|---|---|---|---|---|---|---|---|---|---|

## VEHICLE OR BOAT INFORMATION

| **15** | a. Color<br>Gray | b. Year<br>1995 | c. Mfg. Trade Name<br>Jeep | d. Body/Hull Style<br>Grand Cherokee | e. Year/State<br>00/IL | f. License No.<br>Lic App for | g. VIN/HIN<br>1J4GZ78Y7SC725422 |
|---|---|---|---|---|---|---|---|

| h. Owner<br>Unknown | i. Address<br>Unknown | j. Est. Damage<br>$1500.00 |
|---|---|---|

| k. Telephone<br>Unknown | l. Vehicle Removed By<br>Joe's Towing | To<br>Joe's Bloomington | m. Quality Check<br>Initials | I.D. No. |
|---|---|---|---|---|

| **16** | Signature of Investigating Officer | a. Date<br>01/15/00 | b. Copies to:<br>Mclean Co. S/A | Page — 1 — of — 6 |
|---|---|---|---|---|

THE CONTENTS OF THIS DOCUMENT ARE CONFIDENTIAL AND CONTAIN NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF THE ILLINOIS STATE POLICE.
THE CONTENTS OF THIS DOCUMENT ARE NOT TO BE DISTRIBUTED OUTSIDE THE ILLINOIS STATE POLICE.

ISP 5-048 (8/97)

## NARRATIVE OR ROAD BLOCK LOG

| TIME | COLOR OF VEHICLE | YEAR | MAKE | REGISTRATION NO. | STATE OF ISSUANCE |
|------|------------------|------|------|------------------|-------------------|

The purpose of this report is to document the arrest of Michael C. Threlkeld, date of birth 05/07/79, of 5451 S. Cornell Chicago, Illinois 60615 on 01/13/00 on I-55 southbound milepost 177. The arrest of Threlkeld was for Obstruction of Justice, Driving while Revoked, Illegal Consumption by a Minor, Possession of Cannabis 2.5 grams to 10 grams, Operating and Uninsured Motor Vehicle, and Improper Lighting (one headlamp).

On 01/13/00 at approximately 2:30 A.M., I (Tpr. Brian Gray #4994) was on a traffic stop at I-55 southbound milepost 191 when a truck tractor semi-trailer stopped, on the shoulder, behind me. I exited my vehicle and approached the truck driver. The driver stated there was a Gray Jeep Grand Cherokee southbound on I-55 about milepost 193. The vehicle was all over the roadway, slowing down in traffic and sometimes almost coming to a stop. The vehicle had no license plates and the right headlamp was inoperative. The truck driver turned around and stated the vehicle was approaching our location. I noticed the vehicle had a right headlight out. I attempted to motion the vehicle over with my flashlight and hand signals. The vehicle proceeded southbound on I-55. I noticed the description matched that of the truck driver's information obtained. I asked radio to broadcast an ISPERN Dispatch with the information obtained by the truck driver. Radio broadcasted the ISPERN Dispatch. I completed my traffic stop at approximately 2:38 A.M. and notified radio I was attempting to catch up to the Gray Jeep reference the ISPERN Dispatch.

I monitored citizen's band radio channel 19 for radio traffic. Channel 19 notified me the vehicle was still southbound on I-55. At approximately 2:45 A.M. I caught up to a Gray Jeep Grand Cherokee at I-55 southbound milepost 178. I noticed the vehicle did not have a rear registration plate light. Channel 19 notified me the vehicle in front of my squad car was the vehicle reported to be all over the roadway. The vehicle matched the ISPERN Dispatch. I affected a traffic stop at I-55 southbound milepost 177 by activating my emergency lights. I notified radio of my location. The driver of the vehicle slowed down extremely in the right lane of traffic. The vehicle came to a stop. I noticed one male occupant, the driver, in the vehicle. The subject immediately placed his hands on the roof of the vehicle. I approached the vehicle from the passenger side. I noticed extensive front end damage to the front passenger side of the vehicle. I asked the driver where he was coming from. The driver stated Chicago going to Champaign to see his girlfriend. I asked the driver to present a driver's license. The driver asked if he could look in his pockets. I stated use one hand at a time and to keep the other hand on the steering wheel. This was for officer safety. The driver stated he did not have his driver's license. I asked the driver what his name was. The driver stated Kevin Tevin Williams, date of birth 04/07/79. I asked William's to turn off the ignition to the vehicle. Williams complied. I walked around the front of the vehicle to check the Vehicle Identification Number (VIN). I approached the driver side window and asked Williams to place his hands on the steering wheel for officer safety. Williams complied. I asked radio to run a computer check on VIN: 1J4GZ78Y7SC725422. Radio notified me there was no record on file. I asked Williams to present proof of insurance for the vehicle. Williams opened the glove compartment. I noticed the temporary registration card in the glove compartment. I asked Williams if I could see the registration card. Williams handed me the

| | COURT LOCATION |
|--|----------------|
| | |
| | McLean County |

THE CONTENTS OF THIS DOCUMENT ARE CONFIDENTIAL AND CONTAIN NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF THE ILLINOIS STATE POLICE.
THE CONTENTS OF THIS DOCUMENT ARE NOT TO BE DISTRIBUTED OUTSIDE THE ILLINOIS STATE POLICE.

| ILLINOIS STATE POLICE Universal Addendum Form | 1. Original Report Type 1,2,3,4 | 2. Report Date 01/15/00 | 3. Original Report# F-06-00-035 S |
|---|---|---|---|

NARRATIVE                      PASSENGER/WITNESS/OTHER LIST

| Name | Address | City/State | Age | Inj. Code | Seat Pos. | Unit # | Sex |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

registration card. Williams could not present proof of insurance. I asked Williams to come back to my vehicle. I patted Williams down for weapons. I placed Williams in my vehicle. I asked Williams when his birthday was again. Williams stated 04/07/79. I asked radio to run a computer check on Williams. Radio notified me there was no record of file. I asked Williams for his address. Williams stated 5327 N. Lake park Chicago, Illinois 60615. I asked Williams who the owner of the vehicle was. Williams stated Bobby Petty, Williams uncle, of Chicago. The registration card was torn in half. The only information on the card was owner Bobby Renolds of Chicago. I asked who Bobby Renolds was. Williams stated Renolds was a friend of his uncles. Williams stated Renolds really owned the vehicle and gave Williams permission to drive the vehicle. I asked Williams how long Renolds owned the vehicle. Williams stated about a month.

I noticed the smell of an alcoholic beverage emitting from Williams. I asked Williams if he had been drinking alcohol. Williams stated yes. I asked what he was drinking. Williams stated Gin and orange juice. I asked where the bottle of gin was. Williams stated he threw the bottle out somewhere in Chicago. I asked how much he drank. Williams stated the whole pint of Gin. I told Williams I was placing him in handcuffs for his protection and mine. I stated he was not under arrest. I handcuffed Williams, checked for fit and double locked. I placed Williams back in my vehicle.

I approached the vehicle and asked radio to run the VIN again. Radio stated there was no record on file. I walked around to the passenger front of the vehicle where I noticed the right headlamp was inoperative. There was extensive damage to the right front of the vehicle. The hood was wrinkled with an oval dent approximately 2 feet in diameter on the right side of the hood. The clear headlamp cover was broken. The bumper had scratches on it. The front quarter panel was wrinkled. paint had chipped from the hood approximately 3 inches long by 2 inches wide. I noticed there was no rust anywhere in the damaged area. Inside the headlamp cavity was no sign of dirt or impression of being broken for a long period of time. I noticed there was no rust anywhere in the damaged area. I was unable to determine any paint transfer. The conclusion I drew from the damage was it occurred very recently, due to the fact there was no dirt around the damaged areas or rust on the exposed metal. I noticed a piece of paper in the passenger seat with the name Agent Williams.

| Investigating/Reporting Officer's Signature | ID # 4994 | District # 06 | Date 01/15/00 |
|---|---|---|---|

| ILLINOIS STATE POLICE<br>Universal Addendum Form | 1. Original Report Type<br>1,2,3,4 | 2. Report Date<br>01/15/00 | 3. Original Report#<br>F-06-00-035 S |
|---|---|---|---|

**NARRATIVE**          PASSENGER/WITNESS/OTHER LIST

| Name | Address | City/State | Age | Inj. Code | Seat Pos. | Unit # | Sex |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

I returned to my vehicle. I asked Williams where the damage to the vehicle came from. Williams stated his uncle hit something about a month ago. I ask Williams what his uncle hit. Williams did not know. I asked Williams for his name again. Williams stated Kevin Tevin Williams. I asked Williams for his date of birth. This time, Williams stated 06/07/79. I asked radio to run a computer check on Williams again. Radio notified me there was no record on file. I asked Williams if he had ever been in trouble. Williams stated no. I asked Williams who Agent Williams was. Williams stated that was his parole officer. I asked Williams for his parole officer's phone number. Williams did not know the number. I asked Williams for his Social Security Number. Williams stated he was in school at Robert Morris College, never had a job and did not know his Social Security Number. I asked Williams for his parole number. Williams stated K66118 out of Cook County. A computer check of parole number K66118 revealed no record on file. Due to the fact no information was obtained about Kevin Tevin Williams, this led me to believe the subject was not Kevin Tevin Williams.

Tpr. Zappa #4741 arrived to assist on the stop. I notified him of the information I have received.

I asked Williams what his address was. Williams stated this time 5451 S. Cornell Chicago, Illinois 60615. I asked Williams for his mothers phone number. Williams stated 773/ 752-6864, mother's name was Gladice Williams. Gladice was an Registered Nurse at Cook County Hospital. Gladice was unable to be contacted at home or at the hospital for information about her son. Williams stated his aunts name was Judy Carter 773/468-0599. No one answered upon calling the number. From the information obtained, I was unable to determine Williams had a valid driver's license.

I asked radio to call a Tow. Radio notified me Joe's Towing was en route. At 4:15 A.M. I asked Williams to submit to a preliminary breath test with the Alco-Sensor IV. Williams stated yes. The results of the preliminary breath test was .006. Williams fell under the Zero Tolerance law for being under age. At this time I placed Williams under arrest for No Valid Driver's License and Illegal Consumption by a Minor.

| Investigating/Reporting Officer's Signature | ID #<br>4994 | District #<br>06 | Date<br>01-15-00 |
|---|---|---|---|

| ILLINOIS STATE POLICE<br>Universal Addendum Form | 1. Original Report Type<br>1,2,3,4 | 2. Report Date<br>01/15/00 | 3. Original Report#<br>F-06-00-035 S |
|---|---|---|---|

NARRATIVE     PASSENGER/WITNESS/OTHER LIST

| Name | Address | City/State | Age | Inj. Code | Seat Pos. | Unit # | Sex |
|---|---|---|---|---|---|---|---|

I asked Williams if there were any weapons, drugs, or alcohol in the car before I inventoried the vehicle for the Tow. Williams stated no. I inventoried the vehicle due to the Tow being en route. While inventorying the vehicle I noticed 3 small approximately 1 inch by 1 inch bags tightly packed with a green leafy substance in the middle console by the parking break lever. I notice two cigars wrapped in cellophane in the middle console by the parking break lever and a book of matches in a driver's side door compartment. I field tested the green leafy substance for marijuana. The field test result was positive for marijuana. I continued the inventory. I noticed a small Sentry safe Model 1100 approximately 1 foot by 1 foot by 6 inches in a plastic bag in the middle of the rear passenger seat. I also notice a piece of paper with an address of 3216 Misty Albin, Pennsylvania and a social security number on the back (SSN: 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). I returned to my vehicle. I asked Williams what was in the safe. Williams stated approximately $2600.00 cash was in the safe and that he was going to spend it on his girlfriend in Champaign. Williams asked if he could have his money before the Tow truck left. I asked Williams if I could open the safe. Williams stated yes. Williams only request was that the safe be opened in front of him. I stated yes. I asked Williams where the key to the safe was. Williams stated on his key chain in the ignition. I removed the Sentry key from the key chain in the ignition of the vehicle. I opened the safe in front of Williams. Inside the safe was a large sum of U.S. Currency seemed to be mostly $20 denominations. Also, there were various pictures in the safe. I locked the safe and placed it in my trunk. I asked Williams what the green leafy substance was in the center console. Williams called the substance herb. I asked what herb was. Williams stated weed. I asked Williams if it was marijuana. Williams stated yes. I asked Williams why he lied to me about the drugs in the vehicle. Williams stated he thought I was looking for a large sum of drugs. At this time, I place Williams under arrest for Possession of Cannabis.

Tpr. Zappa stated he would complete the Tow report (T-06-00-040).

District 06 Investigations was notified of the stop and items found in the vehicle. Investigations stated to tow the vehicle to the Investigations Building in Bloomington and also transport Williams there for further interviewing. I secured the seatbelt around Williams and transported him to investigations at approximately 5:47 A.M. (beginning mileage 109703). I arrived at investigations at approximately 6:08 A.M. (mileage 109718).

| Investigating/Reporting Officers Signature | ID #<br>4994 | District #<br>06 | Date<br>01-15-00 |
|---|---|---|---|

IL 493-0567    ISP 5-264 (1/88)  Page 4 of 6 Pages

| ILLINOIS STATE POLICE Universal Addendum Form | 1. Original Report Type 1,2,3,4 | 2. Report Date 01/15/00 | 3. Original Report# F-06-00-035 S |
|---|---|---|---|

**NARRATIVE**        PASSENGER/WITNESS/OTHER LIST

| Name | Address | City/State | Age | Inj. Code | Seat Pos. | Unit # | Sex |
|---|---|---|---|---|---|---|---|

Sgt. Brendan Heffner #4625 took Williams for interviewing. A K-9 officer was called to investigations. Officer Les Stevens (Chenoa #4) responded. A K-9 alerted on the passenger side just below the A-Frame of the vehicle, the passenger door and center console. Further investigation resulted in no contraband found. The K-9 alerted on the model 1100 Sentry safe.

I took the Sentry safe into investigations and counted the currency in front of Williams. Total amount in the safe was $2600.00. The $2600.00 was placed into a single evidence bag and sealed. I entered the cash into evidence as well as the Sentry safe Model 1100. I weighed the 3 bags of green leafy substance. The total weight was 4.2 grams. I sealed the 3 bags of green leafy substance in a single evidence bag and sealed it. I sent the green leafy substance to the lab for analysis and amount.

Sgt. Brendan Heffner notified me Williams' real name was Michael C. Threlkeld, date of birth 05/07/79, of 5451 S. Cornell Chicago, Illinois 60615. At this time I attempted to contact McLean County States Attorneys Office to receive advise on charging the subject for Obstructing Justice. I was unable to contact a State's Attorney therefore charged Threlkeld for Obstructing Justice. I asked Threlkeld who owned the vehicle. Threlkeld stated Bobby Rental.

At approximately 9:21 A.M. I transported Threlkeld to McLean County Jail (mileage 109718). I arrived at McLean County Jail at approximately 9:33 A.M. (mileage 109723). At the jail I issued Threlkeld his copies of the citations. I issued Threlkeld warnings for No Rear Registration Light and No Driver's License on person (WW-06-2012566). I issued citations to Threlkeld for Operating an Uninsured Motor Vehicle (CC-06-0804841) 625 ILCS 5/3-707, Driving while Revoked (CC-06-0804842) 625 ILCS 5/6-303, Improper Lighting (One Headlamp) (CC-06-0804843) 625 ILCS 5/12-211, Illegal Consumption by a Minor (CC-06-0804844) 235 ILCS 5/6-20 134a, Possession of Cannabis 2.5 grams to 10 grams (CC-06-0804845 720 ILCS 550//4B 704(b), and Obstructing Justice (CC-06-0804846) 720 ILCS 5/31-4. At 9:45 A.M. I read Threlkeld his Written Warning to Motorist Zero Tolerance Under 21. Threlkeld understood the Warning and submitted to a breath test. At 9:59 A.M. Threlkeld issued the sample into the INTOX EC/IR. The subject result was .002. At 10:00 A.M. I read Threlkeld his Miranda Rights. Threlkeld stated he understood his rights. I asked Threlkeld if he would submit to the Alcohol Influence Interview. Threlkeld stated yes.

| Investigating/Reporting Officer's Signature | ID # 4994 | District # 06 | Date 01-15-00 |
|---|---|---|---|

IL 493-0567        ISP 5-264 (1/88)        Page 5 of 6 Pages

| ILLINOIS STATE POLICE Universal Addendum Form | 1. Original Report Type 1,2,3,4 | 2. Report Date 01/15/00 | 3. Original Report# F-06-00-035 S |
|---|---|---|---|

NARRATIVE                    PASSENGER/WITNESS/OTHER LIST

| Name | Address | City/State | Age | Inj. Code | Seat Pos. | Unit # | Sex |
|---|---|---|---|---|---|---|---|

I issued Threlkeld his copies of the Written Warning to Motorist and Law Enforcement Officer's Sworn Report.  I turned Threlkeld

over to McLean County Jail Division for further processing.  I exited the jail.

| Investigating/Reporting Officer's Signature | ID # 4994 | District # 06 | Date 01-15-00 |
|---|---|---|---|

IL 493-0567                              ISP 5-264 (1/88)        Page 6 of 6 Pages

EXHIBIT 4

State Of Illinois)
                   Affidavit Statement Of
  Cook County   )    Terrance Coleman


In pursuant to the 28 U.S.C. Act,Penalty of Perjury, I Terrance

Coleman swear under the penalty of perjury that this affidavit is

correct and true as I know it. I understand that if anything I'm

saying is proven to be false,I could and will be prosecuted under

the law.

      I was a witness for the defense on the behalf of Michael

Threlkeld. I just want to clear up the wrong that have been done

by the attorney Mr. Martin Abrams. On March 13,2001 during the

trial of Michael Threlkeld,I was told by the attorney of Michael's

not to tell the real truth about what was going on with Michael,

and about the drinking problem that Michael had,and the fact that

every time I seen him in a car or anywhere he is always drunk.

Attorney Abrams told me to say a different story,and instead of

admitting that he was over intoxicated and driving during that night

of Jan.12,2000,that he was to only testify that he only drinked 2

shots of gin after the accident of Jan.12,2000.

Myself,Jasmine Carter and Ahmad Kendell all was there when Michael

Threlkeld's attorney was giving us the instructions of what we is

to say which I thought was the best thing to do for Michael.

Mr. Abrams said the reason he did not want nothing said about Michael

being an alcoholic because if it was found out and Michael was in-

toxicated during that accident Jan.12,2000,that it will only make

the case aggravated and that the State Attorney will use it against

Michael to get him convicted and a lot of time.

Mr. Abrams then said that Michael got a D.U.I. already and some more other driving under the influence arrests and that Michael will be crazy to testify that he was a alcoholic and that he was drunk when he was behind the wheel of his car the night of the accident.

I will give this statement in person and under oath in court the same that I've stated here. I know that if my words are not true that I will be prosecuted under the penalty of perjury.

I have not been promised anything in exchange for this statement; it is of my own free will and I have not been coerced in ant way.

Respectfully Submitted;

Terrance Coleman

Subscribed before me and sworn to
on the ___ day of ___ 2005.

Notary Public



"OFFICIAL SEAL"
MAXWELL A. FISHER
COMMISSION EXPIRES 11/27/05

2

**EXHIBIT 5**

STATE OF ILLINOIS )
                       )  AFFIDAVIT OF JASMINE CARTER
COUNTY OF COOK     )

Pursuant to the 28 USC § 1746, I certfy under the penalty of perjury
that the foregoing is true and correct and I understand that if any
of the foregoing is false,that I could be and will be prosecuted.

      My name is Miss Jasmine Carter who was a defense witness in
the trial of Michael Threlkeld. My reason for giving this sworn and
signed statement is because March 13,2001 during the defense part
of Michael Threlkeld's trial I was told by the attorney of Michael's
not to reveal the truth about what I actually knew about Michael's
drinking problem and that he's always drunk when he drives and that
instead of Michael admitting that he was over intoxicated and driving
during that night of January 12th 2000,that he was to only testify
that he only drinked 2 shots of gin after the incident of January
12th 2000.
I,Miss Jasmine Carter,Terrance Coleman,and Ahmad Kendell all was
there when Michael Threlkeld's attorney was giving us these instruc-
tions about what to say,not admitting the truth.
Michale Threlkeld's attorney Martin Abrams also said that the reason
he did'nt want nothing said about Michael being an alcoholic because
if it was revealed that Michael was an alcoholic and was intoxicated
during that night January 12th 200,that it would only make the case
aggravated and that the state would use that against Michael to put
him away for a long time.
Michale's attorney Martin Abrams as well stated that Michael already
have a DUI and alot of other driving while intoxicated arrests,
under the influence,that Michael would be a fool to testify that
he was an alcoholic and was highly intoxicated in that car on the
night of the incident.

-1-

I will also testify under oath the actual truth about what I was told not to say at the trial of Michael Threlkeld if called to do so.

Any falsehoods in this affidavit could subject me to prosecuted under the penalty of perjury.

Sincerly; *Jasmine Cox*

Sworn to and subscribed before me;
__14__ Day of __May_____ 2005

"OFFICIAL SEAL"
AHISA HOLIDAY
NOTARY PUBLIC STATE OF ILLINOIS
COMMISSION EXPIRES 05/11/08

**EXHIBIT 6**

## Affidavit Of Ahmad Kendell

I,Ahmad Kendell,being first duly sworn upon oath is making this sworn statement of these facts and do understand that if I am found to be giving false information that I can and will be prosecuted under the penalty of perjury. Pursuant to 28 U.S.C.§ 1746 declare that the foregoing is true and correct.

My name is Ahmad Kendell,the defense primary witness within the Michael Threlkeld's trial,and my reason and purpose for this typed and signed affidavit is because in the month of March 2001 during the defense of Michael Threlkeld's trial .I was cohersed by a Mr. Martin Abrams,Michael Threlkeld's attorney to not testify about his drinking problem and about how he drink when he drives.

That instead of Michael Threlkeld admitting that he was intoxicated while driving during the night of Jan.12,2000,that he was to only testify that he only consumed two shots of gin afterwards of of the incident of Jan.12,2000.

Myself,Jasmine Carter,Michael Threlkeld's cousin,and also Terrance Coleman were all present during the cohersed instructions given by Michael Threlkeld's attorney Martin Abrams. Mr. Abrams also stated that the reason why he did'nt want any statements mentioned about Michael Threlkeld's drinking problem was because if it was found out by the States Attorney that Michael Threlkeld was intoxicated during the night of Jan.12,2000 that it would only make the case aggravated and the State's Attorney would use it against Michael's advantage and possibly put him away for a very long time.

He also stated that since Michael Threlkeld also has a D.U.I. and also various arrests where he drove under the influence,and that

he would be a fool to admitt that he was drinking on the night of the incident.

I,Ahmad Kendell under oath is willing to testify truthfully to this statement if called to testify in the defense of Michael Threlkeld.

_____
Affiant

Subscribed and sworn to before me, this ___ day of _____ 2005.

_____
Notary Public

Official Seal
Beverly Hudson
Notary Public State of Illinois
My Commission Expires 01/03/07

EXHIBIT 7

# ILLINOIS STATE POLICE
## INVESTIGATIVE REPORT

| File #: | Reporting/Incident Date(s): | Reporting Agent(s): | ID#: | | Dictated/LEAD #: |
|---|---|---|---|---|---|
| 00G0379 | 01/13-14/00 | Sgt Brendan Heffner #4225 | | | |

| Title: | Case Agent: ID# | Office: | Typed by: | Date: |
|---|---|---|---|---|
| Michael C Threlkeld | Heffner #4225 | D6/Inv. | cmh | 011900 |

Purpose:

Documentation for request of search warrant

On 01/13/00, at approximately 12:00pm, after being informed by Sgt Salburra of the Chicago Police Department that **MICHAEL THRELKELD** was the suspect in a vehicular homicide in the Chicago area, I used the information to obtain the attached search warrant. I obtained the search warrant from Judge Prall in order and obtain evidence from a 1995 silver Jeep, VIN 1J4GZ78Y7SC725422, which **THRELKELD** had occupied at the time of his arrest by Trooper Gray.

On 01/14/00, I was informed by Detective Charles Williams of the Chicago Police Department that the time indicated on the search warrant of 11:30pm for the homicide was incorrect. The correct time was approximately 9:30pm.

See attached.

End of report.

Dissemination:

This document contains neither recommendations nor conclusions of the Illinois State Police. It and its contents are not to be disseminated outside your agency.

IL493-0117

ISP 4-3 (01/96)

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF MCLEAN

## COMPLAINT FOR SEARCH WARRANT

A. Complainant: Sergeant Brendan Heffner of the Illinois State Police District 6.

B. Place or Objects to be searched: the entire premises of a 1995 silver Jeep S.U.V., VIN # I J4GZ7847SC725422

C. Items or Materials to be seized: any and all paint, blood and/or fiber transfer. Any documents in the car showing ownership and any latents lifted from within the vehicle.

D. Applicant has probable cause to believe said items or materials are located in said vehicle based on the following:

1. Affiant is a sergeant with the Illinois State Police. As a regular part of affiant's duties, affiant conducts investigations into criminal offenses, interviews of witnesses, seizes and collects evidence connected to the investigations.

2. That on Wednesday, January 13, 2000 approximately 1 mile south of Lexington, Mclean County a 1995 Jeep SUV being driven by Michael Threlkeld was stopped by Trooper Gray after complaints of reckless driving, specifically, that the car had been reported driving all over the road, and at times, almost stopping in traffic. It was reported that the vehicle only had one headlight. During the traffic stop the trooper noticed an odor of alcohol. The driver advised his name was Kevin Williams, with a date of birth of 4/7/79. Later on, the driver provided a different date of birth, of 6/7/79. The driver was unable to provide insurance for the vehicle. In addition the trooper was unable to verify any record of the name Kevin Williams, and no record on file returned on the vehicle's VIN number. The driver opened the glove compartment and the trooper observed a registration card in the name of Bobby Reynolds which was ripped in half. A portable breath test was administered upon the driver which registered alcohol in the amount of .006 and the driver admitted drinking. As a result, the defendant was arrested for illegal consumption. The vehicle was towed and inventoried which revealed a small amount of cannabis in 3 small bags in the console and a safe box with a large amount of cash in the amount of $2600. Traffic citations were issued for no valid driver's license, improper lighting, uninsured motor vehicle, illegal consumption and possession of cannabis under the name of Kevin Williams.

The driver was later interviewed by Sergeant Heffner who admitted his name was Michael Threlkeld. During this interview, Michael Threlkeld advised that he lied about his name because his driver's license was revoked. He further advised Sergeant Heffner that he had left Chicago at approximately 1:00 a.m. 1/13/2000 and was enroute to see his girlfriend in Champaign. He stated that he borrowed the vehicle from his friend on 1/12/2000.

The driver was subsequently arrested for obstruction of justice for providing a false name.

At approximately noon on 1/13/2000 Sergeant Heffner was advised by Chicago Police Department that the driver of the above vehicle was a suspect in a murder which occurred on 1/12/2000. Based on conversation between Sergeant Heffner and Detective Charles Williams of the Chicago Police Department, Sergeant Heffner was advised that witnesses initially reported to Chicago Police officers that they observed a vehicle strike another person at 6335 S. Stoney Island, Chicago, on 1/12/2000 at approximately 11:30 p.m.. Police responded and spoke to Edwina Quansah. Edwina reports that she was with Linton Douglas Robert Boyd Jr. (victim), in her vehicle when Michael Threlkeld approached in a silver jeep and words were exchanged. Michael Threlkeld drove off. The victim left Edwina Quansah's vehicle and headed toward his own vechicle. As the victim was entering his own vehicle, a silver Jeep drove toward the victim. The victim was struck by the silver jeep and killed. The silver Jeep then left the area. Edwina Quansah reported to officers that she is the former girlfriend of Michael Threlkeld and positively identified

him as the driver of the silver colored jeep.

Sgt B.E. Heffner 4225
Applicant signature

Subscribed and sworn to before me this 13 day of Jan. 2000 at 5:35 p.m.

G. Michael Prall

Circuit Judge G. Michael Prall

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
COUNTY OF MCLEAN

## SEARCH WARRANT

**TO ALL PEACE OFFICERS OF THE STATE:**

On this date January 13, 2000, Sergeant Brendan Heffner has subscribed and sworn to a Complaint for Search Warrant before me. Upon examination of said Complaint, I find it states facts sufficient to establish probable cause for the issuance of a warrant to search the following described place, person or objects for the items listed.

## I THEREFORE COMMAND THAT YOU SEARCH:

The entire premises of a 1995 silver Jeep SUV, VIN I J4GZ7847SC725422 operated by Michael Threlkeld..

## AND, IF FOUND, SEIZE THE FOLLOWING:

Any paint transfers, blood transfer, fiber transfer and any documentation showing ownership of said vehicle and any latent prints processed fronm said vehicle.

ISSUED this 13 day of January , 2000 5:36 a.m./p.m.

Circuit Judge Prall

# ILLINOIS STATE POLICE
## Division of Criminal Investigation Evidence Log

Fog-00-35

| EX. # | Time | Date | Description | Location Found | Found By | Witness | Storage Location |
|---|---|---|---|---|---|---|---|
| | 1045pm | 1/14/00 | PAINT STANDARDS | SILVER 1995 JEEP CHEROKEE (1J4GZ78Y73C025442) | CST. TRUMMEL | SGT. HEFFNER | CHICAGO LAB |
| | | | DAMAGED PIECES OF PASSENGER SIDE FRONT GRILL | " | " | " | " |
| | | | DAMAGED PIECES OF PASSENGERS SIDE FRONT HEADLAMP | " | " | " | " |
| | | | DAMAGED FOGLIGHTS FROM DRIVER + PASSENGER SIDE | " | " | " | " |
| | | | DAMAGED SECTION OF FRONT BUMPER WITH RED PAINT TRANSFER | " | CST. TRUMMEL | SGT. HEFFNER | CHICAGO LAB |
| | | | $6.00 US (DRIVERS SIDE VISOR) LETTER (BUSINESS) | " | SGT. HEFFNER | CST. TRUMMEL | DIST 06 JRKL |
| | 1045pm | 1/14/00 | (PHONE) AUDIOVOX PHONE (CELL) (UNDER DRIVERS SEAT) | SILVER 1995 JEEP CHEROKEE (1J4GZ78Y73C025442) | SGT. HEFFNER | CST. TRUMMEL | DIST 06 JRKL |

ISP 4-41 (1/88)

## ILLINOIS STATE POLICE
### INVESTIGATIVE REPORT

| File #: | Reporting/Incident Date(s): | Reporting Agent(s): | ID#: | | Dictated/LEAD #: |
|---|---|---|---|---|---|
| 00G0379 | 01/13/00 | Sgt Brendan Heffner #4225 | | | |

| Title: | Case Agent: ID# | Office: | Typed by: | Date: |
|---|---|---|---|---|
| Michael Threlkeld | Heffner #4225 | D6/Inv. | cmh | 011800 |

Purpose:

Interview of **MICHAEL THRELKELD**

The following will reflect the summary of an interview conducted with **MICHAEL C THRELKELD** on 01/13/00 at approximately 7:15am at D6/I. The interview was conducted after **THRELKELD** had been taken into custody on charges of obstructing justice, possession of cannabis 2.5 - 10 grams, and zero tolerance violation (traffic violation.) **THRELKELD** was advised of his Miranda rights, waived them and was subsequently interviewed.

Upon first speaking with **THRELKELD**, I had been informed by Trooper Brian Gray that the person whom he had taken into custody had furnished him false information regarding his identity. I advised **THRELKELD** as to the charges he was facing, and prior to reading him his Miranda rights, advised him that continuing to provide false information would only aggravate matters in regards to his charges. It was at this time that **THRELKELD**, who had been informing Troopers Gray and Zappa that his identity was **KEVIN WILLIAMS** informed me that he was indeed **MICHAEL C THRELKELD**. **THRELKELD** advised he left his residence at approximately 1:00am en route to Champaign, Illinois to visit a girlfriend with whom he was going to spend approximate one week. **THRELKELD** refused to identify his girlfriend on three different occasions. **THRELKELD** stated he had been at the U of I on approximately five to six occasions in 1999 and this was his first time visiting during the year 2000. **THRELKELD** stated he had bought his vehicle from a friend named **ROBERT AMES**, who was home in Chicago visiting while on Christmas break from a college in Alabama. **THRELKELD** advised his intention was to go visit his girlfriend and stay with her approximately one week, then return to Chicago and resume working at his place of employment, Williams Discount Furniture. While discussing his arrest, **THRELKELD** stated he had purchased approximately two dime ($10.00 bags) of cannabis from an unnamed source in Chicago and stated the $2,600.00 in his possession was money he had saved while being employed at Williams Discount Furniture. **THRELKELD** advised me he works approximately five days per week and earns $100.00 per day in cash as a supervisor of a delivery team for the furniture company. **THRELKELD** stated he had the $2,600.00 secured in a safe for fear it might get stolen if left in his mother's residence, and advised that there was less of a chance of the money being stolen if it were in a safe. **THRELKELD** stated he does not believe in putting money in banks. **THRELKELD** advised he does not have any financial obligations other than paying his mother $400.00 per month to assist her with bills at their residence. I asked **THRELKELD** how much money he declared on his taxes last year and he advised he does not file taxes since he is paid in cash.

Dissemination:

This document contains neither recommendations nor conclusions of the Illinois State Police. It and its contents are not to be disseminated outside your agency.

L193-0117

ISP 4-3 (01/96)

00G0379
Sgt Brendan O Heffner #42<u>2</u>
January 13, 2000
Page 2

THRELKELD advised me he was untruthful about his identity with the troopers because he is scared of the police. THRELKELD stated he has a friend named DARRYL DAVIS who was arrested for an unknown driving offense somewhere in Central Illinois and had to post a $5,000.00 cash bond. THRELKELD advised he thought since his current driving status was revoked, he might meet with the same fate as his friend. THRELKELD stated the only reason the canine unit alerted on the safe which contained his money was because the owner of the Jeep is a cannabis smoker. THRELKELD stated he smokes marijuana regularly and had last smoked it on the morning of 01/12/00.

I then asked THRELKELD whom I could contact regarding confirming his employment and payment method. THRELKELD advised me speak to a BARRY WILLIAMS at a phone number THRELKELD provided. The first number he gave me was incorrect, however I obtained the number of a Williams Discount Furniture as 1-773-994-5066. I was informed by a SHARON R MORGAN, DOB 11/19/44, that it was now Supreme Furniture Store, 8557 S Cottage Grove, Chicago, Illinois 60619. MORGAN stated BARRY WILLIAMS had been deceased as recently as three months prior, but she was aware of Mr THRELKELD. MORGAN stated THRELKELD did indeed work at Supreme Furniture in the delivery Department and was paid $250.00 cash per week for his services.

I then asked THRELKELD again about the owner of the Jeep and he reiterated that it belonged to a friend of his named ROBERT AMES, whom he has known approximately two years. He stated that AMES currently attends school in Alabama. THRELKELD stated he did not know AMES correct address and that there was no phone at his residence to contact him.

The interview was then terminated and THRELKELD was transported to the McLean County Jail by Trooper Gray. THRELKELD was held in the McLean County Jail until later being picked up by the Chicago Police Department's Detective Williams, as he was later found to be a suspect in a vehicular homicide in the Chicago area. Trooper Gray will be filing charges against THRELKELD at a later date.

**IDENTIFIERS:**

| | |
|---|---|
| NAME: | MICHAEL C THRELKELD |
| SEX/RACE: | M/B |
| DOB: | 05/07/79 |
| HEIGHT: | 506 |
| WEIGHT: | 140 lbs |
| HAIR: | Black |
| EYES: | Brown |
| ADDRESS: | 5451 S Cornell |
| | Chicago, Illinois |
| TX: | 773/325-6547 |

Dissemination:

This document contains neither recommendations nor conclusions of the Illinois State Police.
It and its contents are not to be disseminated outside your agency.

IL493-0117                                               ISP 4-3 (01/9(



# ILLINOIS STATE POLICE

## STATEMENT OF CONSTITUTIONAL RIGHTS AND WAIVER

Before we ask you any questions, it is my duty to advise you of your rights:

1. You have the right to remain silent.

2. Anything you say can be used against you in court or other proceedings.

3. You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning.

4. If you cannot afford a lawyer, one will be appointed for you, free of any cost to you, before any questioning if you wish.

STATEMENT OF RIGHTS GIVEN BY _____ SGT. B. O. HEFFNER _____,

TO _____ MICHAEL T. THRELKELD, AT _____ 7:12am _____ (Time),

ON _____ 01/13/00 _____ (Date).

## WAIVER

I understand what my rights are, and I am willing to answer questions.

_____ Sgt. B.O.Heffner 4225 _____          _____ Mike Threlkeld _____
              WITNESS                              Signature of person receiving rights

_____ Tpe Bua Gray 4994 _____
              WITNESS

Case/File Report # 5060379

IL493-0198                                                                    ISP5-48(1/88)

EXHIBIT 8

STATE OF ILLINOIS
COUNTY OF WILL

AFFIDAVIT OF MICHAEL THRELKELD

I, Michael Threlked, being first duly sworn upon oath, makes this sworn statement of facts, and do so with the understanding that if I am found to have given false information, I can and will be prosecuted under the penalty of perjury.

Pursuant to 28 USC. 1746, I, Michael Threlkeld, declare the forgoing to be true and correct to the best of my knowledge.

1. I retained the legal services of attorney Martin Abrams to represent me in criminal Case No# 00 Cr 4537.

2. Accordingly, Mr. Abrams would visit me at the Cook County Jail, as well as accept collect phone calls for the purpose of developing a startegy and establishing a defense to the charges I was facing in Case No# 00 CR 4537. (I was charged with the Fisrt degree Murder Linton Boyd Jr., in that I allegedly ran him over with my vehicle. I contend now, as I did then, this was an accident).

3. After consultation with Mr. Abrams, we both agreed that this unfortunate incident was nothing more than an accident.

4. That during consultation with Mr. Abrams, after a status hearing. Mr. Abrams informed me that it would not be in my best interest to give testimony at my trial concerning my chronic alcohol abuse, reckless driving, and history of driving under the influence.

5. Mr. Abrams would make this clear to me everytime we discussed the case. Mr. Abrams, after I insisted on presenting this evidence at trial, specifically would state over and over that, "testimony about you being an alcoholic and driving under the influence the night of the accident, would aggravate the charge, and make you eligible for an extended term up to natural life.



6. I kept explaining to Mr. Abrams this was an accident, and I would like
for the evidence of my drinking and driving problems to be used in my
favor. Mr. Abrams would reply, "it doesn't matter, if you tell them you
were driving drunk, it will only aggravate the charge. And you could receive
an extended term. And since this is a First Degree Murder charge, you
could get life."

7. Some of our conversations were witnessed by Michael Flournoy, who also
was a client of Mr. Abrams. Mr. Abrams, at times, would call us both out
for legal visits simultaneously. Mr. Flournoy would overhear Mr. Abrams
telling me that 'any testimony about being an alcoholic and driving drunk
would aggravate my charge, and make me elgible for an extended term."

8. Further, Mr. Abrams had me set up a meeting with defense witnesses
Terrance Coleman, Jasmine Carter and Ahmad Kendell. To which I learned the
basis of this meeting was to instruct these defense witnesses not to testify
about my history of drinking, reckless driving and driving under the influence.
Mr. Abrams explained to the defense witnesses that if they testify to any
of this information, it aggravate my charge and make me eligible for more
time. Based Mr. Abrams instructions, defense witnesses withheld this
crucial evidence.

9. Finally, affiant asserts that his history of chronic alcohol abuse,
reckless driving and driving under the influence is well documented. And
this information was more than available to Mr. Abrams. And refusal to use
this vital evidence highlights Mr. Abrams' incompetence.

FURTHER AFFIANT SAYETH NAUGHT-

/s/ Michael Threlkeld, Pro Se

SUBSCRIBED AND SWORN TO BEFORE ME
ON THIS 11th DAY OF JULY, 2005.

NOTARY PUBLIC

"OFFICIAL SEAL"
Phyllis Baker
Notary Public, State of Illinois
My Commission Exp. 01/21/2007

EXHIBIT 9

STATE OF ILLINOIS)
               ) AFFIDAVIT OF MICHAEL FLOURNOY
COUNTY OF COOK  )
               )

I,Michael Flournoy,Pursuant to 28 U.S.C.§ 1746 declare under penalty of perjury that the foregoing is true and correct,and will testify if called to do so.

My reason for compiling this affidavit and signing it to the Circuit Court of cook County is because I really want to expose an ineffective assistance of counsel issue on Mr.Michael Threlkeld's behalf that was orchestrated and also played out by his previous attorney Mr. Martin Abrams. In the month of March,the year of 2001,I Michael Flournoy was incarcerated in the Cook County Department Of Corrections in Division Eleven where I was Michael Threlkeld's cellmate and also a client of Attorney Martin Abrams.

On various occasion while incarcerated there,Attorney Abrams would come to visit both Michael and myself where he would call both of us out at the same time within the same room and discuss both of our cases. While doing so, I would overhear Mr. Abrams trial strategy in regards to Michael's case. Mr. Abrams would continuously state to Michael that in his defense he is instructed not to testify to the actual fact that he was intoxicated during the night of January 12, 2000,but that he was only to testify that he was a bad driver and that it was a simple accident.

I would comfort Michael Threlkeld on many occasions within the cell concerning why Mr. Abrams instructed him to testify in such an unorthodox way and the only thing Michael would say was that Mr. Abrams promised him that he could beat the case,and that with the release of the statement being made that he was actually drunk could possibly

-1-

hurt him in which would make the case aggravated!!!

On one occasion while on the phone speaking with Attorney Abrams,
being that I am much older and I would say more muture asked him
on a one on one basis as to why he was fighting Michale's case the
way he was? His exact words to me were that, number one, his case
is not a murder case, and number two, if there was any testimony from
Michael stating that he was in fact intoxicated during the night
of January 12, 2000 that the state would more than likely use it
against him to convict him.

Everything that I, Michael Flournoy have stated within this
affidavit is true and an absolute fact and I do understand that I
could be prosecuted for signing false documents and making false
statements under the penalty of perjury.

Respectfully; *Michael C. Flournoy*

"OFFICIAL SEAL"
LYNN ORI
Notary Public, State of Illinois
My Commission Expires June 11, 2007

Subscribed and sworn to before me,

Notary Public *Lynn Ori*

on this 26 day of MAy. 2005.

-2-

IN THE

*CIRCUIT COURT*
*COOK COUNTY*

Michael Threelkeld
**Plaintiff,**

    v.

State OF Illinois
**Defendant**

)
)
)  Case No. _00 CR. 4537_
)
)
)

## PROOF/CERTIFICATE OF SERVICE

TO: Dorothy Brown
    Circuit Court Clerk
    2650 S. California
    Chicago, Illinois 60608

TO: State Attorney Richard Devine
    State's Attorney's Office
    2650 S. California
    Chicago, Illinois 60608

PLEASE TAKE NOTICE that on _July 14_ , 20_05_, I have placed the documents listed below
in the institutional mail at _Statesville_ Correctional Center, properly addressed to the parties listed above
for mailing through the United States Postal Service: _A) Original and two (2)_
_copies of my Post Conviction Petition along with, B) Motion_
_For Appointment OF Counsel_

Pursuant to 28 USC 1746, 18 USC 1621 or 735 ILCS 5/109, I declare, under penalty of perjury, that I am a
named party in the above action, that I have read the above documents, and that the information contained
therein is true and correct to the best of my knowledge.

DATE: _7/14/05_

/s/ Michael Threelkeld
NAME: Michael Threelkeld
IDOC#: K-66117
Statesville Correctional Center
P.O. BOX 112
_Joliet_ , IL 60434

Revised Jan 2002

CASE NO. __08 cv 1479_____

ATTACHMENT NO._____

EXHIBIT __I - L_____

TAB (DESCRIPTION) _____

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT – CRIMINAL DIVISION

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS )<br>)<br>VS. )<br>)<br>MICHAEL THRELKELD )<br>) | CASE NO. 00CR04537-01 |

### CERTIFIED REPORT OF DISPOSITION

The following disposition was rendered before the Honorable Judge

JAMES LINN ON AUGUST 1,2005 POST CONVICTION PETITION DENIED.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

I hereby certify that the foregoing has been entered of record on the above-
captioned case.

Date: AUGUST 2,2005

_____, Clerk of the Circuit Court

### CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

FILE/POSTCONVICTION3.WP

EXHIBIT I

No. 1-05-2915

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| **PEOPLE OF THE STATE OF ILLINOIS,** | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Respondent-Appellee, | ) | |
| | ) | |
| -vs- | ) | No. 00 CR 4537. |
| | ) | |
| **MICHAEL THRELKELD,** | ) | Honorable |
| | ) | James B. Linn, |
| Petitioner-Appellant. | ) | Judge Presiding. |

BRIEF AND ARGUMENT FOR PETITIONER-APPELLANT

MICHAEL J. PELLETIER
Deputy Defender

HOLLY J. K. SCHROETLIN
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR PETITIONER-APPELLANT

ORAL ARGUMENT REQUESTED

RECEIVED
CRIMINAL APPEALS

JAN - 9 2007

RICHARD J. DALEY CENTER
RICHARD A. DEVINE
STATE'S ATTORNEY'S OFFICE

EXHIBIT J

**POINT AND AUTHORITIES**                                    Page

**Threlkeld's post-conviction petition alleged that his trial attorney was
ineffective for refusing, over Threlkeld's insistence, to introduce evidence of
intoxication because he misunderstood applicable law. Threlkeld alleged
this evidence would have established the lesser-included offense of reckless
homicide and supported his contention with documentation. The circuit
court erred in summarily dismissing Threlkeld's petition because he stated
the gist of an ineffectiveness claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12**

*People v. Coleman*, 183 Ill. 2d 366, 701 N.E.2d 1063 (1998) . . . . . . . . . . . . . 12

*People v. Edwards*, 197 Ill. 2d 239, 757 N.E.2d 442 (2001) . . . . . . . . . . .   12,13

725 ILCS 5/122-1 (West 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*People v. Dredge*, 148 Ill. App. 3d 911, 500 N.E.2d 445 (4th Dist. 1986) . . . . 13

*People v. Paleologos*, 345 Ill. App. 3d 700, 803 N.E.2d 108 (1st Dist. 2003) . 13

*Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984) . . . . . . . . . . . 13

*People v. Albanese*, 104 Ill. 2d 504, 473 N.E.2d 1246 (1984) . . . . . . . . . . . . . 13

*People v. McPhee*, 256 Ill. App. 3d 102, 628 N.E.2d 523 (1st Dist. 1993),

*People v. Shevock*, 353 Ill. App. 3d 361, 818 N.E.2d 921 (4th Dist. 2004) . . . . 13

*People v. Ledbetter*, 342 Ill. App. 3d 285, 794 N.E.2d 1067 (4th Dist. 2003) . 13

*People v. Delton*, No. 103420 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*People v. Brocksmith*, 162 Ill. 2d 224, 642 N.E.2d 1230 (1994) . . . . . . . . . . . 14

*People v. Ramey*, 152 Ill. 2d 41, 604 N.E.2d 275 (1992) . . . . . . . . . . . . . . . . . 14

*People v. Dominguez*, 331 Ill. App. 3d 1006, 773 N.E.2d 116 (2d Dist. 2002)   14

*People v. DePaolo*, 317 Ill. App. 3d 301, 739 N.E.2d 1027 (2d Dist. 2000) . . 14

*People v. Pring*, 414 Ill. 63, 110 N.E.2d 214 (1953) . . . . . . . . . . . . . . . . . . . . . 14

730 ILCS 5/5-8-1(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

720 ILCS 5/9-1 (West 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

720 ILCS 5/9-3 (West 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

730 ILCS 5/5-5-3.2(b) .......................................... 14

*People v. Wright*, 111 Ill. 2d 18, 488 N.E.2d 973 (1986) ................. 15

*People v. Lemke*, 349 Ill. App. 3d 391, 811 N.E.2d 708 (5th Dist. 2004) ..... 15

720 ILCS 5/9-2 (West 2005) ...................................... 18

# NATURE OF THE CASE

Michael Threlkeld, petitioner-appellant, appeals from a judgment dismissing his petition for post-conviction relief.

No issue is raised concerning the charging instrument.  However, an issue is raised concerning the sufficiency of the post-conviction pleadings.

## ISSUES PRESENTED FOR REVIEW

Threlkeld's post-conviction petition alleged that trial counsel was ineffective for refusing to present evidence of intoxication to establish the lesser offense of reckless homicide. Attached to the petition were police reports and affidavits that document Threlkeld's intoxication. The documents further show that the trial attorney failed to present this evidence because he misunderstood applicable law. Was counsel ineffective for failing to present this defense and for preventing his client from exercising his right to request a lesser-included offense?

## JURISDICTION

Michael Threlkeld, petitioner-appellant, appeals the dismissal of his post-conviction petition. The judgment being appealed was entered on August 1, 2005. (C. 62).[1] Notice of appeal was timely filed on August 26, 2005. (C. 64). Jurisdiction therefore lies in this Court pursuant to Article VI, Section 6, of the Illinois Constitution, and Supreme Court Rule 651(a).

---

[1] Citations to the trial report of proceedings and common law record are indicated with (Tr.__) and (Tr.C. __) respectively. Citations from Threlkeld's appeal are cited as (Supp. __). Citations to the report of proceedings and common law record for post-conviction proceedings are indicated with (R. __) and (C. __).

## STATEMENT OF FACTS

Procedural and Factual Summary

Michael Threlkeld was charged with first-degree murder arising from a car accident that caused the death of Linton Boyd. (Tr.C. 19). Following a bench trial he was convicted on March 14, 2001. (Tr. D114). After pursuing an unsuccessful direct appeal, Threlkeld filed a *pro se* post-conviction petition alleging that his trial counsel was ineffective for persuading Threlkeld not to request the lesser-included offense of reckless homicide and present a defense of intoxication because trial counsel mistakenly believed this would aggravate Threlkeld's sentence. (C. 10). The trial court ruled on the petition stating only "James Linn on August 1, 2005 Post Conviction Petition Denied." (C. 62). Threlkeld timely appealed. (C. 64).

The accident happened in the evening of January 12, 2000. According to the State, Quansah had given Boyd, her co-worker, a ride to his car which was parked on the street in front of their workplace. Quansah parked her car parallel to Boyd's and the pair remained inside her car talking. At this time, Threlkeld pulled up. One witness stated that Threlkeld and Quansah exchanged loud words, though they denied this. After stopping next to Quansah's car, Threlkeld pulled his Jeep ahead and made a U-turn. According to State witnesses, his car struck Boyd who by this time had begun to climb into his own vehicle without slowing down.

The defense evidence showed that Threlkeld was meeting Edwina Asha Quansah to go to a movie. He saw Quansah's car parked in the street and stopped next to it. He tried to talk to Quansah but she could not hear him and instead gestured that he follow her. Threlkled then turned his car around and proceeded to follow Quansah's car. During this time, Boyd, Quansah's passenger, had exited the vehicle and begun entering his own

-4-

parked car. Threlkeld's car accidently struck Boyd's car and Boyd who was standing in the street near the open door of his parked car.

The following evidence was presented at trial:

The State's Case

The State presented testimony of three eyewitnesses, including Quansah. Police officers, investigators, and a medical examiner testified as well. Quansah testified that she and Boyd left the YMCA where they worked at 9:00 p.m. on January 12, 2000. (Tr. A28). Quansah drove Boyd to his car and double parked her car alongside his on the street in front of the facility. (Tr. A29). Threlkeld drove up in his own car, and parked briefly next to Quansah facing the opposite direction. (Tr. A 60, B12).

Quansah testified that Threlkeld tried to speak to her through her window but she could not hear him, so she gestured for him to wait a minute. (Tr. A31). Michelle Slater, a witness who was waiting at a bus stop, saw the two carrying on a conversation, but could not hear what they said until they began speaking louder, then she heard Threlkeld say "okay, well, I'll be back." (Tr. A60-61, 69-70). A second witness, Kyra Ester, who was also at the bus stop, testified that Quansah lowered her window and said something to Threlkeld. (Tr. B13). During the defense case, Threlkeld testified on his own behalf, telling the court that he rolled down his window and told Quansah the movie time; she did not verbally respond but indicated with her hand that he follow her. (Tr. D18, D21).

According to all of these witnesses, Threlkeld pulled ahead and made a U-turn. (Tr. A32, 62, B15, D23). Slater testified that Threlkled drove forward about five feet to a stop sign and waited at the intersection for a time before turning his car around. (Tr. A61-62, A65). Ester testified that the stop sign where Threlkeld turned around was a half block from Boyd's car; she did not see Threlkeld stop his car or hesitate at the stop sign

or at any time before the accident. (Tr. B16-17). Quansah saw Threlkeld make the U-turn through her review mirror; she saw him drive about three parking spaces past Boyd's car before turning around. (Tr. A32-33).

Before Threlkeld turned his car around, Boyd got out of Quansah's car and Quansah drove to the light at the next intersection. (Tr. A61, B28-29). Boyd opened the driver's door of his car and stood just inside of it. (Tr. A33, A71-72, B20, B31). Threlkeld's Jeep, having made the U-turn, struck the open door and Boyd; it continued to the stoplight at the next intersection. (Tr. A33, A35, A65, B32). The two bystanders said Threlkeld did not stop at the light; however, Quansah testified that he stopped and glared at her before driving on. (Tr. A35, A73, B17).

According to Illinois State Trooper Brian Gray, around 2:30 in the morning on January 13, 2000, a truck driver reported a gray Jeep slowing down on the highway and nearly coming to a complete stop. (Tr. B35). Gray responded to this report and arrested Threlkeld on I-55 in southern Illinois. Gray smelled alcohol when he questioned Threlkeld. (Tr. B38). Threlkeld admitted drinking a pint of gin. (Tr. B38). Nearly two hours after stopping Threlkeld, Gray administered a preliminary breath test which indicated a .002 level of alcohol. (Tr. B42, B47, B51).

Before Gray testified at trial regarding Threlkeld's intoxication, the defense objected to late discovery which disclosed his report of intoxication only 15 minutes before Gray was to testify. (Tr. B3, 38-42). Threlkeld's attorney stated that his defense strategy and the way he researched the case would have changed if he had earlier notice of this information. (Tr. B3-9). The defense asked that Gray not testify as a sanction for the late discovery. (Tr. B4, B6). The court did not grant this remedy, but it asked whether Threlkeld was asking for a mistrial. (Tr. B6, B8). Threlkeld chose not to request a

-6-

mistrial, and Gray's testimony regarding the breathalyzer and Threlkeld's intoxication was permitted. (Tr. B3-9).

The State also presented Quansah's testimony regarding her relationship with Threlkeld. The pair had been dating on-and-off for over six years. (Tr. A21, A40). At different times in the relationship when Quansah would not speak to him, Threlkeld responded by damaging her car's windshield, tires, lights and wipers. (Tr. A21-22). Quansah reported these incidents to police but did not go to court to testify for all of them. (Tr. A42). Despite these incidents, the pair continued to be in regular contact over the phone. (Tr. A43). In December 1999, however, the pair again broke up and Threlkeld used a BB gun to force Quansah to return the ring and a leather jacket he had given her. (Tr. A26). As a result of this incident, Quansah received an order of protection against Threlkeld. (Tr. A26). Despite this order, Quansah and Threlkeld continued to speak over the phone. (Tr. A30, 43-44). On January 2, 2000, while the restraining order was in effect, Quansah met Threlkeld at Stony Subs. (Tr. A44). Quansah testified that she remembered having a conversation with Threlkeld at the restaurant but could not recall its content. (Tr. A45). She denied that the two made plans for a future date. (Tr. A45).

### The Defense Case

For its case, the defense maintained that the accident happened because Threlkeld was generally a poor driver who did not have a valid license and had a history of car accidents. (Tr. C8-11, 38, 61, D15-17, 97-99). In opening and closing arguments, trial counsel called Boyd's death a tragic accident caused by Threlkeld's poor driving skills and his inability to see Boyd in the street. (Tr. C11, D97-98). Counsel explained that Threlkeld fled because he was scared and aware he lacked a valid license. (Tr. C11-12, D88). The defense argued that this really was an accident, but, before the verdict, it did

not ask the court to consider a lesser included offense. (Tr. D88, D99).

Threlkeld testified in his own defense. He told the court that he never had a license, but had, nevertheless, received several tickets and been involved in car accidents. (Tr. D16). In separate accidents he hit a hospital, a CTA bus driver, four parked cars, fire plugs and a light pole. (Tr. D16-17). Two other defense witnesses, Terrence Coleman, a friend of both Quansah and Threlkeld, and Jasmine Carter, Threlkeld's cousin and Quansah's friend, testified that Threlkeld was a poor driver whom they had warned to be careful and to drive more slowly. (Tr. C38, C61).

Threlkeld also elaborated on his past relationship with Quansah. Despite their breakups, the pair always remained exclusive during their six-year relationship. (Tr. A21, D10). He admitted damaging Quansah's car during rough patches in the relationship. (Tr. A21-22). After each incident, Quansah filed charges; however, each time Quansah did not follow through and all charges were dismissed. (Tr. D4). Threlkeld and Quansah resumed dating after each of these incidents. (Tr. D4, D8). Threlkeld planned to marry Quansah and had given her a diamond ring. (Tr. D5). However, in December 1999, the pair again broke up and Threlkeld used a BB gun to force Quansah to return the ring and a leather jacket he had given her. (Tr. D7). Even after this incident he and Quansah remained in contact through intermediaries, phone calls, and a meeting in a sub shop. (Tr. D8, D11-12). At this meeting, he and Quansah planned to go to a movie on January 12. (D4-8, 11-12, 34-45). Coleman and Carter corroborated Threlkeld's testimony about his relationship with Quansah, testifying that Threlkeld and Quansah planned a date for January 12, and that having these plans even after their breakup was characteristic of their relationship. (Tr. C20-22, 34-38, 56, 60-61, 63-64).

Threlkeld testified that he was not drinking before the accident. (Tr. D55). He

spent part of the evening at his cousin's apartment, leaving around 9:00 p.m. to eat and go to a show with Quansah. (Tr. C23-24, 37). He drove to meet her at the YMCA and parked his car next to hers. (Tr. D 8-19). Through their car windows he tried to tell Quansah movie times, but she could not hear him. (Tr. D18). Since her window was rolled up, Quansah did not verbally answer; instead, she gestured Threlkeld to follow her. (Tr. D20-21).

Threlkeld pulled his car forward turning to the right before making a U-turn to the left to follow Quansah. (Tr. D23). He accelerated as he made the turn, then he saw a car door open, struck it, and realized he hit someone. (Tr. D23-24).

Threlkeld stopped at the light at the next intersection, then he became scared and fled. (Tr. D26). He drove to his mother's house where he had a couple of drinks. (Tr. 27). He then tried to call Quansah, but a police officer answered the phone. (Tr. D27-28). Threlkeld told the officer that it was an accident and he was sorry. (Tr. D27-28). At that time, many things were running through Threlkeld's mind: he had hit someone, he knew he was in trouble and did not have a license, and he considered turning himself in. (Tr. D30-32). Ultimately, he grabbed his safe and started driving south on I-55. (Tr. D 30).

In its closing argument, the defense reiterated its contention that this was only an accident and that Threlkeld did not mean to hit Boyd. (Tr. D88, D99). However, the defense did not request that the court consider a lesser-included offense. Defense counsel instead asked the court to acquit Threlkeld because he lacked an intent to hit Boyd. (Tr. D99).

After hearing this evidence, the court found that, although Threlkeld did not wake up that morning with the intent to kill someone, he did have the necessary intent for first degree murder. (Tr. D114).

The defense filed a motion for new trial asking. Among other things counsel asked, for the first time, that the court reduce Threlkeld's conviction to the lesser-included offense of voluntary manslaughter. (Tr. E11-12). Defense counsel argued that because the court determined Threlkeld was upset by seeing Quansah with another man, this rage turned the offense into voluntary manslaughter rather than murder. The court rejected these arguments, finding that they had no basis in law, and sentenced Threlkeld to 35 years in prison. (Tr. E16, F38).

### Direct Appeal

Threlkeld pursued a direct appeal, arguing that he was denied a fair trial because evidence was improperly admitted, he was not proven guilty beyond a reasonable doubt, and trial counsel was ineffective for failing to call potential witnesses. His appeal was denied. (Supp. 42).

### Post-conviction Petition

On July 14, 2005, Threlkeld filed a *pro se* post-conviction petition. Threlkeld argued that trial counsel was ineffective for: failing to seek a reduced charge of reckless homicide where there was evidence to support the lesser charge and for encouraging defense witnesses not to testify about Threlkeld's intoxication, which could have rebutted the charge of first-degree murder. (C. 13). Threlkeld further alleged that if not for counsel's ineffective representation the outcome of his trial would have been different. (C. 12-13).

More specifically, the petition alleged that trial counsel refused to introduce evidence that Threlkeld was intoxicated on the night of the accident and had a history of alcohol abuse and alcohol-related traffic accidents. (C. 14-15). Threlkeld stated that he urged his attorney to offer this evidence. (C. 56). The petition asserts that had trial

-10-

counsel pursued Threlkeld's preferred defense and presented evidence of intoxication, Threlkeld would have been convicted of reckless homicide rather than first-degree murder. (C. 16). However, his attorney refused, telling Threlkeld that evidence of intoxication would aggravate the offense, making Threlkeld eligible for a natural-life sentence. (C. 56, 59-60).

Several affidavits and police reports supported Threlkeld's claim. (C. 20-60). The police reports demonstrated Threlkeld's long history of alcohol-related driving offenses. (C. 21-26). An investigation report from the accident in this case showed that Threlkeld's roommate was not surprised by the accident since Threlkeld had a history of reckless driving. (C. 28). The field report of Threlkled's arrest, early in the morning on January 13, notes the involvement of alcohol with the officer reporting that Threlkeld smelled of alcohol and admitted drinking a pint of gin with orange juice. (C. 30-32, 48). This same report showed that a preliminary breath test, given approximately seven hours after the accident, registered .006. (C. 33, 48). Five hours later, a second test showed .002. (C. 35). The three defense witnesses attested that they knew of Threlkeld's history of alcohol abuse and driving while intoxicated. (C. 38, 41, 44). Two of these witnesses could testify that Threlkeld was intoxicated on Januray 12, 2000. (C. 41, 44). Threlkeld and the other defense witnesses stated that trial counsel instructed them not to testify that Threlkeld was intoxicated on January 12, 2000. (C. 38, 41, 45, 57).

The trial court summarily dismissed Threlkeld's post-conviction petition. stating that trial counsel "urged the Court in the . . . beginning that this was an accident" and concluded that "[a]ccordingly, the Pro Se Post-Conviction Petition is without merit, and it is denied." (R.Supp. A3).

Threlkeld timely appealed. (C. 63).

-11-

## ARGUMENT

**Threlkeld's post-conviction petition alleged that his trial attorney was ineffective for refusing, over Threlkeld's insistence, to introduce evidence of intoxication because he misunderstood applicable law. Threlkeld alleged this evidence would have established the lesser-included offense of reckless homicide and supported his contention with documentation. The circuit court erred in summarily dismissing Threlkeld's petition because he stated the gist of an ineffectiveness claim.**

Threlkeld's post-conviction petition stated the gist of a claim of ineffective assistance of counsel. Specifically, it alleged that trial counsel was ineffective for persuading Threlkeld that it was against his interest to introduce evidence of intoxication, even though this evidence negated the mental state required for first-degree murder. Supporting documents included in Threlkeld's petition show that Threlkeld urged his attorney to pursue a lesser-included offense, but his attorney opposed it because he mistakenly believed this evidence would aggravate the offense and subject Threlkeld to a sentence of life imprisonment. These facts, taken as true, show that counsel both prevented Threlkeld from knowingly and intelligently asserting his right to request a lesser-included offense and failed, due to his own legal error, to introduce evidence in support of the lesser-included finding. Thus, Threlkeld stated the gist of the ineffectiveness claim, and it was error for the circuit court to summarily dismiss his petition.

The summary dismissal of a post-conviction petition is reviewed *de novo*. *People v. Coleman*, 183 Ill.2d 366, 389, 701 N.E.2d 1063 (1998); *People v. Edwards*, 197 Ill.2d 239, 247, 757 N.E.2d 442 (2001).

A post-conviction petition need only state the "gist of a constitutional claim" to survive summary dismissal at the first stage of proceedings under the Post-Conviction Hearing Act 725 ILCS 5/122-1 (West 2005). *Edwards*, 197 Ill.2d at 244. The petition

must simply allege facts from which a meritorious claim may be found to satisfy this low
threshold. *Edwards*, 197 Ill.2d at 244. A petition that establishes a portion of a claim but
omits others satisfies the gist standard. *Edwards*, 197 Ill.2d at 246-47. "[R]equiring *pro*
*se* petitioners to state their claims in greater detail than this would have the practical
effect of depriving many such persons of their right to meaningful access to the courts."
*People v. Dredge*, 148 Ill. App.3d 911, 913, 500 N.E.2d 445 (4th Dist. 1986). Thus,
summary dismissal is improper where the petition alleges a constitutional deprivation
that is not expressly rebutted by the record. *People v. Paleologos*, 345 Ill. App.3d 700,
706, 803 N.E.2d 108 (1st Dist. 2003).

Criminal defendants have a right to effective assistance of counsel under the
Sixth and Fourteenth Amendments to the United States Constitution and Article I,
Section 8 of the Illinois Constitution. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct.
2052 (1984); *People v. Albanese*, 104 Ill.2d 504, 473 N.E.2d 1246 (1984). A defendant
is denied this right if counsel's performance falls "below an objective standard of
reasonableness." *People v. McPhee*, 256 Ill.App.3d 102, 106, 628 N.E.2d 523 (1st Dist.
1993), *citing Strickland*, 466 U.S. at 687-94 and *Albanese*, 104 Ill.2d at 525.
Additionally, a first-stage petitioner alleging ineffective assistance of counsel need not
establish prejudice. *People v. Shevock*, 353 Ill.App.3d 361, 365, 818 N.E.2d 921 (4th
Dist. 2004); *see also People v. Ledbetter*, 342 Ill.App.3d 285, 288, 794 N.E.2d 1067 (4th
Dist. 2003)(In a non-guilty plea context harmlessness is irrelevant at first stage post-
conviction proceedings). *See also People v. Delton*, No. 103420 petition for leave to
appeal allowed from unpublished order (November 29, 2006)(Allowing petition for
leave to appeal alleging that the appellate court improperly considered prejudice in an
appeal from the summary dismissal of post-conviction petition alleging ineffective

-13-

assistance of counsel).

Ultimately, the decision to tender a lesser-included offense lies with the defendant. *People v. Brocksmith*, 162 Ill.2d 224, 229, 642 N.E.2d 1230 (1994). The power to make this choice is a defendant's fundamental right. *See People v. Ramey*, 152 Ill.2d 41, 54, 604 N.E.2d 275 (1992). As such, the decision to request a lesser-included offense verdict must be made knowingly and intelligently. *People v. Dominguez*, 331 Ill.App.3d 1006, 1013, 773 N.E.2d 116 (2d Dist. 2002) (*citing People v. DePaolo*, 317 Ill.App.3d 301, 310-11, 739 N.E.2d 1027 (2d Dist. 2000)). A decision regarding a fundamental right induced by misapprehension or misrepresentation of the consequences is neither knowing nor intelligent. *See People v. Pring*, 414 Ill. 63, 70, 110 N.E.2d 214 (1953).

Trial counsel induced Threlkeld to forgo a lesser-included offense, and therefore failed to offer evidence supporting the lesser-included offense, because counsel misapprehended the law. Threlkeld's petition states that he wished to pursue the lesser-included offense of reckless homicide and urged his attorney do so numerous times. (C. 18, 38, 41, 44, 56-57, 59-60). Under *Brocksmith*, this choice belonged solely to Threlkeld. However, at the time Threlkeld needed to make this decision, trial counsel believed that the evidence of intoxication needed to support the lesser offense would also aggravate the charged offense and render Threlkeld eligible for a natural-life sentence. (C. 18, 38, 41, 44, 56-57, 59-60).

Trial counsel was, however, mistaken. *See* 730 ILCS 5/5-8-1(a)(1) (West 2000); 720 ILCS 5/9-1 (West 2000); 720 ILCS 5/9-3 (West 2000); 730 ILCS 5/5-5-3.2(b) (West 2000) (the Illinois statutes setting eligibility for extended terms: none extend a murder sentence for intoxication). Based on his mistake, counsel convinced Threlkeld not to

request the applicable lesser-included offense. Counsel did so by warning of the life sentence he believed was applicable and reiterating to Threlkeld and other defense witnesses the importance of excluding evidence of intoxication. (C. 18, 38, 41, 44, 56-57). Because of the misguided advice of trial counsel, Threlkeld could not make a knowing and intelligent decision regarding the lesser-included offense.

Counsel was ineffective for urging Threlkeld to avoid this defense where the lesser-included offense was applicable and would not have subjected Threlkeld to a longer sentence. Failure to raise a lesser offense because of this kind of misapprehension of the law constitutes ineffective assistance of counsel. *See People v. Wright*, 111 Ill.2d 18, 31, 488 N.E.2d 973 (1986) (finding trial counsel ineffective for failing to present the defense of intoxication that would have shown the defendant was guilty of involuntary manslaughter instead of murder where the defense was avoided because of counsel's fundamental misunderstanding of the law); *People v. Lemke*, 349 Ill.App.3d 391, 402, 811 N.E.2d 708 (5th Dist. 2004) (counsel was ineffective for failing to present an argument for the lesser offense of involuntary manslaughter where there was no reason not to do so). In *Wright*, the Supreme Court found that the defendant stated the gist of a meritorious claim in her *pro se* post-conviction petition where, as here, she alleged that trial counsel was aware of and failed to present evidence of intoxication that would have caused the trial court to consider an alternative, lesser offense to murder. Threlkeld's petition similarly alleged the gist of an ineffectiveness claim.

Counsel could have presented ample evidence that Threlkeld was, in fact, intoxicated at the time of the accident. Counsel did not elicit testimony regarding Threlkeld's intoxication from any defense witnesses or submit the related lesser-included offense of reckless homicide to the court. Had counsel given defense witnesses

-15-

the chance, Threlkeld's petition shows that he, Terrence Coleman and Jasmine Carter would have testified that Threlkeld was drinking and intoxicated *before* the accident on January 20, 2000. (C. 38, 41, 57). At trial counsel's insistence, however, the court learned only that Threlkeld had been drinking *after* the accident. (C. 38). Reports from Threlkeld's arrest show that he smelled of alcohol, admitted drinking a pint of gin and had alcohol in system; breath tests for alcohol showed results of .006 and .002 seven and 12 hours after the accident. (C. 30-32, 33, 35, 48).

Trial counsel also had access to evidence that would have shown that Threlkeld's intoxication on January 12, 2006, was part of an ongoing habit of drunk-driving. This history was detailed in affidavits of defense witnesses and police reports attached to Threlkeld's petition. Police records show incidents of driving under the influence of alcohol in January 1998, March 1999, and June 1999. (C. 21-26). Coleman's affidavit stated that Threlkeld had a drinking problem and "every time I seen him in a car or anywhere he is always drunk." (C. 38). Carter's affidavit corroborated this, she stated that she "knew about Michael's drinking problem and that he's always drunk when he drives." (C. 41). Kendell also could have testified that Threlkeld had a drinking problem and drinks when he drives. (C. 44). Counsel presented none of this available evidence to the trial court.

Although State Trooper Gray testified, over counsel's objection, that Threlkeld was intoxicated, from this testimony alone the court could not understand the full extent of Threlkeld's condition on January 12. (Tr. B3, B38-42). Gray's testimony does not make clear that Threlkeld submitted two different alcohol tests five hours apart. (Compare C. 33,35 with Tr. B42, B47). On direct examination Gray mentions a result of .006. (Tr. B42). However, on cross examination he focuses on a later test with a result of

-16-

.002. (Tr. B47). His testimony seemed to focus on the last test taken 12 hours after the accident and more than five hours after Threlkeld's arrest. This later test necessarily resulted in a level of intoxication much lower than Threlkeld would have registered immediately after the accident. Defense counsel tried vigorously to impeach Gray with this testimony; he questioned Gray about his reporting of test results and then focused only on the results from the test taken the morning after the accident, .002, while also asking about the timing of the preliminary test, taken hours earlier, but omitting mention of the earlier test's higher result. (Tr. B46-48). Given the confusing way it was elicited, Gray's testimony could not establish that Threlkeld was intoxicated before the accident. The testimony he gave could not clearly portray Threlkeld's condition at the time of his arrest, let alone provide the court insight into Threlkeld's condition at the time of the accident several hours before the arrest. Because of this, the court did not have sufficient evidence to determine that Threlkeld was intoxicated at the time of the accident. Only the testimony of defense witnesses, had it been presented unbiased by defense counsel's misunderstanding of the law, could have established that Threlkeld was intoxicated before he drove to the YMCA.

Trial counsel's failure to present evidence of intoxication here precluded the trial court from fully considering the applicability of reckless homicide. Evidence available to trial counsel could have negated the mental state required for murder. Threlkeld's mental state was the key issue at trial. This was acknowledged by the trial court: "the question I must decide [is] what was the mental state of Michael Threlkeld when this happened." (Tr. D110). Because trial counsel misunderstood the law, and he subsequently failed to introduce evidence of intoxication and Threlkeld's history of drunk-driving offenses, the trial court was left only to consider whether Threlkeld's poor driving skills caused the

accident. Not surprisingly, this defense did not win over the court. Still, the court seriously reviewed the issue of Threlkeld's mental state at the time of the accident. (Tr. D110-114). Had evidence of Threlkeld's intoxication been brought to light, the trial court would have had reason to find Threlkeld guilty only of the lesser offense.

The record does not rebut these allegations. In summarily dismissing Threlkeld's petition, the circuit court stated that trial counsel argued that Boyd's death was an accident. (C. A3). While the record does support this fact, this does not rebut Threlkeld's allegations of ineffectiveness. In his petition, Threlkeld states that his case was prejudiced because counsel did not present evidence of intoxication and urge that this evidence supports reckless homicide. (C. 12, 16). The record shows that trial counsel did not present this evidence or argue for this result. Rather, counsel argued at trial that the accident was the result of poor driving. (Tr. D 97). In fact, defense counsel tried to prevent and impeach evidence of intoxication, and only in the motion for a new trial did counsel urge the court to consider the offense of second-degree murder. (Tr.C. 41-42, Tr. E12-13). This lesser-included offense was inapplicable because it requires either provoked intense passion or a mistaken belief that the force was justified. 720 ILCS 5/9-2 (West 2005). Neither of these was present in this case. Were Boyd's death an accident, as trial counsel argued, it would not be second-degree murder. However, at no time did counsel urge the court to consider the applicable lesser-included offense of reckless homicide or present the supporting defense of intoxication. It is counsel's failure in this regard that Threlkeld alleges deprived him of his right to a fair trial and establishes the gist of a meritorious claim.

Further, Threlkeld's testimony that he was not intoxicated does not rebut his claim of ineffective assistance of counsel. Rather, Threlkeld's testimony sprang from

trial counsel's misapprehension of the law and forceful warnings that Threlkeld could be subjected to an aggravated offense and a life sentence should this information be presented at trial. Cross examination was the only time Threlkeld was directly asked whether he was intoxicated during the accident; he answered that he was not. (Tr. D55). In his petition, Threlkeld explains that he answered this way only because trial counsel's mistaken warnings caused him to believe that an affirmative answer would result in life imprisonment. (C. 17, 56). Specifically, Threlkeld states in his affidavit that trial counsel advised him "'if you tell them you were driving drunk, it will only aggravate the charge. . . . and you could get life.'" (C. 57). In his petition Threlkeld alleges that his trial counsel coerced him to present false testimony of the events of January 12, 2000. (C. 18). Instead of refuting Threlkeld's claim of ineffective assistance, petitioner's testimony shows that trial counsel was mistaken as to the effects of this evidence and impressed upon Threlkeld a great urgency to avoid admissions of his intoxication at trial.

Taken as true, the allegations in Threlkeld's post-conviction petition state the gist of a meritorious claim of ineffective assistance of counsel. These allegations are not rebutted by the record. Consequently, the circuit court erred by summarily dismissing Threlkeld's petition, and this cause should be remanded for further proceedings.

## CONCLUSION

For the foregoing reasons, Michael Threlkeld, Petitioner-Appellant, respectfully requests that this Court reverse the circuit court's summary dismissal of his post-conviction petition and remand it for further proceedings.

Respectfully submitted,

MICHAEL J. PELLETIER
Deputy Defender

HOLLY J. K. SCHROETLIN
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR PETITIONER-APPELLANT

CERTIFICATE OF COMPLIANCE


I, Holly J. K. Schroetlin, certify that this brief conforms to the requirements of Supreme

Court Rule 341(a) and (b). The length of this brief, excluding the appendix is 22  pages.


HOLLY J. K. SCHROETLIN
Assistant Appellate Defender

## APPENDIX TO THE BRIEF

Index to the Record .......................................................... A-1

Certified Report of Disposition ................................................ A-5

Notice of Appeal ............................................................ A-6

## INDEX TO THE RECORD

**Common Law Record ("C")**                                                      **Page**

Memorandum of Orders ("Half Sheet") ............................................. 2

Indictment ....................................................................... 5

*Pro Se* Petition for Post-Conviction Relief (July 22, 2005) ..................... 8

Certified Report of Disposition (August 1, 2005) ................................ 62

Notice of Appeal (August 26, 2005) ............................................. 64

Appellate Court Rule 23 Order, appeal no. 01-2879 (September 7, 2004) ........... 2


**Report of Proceedings ("R")**

|                                                | **Direct** | **Cross** | **Redir.** | **Recr.** |
|------------------------------------------------|------------|-----------|------------|-----------|
| August 1, 2005                                 |            |           |            |           |
| Petition for Post-Conviction Relief - Denied   |            |           |            | 3         |


**Direct Appeal Record**
**Common Law Record ("SC")**                                                     **Page**

Memorandum of Orders ("Half Sheet") ............................................. 1

Certified Statement of Conviction / Disposition ................................. 4

Arrest Report (January 15, 2000) ............................................... 11

Circuit Court Order (January 15, 2000) ......................................... 12

Complaint for Preliminary Examination (January 15, 2000) ....................... 15

Appearance .................................................................. 16,20

Indictment ..................................................................... 17

State's Motion for Discovery (February 25, 2000) ............................... 21

Defendant's Motion for Discovery (February 25, 2000) ........................... 23

State's Answer to Discovery (April 6, 2000) .................................... 29

Defendant's Answer to Discovery (August 7, 2000) .............................. 34

Motion to Introduce Proof of Other Crimes Evidence (August 9, 2000) . . . . . . . . . . . . . . . . . . 36

Signed Jury Waiver (March 21, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Motion for New Trial (April 11, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Presentence Investigation Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Victim Impact Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87-90

Motion to Reduce Sentence (June 13, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

Sentencing Order (May 15, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

Notice of Appeal (June 13, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

**Direct Appeal**
**Report of Proceedings ("SR")**

|  |  | **Direct** | **Cross** | **Redir.** | **Recr.** |
|---|---|---|---|---|---|
| **Volume I of III** | | | | | |
| March 12, 2001 | | | | | |
| **Bench Trial** | | | | | |
| Jury Waiver Signed | | | | | A4 |
| Opening Statement | | | | | |
| | Ms. Forester - State | | | | A5 |
| State Witnesses | | | | | |
| | Sue Estra Boyd | A13 | A17 | | |
| | Edwina Asha Quansah | A19 | A40 | A53 A57 | A55 |
| | Michelle Slater | A58 | A66 | A74 | A75 |
| | Dr. Rexene Worrell | A76 | A83 | A85 | A86 |
| | Officer Ronald w. Gibbs | A87 | A94 | | |
| | Sergeant Brendon Heffner | A102 | A114 | | |

|  |  | **Direct** | **Cross** | **Redir.** | **Recr.** |  |
|---|---|---|---|---|---|---|
|  | Investigator Michael Trummel | A115 | A124 | A126 | A127 |  |
|  | Sergeant Charles Williams | A128 |  |  |  |  |
| March 13, 2001 |  |  |  |  |  |  |
|  | Kyra Ester | B10 | B24 |  |  |  |
|  | Brian Gray | B33 | B46 |  |  |  |
|  | Leonard Stocker | B54 | B67 |  |  |  |

**Volume II of III**

March 14, 2001

| Stipulations |  |  |  |  |  | C2 |
|---|---|---|---|---|---|---|
| State Rests |  |  |  |  |  | C5 |
| Motion for Directed Finding - Denied |  |  |  |  |  | C7 |

Opening Statement

|  | Mr. Abrams - Defense |  |  |  |  | C8 |
|---|---|---|---|---|---|---|

Defense Witnesses

|  | Terrence Coleman | C17 | C25 | C30 C32 | C31 |  |
|---|---|---|---|---|---|---|
|  | Ahmand Kendall | C33 | C40 | C49 C53 | C51 |  |
|  | Jasmine Carter | C55 | C65 | C68 | C71 |  |
|  | Michael Threlkeld | D3 | D32 |  |  |  |

Rebuttal Witnesses

|  | Sergeant Charles Williams | D70 | D72 |  |  |  |
|---|---|---|---|---|---|---|

| State Rests in Rebuttal |  |  |  |  |  | D76 |
|---|---|---|---|---|---|---|

Closing Arguments

|  |  | **Direct** | **Cross** | **Redir.** | **Recr.** |  |
|---|---|---|---|---|---|---|
|  | Ms. Callahan - State |  |  |  |  | D76 |
|  | Mr. Abrams |  |  |  |  | D87 |
| Rebuttal | Ms. Forester |  |  |  |  | D99 |
| Finding of Guilt |  |  |  |  |  | D114 |
| May 2, 2001 |  |  |  |  |  |  |
| Motion for New Trial - Denied |  |  |  |  |  | 16 |
| Sentencing Hearing |  |  |  |  |  |  |
| Witnesses in Aggravation |  |  |  |  |  |  |
|  | Lt. Chester Plexico | 21 | 26 |  |  |  |
|  | Margaret Anderson | 36 | 40 |  |  |  |

**Volume III of III**

May 15, 2001

|  |  |  |
|---|---|---|
|  | Sue Boyd | F6 |
|  | Linton Boyd, Sr. | F8 |
|  | Lakeysha Vaughan | F11 |
|  | Marine Body | F13 |
|  | Glenn Hartson | F16 |
|  | Argument in Mitigation | F20 |
|  | Argument in Aggravation | F26 |
|  | Allocution | F30 |
| Imposition of Sentence |  | F38 |
| June 13, 2001 |  |  |
| Motion to Reduce Sentence - Denied |  | G8 |

**Supplemental Report of Proceedings ("S.R.")**

August 24, 2000

|                                                      | **Direct** | **Cross** | **Redir.** | **Recr.** |
|------------------------------------------------------|------------|-----------|------------|-----------|
| Motion to Motion to Introduce Proof of Other Crimes Evidence |            |           |            |           |
| Court's Ruling on Motion                             |            |           |            | 16        |

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT – CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS     )
    )
    )    CASE NO. 00CR04537-01
    VS.    )
    )
    MICHAEL THRELKELD    )

## CERTIFIED REPORT OF DISPOSITION

The following disposition was rendered before the Honorable Judge

JAMES LINN ON AUGUST 1, 2005 POST CONVICTION PETITION DENIED.

I hereby certify that the foregoing has been entered of record on the above captioned case.

Date: AUGUST 2, 2005

_____, Clerk of the Circuit Court

CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

FILE/POSTCONVICTIONJ.WP

C00002


A-5

IN THE
CIRCUIT COURT OF THE FIRST JUDICIAL CIRCUIT
COOK COUNTY, ILLINOIS

**RECEIVED**

AUG 2 6 2005

CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

THE PEOPLE OF THE STATE OF ILLINOIS,    )
      Plaintiff/Appellee,    )
                       )    Case No. 00CR04537-01
                       )
           v.    )    The Honorable
                       )    JAMES LINN
                       )    Judge Presiding.
                       )
MICHAEL THRELKELD,    )
      Defendant/Appellant.    )

**FILED**
CR-526-4
AUG 26 2005
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

NOTICE OF APPEAL

An appeal is taken from the judgment described below:

1. This appeal is taken from the **Circuit Court of Cook County.**

2. Appellant's name: **Michael Threlkeld**, Reg. No. K-66117,
   Address: **Stateville Correctional Center, P.O. Box 112, Joliet, Illinois**
           **60434-0112.**

3. Defendant/Appellant is PRO Se. And request that attorney be appointed
   to represent him.

4. Date of Judgment: **August 1, 2005.**

5. Offense of which convicted: **Murder.**

6. Sentence: **35 Years.**

7. This appeal is taken from a Post Conviction Petition.

MICHAEL THRELKELD

C00004

A-6

NO. 05-2915

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

---

PEOPLE OF THE STATE OF ILLINOIS,

                                                Respondent-Appellee,

                                    vs.

MICHAEL THRELKELD,

                                                Petitioner-Appellant.

---

Appeal from the Circuit Court of Cook County, Criminal Division.
Honorable James B. Linn, Judge Presiding.

BRIEF AND ARGUMENT FOR
RESPONDENT-APPELLEE

---

RICHARD A. DEVINE,
State's Attorney,
County of Cook,
Room 309 - Richard J. Daley Center,
Chicago, Illinois 60602

Attorney for Respondent-Appellee

JAMES E. FITZGERALD,
MARY NEEDHAM,
MAUREEN MCGEE,
Assistant State's Attorneys,
    Of Counsel.

EXHIBIT K

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

PEOPLE OF THE STATE OF ILLINOIS,

Respondent-Appellee,

vs.

MICHAEL THRELKELD,

Petitioner-Appellant.

## POINTS AND AUTHORITIES

### I.

**THE TRIAL COURT PROPERLY DISMISSED DEFENDANT'S POST-CONVICTION PETITION WHERE THE AFFIDAVITS AND RECORDS ATTACHED TO THE PETITION DID NOT SUPPORT PETITIONER'S CLAIM, WHERE THE RECORD SUFFICIENTLY CONTRADICTED THE ALLEGATIONS IN THE PETITION AND WHERE THE PETITION FAILED TO STATE THE GIST OF A MERITORIOUS CONSTITUTIONAL CLAIM ............ 24**

People v. Munson, 206 Ill. 2d 104 (2002) ..................................................... 24,25

People v. Williams, 186 Ill. 2d 55 (1999) ..................................................... 24

People v. Richardson, 189 Ill. 2d 401 (2000) ............................................... 24

People v. Hobley, 182 Ill. 2d 404 (1998) ....................................................... 24,25

People v. Gaultney, 174 Ill. 2d 410 (1996) ................................................... 25

People v. Collins, 202 Ill. 2d 59 (2002) ......................................................... 25

1

People v. Coleman, 183 Ill. 2d 366 (1998)...................................................... 25

People v. Seaberg, 262 Ill. App. 3d 79 (2nd Dist. 1994) ................................. 27

Strickland v. Washington, 466 U.S. 668 (1984)............................................ 28,34,35

People v. Flores, 153 Ill. 2d 264 (1992) ......................................................... 28,34,35

People v. Albanase, 104 Ill. 2d 504 (1984) ..................................................... 28

People v. Patterson, 192 Ill. 2d 93 (2000) ...................................................... 28

People v. Gonzalez, 238 Ill. App. 3d 303 (1st Dist 1992)............................... 28,30

People v. Pecoraro, 175 Ill. 2d 294 (1997) ..................................................... 28

People v. Armstrong, 318 Ill. App. 3d 607 (1st Dist. 2000)........................... 29

People v. Barnard, 104 Ill. 2d 218 (1984) ....................................................... 30

People v. Shevock, 353 Ill. App. 3d 361 (4th Dist. 2004)............................... 32,33

People v. Ledbetter, 342 Ill. App. 3d 285 (4th Dist. 2003) ............................ 32-33,34

People v. Delton, No. 103420 (November 29, 2006) ...................................... 33

People v. Edwards, 197 Ill. 2d 239 (2001) ...................................................... 33

Roe v. Flores-Ortega, 528 U.S. 470 (2000)..................................................... 33

People v. Robinson, 217 Ill. 2d 43 (2005)........................................................ 34

725 ILCS 5/122-1 ............................................................................................ 24

725 ILCS 5/122-2.1(a)(2) ............................................................................... 26

725 ILCS 5/122-2 ........................................................................................... 26

2

## ISSUE PRESENTED FOR REVIEW

Whether the summary dismissal of the post-conviction petition was proper where the affidavits and records attached to the petition did not support petitioner's claim, where the record sufficiently contradicted the allegations in the petition and where the petition failed to state the gist of a meritorious constitutional claim.

## STATEMENT OF FACTS

Petitioner was indicted for first degree murder in the death of Linton Boyd. (Tr. C. 17-19)1 Prior to trial, the State's Motion to Introduce Proof of Other Crimes Evidence was granted. (Tr. Supp. R. 15-16) After a bench trial, petitioner was convicted of first degree murder. (Tr. R. Vol. II D11, TR .C. 2) Petitioner was sentenced to thirty five years in the Illinois Department of Corrections. (Tr. R. Vol. III F38, TR. C. 3) Petitioner appealed his conviction and argued on direct appeal that the trial court erred in allowing evidence of other crimes, that the State failed to prove him guilty beyond a reasonable doubt and that his trial counsel was ineffective for failing to call Nikki Wittingham as a witness at trial and at sentencing. (Supp. C. 2) This Court affirmed petitioner's conviction for first degree murder. (Supp. C. 38) On July 22, 2005, petitioner filed a pro se petition for post-conviction relief. (C.

---

1 Citations to the trial report of proceedings and common law record are indicated with (Tr. R. Vol. _) and (Tr. C. _) respectively. Citations to the report of proceedings and common law record for post-conviction proceedings are indicated with (R. _) and (C. _).

3

10-60) The petition alleged that petitioner's trial counsel was ineffective for failing to seek a reduced charge of reckless homicide and for encouraging defense witnesses to withhold testimony of petitioner's history of alcohol abuse. (C. 11-19) On August 1, 2005, the trial judge dismissed the petition as without merit. (R. A3) Petitioner now appeals the denial of his petition.

The following evidence was adduced at trial. Petitioner and Edwina Asha Quansah (Asha) had been dating for six and a half years. (Tr. R. Vol. I A21) In approximately September of 1999, their relationship ended. (Tr. R. Vol. I A21) In June of 1999, there was an incident where petitioner broke Asha's front windshield and side window on her 1991 red Blazer. (Tr. R. Vol. I A21) About five months later, petitioner bent her windshield wiper and side mirror. (Tr. R. Vol. I A22) Petitioner admitted to Asha that he did both of these things because he was angry that she would not talk to him. (Tr. R. Vol. I A22) In December of 1999, petitioner slashed three of the tires on Asha's Blazer because he was angry that she would not talk to him. (Tr. R. Vol. I A22-23) Also, in December of 1999, while Asha was in her car in the back of the YMCA about to take an older lady home, petitioner approached the car with a bat, attempted to speak to Asha and then cracked her rear light with the bat. (Tr. R. Vol. I A23) Another time, at about 4:00 a.m., Asha was in the alley on her way home when she saw petitioner driving a van towards her. (Tr. R. Vol. I A24) Asha reversed down the alley, crashed into a gate and jumped out of her car while petitioner exited his vehicle, approached her and demanded, at gun point, that she return the leather coat and diamond ring that he had given her. (Tr. R. Vol. I A24-26) Asha struggled with petitioner over the gun and the gun fell. (Tr. R. Vol. I A26) Petitioner ran for the gun and when he returned, Asha gave him the coat

4

and the ring and petitioner left. (Tr. R. Vol. I A26) Asha contacted the police, went to court and obtained an order of protection against petitioner, which stated in part that petitioner was to stay away from Asha's home and work. (Tr. R. Vol. I A26-27)

On January 2, 2000, at about 2:00 a.m., Asha was at Stony Subs when she saw petitioner with Terrance Coleman and Armanis Kendall. (Tr. R. Vol. I A44) Asha and petitioner talked, and although Asha did not remember what the conversation was about, she did remember that she did not make a date to go to the movies with petitioner. (Tr. R. Vol. I A45)

On January 12, 2000, Asha was working at the YMCA as a membership representative and a switchboard operator and the victim, Linton Boyd, was working as the director of aquatics. (Tr. R. Vol. I A27-28) Asha and the victim had been friends and co-workers for about a year and they hung out all the time, but they were not dating. (Tr. R. Vol. I A27, A46) At about 9:20-9:25 p.m., Asha and the victim went to her car that was parked in the back of the building and she drove him around to the front of the building where his car was parked. (Tr. R. Vol. I A28-29) Asha double parked next to the victim's car and they talked for a minute until petitioner, who was prohibited by an active order of protection from going to Asha's work, drove up in a silver gray Jeep Cherokee. (Tr. R. Vol. A26, A29) Petitioner had been calling Asha at work and had been asking her to go out with him, however she kept telling him no, that she would think about it and that she would call him back. (Tr. R. Vol. I A30) Asha never called petitioner back, did not know if she was going to call him back and did not have plans with him on January 12, 2002. (Tr. R. Vol. I A30) Asha did not expect to see petitioner outside her work that night, she did not tell him to pick her up and this was the only

5

time petitioner ever saw her in the presence of another man. (Tr. R. Vol. I A53-54)

Asha's car was double parked next to the victim's car facing north and the victim was in the passenger seat. (Tr. R. Vol. I A30) Petitioner pulled up and stopped next to Asha's car. (Tr. R. Vol. I A30-31) Petitioner's car was facing south and the driver's side of his car was closest to Asha's car. (Tr. R. Vol. I A30-31) Petitioner said something and Asha put up her finger "like one minute." (Tr. R. Vol. I A31) At some point, petitioner drove away going south. (Tr. R. Vol. I A31) The victim got out of Asha's car and opened the door of his car, which was parked directly next to Asha's car, while Asha drove off. (Tr. R. Vol. I A31-32) As the victim was opening his car door, petitioner, who was waiting in the next intersection, made a U-turn, accelerated, hit the victim with his vehicle and continued driving. (Tr. R. Vol. I A32, A61-62) Asha, who was at the light at 63rd Street, saw the entire incident in her rear view mirror and did not hear the screech of brakes. (Tr. R. Vol. I A32-33) After petitioner hit the victim, the victim flew 78 feet in the air and fell to the ground. (Tr. R. Vol. I A35, B17, B63) Asha testified that petitioner drove up next to her at the traffic light, stopped, stared at her and then kept driving. (Tr. R. Vol. I A35) Asha then drove back to the victim's car and found the victim unconscious and unable to talk. (Tr. R. Vol. I A36) Asha attempted to call 911, but someone had already called, so she called the victim's mother, told her that he had been hit and that she would call her back when she knew what hospital he was going to. (Tr. R. Vol. I A36-37)

After petitioner hit the victim and fled, Asha received two voice mails from petitioner. (Tr. R. Vol. I A54) While Asha did not remember the exact words, the first voice mail was basically about petitioner hitting or smashing the victim with his car and he did not

6

say that it was an accident. (Tr. R. Vol. 1 A55) In the second voice mail, petitioner said something about an accident. (Tr. R. Vol. I A58)

On January 12, 2000, at about 9:30-9:40 p.m., Michelle Slater, a dental assistant who worked at Walgreens, was waiting for the bus at 63rd and Stony Island when she saw Asha sitting in the driver's seat and the victim sitting in the passenger seat of Asha's truck. (Tr. R. Vol. I A59-60) About 15 minutes later, Slater saw a white truck pull up on the side of Asha's truck and heard them have "a couple of words." (Tr. R. Vol. I A60) Slater could not hear what they were saying until it got "kind of loud" and she heard the guy in the white truck say loudly "okay, well, I'll be back." (Tr. R. Vol. I A60-61) Slater testified that when the man in the truck said this, he seemed kind of upset or agitated. (Tr. R. Vol. I A74) After he said that he would be back, he pulled up about five feet to the stop sign and waited. (Tr. R. Vol. I A61-62) At that time, Slater saw the victim exit the red truck and saw Asha drive away towards the stop light at 63rd Street. (Tr. R. Vol. I A61) Slater saw the victim trying to enter the red car and then saw the white truck make a U-turn, hit the victim and continue driving. (Tr. R. Vol. I A62) Slater testified that the white truck was going "really fast" when it struck the victim; that it never slowed down, stopped or came back; that it hit the victim at full speed and that it did not appear to be out of control because it was going straight, did not swerve and did not slow down either before or after striking the victim. (Tr. R. Vol. I A62-65) Slater testified that there was no traffic on the street and that she had never seen petitioner, the victim or Asha before. (Tr. R. Vol. I A69, A73)

Kyra Ester testified that on January 12, 2000, at approximately 9:00 p.m., she was waiting at the bus stop at 63rd and Stony. (Tr. R. Vol. I B10) When Ester arrived at the bus

7

stop, Michelle Slater was already there and there was a red truck double parked in the middle

of the street with a male and a female inside. (Tr. R. Vol. I B11) About four to five minutes

after she arrived, a silver jeep approached from the south and stopped next to the red truck.

(Tr. R. Vol. I B12, B26) Ester saw the lady in the red truck lower her window and say

something and even though she was only ten feet away, she could not hear the conversation.

(Tr. R. Vol. I B13) The Jeep then pulled off going southbound and it waited at the stop sign

at 64th and Stony Island for about two minutes, while the victim got out of the red truck and

proceeded to get into the red car. (Tr. R. Vol. I B13-14) The Jeep then made a U-turn,

proceeded northbound at a high rate of speed, hit the red car, then hit the man getting into the

red car and kept going towards 62nd Street. (Tr. R. Vol. I B15-17, B32) The man that the

Jeep hit flew in the air and then fell to the ground. (Tr. R. Vol. I B17) According to Ester,

the Jeep never swerved, stopped or hesitated, in fact, it increased speed before it struck the

victim. (Tr. R. Vol. I B17-18, B32)

Chicago Police Officer Ronald W. Gibbs testified that on January 12, 2000, while

working in the Third District on routine patrol, he heard a call of an accident at 6335 Stony

Island, went to that location, found other police officers already there and learned that a

person named Michael Threlkeld was wanted in the hit and run. (Tr. R. Vol. I A88-90)

Gibbs spoke to Ms. Serena Hill-Pratt, an employee of the YMCA, who was standing outside

talking on Asha's cell phone. (Tr. R. Vol. I A88-89) After having a conversation with her,

he listened to the cell phone, heard a male voice on the other end of the phone talking and

then sent three officers to look for petitioner. (Tr. R. Vol. I A89) Gibbs also spoke to Robert

Culverson, who walked up and was trying to enter the crime scene. (Tr. R. Vol. I A90, A98)

8

Culverson gave Gibbs petitioner's cell phone number and told him that petitioner had sent him to the scene. (Tr. R. Vol. I A90-91) Gibbs contacted the cell phone number and spoke to someone who identified himself as petitioner and who admitted hitting the victim with his car. (Tr. R. Vol. I A91, A98-99) The next morning, Gibbs called petitioner's father, Michael Robbins and asked Robbins to contact him if he heard anything. (Tr. R. Vol. I A92-93) About fifteen minutes after this conversation with petitioner's father, Gibbs had a second conversation with him and learned that petitioner was being held in custody in Bloomington, Illinois. (Tr. R. Vol. I 93)

           Forensic Investigator Leonard Stocker testified that on January 12, 2000, while working in the mobile crime lab, he processed a homicide scene at 6335 Stony Island. (Tr. R. Vol. I B55-56) At the scene, Stocker did not see any skid marks. (Tr. R. Vol. I B58) Stocker recovered a right hand glove, a black knit cap and a black scarf from the street at approximately 6335 to 6331 S. Stony. (Tr. R. Vol. I B56) Stocker also recovered glass fragments; pieces of mirror; a gray plastic piece and several pieces of black, clear and red plastic. (Tr. R. Vol. I B56-57) Additionally, Stocker recovered paint scrapings from the left rear quarter panel of a red Escort located at 6335 Stony Island. (Tr. R. Vol. I B57) Stocker took photographs of the damage on the rear right bumper; the driver's door; the hood; the left front quarter panel; the steering wheel area that showed an exposed drivers side air bag and the gear shift area. (Tr. R. Vol. I B58-62) Stocker also photographed the clothing and debris in the street near the car. (Tr. R. Vol. I B58-62) Stocker noted that the victim's body was found at the far north end of the two parked cars at 6331 Stony Island, which was 78 feet from where the initial impact occurred. (Tr. R. Vol. I B63)

9

Illinois State Trooper Brian Gray testified that on January 13, 2000, while working patrol in the Sixth District, a trucker pulled beside him at a traffic stop and told him that there was a gray Jeep slowing down almost coming to a complete stop in the roadway that had a headlight out and no registration. (Tr. R. Vol. I B33-35)  Gray saw the Jeep coming southbound and unsuccessfully tried to wave the driver over with his flashlight and hand signals. (Tr. R. Vol. I B35)  After finishing his traffic stop, at approximately 2:30 a.m., Gray caught up with the Jeep and asked petitioner for a license and proof of insurance. (Tr. R. Vol. I B35, B36, B48)  Petitioner looked for a license and proof of insurance, but could not find either. (Tr. R. Vol. I B36)  Petitioner told Gray that his name was Kevin Tevin Williams and that his date of birth was April 7, 1979.  (Tr. R. Vol. I B36)  Petitioner gave Gray the orange temporary registration sticker that was in the glove compartment and Gray noticed that it was ripped in half and had the name of Bobby Reynolds, so he asked petitioner to come back to his car for further questioning. (Tr. R. Vol. I B37)  Gray ran the VIN on the Jeep and there was no record on file. (Tr. R. Vol. I B37)

Gray noticed that petitioner was very nervous and was shaking and after detecting an odor of alcohol, Gray asked petitioner if he had been drinking and petitioner responded that he drank a whole pint of gin with orange juice and that he threw the bottle out somewhere in Chicago. (Tr. R. Vol. I B37-38)  Gray noticed that the right quarter panel had massive damage, that the taillight was broken and that there was massive body damage on the Jeep, so he asked petitioner about the damage and petitioner said that his uncle hit something a month ago. (Tr. R. Vol. I B39)  It was apparent to Gray that the damage was recent because there was no rust on where the paint had chipped and there was no dirt or debris inside the glass cavity of the

10

headlight, so he asked petitioner what his uncle hit and petitioner said that he did not know. (Tr. R. Vol. I B40) Gray asked petitioner for his name and date of birth again and petitioner again said that his name was Kevin Tevin Williams, but this time he gave the birth date of June 7, 1979. (Tr. R. Vol. I B39-40) Gray checked this name and date of birth and did not get any information. (Tr. R. Vol. I B41) Gray asked petitioner for his address and petitioner initially said that his address was 5327 N. Lake Park, then later said that it was 5451 Cornell. (Tr. R. Vol. I B41) Based in the information petitioner provided, Gray could not determine whether petitioner had a valid driver's license, so he called for a tow truck. (Tr. R. Vol. I B42) At approximately 4:15 a.m., Gray administered a breathalyzer test on petitioner and the preliminary results were .006, so he advised petitioner that he was under the legal age for drinking and was in violation of the zero tolerance policy. (Tr. R. Vol. I B42, B47) Gray issued citations and after conducting an inventory search of the Jeep, recovered three small baggies of marijuana, a safe that contained $2,600 and some pictures. (Tr. R. Vol. I B43, B44, B46) Petitioner was then taken to the Illinois State Police Department Investigations Section. (Tr. R. Vol. I B44)

On cross-examination, Gray testified that at the time of petitioner's arrest, he had been a sworn officer for about four months and that he had mistakenly put in his handwritten report that the alcohol concentration of the breathalyzer test was .000. (Tr. R. Vol. I B46-47) Gray testified that he later amended his report to .002. (Tr. R. Vol. I B47) Gray admitted that he thought it was unusual that a person who drank a pint of gin would come up with a concentration of .002. (Tr. R. Vol. I B47)

Illinois State Police Sergeant Brendon Heffner testified that on January 12, 2000, at

11

about 6:00 a.m., he was called to the Sixth District police station. (Tr. R. Vol. I A101) At approximately 7:00 a.m., Heffner, who was unaware of the investigation in Chicago, had a conversation with petitioner wherein petitioner stated that his name was Kevin Williams. (Tr. R. Vol. I A106-107) After Heffner explained why petitioner was at the police station and informed him that providing false information would make matters worse, petitioner gave the name Michael Threlkeld. (Tr. R. Vol. I A107) Heffner looked into the safe that was recovered from petitioner's car and found photos and money. (Tr. R. Vol. I A109) Later, after receiving a phone call from the Chicago Police Department and learning of the Chicago investigation involving petitioner, Heffner obtained a search warrant for the 1995 Silver Jeep. (Tr. R. Vol. I A112)

Illinois State Police Crime Scene Investigator Michael Trummel testified that on January 14, 2000, he went to Joe's towing services in Bloomington to examine and process a 1995 silver Jeep Cherokee pursuant to a search warrant. (Tr. R. Vol. I A115-116) Trummel noted that the Jeep had damage around the passenger side front headlight, fog lamp, hood area and front bumper; scratches and red paint transfers on the front driver's side bumper and red paint particles on the tow hook that was attached to the front frame of the car. (Tr. R. Vol. I A118-119) Further, the lens cover of the passenger side front headlight was broken, the headlight fixture was loose, there were pieces of glass over the headlight and it appeared as though some of the glass was missing. (Tr. R. Vol. I A120) Trummel verified that the Vehicle Identification Number (VIN) on the search warrant matched the VIN on the Jeep. (Tr. R. Vol. I A117) Trummel collected nineteen exhibits from the car, including exhibits from the front passenger side area, the headlight assembly, the passenger side fog light, the front passenger

12

side bumper and paint samples from the under carriage. (Tr. R. Vol. I A117-118) Based on his experience, Trummel believed that the car had been involved in an accident and that the red paint transfer on the driver's side was consistent with someone striking a red car that had it's door open and consistent with someone striking the rear of another red car. (Tr. R. Vol. I A125-127)

Chicago Police Sergeant Charles Williams testified that on January 13, 2000, he and Detective Fraizer picked up petitioner in Bloomington, Illinois. (Tr. R. Vol. I A129) Williams noted that petitioner had two tattoos, one that said "Asha" and another that said "mom did not raise no fool." (Tr. R. Vol. I A130)

It was stipulated that Illinois State Police Forensic Scientist Ellen Connolly qualified as an expert in the field of trace analysis and that she found that some of the fragments of the possible light cover fit together to form a portion of a single larger item. (Tr. R. Vol. II C2-3) Further, she compared the eleven plastic fragments recovered from the scene to petitioner's passenger side headlight and turning light assembly and it was her expert opinion that some of the colorless fragments of plastic recovered from the scene physically matched the broken light cover on petitioner's Jeep. (Tr. R. Vol. II C3-4) Additionally, she determined that the four mirrored gray plastic fragments recovered from the scene fit together to form a portion of single item, which may be a reflector. (Tr. R. Vol. II C3) Also, she observed that there was a broken loose reflector ball assembly on petitioner's passenger side front fog lamp, that part of the reflector was broken and that pieces of the reflector were missing. (Tr. R. Vol. II C3) Further, the reflector fragments recovered from the scene matched the dressing reflector housing of the fog light on petitioner's vehicle. (Tr. R. Vol. II C3-4) Moreover, while the four red plastic

13

fragments recovered from the scene formed a possible light cover, that light cover did not match petitioner's car. (Tr. R. Vol. II C4) Additionally, there were red paint chips on petitioner's front bumper that were not analyzed. (Tr. R. Vol. II C4)

Assistant Medical Examiner Dr. Rexene Worrell testified as an expert in the field of forensic pathology. (Tr. R. Vol. I A77-78) On Jan. 13, 2000, Dr. Worrell performed a post mortem exam on the victim and the external exam revealed abrasions on the victim's forehead, upper back, mid back, right back, right elbow, knee, buttock and penis; small lacerations on his right arm and left elbow and a bruise on his groin. (Tr. R. Vol. I A79) The internal exam revealed that the victim's cervical spine (neck) was fractured in several places, that his head was dislocated, that he had blood in the peritoneal cavity, that he had hemorrhages in the fat surrounding the intestines and that he had a hemorrhage around the pelvis. (Tr. R. Vol. I A80) The victim died as a result of multiple injuries resulting from being struck by an automobile. (Tr. R. Vol. I A80)

Petitioner's motion for directed finding was denied. (Tr. R. Vol. II C5-7) Terrence Coleman, a convicted felon who was on probation for Delivery of a Controlled Substance and who had previously been convicted of Intimidating a Witness, testified that in January of 2000, he lived with petitioner and Ahmad Kendall at 5451 S. Cornell. (Tr. R. Vol. II C18-19, C29) Coleman testified that he knew petitioner and Asha for nine years; that petitioner and Asha were a couple for six and a half years and that during their relationship, there were about four to five break ups that each ended with a reconciliation. (Tr. R. Vol. II C19-20) Coleman testified that he never knew petitioner to cause harm to Asha or any other person, that petitioner never dated other woman and that Asha never dated other men. (Tr. R. Vol. II C20-21)

14

Coleman testified that on January 2, 2000, at approximately 2:00 am, he was with petitioner and Kendall at Stony Subs Restaurant and they saw Asha. (Tr. R. Vol. II C21-22) At that time, petitioner and Asha were split up and there was an order of protection against petitioner prohibiting him from seeing her. (Tr. R. Vol. II C22) Coleman testified that after they arrived, petitioner and Asha spoke for a minute and he heard them agree to go out on a date, however they did not make specific plans. (Tr. R. Vol. II C22)

Coleman testified that on January 12, 2000, at about 6:30 pm, he was in his apartment with petitioner and Kendall. (Tr. R. Vol. II C23) Coleman testified that he had a conversation with petitioner and learned that petitioner was going out with Asha that evening to get something to eat and to go to a movie. (Tr. R. Vol. II C24) Coleman testified that petitioner was in good spirits because he was looking forward to seeing Asha and because they were reconciling. (Tr. R. Vol. II C29) At about 9:00 p.m., petitioner left the apartment, which was about five minutes from the YMCA where Asha worked. (Tr. R. Vol. II C24)

Coleman testified that people knew about petitioner and Asha's problems because they talked about them. (Tr. R. Vol. II C25) A lot of times, petitioner and Asha fought about "jealousies" and whether or not they were seeing other people and these fights made each of them upset and angry. (Tr. R. Vol. II C26) Petitioner and Asha also accused each other of seeing other people, which caused them both to get really upset. (Tr. R. Vol. II C26) Coleman testified that although Asha talked to him about petitioner, he was not aware that petitioner slashed her tires, broke out her rear view mirror, broke off her windshield wiper or used a gun to take back a ring and a coat. (Tr. R. Vol. II C27)

Ahmand Kendall, a convicted felon, testified that in January of 2000, he lived with

15

petitioner, that no one else lived with them and that Terrence Coleman just came in and out. (Tr. R. Vol. II C34, 48) Kendall testified that he has known Asha for as long as he has known petitioner and that he has seen them break up and get back together many times. (Tr. R. Vol. II C35) Kendall testified that on January 2, 2000, he was at Stony Subs with petitioner and Coleman and they saw Asha and her friend. (Tr. R. Vol. II C35) Petitioner and Asha talked and they made plans to go see a movie and get something to eat. (Tr. R. Vol. II C36-37) Kendall knew that there was a restraining order against petitioner at that time, but during that restraining order, petitioner and Asha still talked. (Tr. R. Vol. II C36-37) On January 12, 2000, at about 6:30 p.m., Kendall and Coleman were at Kendall's apartment when petitioner arrived, having just gotten off work. (Tr. R. Vol. II C37) Kendall testified that when petitioner got home, he was ecstatic and was telling them that he was going out with Asha. (Tr. R. Vol. II C37) According to Kendall, petitioner left about 8:30-9:00 p.m. and went to Asha's work. (Tr. R. Vol. II C38)

Kendall testified that petitioner drives fast and erratic and that he would describe petitioner's driving skills as poor. (Tr. R. Vol. II C38) Kendall testified that he has never known petitioner to harm Asha or anyone else. (Tr. R. Vol. II C38) Kendall knew that Asha had brought charges against petitioner, but did not know the details of the incidents. (Tr. R. Vol. II C39) Kendall knew that petitioner gave Asha a diamond ring and a leather coat; that he forcefully took them away from her; that as a result of that incident, she obtained a restraining order against him and that he was forced to give those items back to her, however Kendall did not know that petitioner had pulled a gun on Asha when he took the items back. (Tr. R. Vol. II C39, C42, C43) Kendall did not know that petitioner slashed Asha's tires, that petitioner

16

approached her at work with a baseball bat or that he damaged her car. (Tr. R. Vol. II C42) Kendall never knew petitioner to go out with other women or Asha to go out with other men. (Tr. R. Vol. II C40) Kendall testified that when petitioner and Asha would break up, petitioner would take it badly and would want her back the next day. (Tr. R. Vol. II C50)

Petitioner's cousin, Jasmine Carter testified that she had been friends with Asha for about eight or nine years, that she knew petitioner and Asha had a relationship and that she knew they broke up and got back together all the time. (Tr. R. Vol. II C55-56) Carter testified that Asha confided in her all the time and at no time did Asha ever tell her that she went out with another man. (Tr. R. Vol. II C57) According to Carter, petitioner never went out with any other girls and neither petitioner nor Asha ever accused each other of going out with other people. (Tr. R. Vol. II C57) Carter testified that Asha confided in her about a male friend at work and that Carter then told petitioner about this. (Tr. R. Vol. II C58) Carter testified that on January 12, 2000, she called petitioner on his cell phone and asked him to take her to the movies, but he said that he couldn't because he was going to the movies with Asha. (Tr. R. Vol. II C62-64)

Carter was aware that Asha had an order of protection against petitioner and that Asha had brought charges against petitioner on previous occasions. (Tr. R. Vol. II C59-60) Carter testified that both petitioner and Asha told her that in June of 1999, petitioner busted out Asha's front windshield; that in November and December of 1999, petitioner vandalized Asha's car; that petitioner slashed Asha's tires and that petitioner pulled a gun on Asha and demanded that she return a coat and a ring. (Tr. R. Vol. II C66-67) Carter testified that petitioner did not tell her that he went to Asha's work with a baseball bat to damage her car.

17

(Tr. R. Vol. II C67) According to Carter, petitioner is a terrible driver, can never keep the car straight and has a hard time controlling the car. (Tr. R. Vol. II C61)

Petitioner testified that on January 12, 2000, he was 20 years old, was living at 5451 S. Cornell and had been dating Asha for 6½ -7 years. (Tr. R. Vol. II D3) Petitioner testified that he and Asha fought a lot while they were dating, but they never fought about either of them seeing anyone else. (Tr. R. Vol. II D10) Petitioner testified that there was no reason for him to be jealous of Asha because she was not seeing anyone else. (Tr. R. Vol. II D34) Petitioner testified that he and Asha broke up many times, but each time they got back together. (Tr. R. Vol. II D4)

Petitioner testified that Asha brought criminal charges against him many times, but since she never went to court, the cases were dropped. (Tr. R. Vol. II D4) Petitioner admitted that he caused property damage to some of Asha's things, but he could not remember how many times and he denied ever physically hitting her. (Tr. R. Vol. II D4-5) Petitioner testified that he broke out the front windshield of Asha's car with a brick and while he couldn't remember why he did it, he did remember that he was angry when he did it. (Tr. R. Vol. II D35-36) Petitioner testified that in November of 1999, he broke the side mirror and windshield wiper on Asha's car because he was angry with her. (Tr. R. Vol. II D38) Petitioner testified that he did not remember what he was angry about. (Tr. R. Vol. II D39) Petitioner testified that in December of 1999, he slashed the tires on Asha's car while it was parked outside of her work because he was mad. (Tr. R. Vol. II D39-40)

Petitioner testified that when he and Asha broke up, he wanted the diamond ring and leather coat that he had given her back, but she did not want to return them. (Tr. R. Vol. II D5)

18

Petitioner admitted that when Asha would not return the coat and the ring, he got very upset and forcibly took them back, while armed with a weapon. (Tr. R. Vol. II D5-7) Petitioner claimed that the weapon was a BB gun, and that he did not point the gun at her, threaten her with the gun or hit her with the gun. (Tr. R. Vol. II D7) After petitioner forcibly took the leather coat and ring back, Asha obtained an order of protection against petitioner. (Tr. R. Vol. II D7) Petitioner testified that Asha had never obtained an order of protection against him in the past and when he and Asha broke up they stayed in contact, would call each other and would pass on information through his cousin Jasmine Carter. (Tr. R. Vol. II D8) Petitioner testified that through all of these problems he was in love with Asha, that he still is in love with her, that they both intended to get married and that they have each others names tattooed on their chests. (Tr. R. Vol. II D9) According to petitioner, all of their fights were just "little stupid things" and they never had any fights about her going out with another guy. (Tr. R. Vol. II D10)

On direct examination, petitioner testified that on January 2, 2000, at about 4:00 a.m., he met Asha at Stony Subs and they made a date to go to dinner and a movie on January 12, 2000. (Tr. R. Vol. II D11) On cross-examination, petitioner testified that when they saw each other at the sub shop, they just agreed to go out and that they did not set up a date until the next morning when they talked again. (Tr. R. Vol. II D47-48) Petitioner testified that on January 12, 2000, Asha was going to meet him in front of her house when she got off work between 9:00 and 9:30 p.m. (Tr. R. Vol. II D50) Petitioner wanted to take her to the Ford City Olive Garden to eat and then to the theater to see the movie "Next Friday." (Tr. R. Vol. II D11) On January 12, 2000, petitioner got home from work about 6:30 p.m. (Tr. R. Vol. II D12) At

19

that time, petitioner lived at 5451 S. Cornell with Mike Nis and Terrence Coleman. (Tr. R. Vol. II D12) Petitioner testified that when he got home he was happy and excited, that he prepared for his date and that he did not drink, eat or smoke anything. (Tr. R. Vol. II D13)

Petitioner testified that although he never had a driver's license, he was driving under a revoked license, was uninsured and did not have registration on the car, he did have the orange tag on the car. (Tr. R. Vol. II D15-16) Petitioner testified that he had received numerous tickets and had been in numerous accidents. (Tr. R. Vol. II D16) Specifically, petitioner testified that he ran into Wyler's Children's Hospital wall, hit four parked cars, hit a CTA bus driver, hit a car and knocked off the "so I can see mirror", hit fireplugs and hit light poles. (Tr. R. Vol. II D16-17) Nevertheless, petitioner testified that he left his house at about 9:15 p.m., got gas, drove to Asha's job and arrived there at about 9:30 p.m. (Tr. R. Vol. II D14-15) Petitioner testified that even though he and Asha agreed to meet at her house, he went to her job instead and saw her sitting in a parked car. (Tr. R. Vol. II D51)

Petitioner testified that although he did not know any of Asha's friends at work, she did speak of a male friend. (Tr. R. Vol. II D14) Petitioner testified that he never saw this male friend and that he did not feel threatened by him or jealous of him. (Tr. R. Vol. II D14) Petitioner testified that when he arrived at the YMCA he saw Asha on the east side of the street, facing northbound in her vehicle. (Tr. R. Vol. II D19) Petitioner testified that he pulled alongside of her, rolled down his window and told her that the movie started at 10:30 p.m. (Tr. R. Vol. II D19) Petitioner testified that he was using a normal tone of voice, that his window was down and that Asha could not hear him because her window was up. (Tr. R. Vol. II D20) Petitioner testified that Asha did not roll down her window and did not say anything, but that

20

she did hold up her finger and petitioner thought that she meant for him to follow her. (Tr. R. Vol. II D19-20) Petitioner testified that he never had a conversation with Asha, that he only sat there for 15-20 seconds, that there was traffic in both directions and that he never uttered the words "I'll be back." (Tr. R. Vol. II D21)

Petitioner testified that he drove up a few feet, accelerated, tried to dip a little to the right, made a left, sped up, "swooped around" and tried to make a u-turn. (Tr. R. Vol. II D23) Petitioner admitted that when he sped up, he noticed that the door was open and that he had hit someone. (Tr. R. Vol. II D23) Petitioner testified that he did not know the person that he hit, that he never saw him before, that he couldn't recall seeing him in Asha's car because he was not paying attention, that he did not see him at any time on the street before he hit him and that the first time he noticed him was when the car door opened. (Tr. R. Vol. II D25-26) Petitioner testified that he did not mean to hit the victim, that it was an accident and that he did not see where the victim went after he hit him. (Tr. R. Vol. II D25-27) Petitioner testified that he that he got scared because he knew that he had a revoked drivers license and just hit someone, so he fled the scene and drove home to his mother's house at 5307 S. Hyde Park Blvd. (Tr. R. Vol. II D25-27) At his mother's house, petitioner called a friend named Ronald, told him that he hit someone and told him to go to the scene so he could tell petitioner what was going on. (Tr. R. Vol. II D27) Petitioner then had two drinks and called Asha on her cell phone. (Tr. R. Vol. II D27) Petitioner did not speak to Asha when he called her, instead, he spoke to a police officer who told him that he needed to turn himself in because he hit someone. (Tr. R. Vol. II D27-28) Petitioner testified that he told the police officer that he would turn himself in, that he was sorry and that it was an accident. (Tr. R. Vol. II D28)

21

Petitioner testified that Ronald called him and told him that he needed to turn himself in. (Tr. R. Vol. II D29) Petitioner testified that he never spoke to Asha, any of his roommates, or his mother that evening. (Tr. R. Vol. II D29) Petitioner testified that about 30 minutes after he got to his mother's house, the police officer he previously spoke to called him and told him that the guy he hit was dead. (Tr. R. Vol. II D30) Petitioner testified that he got scared, got his safe and fled. (Tr. R. Vol. II D30) Petitioner testified that he needed to get a lawyer because his driver's license was revoked, so he took his safe, entered I-55 and kept driving. (Tr. R. Vol. II D30-31) Petitioner testified that as he was driving, he was thinking that he had just hit someone and that he needed to turn himself in, but he knew that he needed to do it the right way and get a lawyer. (Tr. R. Vol. II D31) Petitioner testified that eventually he was stopped by a state trooper gave his brother's name, Kevin Williams and said that he was going to Champaign. (Tr. R. Vol. II D31) Petitioner testified that he now realizes that I-55 is the wrong way to Champaign. (Tr. R. Vol. II D32)

In rebuttal, the State entered a certified copy of conviction for petitioner which showed that petitioner was convicted of Delivery of a Controlled Substance in June of 1988. (Tr. R. Vol. II D70) Sergeant Williams testified that on January 14, 2000 at about 12:31 am, he interviewed petitioner and petitioner told him that he was drunk on Jan 13, 2000, that he had an accident; that he hit a red car, that he had consumed a pint of Seagrams gin and that he just happened to be driving in the area of 67th and Stony Island when he saw Asha in her car. (Tr. R. Vol. II D71)

The trial court found petitioner guilty of first degree murder. (Tr. R. Vol. II D77-114) On May 2, 2001, petitioner's post trial motion was denied and the trial court sentenced

22

petitioner to thirty five years in the Illinois Department of Corrections. (Tr. R. Vol. II D16, Tr. R. Vol. III F38)  Petitioner appealed his conviction and this Court affirmed petitioner's conviction for first degree murder. (Supp. C. 38)  On July 22, 2005, petitioner filed a pro se petition for post-conviction relief alleging that petitioner's trial counsel was ineffective. (C. 11-19)  On August 1, 2005, the trial judge dismissed the petition as being without merit.  (R. A3) Petitioner now appeals the denial of his petition.

23

## ARGUMENT

### I.

**THE TRIAL COURT PROPERLY DISMISSED DEFENDANT'S POST-CONVICTION PETITION WHERE THE AFFIDAVITS AND RECORDS ATTACHED TO THE PETITION DID NOT SUPPORT PETITIONER'S CLAIM, WHERE THE RECORD SUFFICIENTLY CONTRADICTED THE ALLEGATIONS IN THE PETITION AND WHERE THE PETITION FAILED TO STATE THE GIST OF A MERITORIOUS CONSTITUTIONAL CLAIM.**

Defendant claims that "[t]he circuit court erred in summarily dismissing [his] petition because he stated the gist of an ineffectiveness claim." (Deft. Br. 12) The People contend that the summary dismissal of the post-conviction petition was proper since the affidavits and records attached to the petition did not support petitioner's claim, since the record sufficiently contradicted the allegations in the petition and since the petition failed to state the gist of a meritorious constitutional claim.

The Post-Conviction Hearing Act (Act) provides a remedy by which defendants may challenge their convictions or sentences for violations of federal or state constitutional law. People v. Munson, 206 Ill. 2d 104, 115 (2002); 725 ILCS 5/122-1. A post-conviction proceeding is not an appeal from the underlying judgment, but is a collateral attack upon a final judgment. People v. Williams, 186 Ill. 2d 55, 62 (1999). The petitioner bears the burden of establishing a substantial depravation of constitutional rights. People v. Richardson, 189 Ill. 2d 401, 407 (2000). A defendant is not entitled to an evidentiary hearing on a post-conviction petition as a matter of right. People v. Hobley, 182 Ill. 2d 404, 427-28

24

(1998). Rather, an evidentiary hearing is warranted only when the allegations of the post-conviction petition, supported when necessary by the trial record or accompanying affidavits, make a substantial showing that the defendant's constitutional rights have been violated. Hobley, 182 Ill. 2d at 428.

Where a prisoner files a pro se post-conviction, the courts engage a three-stage process to evaluate the claim. People v. Gaultney, 174 Ill. 2d 410, 418 (1996). At the first stage, the trial court is to conduct a threshold evaluation of the allegations pled in the post-conviction petition and must dismiss the petition if it is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2). A post-conviction petition is considered frivolous or patently without merit if the petition's allegations, taken as true, fail to present the gist of a meritorious claim. People v. Collins, 202 Ill. 2d 59, 66 (2002). The language of the Act provides that a first-stage pleading must "clearly set forth the respects in which petitioner's constitutional rights were violated." 725 ILCS 5/122-2. Further, the allegations in the petition must be supported by "affidavits, records or other evidence," or at the very least, an explanation as to why "the same are not attached." 725 ILCS 5/122-2; People v. Coleman, 183 Ill. 2d 366, 380-81 (1998). A dismissal at the first stage of the post-conviction petition is to be reviewed de novo. Munson, 206 Ill. 2d at 115, People v. Coleman, 183 Ill. 2d 366, 388-89 (1998).

Initially, the People maintain that the trial court's finding that the post-conviction petition was without merit was proper because petitioner's pleading did not set forth the respects in which his constitutional rights were violated and even if it did, the affidavits and records attached to the pleading do not support his claim. In the instant case, petitioner's

post conviction petition claims that "[trial counsel was ineffective for withholding exculpatory evidence that would have exonerated [him] of First Degree Murder; trial counsel was ineffective for encouraging defense witnesses to withhold exculpatory evidence [and] trial counsel was ineffective for not [seeking] a reduced charger to Reckless Homicide." (C. 19) Nowhere in the very detailed nine page petition, the attached affidavits or the attached reports is there the "exculpatory" evidence that would support a charge of reckless homicide. In the post conviction petition, petitioner wrongly claims that the "[a]ffidavits of Terrance Coleman, Jasmine Carter and Ahmad Kendell all support the fact Petitioner was intoxicated before the accident..." (C. 15) A review of these affidavits reveals that not one of them states that petitioner was under the influence of alcohol at the time of the victim's death. (C 38-45) Interestingly, petitioner's own affidavit does not even state that had any alcohol to drink **before** the victim was killed or that he was intoxicated at the time that the victim was killed. (C. 56-57) Further, the remaining documentation attached to the petition; the affidavit from Michael Flournoy, the Cook County State's Attorney's Office Investigative Report and the McLean County Complaint for Search warrant also do not establish that petitioner was intoxicated at the time the victim was killed. As such, neither petitioner's pleading nor his supporting documentation sets forth the respects in which his counsel violated his constitutional rights by failing present "exculpatory evidence" and failing to seek a reduced charge of reckless homicide since there was no claim in the petition or the supporting documentation that petitioner was under the influence of alcohol at the time the

26

victim was killed. Therefore, the trial court's finding that the post-conviction petition was completely without merit was proper.

Further, the trial court properly dismissed defendant's petition since the record sufficiently contradicts the allegations in the petition. See People v. Seaberg, 262 Ill. App. 3d 79, 84 (2nd Dist. 1994)(the court has authority to dismiss a petition as frivolous and patently without merit if the record sufficiently contradicts the allegations in the petition). At trial, defendant testified that on January 12, 2000, he got home from work at 6:30 p.m. and did not drink anything, smoke anything or do any drugs; that he got ready for his date and that at about 9:30 p.m. he went to his former girlfriend's work. (Tr. R. Vol. II D13-15) Defendant testified that once at her work, he attempted to make a U-turn and when he did so, he hit an open car door and the victim, who was standing by the car door. (Tr. R. Vol. II D23-25) Defendant testified that it was an accident and that he did not mean to hit the victim. (Tr. R. Vol. II D25) Defendant testified that he then went to his mother's house and had two drinks. (Tr. R. Vol. II D27) Defendant testified that after he heard that he had killed the victim, he took his safe and drove down I55, where he was eventually stopped by a state trooper. (Tr. R. Vol. II D30-32) On cross-examination, defendant testified that after he hit the victim, he went home and had a couple of Gin and orange juices and that he told the state trooper that he had a couple of shots. (Tr. R. Vol. II D55) Defendant testified on cross-examination that he was not drinking at the time that he hit the victim and that he had not had anything to drink when he saw his former girlfriend that night. (Tr. R. Vol. II D55, D61) Therefore, since the record shows that defendant had not been drinking at the time he struck the victim with his car, it clearly contradicts the claim that counsel was ineffective in not

27

seeking a reduced charge of reckless homicide. As such, the trial court properly dismissed defendant's petition.

Moreover, the trial court properly dismissed defendant's petition because it failed to state the gist of a meritorious ineffective assistance of counsel claim. A petitioner claiming ineffective assistance of counsel must show that counsel's representation fell below an objective standard of reasonableness and there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. Strickland v. Washington, 466 U.S. 668, 687 (1984); People v. Flores, 153 Ill. 2d 264, 283 (1992), People v. Albanase, 104 Ill. 2d 504, 525 (1984). A petitioner must satisfy both prongs of the Strickland test and the failure to satisfy either prong precludes a finding of ineffective assistance of counsel. People v. Patterson, 192 Ill. 2d 93, 107 (2000); Flores, 153 Ill. 2d at 283. However, if the ineffectiveness claim can be disposed of on the basis that the petitioner did not suffer sufficient prejudice, a court need not consider whether counsel's performance was deficient. People v. Gonzalez, 238 Ill. App. 3d 303, 324 (1st Dist 1992); People v. Montgomery, 327 Ill. App. 3d 180, 185 (1st Dist. 2001). Judicial scrutiny of counsel's performance is highly deferential and petitioner must overcome a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and that the challenged conduct constitutes sound trial strategy. People v. Pecoraro, 175 Ill. 2d 294, 319-320 (1997); People v. Gonzalez, 238 Ill. App. 3d 303, 324 (1st Dist. 1992). A petitioner is entitled to competent, not perfect, representation and the fact that in retrospect a tactic proved unsuccessful does not demonstrate incompetence. Gonzalez, 238 Ill. App. 3d at 324.

28

The reviewing court must examine the record as a whole, rather than focusing on isolated incidents. <u>People v. Armstrong</u>, 318 Ill. App. 3d 607, 615 (1st Dist. 2000).

Here, petitioner has failed to establish that that but for counsel's errors, the result of the proceedings would have been different. In the instant case, there was overwhelming evidence that petitioner was guilty of first degree murder. The evidence at trial proved that petitioner approached Asha and the victim, looked into the car and unsuccessfully attempted to have a conversation with her. (Tr. R. Vol. I 59-61) Petitioner then got upset, agitated and stated that he would be back. (Tr. R. Vol. I 59-61) Petitioner then drove off and waited at the end of the block for several minutes, while the victim exited the car. (Tr. R. Vol. I A61-62, B14-16, B23) After the victim exited the car and Asha drove off, petitioner made a U-turn, accelerated, drove straight at the victim and hit him. (Tr. R. Vol. I A61-63, B14-16) At no time did petitioner ever slow down, swerve, hesitate or stop. (Tr. R. Vol. I A65, B17-18) Petitioner then drove up next to Asha at the traffic light, stopped, stared at her, and then kept driving. (Tr. R. Vol. I A35-36) After he hit the victim, petitioner fled the scene, went home, got his safe that contained a large sum of money and then fled the county. (Tr. R. Vol. II D26-27, D30-32) At no time did petitioner ever call the police or an ambulance. Further, the State introduced evidence of other crimes that showed that when petitioner and Asha are broken up and she will not talk to him, petitioner gets angry and intentionally acts out against her. (Tr. R. Vol. I A21-22, A24; R. Vol. II D6, D35, D38-43) Therefore, since there was overwhelming evidence that petitioner was guilty of first degree murder; petitioner has failed to establish that that but for counsel's errors, the result of the proceedings would have been different.

29

Further, petitioner has failed to establish that counsel's representation fell below an objective standard of reasonableness. The defendant must overcome a "strong presumption that his lawyer's conduct falls within the wide range of reasonable professional assistance and that the challenged conduct constitutes sound trial strategy. People v. Gonzalez, 238 Ill. App. 3d at 324. A defendant is entitled to competent, not perfect, representation, and the fact that in retrospect a tactic proved unsuccessful does not demonstrate incompetence. Id.

Here, the record clearly supports the fact defense counsel's action was a matter of trial strategy and that petitioner and trial counsel chose to take an all-or-nothing approach. See People v. Barnard, 104 Ill. 2d 218, 231-32 (1984)(defense counsel's strategy of presenting the jurors with only the option of finding the defendant guilty or not guilty of the murder charge and not presenting them with an alternate verdict of voluntary manslaughter did not constitute incompetence). By not presenting testimony that supported a conviction for reckless homicide, defense counsel placed the trial court in the position of either finding petitioner guilty of first degree murder or finding petitioner not guilty because the victim's death was an accident. Had defense counsel presented testimony that the petitioner was under the influence of alcohol at the time of the victim's death, then he would guaranteed a felony conviction and the only question would have been if the conviction was for reckless homicide or for first degree murder. Therefore, it is clear that defense counsel's action of seeking a complete acquittal was a matter of trial strategy.

Further, the record establishes that not only was defense counsel's action a matter of trial strategy, but that petitioner agreed with that strategy. In his affidavit, petitioner admits:

30

"2. ...[defense counsel] would visit me at the Cook County Jail, as well as accept collect phone calls for the purpose of developing a strategy (sic) and establishing a defense to the charges I was facing in Case No# 00 CR 4537. (I was charged with the Fisrt (sic) degree Murder Linton Boyd Jr., in that I allegedly ran him over with my vehicle. I contend now, as I did then, this was an accident).

3. After consultation with [defense attorney], we both agreed that this unfortunate incident was nothing more than an accident."

(C. 56)

Therefore, not only does the record establish that counsel's actions were a matter of trial strategy, it also established that petitioner agreed with that strategy at the time.

Moreover, an examination of the witness affidavits that petitioner attached to his petition supports the fact that counsel's actions were a matter of trial strategy. None of the witness affidavits support petitioner's claim that he was under the influence of alcohol when he struck the victim. The affidavits discuss petitioner's drinking problem, his habit of drinking and driving and the fact that his trial attorney did not want the witnesses to testify to these things because it would be used as aggravation by the State at sentencing. (C. 38-45) Therefore, since petitioner's witnesses would not have supported his claim that he was under the influence of alcohol at the time that he killed the victim, trial counsel's decision not to present testimony about petitioner's history of drinking, reckless driving and driving under

31

the influence was clearly a matter of trial strategy. (C. 57) Consequently, since it is clear that defense counsel's actions were a matter of trial strategy, petitioner has failed to establish that counsel's representation fell below an objective standard of reasonableness.

Accordingly, since the petition has failed to show that petitioner was prejudiced or that his trial attorney was actually incompetent, petitioner has failed to state the gist of a constitutional claim. As such, the trial court properly dismissed petitioner's petition.

In his brief, petitioner claims that "[s]upporting documents included in [petitioner's] petition show that [petitioner] urged his attorney to pursue a lesser-included offense..." (Pet. Br. 12) The record does not support this claim. In petitioner's affidavit, he admits that he met with his counsel for "the purpose of developing a strategy and establishing a defense to the charges..." and that "[a]fter consultation with [defense counsel,] we both agreed that this unfortunate incident was nothing more than an accident." (C. 56) By choosing to pursue an accident defense, petitioner and his counsel chose to reject the lesser included offense of reckless homicide and instead attempt to get the trier of fact to absolve him of all criminal responsibility. As such, the record does not support petitioner's claim.

Petitioner argues in his brief that "a first-stage petitioner alleging ineffective assistance of counsel need not establish prejudice." (Pet. Br. 13) In support of this claim, he cites People v. Shevock, 353 Ill. App. 3d 361, 365 (4th Dist. 2004); People v. Ledbetter, 342 Ill. App. 3d 285, 288 (4th Dist. 2003) and the unpublished opinion of People v. Delton, No. 103420 (November 29, 2006). Shevock does not stand for the proposition that a first-stage petitioner need not establish prejudice when alleging ineffective assistance of counsel. As such, it does not support petitioner's argument.

32

However, even if <u>Shevock</u> did stand for that proposition, it is flawed because it relied upon on <u>People v. Edwards</u>, 197 Ill. 2d 239 (2001), and <u>Edwards</u> was unique to its own facts. <u>Shevock</u>, 353 Ill. App. 3d at 364; <u>Edwards</u>, 197 Ill. 2d at 251-52. In <u>Edwards</u>, the defendant sought post-conviction relief from his plea and sentence to a drug offense. In his petition, he alleged that he pled guilty to a drug offense. He also alleged that he understood that timely filing to withdraw his guilty plea was a prerequisite to appeal, and requested that his attorney file such a motion. The motion was never filed, nor was the appeal. Defendant argued in his post-conviction petition that he was denied his Illinois constitutional right to appeal because of ineffective assistance of counsel, in that counsel refused to discuss a possible appeal. The Illinois Supreme Court, relying in part on <u>Roe v. Flores-Ortega</u>, 528 U.S. 470 (2000), found that, first, a lawyer who disregards specific instruction from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable; and second, that defense counsel's failure to file the appeal was, in and of itself the prejudice suffered because it deprived defendant of the appellate proceeding altogether. <u>Edwards</u>, 197 Ill. 2d at 251-2. Therefore, the <u>Edwards</u> court rightly understood that the defendant in that case, by virtue of his attorney's failure to even file an appeal, suffered prejudice. See <u>Edwards</u>, 197 Ill. 2d at 251-52. <u>Edwards</u> never held that a defendant raising an ineffective assistance of counsel claim did not have to show the gist of prejudice-on the contrary, the forfeiture of an appeal was proof of a gist of prejudice suffered by a defendant whose lawyer neglected to file a notice of appeal at the request of defendant.

Defendant's reliance on <u>People v. Ledbetter</u>, 342 Ill. App. 3d 285, 288 (4th Dist. 2003), is misplaced. In <u>Ledbetter</u>, the issue was whether the petitioner raised the gist of a

33

Brady violation and there was no ineffective assistance of counsel issue in that case. Ledbetter, 342 Ill. App. 3d at 287. As such, Ledbetter is distinguishable from the instant case.

Further, defendant's reliance on People v. Delton should be ignored. The decision in Delton was an unpublished order. Pursuant to Supreme Court Rule 23, "[a]n unpublished order of the court is not precedential and may not be cited by any party except to support contentions of double jeopardy, *res judicata*, collateral estoppel or law of the case." Ill. S.Ct. Rule 23 (e). As such Delton should not be relied upon.

In this case, the appropriate Strickland standard to be employed, even at the first stage of post-conviction review, is clearly and concisely discussed in People v. Robinson, 217 Ill. 2d 43, 61 (2005), an Illinois Supreme Court case issued four years after Edwards:

> "To establish that appellate counsel was ineffective, petitioner
> must shoe both that counsel's performance was deficient **and**
> **that counsel's error was prejudicial.** People v. Flores, 153
> Ill. 2d 264, 283 (1992), citing Strickland v. Washington, 466
> U.S. 668 (1984). **Counsel's error was prejudicial if there is**
> **a reasonable probability the result of the appeal would**
> **have been different but for the error.** Flores, 153 Ill. 2d at
> 283, quoting Strickland, 466 U.S. at 694"(Emphasis added)
> Robinson, 217 Ill, 2d at 61.

34

Therefore, petitioner's claim that a first-stage petitioner alleging ineffective assistance of counsel need not establish prejudice is incorrect.

Petitioner argues that "[c]ounsel could have presented ample evidence that [petitioner] was, in fact, intoxicated at the time of the accident" and "[h]ad counsel given defense witnesses the chance, [petitioner's] petition shows that he, Terrence Coleman and Jasmine Carter would have testified that [petitioner] was drinking and intoxicated *before* the accident on January 20, 2000." (Deft. Br. 15) The record simply does not support petitioner's argument. Terrence Coleman's affidavit states that he was told by defense counsel "not to tell the real truth about what was going on with [petitioner,] and the fact that every time [he] seen him in a car or anywhere he is always drunk." (C. 38) Further, Coleman's affidavit states that defense counsel told him to say a different story , and "instead of admitting that he was over intoxicated and driving during that night of Jan. 12, 2000, that he was only to testify that he only drinked two shots of gin after the accident of Jan. 12, 2000." (C. 38) Moreover, Coleman's affidavit states that defense counsel "said the reason he did not want nothing said about [petitioner] being an alcoholic because if it was found out and [petitioner] was intoxicated during the accident Jan. 12, 2000, that it would only make the case aggravated..." (C. 38) Even taking Coleman's allegations as true, they don't prove that petitioner was drinking before the victim's death. Simply because petitioner may be an alcoholic and have a habit of drinking and driving, does not prove that petitioner was under the influence of alcohol at the time of the victim's death. Further, even if the petitioner was intoxicated and driving "during that night of Jan. 12, 2000," it does not prove that petitioner

35

was intoxicated before he killed the victim. Petitioner himself testified that he had been drinking during that night; however, not until **after** he killed the victim. (Tr. R. Vol. II D55)

Jasmine Carter's affidavit does not support petitioner's claim either. In her affidavit, Carter states that she was told by defense counsel "not to reveal the truth about what [she] actually knew about [petitioner's] drinking problem and that he is always drunk when he drives and that instead of [petitioner] admitting that he was overintoxicated and driving that night of January 12, 2000, that he was to only testify that he only drinked 2 shots of gin after the incident of January 12, 2000." (C. 41) Further, her affidavit states that the reason defense counsel did not "want nothing said about [petitioner] being an alcoholic because if it was revealed that [petitioner] was an alcoholic an was intoxicated during that night Jan 12, 200, [sic] that it would make the case aggravated and that the state would use that against [petitioner] to put him away for a long time." (C. 41) Moreover, it stated that defense counsel stated that petitioner "would be a fool to testify that he was an alcoholic and was highly intoxicated in the car on the night of the incident." (C. 41) Carter's affidavit does not even state that she saw petitioner on the night the victim was killed and a review of her trial testimony shows that she did not see petitioner on the evening of the victim's death, instead, she simply talked to him on the phone that afternoon. (C.41; Tr. Vol. II C62-64, D69) Moreover, even taking her affidavit at the truth, it does not establish that petitioner was under the influence of alcohol at the time he killed the victim. Again, the fact that petitioner may be an alcoholic and have a habit of drinking and driving does not indicate that he was under the influence of alcohol at the time of the victim's death.

36

Additionally, petitioner's affidavit does not support his claim. Nowhere in his detailed affidavit does petitioner state that he had any alcohol to drink **before** he killed the victim. (C. 56-57) Petitioner's affidavit states that his counsel advised him that it would not be in his best interest to give testimony concerning his "chronic alcohol abuse, reckless driving and history of driving under the influence." (C. 56) Further, it states that his attorney told him that "'testimony about you being an alcoholic and driving under the influence the night of the accident, would aggravate the charge..." (C. 56) Moreover, it states that petitioner informed his counsel that he "would like for the evidence of [his] drinking and driving problems to be used in [his] favor." (C. 57) Additionally, it states that he learned that defense counsel set up a meeting with his trial witnesses and the basis of that meeting was to "instruct these defense witnesses not to testify about his history of drinking, reckless driving and driving under the influence." (C. 57) None of these facts show that petitioner was under the influence of alcohol before he killed the victim. Simply because petitioner has "drinking and driving problems" does not prove that he was under the influence of alcohol before he killed the victim. Further even if petitioner would have testified that he under the influence "the night of the accident" does not prove that he had any alcohol to drink **before** the incident. (C. 56) Therefore, petitioner's claim that his brief that the "petition shows that he, Terrence Coleman and Jasmine Carter would have testified that petitioner was drinking and intoxicated *before* the accident on January 20, 2000" is not supported by the record. (Deft. Br. 15)

37

Petitioner also argues that "[r]eports from [his] arrest show that he smelled of alcohol, admitted drinking a pint of gin and had alcohol in his system; breath tests for alcohol showed results of .006 and .002 seven and 12 hours after the accident." (Pet. Br. 16) Again, none of this establishes that petitioner was under the influence of alcohol **before** he killed the victim. Petitioner himself testified that he did not have anything to drink "at the time he hit [the victim]"and that he consumed alcohol **after** he killed the victim. (Tr. Vol. II D54)(emphasis added) Therefore, the fact that the police reports indicate that he had alcohol in his system seven and 12 hours after the victim's death does not prove that he was under the influence at the time of the victim's death.

In an attempt to argue that petitioner's "testimony that he was not intoxicated does not rebut his claim of ineffective assistance of counsel", petitioner argues in his brief that "[c]ross examination was the only time [petitioner] was directly asked whether he was intoxicated during the accident; he answered he that he was not." (Pet. Br. 19; citing Tr. Vol. II D55) A review of petitioner's direct examination reveals that he testified that he got home from work at 6:30 p.m. and got prepared for his date. (Tr. Vol. II D13) Defense counsel specifically asked him "[w]hen you got home, did you drink anything?" and petitioner responded "no." (Tr. Vol. II D13) Defense counsel also asked him if he smoked any drugs or did any drugs and petitioner responded that he did not. (Tr. Vol. II D13) Petitioner then testified that after he got ready for his date, he stopped for gas and then went to Asha's work. (Tr. Vol. II D13) As such, petitioner's argument in his brief that "cross examination was the only time [petitioner] was directly asked whether he was intoxicated during the accident" is

38

misleading. Further, even if cross examination was the only time petitioner testified about his alcohol consumption before the incident that does not diminish the fact that the record rebuts petitioner's allegations. (Tr. Vol. II D55)

In sum, the trial court correctly dismissed the post-conviction petition as frivolous and patently without merit. The People respectfully request that this Honorable Court reject defendant's claims on appeal and affirm the trial courts dismissal of the petition.

39

## CONCLUSION

The People of the State of Illinois respectfully request that this Honorable Court affirm the trial court's dismissal of petitioner's post-conviction petition.

Pursuant to People v. Nicholls, 71 Ill. 2d 166, 374 N.E.2d 194 (1978) and relevant statutory provisions 725 ILCS 5/110-7(h)(West 2004) and 55 ILCS 5/4-2002.1 (West 2004), the People of the State of Illinois respectfully request that this Court grant the People costs and incorporate as part of its judgment and mandate a fee of $100.00 for defending this appeal. In addition, pursuant to People v. Agnew, 105 Ill. 2d 275, 473 N.E.2d 1319 (1985) and 55 ILCS 5/4-2002.1 (West 2004), the People respectfully request that this Court also grant the People an additional fee of $50.00 in the event oral argument is held in this case.

Respectfully Submitted,

RICHARD A. DEVINE,
    State's Attorney,
    County of Cook,
    Room 309 - Richard J. Daley Center,
    Chicago, Illinois 60602

Attorney for Plaintiff-Appellee

JAMES E. FITZGERALD,
MARY NEEDHAM,
MAUREEN MCGEE,
Assistant State's Attorneys.
    Of Counsel.

40

## CERTIFICATE OF COMPLIANCE

I certify that this brief conforms to the requirements of Rules 341 (a) and (b). The length of this brief, excluding the appendix, is 40 pages.

By:      

MAUREEN MCGEE,
Assistant State's Attorney

No. 1-05-2915

## IN THE

## APPELLATE COURT OF ILLINOIS

### FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Respondent-Appellee, | ) | |
| | ) | |
| -vs- | ) | No. 00 CR 4537. |
| | ) | |
| MICHAEL THRELKELD, | ) | Honorable |
| | ) | James B. Linn, |
| Petitioner-Appellant. | ) | Judge Presiding. |

## REPLY BRIEF AND ARGUMENT FOR PETITIONER-APPELLANT

MICHAEL J. PELLETIER
Deputy Defender

HOLLY J. K. SCHROETLIN
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR PETITIONER-APPELLANT

EXHIBIT L

No. 1-05-2915

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Respondent-Appellee, | ) | |
| | ) | |
| -vs- | ) | No. 00 CR 4537. |
| | ) | |
| MICHAEL THRELKELD, | ) | Honorable |
| | ) | James B. Linn, |
| Petitioner-Appellant. | ) | Judge Presiding. |

## REPLY BRIEF AND ARGUMENT FOR PETITIONER-APPELLANT

**Threlkeld's post-conviction petition alleged that his trial attorney was ineffective for refusing, over Threlkeld's insistence, to introduce evidence of intoxication because he misunderstood applicable law. Threlkeld alleged this evidence would have established the lesser-included offense of reckless homicide and supported his contention with documentation. The circuit court erred in summarily dismissing Threlkeld's petition because he stated the gist of an ineffectiveness claim.**

The State does not dispute that Threlkeld wished to purse a lesser-included offense at trial. Nor does it dispute that Threlkeld did not present this defense because of the mistaken advice of counsel, who believed erroneously that Threlkeld's preferred defense could trigger an extended-term sentence. The State nevertheless argues that Threlkeld's post-conviction petition was properly dismissed because the petition's claim of ineffective assistance of counsel was rebutted by the trial record and not supported by the included reports and affidavits. However, Threlkeld's *pro se* petition stated the gist of his ineffectiveness claim as it alleged unreasonable performance by trial counsel and need not allege prejudice to survive first-stage post-conviction proceedings. Further,

-1-

these claims are not refuted by the trial record and have support in the attached affidavits and reports.

*The affidavits and records included with Threlkeld's petition sufficiently support Threlkeld's claim of ineffective assistance of counsel.*

The State argues that the petition does not contain exculpatory evidence to support Threlkeld's ineffective assistance claim because the attached affidavits and documents show only that Threlkeld was intoxicated after the accident. (St.Br. 26, 36). Threlkeld concedes that these affidavits do not explicitly state that the witnesses had personal knowledge of Threlkeld's intoxication at the time of the accident. (De.Br. 16, St.Br. 26). However, Threlkeld's petition alleges that he was intoxicated at the time of the accident. More important, the attached affidavits support the relevant allegation in the petition: that trial counsel misunderstood the law and, accordingly, advised Threlkeld to forgo an available lesser offense that he had the right to choose to pursue. (De.Br. 14-15). Accordingly, these documents corroborate Threlkeld's claim.

Threlkeld in his affidavit attests that he wanted to admit his drinking but was told "'it doesn't matter, if you tell them you were driving drunk it will only aggravate the charge.'" (C. 57). In his *pro se* petition *Threlkeld* specifically stated that he was under the influence of alcohol at the time of the accident: "[Threlkeld] contends that he unintentionally killed Linton Boyd, after driving his vehicle under the influence of alcohol and in a reckless manner." (C.14). The petition also states that Threlkeld was "under the influence of alcohol to the degree that it rendered ... [him] incapable of safely driving his vehicle." (C. 14). The petition alleges that Threlkeld was intoxicated before the accident.

Other witnesses corroborated Threlkeld's allegation of ineffective assistance of counsel. Terrence Coleman's affidavit states that he was told not to testify to the truth that Threlkeld "was over intoxicated and driving during that night of Jan[uary] 12, 2000." (C. 38). Instead, witnesses were instructed to tell a different story – that Threlkeld "only drinked [sic] 2 shots of gin after the accident." (C. 38). Coleman testified this way because he believed if the truth was found out – that Threlkeld "was intoxicated during that accident Jan[uary] 12, 2000, that it will only make the case aggravated." (C. 38). Defense witnesses Jasmine Carter and Ahmad Kendall similarly had knowledge of Threlkeld's history of drunken driving and that Threlkeld was told not to testify regarding his drinking. (C. 41-45). In her affidavit, Carter states that trial counsel advised Threlkeld that he "would be a fool to testify that he was an alcoholic and was highly intoxicated in that car on the night of the incident." (C. 41). Kendell similarly states that he was told by trial counsel not to testify to the truth about Threlkeld's drinking problem "because if it was found out by the State[']s Attorney that Michael Threlkeld was intoxicated during the night of Jan[uary] 12, 2000 that it would only make the case aggravated." (C. 44).

These affidavits indicate that defense witnesses had some knowledge of Threlkeld's intoxication the night of the accident, as all state that they were instructed by counsel not to testify to the truth, and, instead, Threlkeld testified that he consumed alcohol only after the accident.

Police and arrest reports also indicated Threlkeld's intoxication and should have signaled to trial counsel that Threlkeld did not have the required mental state for first degree murder. (C. 20-36, 47-53). The report of Threlkeld's arrest while driving south on Interstate 55 states that he admitted drinking a pint of gin and that after doing so, he

-3-

threw out the bottle in Chicago – the location of the accident. (C. 32).

These documents provide sufficient evidence to support this first stage petition. A first stage a *pro se* petitioner need not prove the credibility of his witnesses or provide every fact to support his claim because while a "*pro se* defendant may be aware of all the facts pertaining to his claim, he will, in all likelihood, be unaware of the precise legal basis for his claim or all the legal elements of that claim. In many cases, the *pro se* defendant will be unaware that certain facts, which in his mind are tangential or secondary, are, in fact, critical parts of a complete and valid constitutional claim." *Edwards*, 197 Ill.2d at 245. In this case, Threlkeld supported his claim with affidavits and documents that sufficiently support his contention that trial counsel misunderstood that law and as a result discouraged Threlkeld from pursuing an available and desired lesser offense, a decision that belonged to Threlkeld.

*As a first stage pro se petitioner, Threlkeld need not prove all elements of his claim of ineffective assistance of trial counsel*

The State agues that a *pro se* post-conviction petition alleging ineffective assistance of counsel must allege prejudice to state the gist of a claim. (St.Br. 32-34). Here, this issue is not dispositive because Threleld's petition did allege prejudice. (C. 12-13). Nonetheless, as Threlkeld argued, several cases support the proposition that prejudice is not required to state the gist of a claim of ineffective assistance of counsel. *People v. Shevock*, 353 Ill.App.3d 361, 365, 818 N.E.2d 921 (4th Dist. 2004); *People v. Ledbetter*, 342 Ill.App.3d 285, 288, 794 N.E.2d 1067 (4th Dist. 2003); *People v. Delton*, No. 103420 *petition for leave to appeal allowed* from unpublished order (November 29, 2006). (De.Br. 13).

The State argues that *Shevock* "does not stand for the proposition that a first-

-4-

stage petitioner need not establish prejudice when alleging ineffective assistance of counsel," and alternatively, "even if *Shevock* did stand for that proposition, it is flawed," because of its reliance on *People v. Edwards*, 197 Ill.2d 239, 757 N.E.2d 442 (2001). (St.Br. 32-33). Neither argument has merit.

*Shevock*, which applied *Edwards* to an ineffective assistance of counsel claim explicitly held that the gist standard does not require prejudice:

> The defendant [in *Edwards*] alleged no facts establishing prejudice, and thus his claim was incomplete: it was merely the "gist" of a claim. But the "gist" of a claim was all the Post-Conviction Hearing Act required at the first stage of the postconviction proceeding, and he had stated the "gist" by alleging at least one factual element. . . . Given that factual allegation, summary dismissal of the petition was premature.

*Shevock*, 353 Ill. App. 3d at 365 (citations omitted). The *Shevcock* court's discussion of *Edwards* supports the conclusion that a *pro se* defendant need not establish prejudice at the first stage of post-conviction proceedings.

The State suggests that *Shevock*'s application of *Edwards* is mistaken because the deficient performance in that case, failing to file a certificate of appeal, necessarily caused prejudice to the defendant. (St.Br. 33). However, the *Edwards* reasoning applies similarly here. The court stated that because the ineffective assistance cost the *Edwards* defendant his right to appeal "[i]t is irrelevant whether one characterizes this burden as a requirement to allege deficient performance or prejudice because the principle remains the same: the *pro se* defendant cannot be expected to specify the grounds for his appeal and specify that they have merit." *Edwards*, 197 Ill.2d at 254. Similarly, Threlkeld lost his right to personally choose whether to submit a lesser offense because of his counsel's

deficient performance; to state the gist of his claim he is not required, as a *pro se* petitioner, to state the outcome of this proposed strategy. Like the *Edwards* defendant, Threlkeld stated the gist of a claim of ineffective assistance of counsel by alleging that he lost a right by virtue of counsel's deficient performance.

The State also argues that *Edwards* was "unique to its own facts" (St.Br. 33). Nonesense. *Edwards*, a watershed decision, explicitly repealed the "sufficient facts test," which had required a *pro se* petitioner to establish every element of a constitutional claim. 197 Ill.2d at 245. The State invokes this now-discredited test by arguing that Threlkeld must, at this stage, satisfy every element of *Strickland*: cause and prejudice. That is what *Edwards* rejected.

The State also asserts that *Denton* should be ignored because it is an unpublished rule 23 order. (St.Br. 34). However, the cite to *Denton* was to the Supreme Court's grant of a petition for leave to appeal on this issue. (De.Br. 13).

To support its contention that *pro se* post-conviction petitioners alleging ineffective assistance of counsel ought to be required to allege prejudice, the State cites *People v. Robinson*, 217 Ill.2d 43 (2005). (St.Br. 34). The portion of *Robinson* that the State cites merely lists *all* of the elements of a claim of appellate counsel's ineffective assistance. *See Robinson*, 217 Ill.2d at 61. *Robinson* does not address, and certainly did not repeal, *Edwards'* holding defining a gist as *some* of the elements of a constitutional claim.

*Counsel's trial strategy based upon a mistake of law does not deserve deference.*

The State calls counsel's decision not to urge a lesser offense a matter of trial strategy. (St.Br. 30-31). Threlkeld agrees. He is arguing that counsel's strategy rested on

his misunderstanding of the law. (De.Br. 14-15). The State does not dispute that counsel's strategy stood on a faulty legal foundation. Nor does it explain how such legal error could deserve deference.

Threlkeld also agrees that he deferred to counsel's trial strategy. But the State does not dispute that counsel's advice, and his strategy, rested on counsel's misrepresentation of the applicable law and sentencing consequences. (St.Br. 30-31; De.Br. 14-15). Neither does the State explain how causing a client to unintelligently surrender a fundamental right based on a mistake of law is sound trial strategy.

*The trial record does not refute Threlkeld's claim of ineffective assistance of counsel.*

The State argues that because Threlkeld testified that he only began drinking after the accident, the record contradicts his claim of ineffective assistance of counsel. (St.Br. 36). Threlkeld admitted that he testified at trial that he was not intoxicated at the time of the accident. He explained in his petition that he testified this way only because trial counsel's mistaken understanding of the law led Threlekld to believe that if he testified truthfully, he could receive an enhanced sentence. The State ignores this fact, which is addressed in more detail in Threlkeld's opening brief. (De.Br. 18-19).

The State further argues that it is misleading to say Threlkeld was not asked directly about his intoxication on direct examination because defense counsel asked several questions about drug use, but not this question. (St.Br. 38). However, the trial record shows that defense counsel very carefully avoided asking any direct questions regarding Threlkeld's intoxication before or at the time of the accident. Instead counsel asked about Threlkeld's consumption of drugs before the accident and alcohol after that accident. (Tr.R. D13). Defense counsel did not ask Threlkeld directly whether he was

drunk at the time of the accident.

Finally, the State's brief misleadingly suggests that Boyd was thrown 78 feet into the air. (St.Br. 6, 9). The trial testimony actually indicated that Boyd was found 78 feet from his parked car. (Tr.R. B63). This evidence is very different from the suggestion that he flew up several stories.

For these reasons, Threlkeld's *pro se* post-conviction petition stated the gist of a claim of ineffective assistance of counsel. This claim was supported with affidavits and police reports and unrefuted by the trial record. Accordingly, the trial court erred by summarily dismissing Threlkeld's petition.

## CONCLUSION

For the foregoing reasons, Michael Threlkeld, Petitioner-Appellant, respectfully requests that this Court reverse the circuit court's summary dismissal of his post-conviction petition and remand it for further proceedings.

Respectfully submitted,

MICHAEL J. PELLETIER
Deputy Defender

HOLLY J. K. SCHROETLIN
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR PETITIONER-APPELLANT

CERTIFICATE OF COMPLIANCE

I, Holly J. K. Schroetlin, certify that this brief conforms to the requirements of Supreme

Court Rule 341(a) and (b). The length of this brief, excluding the appendix is 9 pages.

HOLLY J. K. SCHROETLIN
Assistant Appellate Defender

CASE NO.    08 cv 1479     

ATTACHMENT NO. _____

EXHIBIT      M – P       

TAB (DESCRIPTION) _____

NOTICE
The text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same. *Schaetlen*

FIRST DIVISION
AUGUST 20, 2007

No. 1-05-2915

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 00 CR 4537 |
| | ) | |
| MICHAEL THRELKELD, | ) | Honorable James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

### O R D E R

Defendant appeals from the summary dismissal of his pro se petition for relief filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 et seq. (West 2004)). On appeal, he asserts that his petition set forth the gist of a meritorious constitutional claim that trial counsel provided ineffective assistance when he failed to present evidence that defendant was intoxicated at the time of the offense. We affirm.

Following a bench trial, defendant was convicted of the first degree murder of Linton Boyd, a friend of defendant's ex-girlfriend, who defendant hit with his car, and was sentenced to 35 years' imprisonment. On direct appeal, defendant asserted in

1-05-2915

part, that the evidence was insufficient to sustain his conviction and that trial counsel was ineffective for failing to call a witness at trial. We affirmed the judgment. <u>People v. Threlkeld</u>, No. 1-01-2879 (2004) (unpublished order under Supreme Court Rule 23).

In July 2005, defendant filed a post-conviction petition, alleging that trial counsel failed to provide effective assistance because he did not present evidence that defendant was intoxicated when he struck Boyd with his car. He alleged that had counsel presented such evidence, he "would have exonerated Petitioner of First Degree Murder" and defendant would only have been convicted of reckless homicide.

The trial court summarily dismissed defendant's petition. In doing so, the court found:

> "[Defendant] is blaming his lawyer for
> his conviction for first degree murder saying
> his lawyer should have urged and presented a
> case for reckless homicide, which is exactly
> what his lawyer did. His lawyer urged the
> Court in the first beginning that this was an
> accident, it was a reckless homicide.
>
> He is also saying that his lawyer
> suggested that the witnesses testify a
> certain way. Whether that is true or not, it
> would not have changed the fact that his

1-05-2915

> lawyer actively approached the case as though
> it was reckless homicide and not a first
> degree murder. *** [H]e is complaining about
> the result."

On appeal, defendant asserts that his petition set forth the
gist of a meritorious constitutional claim that counsel provided
ineffective assistance when he failed to present evidence that
defendant was intoxicated when he hit Boyd with his car and
failed to argue that defendant was guilty of reckless homicide
instead of first degree murder.

We review a first-stage summary dismissal of a post-
conviction petition de novo. People v. Collins, 202 Ill. 2d 59,
66 (2002); People v. Coleman, 183 Ill. 2d 366, 389 (1998).

The Act permits summary dismissal of a defendant's post-
conviction petition if it is "frivolous or patently without
merit." 725 ILCS 5/122-2.1(a)(2) (West 2004); Collins, 202 Ill.
2d at 66; People v. Gaultney, 174 Ill. 2d 410, 418 (1996).
Summary dismissal is proper when defendant's allegations are
refuted by the record. People v. Coulter, 352 Ill. App. 3d 151,
157 (2004); People v. Deloney, 341 Ill. App. 3d 621, 626 (2003).

When asserting a claim of ineffective assistance of counsel,
the defendant's petition must allege facts showing that (1)
counsel's performance was objectively unreasonable and (2)
resulted in prejudice to defendant. Strickland v. Washington,
466 U.S. 668, 687, 694, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct.

1-05-2915

2052, 2064, 2068 (1984); People v. Enis, 194 Ill. 2d 361, 376
(2000). Defendant must overcome the "strong presumption" that
counsel provided reasonable assistance. Strickland, 466 U.S. at
689; Enis, 194 Ill. 2d at 377. The decisions that counsel makes
regarding matters of trial strategy are "'virtually
unchallengeable.'" People v. McGee, No. 1-05-3030 (May 21, 2007),
quoting People v. Palmer, 162 Ill. 2d 465, 476 (1994).

   Defendant asserts that because his petition need only state
the "gist" of a meritorious claim, he need not meet the prejudice
prong to advance beyond the first-stage of post-conviction
review. We disagree. We have consistently applied both prongs
of the Strickland test when reviewing the summary dismissal of a
first-stage post-conviction petition raising an ineffective
assistance of counsel claim. See, e.g., People v. Hernandez, 351
Ill. App. 3d 28, 36-40 (2004); People v. Morales, 339 Ill. App.
3d 554, 561-64 (2003); People v. Jefferson, 345 Ill. App. 3d 60,
74-77 (2003). Moreover, if we were to accept defendant's
argument, "we would essentially grant all postconviction
petitioners the right to an evidentiary hearing on a claim of
ineffective assistance of counsel so long as they simply alleged
any de minimis error of counsel. Announcing such a rule would
undermine the purpose of section 122-2.1(a)(2) of the Act, which
authorizes the summary dismissal of claims that are frivolous or
patently without merit." People v. Pineda, 373 Ill. App. 3d 113,
120 (2007). Accordingly, defendant's petition must satisfy both

- 4 -

1-05-2915

prongs of the <u>Strickland</u> test.

In defendant's petition, he alleges that "trial counsel was wholly ineffective for failing to seek a reduced charge from First Degree Murder to Reckless Homicide. He asserts there was ample amount of evidence adduced during the investigation of this case that clearly establishes the Petitioner lacked the requisite mental state of intent to be charged or convicted of First Degree Murder" because he was "driving his vehicle under the influence of alcohol" at the time of the offense. Attached to defendant's petition are several affidavits, his arrest record, and several police reports, all of which defendant asserts, support his claim that he was intoxicated at the time of the offense.

Initially, we note that effective January 1, 2002, the Illinois legislature eliminated the defense of voluntary intoxication as an excuse for criminal conduct. 720 ILCS 5/6-3 (West 2002); <u>People v. Jackson</u>, 362 Ill. App. 3d 1196, 1201 (2006). However, because defendant committed his offense in 2000, this legislative enactment does not apply and we will thus consider defendant's claim. See <u>People v. Ramsey</u>, 192 Ill. 2d 154, 157-58 (2000) (recognizing that applying a law that eliminates a possible defense available to a defendant at the time he commits an offense violates the prohibition against <u>ex post facto</u> laws).

Turning to the merits of defendant's claim, we note that defense counsel did not specifically argue that defendant should

- 5 -

1-05-2915

be found guilty of the lesser offense of reckless homicide;
rather, he argued that he should be found not guilty of first
degree murder because Boyd's death was an accident, the result of
defendant's poor driving skills, and not an intentional act.  The
defense called Ahmand Kendall, a close friend of defendant, who
testified that defendant was a "poor" driver who would "drive
irratic [sic]" and "drive fast."  In addition, Jasmine Carter,
defendant's cousin, classified defendant as a "terrible" driver,
who could "never keep the car straight" and had "a hard time
controlling the car."  Defendant testified on his own behalf that
he was a poor driver who had received numerous tickets and had
hit a wall, a fire hydrant, a light pole, four parked cars, and a
CTA bus driver with his car.  Thus, counsel clearly chose to
present as a defense, evidence that defendant was a reckless
driver who had repeatedly gotten into traffic accidents, and that
Boyd's death was the result of an accident caused by defendant's
reckless driving, not an intentional act.  Pursuing an all-or-
nothing defense has been recognized as a valid trial strategy and
does not necessarily constitute ineffective assistance of
counsel.  See People v. Barnard, 104 Ill. 2d 218, 231-32 (1984);
People v. Benford, 349 Ill. App. 3d 721, 728-29 (2004); People v.
Daniels, 331 Ill. App. 3d 380, 392-93 (2002).

    Moreover, contrary to his claim, there was not "ample
amounts of evidence available to counsel to pursue" an
intoxication defense and argue that defendant should be convicted

1-05-2915

of reckless homicide. Notably, the evidence defendant relies upon does not support his claim that he was intoxicated at the time he hit Boyd with his car. Nowhere in defendant's own affidavit does he claim that he was intoxicated at the time of the incident. Rather, in his affidavit, defendant merely asserts that counsel informed him that "it would not be in my best interest to give testimony at my trial concerning my chronic alcohol abuse, reckless driving and history of driving under the influence" and that evidence that he was intoxicated on the "night of the accident, would aggravate the charge." Only in the petition itself does defendant allege that he was "driving his vehicle under the influence of alcohol" when he struck and killed Boyd. However, this allegation is refuted by the trial record. At trial, on direct examination, counsel asked defendant "did you drink anything" prior to leaving his house to visit Asha, his ex-girlfriend, and defendant responded, "no." Moreover, on cross-examination, defendant was asked, "You weren't drinking at the time you hit this person, right?" Defendant responded, "No, I was not." He was also asked whether he had anything to drink prior to arriving to see his ex-girlfriend, and again, he replied, "No." The only statement defendant made at trial regarding his alcohol consumption on the date of Boyd's death was that he drank gin after the incident. Accordingly, defendant's own trial testimony refutes his claim that he was intoxicated at the time of the offense, and summary dismissal is proper when

1-05-2915

defendant's allegations are refuted by the record.  Coulter, 352
Ill. App. 3d at 157; Deloney, 341 Ill. App. 3d at 626.

Furthermore, the affidavits of three defense witnesses,
which are attached to defendant's petition, do not support his
intoxication claim.  In the affidavits, defendant's witnesses
claim that they were aware that (1) defendant had a drinking
problem; (2) defendant is always drunk when he drives; (3)
defense counsel instructed defendant to testify that he only
drank two shots of gin following the accident; and (4) defense
counsel instructed them not to reveal defendant's history of
alcohol abuse.  Nowhere in the affidavits, do defendant's friends
claim to have any personal knowledge that defendant was indeed
intoxicated at the time of the offense.  Similarly, defendant's
arrest record, which reflects that he had several prior DUI
arrests, and the police reports generated on the night of the
incident, which reflect that defendant was discovered driving his
car several hours after he struck Boyd, while under the influence
of alcohol, do not provide support that defendant was intoxicated
at the time of the incident.

As a whole, the affidavits, police reports, and defendant's
arrest record merely demonstrate that defendant has an apparent
drinking problem and that he has been known to drink and drive.
Any claim that defendant was intoxicated at the time of the
offense based on his prior history of alcohol use is merely
speculative.  Failure to present speculative evidence that

- 8 -

1-05-2915

defendant may have been intoxicated at the time of the offense is not unreasonable, and thus defendant's ineffective assistance of counsel claim has no merit. See, e.g., People v. Smith, 195 Ill. 2d 179, 202-03 (2000) (finding that counsel was not ineffective for failing to present speculative evidence that defendant may have been under the influence of PCP on the day of the murder).

Because there was no evidence to support a defense that defendant was intoxicated at the time of the offense and argue that defendant should only be found guilty of reckless homicide, we find defendant's reliance on People v. Wright, 111 Ill. 2d 18 (1986) and People v. Lemke, 349 Ill. App. 3d 391 (2004) unpersuasive. In Wright, counsel failed to present an intoxication defense because he misunderstood the law and was found to be ineffective. Wright, 111 Ill. 2d at 27-31. In Lemke, counsel was found to be ineffective when he failed to argue that defendant should be found guilty of a lesser offense even though it would have been supported by the evidence, but rather adopted a defense that was clearly not supported by the evidence because he misunderstood the law. Lemke, 349 Ill. App. 3d at 399-400. In this case, however, there is no evidence that counsel failed to present an intoxication defense because he misunderstood the law; rather, he did so because the evidence did not support such a defense.

Moreover, defendant's claim necessarily fails because he cannot satisfy the prejudice prong of the Strickland test as

- 9 -

1-05-2915

evidence of his intent was overwhelming and the use of
inconclusive and speculative testimony concerning defendant's
possible intoxication at the time of the offense would not have
altered the trial result. At trial, three witnesses testified
credibly and refuted defendant's claim that he did not
intentionally hit Boyd with his car. Specifically, defendant's
ex-girlfriend, Asha, testified that defendant, against whom she
had a restraining order because he had committed various violent
acts against her person and her property following their recent
break-up, waited for her outside of her workplace in his car.
She was sitting in her car with Boyd when defendant attempted to
converse with her. When Boyd exited her car and walked to his
own, defendant made a u-turn, sped up, hit Boyd, and then sped
off. She never heard the screech of brakes. Two additional eye-
witnesses to the incident confirmed Asha's account and testified
that defendant's truck never seemed out of control and did not
swerve before he struck Boyd, but rather drove directly at him.
Moreover, Asha also testified that following the incident,
defendant left a message on her cellular phone, stating
"something about smacking [Boyd] with the car" and did not claim
that it was an accident. Such testimony negates defendant's
charge that he lacked the requisite intent to be convicted of
first degree murder. Speculative testimony from three witnesses
that defendant may have been intoxicated at the time of his
offense does not create a reasonable probability that the outcome

- 10 -

1-05-2915

of the trial would have differed.   See, <u>e.g.</u>, <u>People v. Lovitz</u>,
127 Ill. App. 3d 390, 397 (1984) (counsel's failure to call a
witness to testify about defendant's alleged intoxication did not
prejudice defendant because testimony was not conclusive and
would not have altered the trial result).

    Accordingly, we affirm the judgment of the trial court.

    Affirmed.

    GARCIA, J., with CAHILL and R. GORDON, JJ., concurring.

No._____

IN THE

SUPREME COURT OF ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, ) | Appeal from the Circuit Court of Cook County Illinois. |
|       Plaintiff-Appellee, ) | No. 00CR 4537 |
|     vs. ) | Honorable James B. Linn. |
| MICHAEL THRELKELD, ) | |
|       Defendant-Appellant, ) | |

Petition for Leave to Appeal from the Illinois Appellate Court, First District, No. 1-05-2915, Affirming the Defendant's Conviction from the Circuit Court of Cook County, Illinois, No. 00CR 4537, . Honorable James B. Linn, Judge Presiding.

DEFENDANT'S (PRO SE) PETITION FOR LEAVE TO APPEAL FROM THE FIRST DISTRICT APPELLATE COURT'S ORDER AFFIRMING DEFENDANT'S CONVICTION

MICHAEL THRELKELD
P.o.BOX 112
STATEVILLE C.C
JOLIET ILL. 60434
K-66117

PRAYER FOR LEAVE TO APPEAL

---

Pursuant to Illinois Supreme Court Rule 315, Defendant Michael
Threlkeld, respectfully requests leave to appeal from August 20,
2007, Order and Opinion of the Illinois Appellate Court, First Di
-strict, affirming the Circuit Court's conviction of the Defend-
ant. The petitioner respectfully submits that the Order of the
First District affirming the Defendant's conviction raises sub-
stantial constitutional questions, misapplies the precedent of
this Court, and directly conflicts with the holding of Courts
in outher jurisdictions. By the Defendant's trial attorney's
ineffectivecy for refusing over Threlkeld's insistence to intro-
duce evidence of intoxication as substantial evidence in this
case, the First District's Order, affirming the trial Court,
violates the Defendant's six Amendment rights under the United
States Constitution.

        This constitutional violation is a direct result of the
First District's failure to properly understanding the jurispr-
udence of this Court. As applied here, the First Districts app-
roach in regards to the Defendant's trial attorney's ineffect-
ivecy for refusing over Threlkeld's insistence to introduce
evidence of intoxication actually embraces, rather than rejects,
the use of impermissable propensity logic. In deed, the First
District's interpretation of this Court's precedent rewards the
State for aruging that the trial Court properly dismissed the
Defendant's post conviction petition: where the affidavit's and
the records did not support the petitioner's claim... and where

the record contradicts the allegations in the petition and where
the petition failed to state the gist of a meritorious constitut-
ional claim.

But such an error is highlighted by the state of langu
-age of the trial Court in rendering it's verdict and the argumen
-ts presented by the State in the trial Court as well as on appea
-l. Futhermore, the First District's application in retrospect to
the issue at hand, in which the Defendant's trial attorney refuse
-d over his insistency to introduce evidence of intoxication con-
flicts authority existing in other jurisdictions. Through this
appeal, this Court has to be given the opportunity to clarify the
proper analysis to be applied to the evidence at hand: in which
the Defendant's attorney refused over his insistency to intro-
duce evidence of intoxication which could of exonerated the petit
-ioner of first-degree murder. It is also critical that the Court
clarify the analytical framework for determining if whether or
not the said issue constitues reversible error. As this Court has
recognized previously, more than the Defendant's constitutional
rights are actively  infringed - if not accepted, the intergrity
of criminal justice system, and it's goal of fundamenatal fair-
ness to all Defendant's will be impugned.

## TIMELINESS OF PETITION AND PROCEEDINGS
## BELOW

On August 20,2007, The First District entered it's Order affirm-
ing the trial Court's conviction of the Defendant. On August 24,
2007, the Defendant filed in the First ■ District Appellate
Court his notice of intent to petition for leave to appeal it's

Order, Defendant then filed this petition for leave to appeal on August 30,2007, within the time limit prescribed by Rule 315 (b).

## POINTS RELIED UPON FOR REVERSAL

1.) The Defendant's right to a fair trial under Illinois law and the clause of the six Amendment to the United States Constitution was prejudiced by the Defendant's trial attorney's ineffectivency: for refusing over the Defendant's insistence to introduce evidence of intoxication as substantial evidence in this case.

2.) That the Appellate Court failed in seeking the evidence of intoxication within the State's reply brief as well as within the transcripts regarding the evidence that trial counsel failed to present an intoxication defence because he misunderstood the law.

3.) That the Circuit Court Judge, Honorable James B. LInn violated the Defendant's 14th Amendment of the U.S Constitution as well as the Illinois Criminal law and Procedures regarding section 5/122 2.1 No.(2).

## STATEMENT OF THE FACTS

In the late evening of Jan 12, 2000, a vehicle driven by the Defendant-Appellant Michael Threlkeld fatally struck the victim, Linton Boyd. Michael Threlkeld, who was twenty at the time of the incident, was charged with murder in the first-degree.(C.18-19,50). At trial, Defendant Threlkeld admitted that he drove the vehicle that struck Linton Boyd, but contended that it was an accident.(R.D23-D25). After a bench trial, the Defendant was found guilty of first-degree murder and sentence to 35 years in an Illinois State penitentiary.(R.D114,F38).

2

On the evening of January 12,2000, the date of the alleged crime,
Michael Threlkeld arrived home from work at approximately 6:30 p.m.
(R.C23,D12). According to Michael's testimony, corroborated by Terrance
Coleman and Ahmad Kendall, Michael had a date planned with his long-time
girlfriend Edwina Asha Quansah, (Asha).(R.C24,D11). Michael left his
apartment and drove southbound on Stony Island Avenue in a silver 1998
Jeep Cherokee.(R.A30.D14.D18). Asha's two-door red Blazer was double
parked, facing the opposite direction on Stony Island, outside of◘ the
Y.M.C.A. where she worked.(R.A30,D18). Linton Boyd was sitting in the
passenger seat of Asha's vehicle.(R.A30). Michael pulled his vehicle
next to Asha's vehicle such that the driver's side windows were adjacent
to each other.(A31).

    Michelle Slater and Kyra Ester, were standing at the bus stop
across the street from where Asha was parked. Ms. Slater arrived first at
the bus stop.(R.A66). When she arrived, Asha's red truck was already
parked accross the street.(R.A60). Approximately fifteen minutes later
Michael's truck approached in the lane closest to the bus stop.(R.A60).
Kyra Ester, arrived at the bus stop just as Michael's vehicle was pull-
ing up.(R.B11-B12).

    Ms. Ester testifyed that Asha rolled down her window and began
talking, but that the conversation was'nt loud enough for her to under-
stand anything that was said.(R.B13-B14). Ms. Slater also testifyed that
she could'nt hear any of the conversation, except that at the end,
Michael allegedly said,"okay", well, I'll be back".(R.A60-A61). Asha
testifyed that she did'nt remember any conversation, but that she put
up a finger signaling for Michael to wait a minute.(R.A31).

    Michael testifyed that he interpreted Asha's motion with her hand
to mean"follow her" and so he pulled forward.(R.D21.D52,A31). After

Michael pulled his vehicle forward, Linton Boyd exited Asha's vehicle on the passenger side and began to open the driver's side to his own car which was parked parallel to Asha's vehicle.(R.A31-A-32,A-62). Asha then pulled away and stopped up the street at the next stoplight.(R.A43). While or just after Linton Boyd, killing him. After striking the victim, the Defendant's vehicle continued forward, paused briefly at the spot-light next to Asha's vehicle, and then departed the scene.(R.D26). Asha backed her car to go check up on the victim.(R.A36). By that time, several other people had come outside and someone called 911.(R.A37). The police arrived on the scene several minutes later.

The Defendant testifyed that after he left the scene, he returned to his mother's home, where he had two shots of gin.(R.D26). He then called Asha's cell phone in order to speak with her, but instead ended up talking with officer Gibbs, who was at the scene of the incident.(R.D28-D29). After his conversation with officer Gibbs, the Defendant got inside his vehicle and drove south on I-55.(R.D30). Trooper Brian Gray of the Illinois State Police testifyed that, while pulling over the Defendant's vehicle for driving erratically.(R.B34-B35). Trooper Gray testifyed that he detected alcohol on the Defendant's breath.(R.B38). Because the Defen-dant was a minor, Trooper Gray issued him a zero tolerance citation for underage drinking and took him into custody.(R.B42-B43). Upon learning that the Defendant had been detained in Bloomington, members of the Chicago Police Department traveled to Bloomington and transported the Defendant back to Chicago.(R.A129-A130).

ARGUMENT

I.

Threlkeld's post conviction petition alleged that his trial attorney
was ineffective for refusing, over Threlkeld's insistence, to introduce
evidence of intoxication because he misunderstood applicable law.
Threlkeld alleged this evidence would have established the lesser-included
offence of reckless homicide and supported his contention with documentat-
ion. The Circuit Court errored in summarily dismissing Threlkeld's petit-
ion because he stated the gist of an ineffective claim.

Threlkeld's post conviction petition stated the gist of ineffective
assistance of counsel. Specifically, it alleged that trial counsel was
ineffective for persuading Threlkeld that it was against his contentions
as well as interest to introduce evidence of intoxication, even though
this evidence negated the mental state required for first-degree murder.
Supported documents included in Threlkeld's petition show that Threlkeld
urged his attorney to pursue a lesser-included offence, but his attorney
opposed it because he mistakenly belived this evidence would aggravate
the defendant's offence and subject Threlkeld to a sentence of life
imprisonment. These facts, taken as true, showed that counsel both pre-
vented Threlkeld from knowingly and intelligently asserting his right to
request a lesser-included offence and failed, due to his own legal error,
to introduce evidence in supporting the lesser-included offence. Thus,
Threlkeld stated the gist of the ineffectiveness claim, and it was error
for the First District to wrongly affirm the Defendant's conviction,
when the Defendant supported the said claim with affidavit's as well as
documents in his petition.

Counsel was ineffective for urging Threlkeld to avoid such a

(9.)

defence where the lesser-included offence was applicable and would not
subject Threlkeld to a longer sentence. Failure to raise a lesser offence
because of his misapprehension of the law constitutes ineffective assist-
ance of counsel. See PEOPLE v. WRIGHT,111.2d 18,31,488 N.E.2d 973(1986)
finding trial counsel ineffective for failing to present the defence of
intoxication that would have shown the Defendant was guilty of involuntary
manslaughter instead of murder where the defence was avoided because of
counsel's fundamental misunderstanding of the law.

  In Wright, the SUPREME COURT found the Defendant stated the gist of a
meritorious claim in her pro se post conviction petition where as here,
she alleged that trial counsel was aware of and failed to present evidence
of intoxication that would have caused a trial court to consider an
alternative, lesser-offence to murder. Threlkeld's petition similarly
alleged the gist of an ineffectiveness claim.

A.

  The First District wrongly affirmed the defendant's post conviction,
in which the State argued that the record and the affidavit's did'nt
support the gist of a constitutional claim, and that the record contradict:
the allegations because it was'nt pin-pointed exactly when it was that
the Defendant was actually intoxicated.

  The State argued that the Defendant's petition does not contain
exculpatory evidence to support Threlkeld's ineffective assistance claim
because the attached affidavit's and document's show only that Threlkeld
was intoxicated after the incident.(St.Br.26,36). Threlkeld concedes
that these affidavit's do not explicitly state that the witnesses had
personal knowledge of Threlkeld's intoxication at the time of the
incident.(De.Br.16,St.Br.26). However, Threlkeld's petition alleges that

?)

he was intoxicated at the time of the incident. More importantly, the attached affidavit's support the relevant allegations in the petition : that trial counsel misunderstood the law and, accordingly, advised Threlkeld to forgo an avilable lesser offence that he had a right to choose to purse(De.Br.14-15). Accordingly, these documents corroborate Threlkeld's claim.

In Threlkeld's affidavit, he attest that he wanted to admit he was drinking"but was told" it did'nt matter, if you tell them you were driving drunk it would only aggravate the charge.(C.57). In his pro se petition, Threlkeld specifically stated that he was under the influence of alcohol at the time of the accident: Threlkeld contends that he unintentionally killed Linton Boyd, after driving his vehicle under the influence of alcohol and in a reckless manner.(C.14). The petitioner also states that he was under the influence of alcohol to the degree that it rendered... him the incapable of safely driving his vehical.(C.14). The petitioner alleges that he was intoxicated "BEFORE" the incident. Other witnesses corroborated Threlkeld's allegations of ineffective assistance of counsel. Terrance Coleman's affidavt states that he was told not to testify to the truth that Threlkeld was over intoxicated and driving during the night of January 12, 2000.(C.38). Instead, witnesses were instructed to tell a different story... that Threlkeld only drinked 2 shots of gin after the incident.(C.38). Coleman testifyed this way because he was instructed in believing that if the truth was found out - that Threlkeld was intoxicated during that incident of January 12,2000, that it would only make the case aggravated. (C.38). Defence witnesses Jasmine Carter and Ahmad Kendall similarly had knowledge of Threlkeld's history of drunken driving and that Threlkeld was told not to testify in regards to his drinking.(C.41-45). In Carter's affidavit, she states that trial counsel advised Threlkeld that he would

8

be a fool to testify that he was an alcoholic and was highly intoxicated in that car on the night of the incident.(C.41). Kendall similarly states that he was told by trial counsel not to testify to the truth about Threlkeld's drinking problem because if it was found out by the State's Attorney that Michael Threlkeld was intoxicated during the night of January 12,2000, that it would only make the case aggravated.(C.44).

These affidavit's indicate that the defence witnesses had some knowledge of Threlkeld's intoxication the night of the accident, as all stated that they were instructed by trial counsel not to testify to the truth, and, instead, Threlkeld testifyed he consumed alcohol only after the accident. The police and the arrest reports also indicated Threlkeld's intoxication and should have signaled to trial counsel as well as to the First District Court, that Threlkeld did'nt have the required mental state for first-degree murder.(C.20-36,47-53).

And yet even during trial, SGT.Charles Williams testifyed:

Q. And did the Defendant tell you he was drunk yesterday, January 12, of the year 2000, and had an accident?

A. That's correct.

A. Yes he did.

Q. Did he tell you he consumed a pint of Seagram's gin and stated he just so happen to be driving in the area of 67th and Stony Island when he saw Asha in her vehicle?

A. That's correct.

The report of Threlkeld's arrest while driving on Interstate 55 also states that he admitted drinking a pint of gin and that after doing so, he threw out the bottle in Chicago - the location of the accident.(C.32). See also the Defendant's trial transcripts concerning SGT.Charles Williams testimony regarding the Defendant's statement regarding being intoxicated.

9

Futhermore, even inside the State's brief, the State implicated and also stated inside their own brief the testimony of SGT.Charles Williams on page 22 last paragraph that: Sergeant Williams testified that on January 14,2000, that at about 12:31 am, he interviewed petitioner and petitioner told him that he was drunk on Jan 13,2000, that he had an accident; that he hit a red car, that he had consumed a pint of Seagrams gin and that he just so happen to be driving in the area of 67th and Stony Island when he saw Asha in her car.(Tr.R. Vol 2D71).

These documents as well as the testimony given at trial provided sufficient evidence in supporting the first stage petition. A first stage pro se petitioner need not prove the credibility of his witnesses or provide every fact to support his claim because while a pro se Defendant may be aware of all the facts pretaining to his claim, he well, in all likelihood,be unaware of the precise legal basic for his claim or all legal elements of that claim. In which many cases, the pro se Defendant will be unaware that certain facts, which in his mind are tangential or secondary are in fact critical parts of a complete and valid constitutional claim. EDWARDS,197 Ill.2d at 245. In this case, Threlkeld supported his claim with affidavit's and documents that sufficiently supported his contentions that trial counsel misunderstood the law, and as a result, discouraged Threlkeld from pursuing an available and desired lesser-offence, a decision that belonged to Threlkeld.

Futher said, the petitioner would also like to notify the Supreme Court that the trial Judge, Honorable James B. Linn, failed at not dismissing the petitioner's post under section 5/122-2.1, in which a written order as well as the finding of facts were never sumitted to the petitioner, and where the Judge failed at not dismissing the petitioner's petition as frivolous... or patently with-out merit.

(O.)

During the month of August 1st of the year of 2005. The Circuit Court judge, Honorable James Linn denied the petitioner's post conviction in which he denied egregiously, violating No. 1 : Illinois Criminal Law and Procedures in regards to the dissmissal order of section 5/122 2.1 No.(2), where it clearly and directly states that :

If the petitioner is sentenced to imprisonment and the court determines the petition is fri - volous or is patently with-out merit, it shall dismiss the pet - ition in a written order, specifing the findings of fact and conclusions of the law it made in reaching it's decision. An that such a order od dismissal is a final judgment and shall be served upon the petitioner by cirtified mail within 10 days it's entry.

But within the cirtified report of Dispostion concerning the prtitioner's denial which was filed and sent to the petitioner in a timely fashion according to the 10 day entry... the judge never does this. In fact, the judge never specifiies at all his reason or findings of fact, but clearly states the petition as only denied.

The judge also denies and violates the petitioner's coonstitutional rights under Illinois law section (2), as well as his 14th amendment rights under the U.S constitution regarding life , liberty , due process as well as equal protection of the law,where the defendant herein never receives.

11.)

Futhermore, it also states within the
Illionis Criminal Law and Procedures in regards to the dismissal
order of 5/122-2.1 letter (B) that :

If the petition is not dis-
missed pursuant to this section, <u>that the court so much shall</u>
<u>order the petition to be docketed for futher consideration to</u>
accordance with section 5/122-4-122-6 of the Criminal Law and
Procedures.

Quoting from the Columbia Human Rights Law
review booklet called J.L.M. regarding Due Process.
<u>Due Process</u> clause of the 14th amendment forbids the state from
depriving any person of life, liberty, or property with out Due
Process of the law. The clause has been interpreted as contain-
ing 2 seeparate types of protection, one called "substantive"
due process and the other is called "procedural" due process.

<u>Procedural Due Process</u> refers to the methods
or procedures by which you'r rights are protected, as disting-
uished from what you'r rights actually are. It's purpose is to
make sure that you are not deprived of life, liberty or property
with out due process of the law. These claims usually arise from
admenistrative procedures <u>or court hearings in which are con-</u>
<u>ducted in some manners that are unfair, including when you have</u>
<u>not been given fair notice of occurance of the procedure, or have</u>
<u>been denied you'r rights to defend you'r self.</u>

(2.)

In the petitioner's hearing of his post, the Honorable judge James Linn denied and dismissed the petition (SUA-SPONTE). The court did not specify his conclusion of the law, and nor did the court express his decision to dismiss the petition on or what grounds or findings as mention in 725 5/122 2.1 (2). It shall also be noted that the court did not state the petition and claims stated therin were "frivolous" or "patently" with out merit.

The word "frivolous" , according to Barron's Legal Guide Law Dictionary, is defined as:

clearly lacking in substance ; clearly insufficient as a matter of law, 185 N.E 2d 583 593; presenting no debatable question...

The word patent or patently is defined as:

"evident; obvious"...

Thus, the term frivolous or patently with out merit was intended by and through legislation to be construed as a claim or petition in it's entirety to be obviously lacking sufficient merit or lacking debatable question of which a petitioner seeks relief. And with this fact of legislation being understood, one must now turn to the issue or questions to determine if in fact there is a debatable question to violations of constitutional rights afforded to persons by the U.S constituttion and the ILL. state constitution.

## CONCLUSION

For the foregoing reason, Michael Threlkeld, the pro se petitioner, respectfully request that this Court reverse the First District's dismissal of his post conviction petition and remand it for futher proceedings.

Respectfully sumitted under such requirments of Supreme Court Rule 341(a)and(b) of 22 pages.

x _Michael Threlkeld_

MICHAEL   THRELKELD

## CERTIFICATE OF SERVICE

I, Michael Threlkeld, certify that true and correct copies of DEFENDANT'S PETITION FOR LEAVE TO APPEAL FROM THE FIRST DISTRICT'S ORDER AFFIRMING THR DEFENDANT'S CONVICTION were deposited on September 3, 2007 in the United States Mail at Stateville C.C, P.o.BOX 112, Joliet Illinois, 60434 to:

    Juleann Hornyak
    Supreme Court Clerk
    Supreme Court Building
    200 E. Capitol Avenue
    Springfield, Illinois 62701

    Richard A. Devine, State's Attorney, 300
    Daley Center, Chicago Il 60602

  Cook County Judicial Advisory Council
  69 W. Washington, Room 2610, Chicago,
  Ill 60602.

                    PRO SE

                             MICHAEL THRELKELD

(5.)

No._____

IN THE

SUPREME COURT OF ILLINOIS

---

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the Circuit Court |
| | ) of Cook County Illinois. |
| Plaintiff-Appellee, | ) |
| | ) No. 00CR 4537 |
| | ) |
| vs. | ) Honorable James B. Linn. |
| | ) |
| MICHAEL THRELKELD | ) |
| | ) |
| Defendant-Appellant, | ) |

---

Petition for Leave to Appeal from the Illinois Appellate Court, First District, No.1-05-2915,Affirming the Defendant's Conviction from the Circuit Court of Cook County, Illinois, No. 00CR 4537, Honorable James B. Linn, Judge Presiding.
- - - - - - - - -

APPENDIX IN SUPPORT OF DEFENDANT'S PETITION FOR LEAVE TO APPEAL (PRO SE) FROM THE FIRST DISTRICT APPELLATE COURT'S ORDER AFFIRM-ING DEFENDANT'S CONVICTION.

---

MICHAEL THRELKELD
P.o.Box 112
STATEVILLE C.C
JOLIET ILL. 60434
K-66117

(10)

# TABLE OF CONTENTS

1.) Defendant's (pro se) corrected petition for Leave to Appeal from the First District.............................................

2.) Appendix in support of Defendant's petition for Leave to Appeal.....

3.) First District's Order Affirming his Conviction....................

4.) Defendant's affidavit of Intent...................................

# OFFICE OF THE CIRCUIT COURT CLERKS OF COOK COUNTY
## 2650 S, CALIFORNIA – 5TH FLOOR
### CHICAGO ILLINOIS 60608
#### (773) 869-3143

DATE: <u>AUGUST 2, 2005</u>

|  |  |  |
|---|---|---|
| **PETITIONER** | ) | |
| | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| **THE PEOPLE OF THE STATE OF ILLINOIS** | ) | CASE NO: <u>00CR04537-01</u> |
| **RESPONDENT** | ) | |

TO: <u>MICHAEL THRELKELD K-66117</u>

ADDRESS: <u>STATEVILLE CORRECTIONAL CENTER</u>
<u>P.O. BOX 112</u>

CITY & STATE: <u>JOLIET, ILLINOIS 60434</u>

## NOTICE

Pursuant to Illinois Supreme Court Rule 651, as Amended and Adopted on January 25, 1996, and effective the same day to read as follows:

"You are hereby notified that on <u>**AUGUST 1, 2005**</u> the court entered an order, a copy of which is enclosed herewith. You have a right to appeal. In the case of an appeal from a post-conviction proceeding involving a judgment imposing a sentence of death, the appeal is to the Illinois Supreme Court. In all other cases, the appeal is to the Illinois Appellate Court in the district in which the circuit court is located. If you are indigent, you have a right to a transcript of the record of the post-conviction proceedings and to the appointment of counsel on appeal, both without cost to you. To preserve your right to appeal you must file a notice of appeal in the trial court within 30 days from the date the order was entered."

_Clerk of the Circuit Court_

105378

**SUPREME COURT OF ILLINOIS**
**CLERK OF THE COURT**
SUPREME COURT BUILDING
SPRINGFIELD, ILLINOIS 62701
(217) 782-2035

November 29, 2007

Hon. Lisa Madigan
Attorney General, Criminal Appeals Div.
100 West Randolph St., 12th Floor
Chicago, IL 60601

No. 105378 - People State of Illinois, respondent, v. Michael
Threlkeld, petitioner.  Leave to appeal, Appellate
Court, First District.

The Supreme Court today DENIED the petition for leave to appeal in the above entitled cause.

The mandate of this Court will issue to the Appellate Court on January 4, 2008.

EXHIBIT O

08-0961

**FILED**
APPELLATE COURT 1st DIST.

APR 1 6 2008

STEVEN M. RAVID
CLERK

IN THE

CIRCUIT COURT OF THE FIRST JUDICIAL CIRCUIT

COOK COUNTY, ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS,      )
                                          )
          Plaintiff-Appellee,             )
                                          )     Case No. 00 CR 4537
                                          )
          v.                              )     The Honorable
                                          )     JAMES LINN
                                          )     Judge Presiding.
MICHAEL THRELKELD,                        )
          Defendant-Appellant.            )

## NOTICE OF APPEAL

An appeal is taken from the judgment described below:

1.)
This appeal is taken from the Circuit Court of Cook County.

2.)
Appellant's name: MICHAEL THRELKELD, Reg. No. K-66117, Address:
Stateville Correctional Center, P.O.Box 112, Joliet Illinois, 60434-
0112.

3.)
Defendant-Appellant is PRO se, and request that an attorney be appoint-
ed to represent him.

4.)
The Date of Judgment was: 3/17/08.

5.)
The offence in which the Defendant was convicted of is: Murder.

6.)
Sentence: 35 Years.

7.)
This appeal is taken from a Relief From Judgment Petition, pursuant

**EXHIBIT P**

to Section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401.

3/27/08

MICHAEL THRELKELD
P.O.BOX 112
STATEVILLE C.C
JOLIET ILLINOIS
60434
K-66117

CLERK OF THE CIRCUIT COURT
08 APR -3 PM 4:05
CRIMINAL
FILED

IN THE

CIRCUIT COURT OF THE FIRST JUDICIAL CIRCUIT

COOK COUNTY, ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, )
)
     Plaintiff-Appellee, )
)
)    Case No. 00 CR 4537
)
)    The Honorable
           v.         )    JAMES LINN
)    Judgme Presiding
)
MICHAEL THRELKELD, )
     Defendant-Appellant. )

## MOTION FOR APPOINTMENT OF COUNSEL FOR PETITIONER

      The undersigned Petitioner <u>MICHAEL THRELKELD</u>, respectfully moves
the Court, to appoint counsel for him in this cause. In support, the
Petitioner states that:

1.)
     I have been incarcerated continuously since <u>1/13/2000</u> and presently
     held in custody and residing at the <u>Statesville</u> Correctional Center
     in <u>Joliet</u> Illinois, County of <u>Will</u>.

2.)
     I am without sufficient income or assets with which to pay for the
     costs of these proceedings or to employ an attorney to represent me
     in this matter.

3.)
     I am without service of counsel to represent me in this matter and I
     wish the Court to appoint counsel to represent me in this matter.

4.)
     I have a constitutional right to have access to the Courts, and with-
     out the assistance of counsel, my access to the Court will not be ad-
     equate, effective, or meaningful because I'm unskilled with the law.

5.)

My claim in this matter is not frivolous or malicious, but is color-
able and meritorious.

6.)

Since this matter concerns the duration of my confinment, I have sought
this matter through the proper procedures before this action was filed.

WHEREFORE, Petitioner MICHAEL THRELKELD respectfully request that
counsel be appointed to represent him in this matter.

*Michael Threlkeld* 3/27/08

MICHAEL THRELKELD
P.O.BOX 112
STATEVILLE C.C
JOLIET ILLINOIS
60434
K-66117

CLERK OF THE CIRCUIT COURT

08 APR -3 PM 4: 05

FILED
CRIMINAL

## VERIFICATION OF CERTIFICATION

I, MICHAEL THRELKELD, the undersigned, certify and state that:

1.)
   I am the Petitioner in the above captioned legal matter;

2.)
   I have read the foregoing application and have knowledge of it's con-
   tents; and

3.)
   Under penalties as provided by law pursuant to sec. 109 of the Code
   of Civil Procedure, I certify that the statements set forth in the
   foregoing motion and this affidavit are true and correct except as to
   matters therein stated to be on information and belief, and as to such
   matters I certify that I believe the same to be true.

                              _Michael Threlkeld_  3/27/08

                              MICHAEL THRELKELD
                              P.O.BOX 112
                              STATEVILLE C.C
                              JOLIET ILLINOIS
                              60434
                              K-66117

CLERK OF THE CIRCUIT COURT
DOROTHY BROWN

08 APR -3 PM 4: 05

CRIMINAL DIVISION
FILED

PEOPLE OF THE STATE OF ILLINOIS,    ) APPELLATE COURT NO. 08-0961
                                        ) Appeal From  James B. Linn
       Respondent-Appellee,    ) Trial Court No.  00 CR 4537
-vs-                              ) Notice of appeal 04/03/2008.
                                          ) On Bond  NO
MICHAEL THRELKELD,         ) In Custody
                                          ) Misdemeanor NO   Felony YES
       Petitioner-Appellant.

---

## DOCKETING STATEMENT - CRIMINAL

Has this case been in this court before, or is it pending?  If yes, Appeal Number.

Have co-defendants, if any, appealed?  If yes, list names and case numbers None.

Does defendant have other cases with currently pending appeals?  If yes, Appeal Number.

### ATTORNEYS

Appellant's Attorney:     Office of the State Appellate Defender
                             203 North LaSalle Street - 24th Floor
                             Chicago, Illinois  60601
                             (312) 814-5472

Trial Counsel:           Unknown

Appellee's Attorney:     Cook County State's Attorney
                             300 Daley Center, Chicago, IL 60602
                             312 603-5496

### COURT REPORTER

Approximate number of days of trial court proceedings to be transcribed: 2

### NATURE OF THE CASE

Type of Case:  Petition for Relief from Judgment.  Defendant's petition for relief from judgment was denied on March 17, 2008.  General statement of issues proposed to be raised:  The trial court erred in denying defendant's petition for relief from judgment.

FILED
APPELLATE COURT 1st DIST.
MAY 2 2 2008
STEVEN M. RAVID
CLERK

I, Patricia Unsinn, Deputy Defender, Office of the State Appellate Defender, as the attorney for the appellant, hereby certify that on May 7, 2008, I asked the Clerk of the Circuit Court to prepare the record, and on May 7, 2008, I made a written request for the preparation of the transcript at the office of the appropriate supervising court reporter.

DATE: May 22, 2008

PATRICIA UNSINN
Deputy Defender

SEE ATTACHED FORM
COURT REPORTER'S SIGNATURE.

# Transcript Order Form

Client Name: **THRELKELD, MICHAEL**

Case No.: **00 CR 4537**

Trial Judge: **James B. Linn**

Judgment Date: **3/17/2008**

Page: **1** OF **1**

Date Ordered: **May 9, 2008**

Office No: **Mar - 39**

Drawer:

Ordered By: **Office of the State Appellate Defender**

OSAD Client No. **105220**

Order Type: **Original Transcript Order**

Date Prepared: **5/6/2008**

| Line No. | Court Reporter | Date | Trial Judge | Room No. | Pages/Comments |
|----------|----------------|------|-------------|----------|----------------|
| A | Terry | 3/14/2008 | Linn | Rm 700 | |
| B | Brennan | 3/17/2008 | Linn | Rm 700 | |

No of Dates: **2**

Attached please find court order for an original and one copy of transcripts.

Pamela Taylor

Date: _____

RECEIVED

MAY 0 7 2008

Official Court Reporters Office

No. 1-08-0961

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Respondent-Appellee, | ) | |
| | ) | |
| -vs- | ) | No. 00 CR 4537. |
| | ) | |
| MICHAEL THRELKELD, | ) | Honorable |
| | ) | James B. Linn, |
| Petitioner-Appellant. | ) | Judge Presiding. |

**PROOF OF SERVICE**

TO:   Richard A. Devine, Cook County State's Attorney, 300 Daley Center, Chicago, Illinois 60602

You are hereby notified that on May 22, 2008, we personally delivered the original and one copy of the attached Docketing Statement in the above-entitled cause to the Clerk of the above Court, a copy of which is hereby served on you.

PATRICIA UNSINN
Deputy Defender

STATE OF ILLINOIS   )
                    )  SS
COUNTY OF COOK      )

The undersigned, being first duly sworn on oath, deposes and says that he personally delivered the required number of copies of the attached Docketing Statement to the Clerk of the above Court and to the State's Attorney of Cook County on the above stated date.

CLERK

SUBSCRIBED AND SWORN TO BEFORE ME
on May 22, 2008.

NOTARY PUBLIC

Official Seal
Joanna Ostrowska
Notary Public State of Illinois
My Commission Expires 05/23/2011